# ORIGINAL

1  J. BRUCE ALVERSON (NV Bar No. 1339)
   NATHAN REINMILLER (NV Bar No. 6793)
2  ALVERSON TAYLOR MORTENSEN & SANDERS
   7401 West Charleston Blvd.
3  Las Vegas, NV 89117
   Telephone:    (702) 384-7000
4  Facsimile:    (702) 385-7000

5  Attorneys for Plaintiffs

6  [Additional Attorneys Appear on Signature Page]

7

                    UNITED STATES DISTRICT COURT
8
                         DISTRICT OF NEVADA
9
                                ***
10
   IN RE WESTERN STATES          )   MDL No. 1566
11 WHOLESALE NATURAL GAS         )
   ANTITRUST LITIGATION          )   CV-S-03-1431-PMP (PAL)
12                               )   BASE FILE
   _____)
13 THIS DOCUMENT RELATES TO:     )   **SECOND CONSOLIDATED AMENDED**
                                 )   **CLASS ACTION COMPLAINT FOR**
14 All Actions.                  )   **VIOLATIONS OF FEDERAL AND**
                                 )   **CALIFORNIA ANTITRUST LAWS**
15                               )
   _____)
16

17        Plaintiffs Fairhaven Power Company, Abelman Art Glass Co., and Utility Savings &

18 Refund Services, LLP, on their own behalf and on behalf of a class of all others similarly

19 situated, bring this Second Consolidated Amended Complaint ("Complaint") for damages and

20 injunctive relief under the federal and California antitrust laws against the Defendants named

21 herein and, demanding a trial by jury, complain and allege as follows:

22                       **JURISDICTION AND VENUE**

23        1.    This Complaint is filed pursuant to Sections 4 and 16 of the Clayton Act (15

24 U.S.C. §§ 15, 26) to recover treble damages and obtain injunctive relief, as well as the costs of

25 this suit, including reasonable attorneys' fees, against the Defendants named herein, for the

26 injuries that Plaintiffs and the members of the class have sustained by reason of Defendants'

27 violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

28                                    1

2.    This Court has jurisdiction over this action pursuant to Section 1331 of Title 28, United States Code, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

3.    The three named Plaintiffs in this Consolidated Complaint originally filed separate actions in the Eastern District of California, which were transferred to this Court by orders of the Judicial Panel on Multidistrict Litigation. Plaintiffs do not waive their right to have their claims remanded to the Eastern District of California, in accordance with Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach, 523 U.S. 26 (1998).

4.    Venue is proper in this district and in the Eastern District of California pursuant to Section 22 of Title 15, United States Code, and Section 1391 (b), (c) and (d) of Title 28, United States Code. Defendants reside, transact business, maintain offices, have agents, and/or are found within this district and within the Eastern District of California. A substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, within the Eastern District of California.

**DEFINITIONS**

5.    "Basis" or "basis spread" or "basis differential" means the difference between the price of natural gas purchased at the wellhead versus the price paid at the California border.

6.    "Bcf" is one billion cubic feet.

7.    "British Thermal Unit" or "btu" means the amount of heat required to raise one pint of water one degree Fahrenheit under specific conditions.

8.    "Capacity" means the total volume of natural gas that can flow through a pipeline over a particular period of time.

9.    "Capacity Rights" means firm transportation service of natural gas *via* a pipeline to which a customer has acquired a contractual right.

10.    "Cf/d" means cubic feet per day.

11.    "Churning" refers to buying and selling gas many times in quick succession or bursts in excess of need, significantly increasing the price of gas.

1    12.    "City Gate" means the location at which gas changes ownership or transportation

2    responsibility from a pipeline to a local distribution company or gas utility.

3    13.    "EOL" means EnronOnline, Enron's former electronic trading platform.

4    14.    "Firm Capacity" means transmission capacity or service generally not subject to

5    interruption.

6    15.    "Inelastic Market" means a market in which the quantity demanded does not

7    fluctuate according to price because purchasers have no significant alternative to natural gas.

8    16.    "Henry Hub" is a pipeline interchange located in Louisiana, which serves as a

9    delivery point for natural gas futures contracts.

10    17.    "LDC" means a local distribution company, including but not limited to investor-

11    owned utilities such as Southern California Gas Company, Pacific Gas and Electric Company,

12    and San Diego Gas & Electric Company, which serve and sell natural gas to business and

13    residential consumers in California.

14    18.    "Mcf" means one thousand cubic feet of natural gas.

15    19.    "Megawatt-Hour" ("MWH") is 1,000,000 Watt hours. a Megawatt is a unit of

16    energy equaling 1,000,000 watts or 1,000 Megawatt-hours.

17    20.    "MMBtu" equals one million Btu's or approximately one Mcf of gas.

18    21.    "Nomination" means the amount of natural gas that a holder of Firm Capacity

19    Rights designates for delivery to a particular point during a given time period.

20    22.    "Price Index" is an index, or average, which may be weighted, of selected prices.

21    intended to be representative of the market.

22    23.    "Spot Market" means the market for short-term supplies for specific quantities of

23    natural gas, typically sales that are 24 hours or less and that are entered into the day of or day

24    prior to delivery.

25    24.    "Spot Price" is the price at which gas for immediate delivery is selling at a given

26    time and place on the Spot Market.

27    25.    "Swap" is a transaction based on the sale of gas which is settled financially and

28

1 | with the actual delivery of gas.

2 | 26.     "Wash trades" are transactions that give the appearance of sales and purchases,

3 | but which are initiated without the intent to make a *bona fide* transaction, and which do not result

4 | in any actual change in ownership or the traders' market position.

5 | 27.     "Wellhead Price" means the cost of natural gas in the basins where the natural gas

6 | is welled before costs of treating, gathering, processing, transportation and distribution are

7 | incurred.

8 | ## THE PARTIES

9 | **A.     The Plaintiffs.**

10 | 28.     Plaintiff Fairhaven Power Company ("Fairhaven") is a corporation organized and

11 | existing under the laws of the State of California, with its principal place of business in Eureka,

12 | California. Fairhaven purchased natural gas in California during the relevant period of time

13 | directly from one or more of the Defendants named herein, which it consumed by using the gas

14 | to fire generators to produce electricity. Fairhaven did not resell natural gas, and the sales of

15 | natural gas by defendants to Fairhaven were not sales for resale. None of Fairhaven's natural gas

16 | purchases was the subject of a tariff or rate filed with or approved by the Federal Energy

17 | Regulatory Commission ("FERC") or any other regulatory agency.

18 | 29.     Plaintiff Abelman Art Glass ("Abelman") is a sole proprietorship, with its

19 | principal place of business in Van Nuys, California. Abelman purchased natural gas in

20 | California during the relevant period of time directly from one or more of the Defendants named

21 | herein, which it used in its business to produce glass works sold commercially. Abelman did not

22 | resell natural gas, and the sales of natural gas by defendants to Abelman were not sales for resale.

23 | None of Abelman's natural gas purchases was the subject of a tariff or rate filed with or approved

24 | by FERC or any other regulatory agency.

25 | 30.     Plaintiff Utility Savings & Refund Services, LLP, formerly doing business as

26 | Charles Toca d/b/a Utility Savings & Refund Services ("Utility Savings"), is a power cooperative

27 | located in San Juan Capistrano, California. Utility Savings purchased natural gas in California

28 |

during the relevant period of time directly from one or more of the Defendants named herein, on behalf of and for the end use by its member growers and nurserymen. None of Utility Savings' natural gas purchases was the subject of a tariff or rate filed with or approved by FERC or any other regulatory agency.

**B.     The Defendants.**

31.     Defendant AEP Energy Services, Inc. ("AEPES") is an Ohio corporation with its principal place of business in Columbus, Ohio. At all relevant times, AEPES was a marketer of natural gas to direct purchasers in the State of California, traded natural gas on EOL, and otherwise sold natural gas in and for delivery to California. AEPES is a subsidiary of defendant AEP.

32.     Defendant American Electric Power Company, Inc. ("AEP") is a New York corporation with its principal place of business in Columbus, Ohio. At all relevant times, AEP sold natural gas for delivery to direct purchasers in California. AEP is the parent company of AEPES. AEP and AEPES are collectively referred to herein as the "AEP Defendants."

33.     Defendant Aquila Merchant Services, Inc. ("AMS") is a Delaware corporation with its principal place of business in Kansas City, Missouri. From 1986 to March 2002, AMS operated as Aquila, Inc. During the Class Period, former Aquila, Inc. and Aquila Energy Marketing Corporation ("AEM") were subsidiaries of UtiliCorp United Inc. ("Utilicorp"). On March 1, 2002, AEM merged into former Aquila, Inc., which then changed its name to AMS. On March 15, 2002, UtiliCorp changed its name to Aquila, Inc. ("Aquila"). AMS is presently a wholly-owned subsidiary of Aquila. At all relevant times, AMS engaged in the business of marketing of natural gas to direct purchasers in North America including California, and had merchant trading operations focusing on natural gas, power and risk management and custom energy products. At all relevant times, AMS and its subsidiaries, affiliates, and parent have acted as a single economic enterprise, such that AMS is liable for the conspiratorial conduct and illicit gains of those subsidiaries, affiliates, and parent as its own.

34.     Defendant CenterPoint Energy, Inc. ("CenterPoint"), previously known as

Houston Industries, Inc. and Reliant Energy, Inc., is a Texas corporation with its principal place of business in Houston, Texas. CenterPoint became the parent of defendants Reliant Energy Services, Inc. and Reliant Resources, Inc. (collectively, "Reliant") as part of a corporate restructuring of Reliant Energy, Inc. and is responsible for Reliant's illegal acts. CenterPoint and Reliant have acted as a single economic enterprise, such that CenterPoint is liable for the conspiratorial conduct and illicit gains of Reliant as its own.

35.     Defendant CMS Energy Corporation ("CMS") is a Michigan corporation with its principal place of business in Jackson, Michigan. At all relevant times, CMS, itself or through its subsidiaries and affiliates, sold natural gas for delivery to direct purchasers in California. CMS owns defendant CMS Enterprises Group, Inc. ("CMS Enterprises"), which, in turn, owned defendant CMS Marketing Services & Trading Co ("CMS MS&T"). CMS is also the parent company of CMS Energy Resources Management Company ("CMS Energy Resources"), and CMS Field Services, Inc. ("CMS Field Services").

36.     Defendant CMS Energy Resources is a Michigan corporation with its principal place of business in Jackson, Michigan. CMS Energy Resources is the successor-in-interest to CMS MS&T. At all relevant times, CMS MS&T was engaged in the business of providing natural gas, electricity, oil and coal marketing, risk management and energy management services to industrial, commercial, utility and municipal energy users throughout the United States and abroad. CMS MS&T marketed natural gas in California, traded on EOL, and otherwise sold natural gas in and for delivery to class members in California. CMS Energy Resources is, and CMS MS&T was, a wholly-owned subsidiary of CMS Enterprises Company, which is a wholly-owned subsidiary of CMS. All references to CMS MS&T in this Complaint shall be deemed to apply to CMS Energy Resources.

37.     Defendant Cantera Natural Gas, Inc. ("Cantera") is the successor-in-interest to CMS Field Services, and is thus responsible for the illegal acts of CMS Field Services and the damages alleged herein. On July 2, 2003, CMS announced that it had completed the sale of CMS Field Services to Cantera. All references to CMS Field Services in this Complaint shall be

6

deemed to apply to Cantera.  CMS, CMS Enterprises, CMS MS&T, CMS Energy Resources, CMS Field Services, and Cantera are collectively referred to herein as the "CMS Defendants."

38.     Defendant Coral Energy Resources L.P. ("Coral"), formerly Salmon Resources, Ltd., is a Delaware limited partnership with its principal place of business in Houston, Texas. Coral is owned by Shell Oil Company and Coral Energy, LLC.  At all relevant times, Coral marketed natural gas, traded natural gas on EOL, and sold natural gas for delivery to direct purchasers in California.

39.     Defendant Duke Energy Trading and Marketing LLC ("DETM") is a Delaware limited liability corporation, with its principal place of business in Houston, Texas.  At all relevant times, DETM marketed natural gas in California, traded natural gas on EOL, and sold natural gas for delivery to direct purchasers in California.  DETM is a subsidiary of Duke Energy Corporation ("Duke Energy").

40.     Defendant Duke Energy North America, LLC ("DENA"), is a Delaware limited liability corporation with its principal place of business in Houston, Texas.  DENA engages in commodities sales and services related to natural gas, and has operating facilities throughout California.  DENA, as an affiliate of DETM, is responsible for the conduct and damages alleged herein.  DENA and DETM have acted as a single economic enterprise, such that DENA is liable for the acts alleged herein of DETM.

41.     Defendant Duke Energy Field Services, LLC ("Duke Services") is a Delaware limited liability corporation with its principal place of business in Denver, Colorado.  Duke Services is the successor-in-interest to Duke Energy Field Services, Inc.  Duke Services transports trades, markets and stores natural gas.  Duke Services and DETM have acted as a single economic enterprise, such that Duke Services is liable for the conspiratorial conduct and illicit gains of DETM as its own.

42.     Defendant Duke Energy Corporation ("Duke Energy") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina.  Throughout the relevant period, Duke Energy and its subsidiaries, including DETM, provided energy and energy

7

services, and offered physical delivery and management of natural gas throughout the United States, including California. Duke Energy, DETM, DENA and Duke Services have acted as a single economic enterprise, such that Duke Energy is liable for the acts alleged herein. These defendants are collectively referred to herein as the "Duke Defendants".

43.     Defendant Dynegy Holding Co., Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Dynegy Holding is a wholly-owned subsidiary of defendant Dynegy, Inc., an Illinois corporation with its principal place of business in Houston, Texas. Dynegy Holding and Dynegy are collectively referred to herein as "Dynegy." Defendants Dynegy Power Marketing, Inc. ("Dynegy Power") and Dynegy Marketing & Trade ("Dynegy Marketing") are subsidiaries of Dynegy. Dynegy and its subsidiaries have acted as a single economic enterprise, such that Dynegy is liable for the acts of Dynegy Power and Dynegy Marketing.

44.     Defendant Dynegy Marketing & Trade is a Colorado general partnership, the partners of which were DMT Holdings, L.P. and Dynegy GP Inc. Dynegy Marketing's principal place of business is Houston, Texas. Throughout the relevant period, Dynegy Marketing marketed natural gas, traded on EOL, and sold natural gas for delivery to direct purchasers in California.

45.     Defendant Dynegy Power Marketing is a Texas corporation with its principal place of business in Houston, Texas. Throughout the relevant period, Dynegy Power marketed natural gas, traded on EOL, and sold natural gas for delivery to direct purchasers in California. Dynegy Power, Dynegy Marketing, and Dynegy are collectively referred to herein as the "Dynegy Defendants".

46.     Defendant El Paso Corporation ("El Paso"), formerly El Paso Energy Corporation, is a Delaware corporation with its principal place of business in Houston, Texas. At all relevant times, El Paso's business included natural gas production, gathering and processing, transmission, and merchant energy services. El Paso is the ultimate parent, in whole or in part, of two independent, distinct and separate commercial divisions – El Paso Merchant Energy Group

8

and El Paso Pipeline Group.  El Paso and its two divisions acted as a single economic enterprise, such that El Paso is liable for the acts of the El Paso Merchant Energy Group and the El Paso Pipeline Group.

47.    Defendant El Paso Tennessee Pipeline Company, ("EP Tennessee") formerly known as Tenneco, is a Delaware corporation and a wholly-owned subsidiary of El Paso.  EP Tennessee and El Paso Merchant Energy Group, LLC, formerly a Delaware limited liability company, have merged.  EP Tennessee is the surviving company.  EP Tennessee is, and at all times relevant herein was, a part of the El Paso Merchant Energy Division.

48.    Defendant El Paso Merchant Energy, L.P. ("El Paso Merchant Energy"), formerly known as El Paso Marketing, is a Delaware limited partnership with a principal place of business in Houston, Texas.  El Paso Merchant Energy and El Paso Merchant Energy-Gas, L.P. merged in January 2001, and the merged entity retained the name El Paso Merchant Energy, L.P.  During the relevant period, El Paso Merchant Energy marketed and traded natural gas and power generation for El Paso, and sold natural gas for delivery to direct purchasers in California.  El Paso Merchant Energy is, and at all times relevant herein was, a part of the El Paso Merchant Energy Division.

49.    Defendant El Paso Merchant Energy-Gas, L.P. ("El Paso Merchant Energy-Gas") is a Delaware corporation with a principal place of business in Colorado.  El Paso Merchant Energy-Gas is, and at all times relevant herein was, a part of the El Paso Merchant Energy Division.

50.    Defendant El Paso Marketing, L.P. ("El Paso Marketing") is a limited partnership organized and existing under Delaware.  During the relevant period, El Paso Marketing marketed, traded, and sold natural gas for delivery to direct purchasers in California.  El Paso Marketing is, and at all times relevant herein was, a part of the El Paso Merchant Energy Division.

51.    Defendant El Paso Merchant Energy Holding Company ("EP Merchant Energy Holding") is a Delaware corporation with a principal place of business in Texas.  EP Merchant

9

Energy Holding is, and at all times relevant herein was, a part of the El Paso Merchant Energy Division.

52.     Defendant El Paso Merchant Energy Company ("EP Merchant Energy Co.") is a Delaware corporation with a principal place of business in Texas. EP Merchant Energy Co. is a wholly-owned subsidiary of EP Merchant Energy Holding and a general partner in El Paso Merchant Energy. EP Merchant Energy Co. is, and at all times relevant herein was, a part of the El Paso Merchant Energy Division.

53.     53.     Defendants EP Tennessee, El Paso Merchant Energy, El Paso Merchant Energy-Gas, El Paso Marketing, EP Merchant Energy Holding and EP Merchant Energy Co are referred to herein collectively as "El Paso Merchant."

54.     Defendant El Paso Natural Gas Company ("EPNG") is a Delaware corporation with a principal place of business in Colorado Springs, Colorado. EPNG operates the "El Paso pipeline" running from the Permian basin in Texas to Topock, Arizona at the California border. Of the four major pipelines delivering natural gas to California, EPNG owns approximately 41% of the pipeline capacity to or into California. EPNG is a wholly-owned subsidiary of El Paso. EPNG is, and at all times relevant herein was, a part of the El Paso Pipeline Division.

55.     Defendant Mojave Pipeline Company ("Mojave Pipeline") is a Texas corporation with a principal place of business in Colorado Springs, Colorado. Mojave Pipeline is a wholly-owned subsidiary of El Paso. Mojave Pipeline owns and operates the Mojave Pipeline, which connects with other interstate systems owned or controlled by El Paso at the Mojave Transfer Line, located at the California border at Topock, Arizona. Mojave Pipeline is, and at all times relevant herein was, a part of the El Paso Pipeline Division.

56.     Defendant El Paso Mojave Pipeline Company ("EP Mojave Pipeline Co.") is a Delaware corporation with a principal place of business in Colorado Springs, Colorado. EP Mojave Pipeline Co. is involved in some manner in ownership and operation of the Mojave Pipeline. EP Mojave Pipeline Co. is, and at all times relevant herein was, a part of the El Paso Pipeline Division.

57.     Defendant Mojave Pipeline Operating Company ("Mojave Operating Co") is a Texas corporation with a principal place of business in Colorado Springs, Colorado. Mojave Operating Co is involved in some manner in ownership and operation of the Mojave Pipeline. Mojave Operating Co is, and at all times relevant herein was, a part of the El Paso Pipeline Division.

58.     Defendant EPNG Mojave, Inc. ("EPNG Mojave") is a Delaware corporation with a principal place of business in Colorado Springs, Colorado. EPNG Mojave is involved in some manner in ownership and operation of the Mojave Pipeline. EPNG Mojave is, and at all times relevant herein was, a part of the El Paso Pipeline Division.

59.     Defendants EPNG, Mojave Pipeline, EP Mojave Pipeline Co, Mojave Operating Co and EPNG Mojave are referred to herein collectively as the "El Paso Pipeline defendants."

60.     El Paso Merchant and El Paso Pipeline defendants are referred to herein collectively as the "El Paso Defendants."

61.     El Paso and its subsidiaries have acted as a single economic enterprise, such that El Paso is liable for the acts of its subsidiaries as alleged herein. All of the El Paso Defendants acted at various times during the relevant period as agents for and alter egos of one another, disregarding the corporate veils between and among them.

62.     Defendant EnCana Corporation ("EnCana") is a corporation organized and existing under the laws of Canada with its principal place of business in Calgary, Province of Alberta, Canada. EnCana is the parent of defendant W.D. Energy Services, Inc. ("WD Energy"), formerly known as Encana Energy Services, Inc. EnCana was formerly known as, and is the successor to, PanCanadian Energy Corporation, the ultimate parent of PanCanadian Energy Services, Inc. PanCanadian Energy Corporation and PanCanadian Energy Services, Inc. are referred to collectively herein as "PanCanadian." EnCana was formed in 2002 following the merger of Pan Canadian Energy Corporation and Alberta Energy Company, Ltd. At all relevant times, PanCanadian Energy Services, Inc. sold natural gas for delivery to direct purchasers in California. EnCana and its present and former subsidiaries have acted as a single economic

1    enterprise, such that EnCana is liable for the actions of PanCanadian and WD Energy.

2          63.     Defendant W.D. Energy, was formerly known as Encana Energy Services, Inc.

3    ("EES"), which in turn was formerly known as PanCanadian Energy Services, Inc., is a Delaware

4    corporation with its principal place of business in Calgary, Province of Alberta, Canada. WD

5    Energy sold natural gas for delivery to direct purchasers in California, and was also engaged in

6    the business of selling natural-gas market-based derivatives or swaps. WD Energy is a wholly-

7    owned subsidiary of EnCana. A sufficient unity of interest and ownership exists between WD

8    Energy and its predecessors, on the one hand, and EnCana and its predecessors, on the other

9    hand, that they are not separate legal entities. WD Energy acted as the sales and marketing arm

10    of EnCana in the United States for the natural gas produced by EnCana in Canada and the United

11    States. WD Energy is EnCana's vehicle in the United States for trading, hedging, and

12    speculating in natural gas, natural gas transportation contracts, and natural gas market based

13    derivatives. EnCana directs, controls the business of, and benefits financially from the activities

14    of WD Energy. The officers of WD Energy report directly to officers of EnCana. EnCana

15    actively monitors and directs the activities of WD Energy, including its natural gas, natural gas

16    transportation and derivative trading activities. The business portfolios of PanCanadian Energy

17    Services, a Canadian division of EnCana, and WD Energy are combined and treated as one

18    portfolio for purposes of risk management and all attendant hedging, trading and speculation

19    activities. EnCana established the risk limits for the entire portfolio. WD Energy and EnCana

20    share the same computer network. EnCana and WD Energy share numerous alleged trade

21    secrets. EnCana captured the benefits of the artificial manipulation of the price of delivered

22    natural gas and natural gas market-based derivatives described below. Accordingly, WD Energy

23    was and is the alter ego of EnCana, at all relevant times, for all purposes in this action.

24          64.     Defendant Reliant Energy Services, Inc. ("RES") is a Delaware corporation with

25    its principal place of business in Houston, Texas. At all relevant times, RES marketed natural

26    gas, traded natural gas on EOL, and sold natural gas for delivery to direct purchasers in

27    California. RES is a subsidiary of defendants Reliant Energy and Centerpoint. Throughout the

28                                              12

1   relevant period, RES and Reliant Energy have acted as a single economic enterprise, such that

2   Reliant Energy is liable for the acts of RES alleged herein.

3      65.   Defendant Reliant Energy, Inc. ("Reliant Energy"), formerly known as Reliant

4   Resources, Inc. ("Reliant Resources"), is a Delaware corporation with its principal place of

5   business in Houston, Texas. At all relevant times, Reliant Energy sold natural gas for delivery to

6   direct purchasers in the State of California. Reliant Energy is a subsidiary of defendant

7   Centerpoint. Centerpoint, Reliant Energy and Reliant Energy Services are collectively referred to

8   herein as the "Reliant Defendants".

9      66.   Defendant Sempra Energy Corporation ("Sempra") is a California corporation

10  with its principal place of business in San Diego, California. Sempra is the parent company of

11  Defendant Southern California Gas Company ("SoCal Gas"), a public utility which serves

12  Southern California including Greater Los Angeles, and Defendant San Diego Gas & Electric

13  ("SDG&E"), a public utility which serves the San Diego area. Sempra is also the corporate

14  parent of Defendant Sempra Energy Trading Corp. ("SET"), now known as Sempra

15  Commodities. Defendant SET is a Delaware corporation with its principal place of business in

16  Stamford, Connecticut. At all relevant times, SET marketed natural gas, traded natural gas on

17  EOL, and sold natural gas for delivery to direct purchasers in California. Sempra, SoCal Gas,

18  SDG&E, and SET are collectively referred to herein as the "Sempra Defendants".

19     67.   Sempra and its subsidiaries have acted as a single economic enterprise, such that

20  Sempra is liable for the acts of its subsidiaries as alleged herein. All of the Sempra Defendants

21  acted at various times during the relevant period as agents for and alter egos of one another,

22  disregarding the corporate veils between and among them.

23     68.   Defendant West Coast Power, LLC ("West Coast") is a California limited liability

24  corporation with its principal place of business in Houston, Texas. At all relevant times, West

25  Coast, a 50-50 joint venture between Dynegy and Xcel Energy Inc.'s NRG Energy, sold natural

26  gas at for delivery to direct purchasers in California. West Coast acted as a counter-party to

27  Dynegy Marketing's fictitious natural gas transactions.

28                                    13

69.     Defendant The Williams Companies, Inc. ("Williams") is a Delaware corporation with its principal place of business in Tulsa, Oklahoma.  At all relevant times, Williams marketed natural gas, traded natural gas on EOL, and sold natural gas for delivery to direct purchasers in the State of California.   Williams is the parent company of Defendant Williams Power Company, Inc. ("Williams Power"), which in turn is the successor-in-interest to Williams Energy Services Company ("Williams Services") and Williams Energy Marketing and Trading ("WEMT"), both of which were subsidiaries of Williams.  Williams and its subsidiaries have acted as a single economic enterprise, such that Williams is liable for the acts of Williams Power, Williams Services, and WEMT.

70.     Defendant Williams Power is a Delaware Corporation with a principal place of business in Tulsa, Oklahoma.  Williams Power is the successor in interest to Williams Services and WEMT.  All references to Williams Services and WEMT in this Complaint shall be deemed to apply to Williams Power.  At all relevant times, WEMT marketed natural gas, traded natural gas on EOL, and sold natural gas for delivery to direct purchasers in California.

71.     Defendant Xcel Energy, Inc. ("Xcel") is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in Minneapolis, Minnesota.  Xcel is the parent of defendant e prime, Inc. ("e prime"), and is the former parent of NRG Energy Inc., ("NRG Energy").  Xcel and its subsidiaries have acted as a single economic enterprise, such that Xcel is liable for the acts of e prime and NRG Energy, which along with defendant Dynegy, operated the joint venture defendant West Coast.

72.     Defendant e prime Inc. is a subsidiary of Xcel, with a principal place of business in Denver, Colorado.  e prime was formed in 1995 as a subsidiary of Public Service Co. of Colorado, a predecessor company of New Century Energies, which in 2000 merged with Northern States Power Company to form Xcel Energy.  During the relevant period, e prime engaged in natural gas marketing and trading in California.

C.      **Co-Conspirators**

73.     Enron Corporation ("Enron") participated as a co-conspirator in the acts alleged

14

herein.  Co-conspirator Enron is an Oregon corporation with its principal place of business in Houston, Texas.  At all relevant times alleged in this complaint, Enron owned and operated Enron OnLine ("EOL"), another co-conspirator, which was used by defendants, with Enron Corporation's knowledge, to commit violations of the antitrust laws as alleged herein.  The Enron entities are in bankruptcy proceedings and therefore cannot at this time be made parties to this action.

74.     Merchant Energy Group of the Americas, Inc. ("Merchant Energy") participated as a co-conspirator in the acts alleged herein.  Co-conspirator Merchant Energy is a Delaware corporation with its principal place of business in Calgary, Canada.

75.     Certain other individuals, partnerships, sole proprietors, business entities, companies, and corporations, presently unknown to Plaintiffs and not named as Defendants in this Complaint, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  Such unknown persons or entities acted as co-conspirators and aided, abetted, or participated with Defendants in the commission of the wrongful acts alleged herein or otherwise caused the damages suffered by Plaintiffs and the other class members.  When and if Plaintiffs learn the identity of such co-conspirators, Plaintiffs may seek leave to amend this complaint to add those co-conspirators as defendants.

76.     The acts that this Complaint alleges were done by each of the defendants and co-conspirators were fully authorized by each of those defendants and co-conspirators, or ordered or done by duly authorized officers, agents, employees or representatives of each such defendant and co-conspirator, while actively engaged in the management, direction, or control of each such defendant and co-conspirator's business or affairs.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Class:

> All business entities in California that directly purchased natural gas in California and/or at the California border, during the period from January 1, 1999 and December 31, 2002, inclusive ("Class

15

Period"), from one or more of the Defendants. Excluded from the class are any of the Defendants or their affiliates, governmental entities and public utilities.

78.     The Class is so numerous that joinder of all members is impracticable. Plaintiffs estimate that there are several thousand class members.

79.     Questions of law or fact are common to the Class, including, among others:

   a.     Whether Defendants and their co-conspirators combined, agreed, or conspired to raise, fix, maintain or stabilize natural gas prices;

   b.     Whether Defendants and their co-conspirators participated in a contract, combination, or conspiracy in restraint of trade;

   c.     The scope and duration of the contract, combination, or conspiracy;

   d.     The conduct of Defendants and others in furtherance of the contract, combination, or conspiracy;

   e.     The character, extent, and duration of Defendants' manipulation of natural gas prices;

   f.     Whether Defendants' contract, combination, or conspiracy, violated the antitrust laws;

   g.     Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and to the members of the Class; and

   h.     The proper measure of damages and the amount of aggregate damages.

80.     The claims of all Plaintiffs, as representatives of the Class, are typical of the claims of the Class.

81.     Plaintiffs will fairly and adequately protect the interests of the class. The Plaintiffs' interests do not conflict with those of the Class.

82.     Plaintiffs have retained counsel who are experienced in class and antitrust litigation.

83.     Plaintiffs and their counsel intend to prosecute this action vigorously.

84.     The questions of law or fact common to the members of the Class predominate over any questions affecting individual members.

16

85.     A Class action is superior to any other available methods for the fair and efficient adjudication of this controversy.

86.     The individual damages of each Class member are relatively small in comparison to the complexity and cost of pursuing this antitrust litigation against Defendants.

87.     Plaintiffs do not anticipate any unusual difficulties with the management of this action as a class action.

## NATURE OF TRADE AND COMMERCE

**A.      The Illegal Acts and Anticompetitive Natural Gas Prices Alleged In This Complaint Were Not Regulated.**

88.     Throughout the relevant period, the California natural gas market was deregulated.  During that time, federal regulators did not provide or enforce any explicit guidelines or prohibitions concerning the anti-competitive behavior alleged in this Complaint including fixing prices on the spot market for natural gas, engaging in wash trades, false reporting to privately-owned price indices, netting, swaps, and churning.

89.     None of the acts alleged in this Complaint were subject to regulatory approval of the (FERC) or other government agency.  None of the prices or rates paid by Plaintiffs and the members of the Class for natural gas during the Class Period were filed with, or approved by, FERC or any other government agency.  Plaintiffs do not intend to prove damages by assuming any hypothetical rates contrary to rates approved or authorized by FERC.

90.     At the time of the illegal acts alleged in this Complaint, the FERC did not regulate the spot market or wash sales.  The alleged price fixing agreements and false price postings which form the basis of this Complaint all occurred on EOL or other privately owned and operated websites, utilized private computer programs, and/or were submitted voluntarily to privately-owned trade publications.  Defendants used unregulated market mechanisms to manipulate market prices in the natural gas industry.  Plaintiffs do not allege that defendants manipulated any FERC regulated price index.

91.     Plaintiffs do not allege that defendants violated any FERC guidelines or rules. No

1    such guidelines or rules existed regarding the alleged wrongful misconduct.  Unlike the

2    electricity market, which was partially regulated by FERC, the natural gas commodity prices at

3    issue in this case were entirely unregulated.  FERC describes its authority over the natural gas

4    prices at issue in this case as follows:

5    http://www.ferc.gov/o12faqpro/default.asp?Action=Q&ID=136:

6              "Q:     Does FERC regulate natural gas prices?

7              "A:     FERC does not regulate the price of natural gas.  It only regulates the price
                       to transport natural gas.  FERC stopped regulating natural gas prices at the
8                      well head during the 1980s."

9         92.    The Natural Gas Act ("NGA") circumscribes federal regulatory jurisdiction.

10   FERC had no authority to regulate the natural gas sales made by the defendants to plaintiffs and

11   class members.

12        93.    FERC has limited regulatory authority over pipelines, but it does not regulate the

13   sale of natural gas, the commodity that flows through those pipelines, or the companies that sell

14   natural gas.  A list of "Gas-Regulated Entities" is maintained by FERC at

15   http://ferc.gov/industries/gas/gen-info/reg-west.asp.  With the exception of El Paso Natural Gas

16   Company and Mojave Pipeline Company, which are named herein strictly in connection with the

17   El Paso bid-rigging conspiracy described in paragraphs 194 through 239 and not in connection

18   with any sales of natural gas by those entities, none of the defendants in this case is listed as a

19   regulated entity.

20        94.    The Natural Gas Act expressly requires that rates subject to FERC regulatory

21   oversight must be filed with that agency.  15 U.S.C. § 717c(c).  None of the rates at issue in this

22   case were filed with FERC.  FERC has issued so-called "blanket sales certificates" to natural gas

23   marketers, but in contrast to electricity market based certificates, which specifically provide for

24   rate tariffs, the natural gas certificates are in the nature of a license to do business, and contain no

25   requirement that rates be filed or that transaction information be reported.  FERC Order 547

26   stated that "the marketing certificates issued by the final rule are of limited jurisdiction.  As such,

27   the holders of marketing certificates are not subject to any other regulation under the Natural Gas

28                                                    18

1   Act jurisdiction of the Commission by virtue of transactions under the certificate." Indeed,

2   FERC would have no authority under law to impose any such requirement.

3        95.    To the extent that the FERC has any regulatory authority at all concerning natural

4   gas, it is limited to "sales for resale of natural gas by pipelines, LDCs or their affiliates." The

5   Defendants in this case are marketers, not pipelines (with the exception of the El Paso Pipeline

6   defendants, who did not themselves sell natural gas) or LDCs. The natural gas at issue in this

7   case was sold by marketers, not pipelines. Although the FERC investigated certain aspects of the

8   conduct alleged in this case after the fact, the FERC recognized when it initiated proposed

9   reporting requirements that these requirements would merely assist the Commission in

10  determining:

11          …what part of the problem [natural gas pricing in the California
            market], if any, is within the scope of its jurisdiction. For example,

12          the information to be collected concerning sales should enable the
            Commission to determine what percentage of the volumes sold into

13          the California market is domestically produced gas sold by
            marketers affiliated with pipelines and LDCs in sales for resale,

14          which are the only sales of natural gas now being made that the

15          Commission has jurisdiction to regulate. (96 FERC ¶61,119 (2001
            WL 840623 at *3))

16       96.    There are no administrative remedies available to Plaintiffs and the class members

17  in connection with the unlawful activity alleged in this complaint. The FERC has no authority to

18  order the Defendants to compensate Plaintiffs and the class members for their unlawful activity.

19  In 2003, after the Class Period alleged in this Complaint, the FERC initiated a proceeding to

20  institute a "code of conduct" designed to prevent the Defendants from engaging in the future in

21  some of the activities alleged herein. However, the FERC expressly recognized this proceeding

22  had no impact on the application of federal antitrust law: "[W]e need not be concerned here

23  whether, or to what extent, federal antitrust law may be broader in scope or more narrow in

24  scope…Federal antitrust law will continue to apply where it is found to apply, with or without

25  our rule." 105 FERC ¶61,217 at para.61 n.31 (2003). The FERC has stated that deregulation of

26  the natural gas market reflects a federal policy of relying, to the maximum extent possible, on

27

28

1   "competitive market forces," and that these forces "should be extended to all sales markets."  107

2   FERC ¶61.174 at para.12 n.9.  The purpose of deregulation of the natural gas market was to

3   promote competition.  The antitrust laws, which govern competition, apply fully to the

4   deregulated natural gas market in general, and to the acts described in this Complaint in

5   particular.

6         **B.**    **Natural Gas Exploration and Transportation.**

7         97.    This case involves the sale of natural gas within the State of California and at its

8   borders.  Defendants are the largest producers and marketers of natural gas in the United States.

9   During the period covered by this Complaint, Defendants derived hundreds of millions of dollars

10   in revenue from their natural gas businesses in California.  The acts of Defendants and their co-

11   conspirators in fixing, maintaining, and stabilizing the prices for natural gas to Plaintiffs and the

12   members of the Class are in the regular and continuous flow of interstate commerce and have a

13   substantial effect upon interstate commerce.

14         98.    Natural gas is a fossil fuel, usually found underneath the surface of the earth.

15   Once the natural gas is located, a well is drilled and the natural gas is pumped out of the ground

16   and processed for transportation.  The transportation system consists of a complex network of

17   interstate and intrastate pipelines.  The exploration, production and transportation of natural gas

18   take time, and the natural gas that is not needed immediately is injected into underground storage

19   facilities.  Distribution is the final step in delivering natural gas to end-users.  While some large

20   industrial, commercial and electric generation customers receive natural gas directly from high-

21   capacity interstate and intrastate pipelines (usually contracted through natural gas marketing

22   companies), most end-users receive natural gas from a local distribution company.

23         99.    The State of California must import supplies of natural gas from outside its

24   borders to meet its natural gas needs.  Natural gas is transported to the State of California from

25   the producing basins in the western portions of the United States and Canada *via* interstate

26   natural gas pipelines. In 1999, California consumed about 6.2 Bcf per day of natural gas.

27   Approximately 84% of that natural gas was imported from out-of-state suppliers, specifically

28

from basins in Western Canada and the Rocky Mountains, and from the Anadarko, Permian and San Juan basins in the Southwest United States.

100.    There are four primary interstate pipelines that transport natural gas from the producing basins to the California border. Those pipelines are: the pipeline of Defendant El Paso, consisting of two main lines (north and south) which run from the Southwest producing basins to the southern California border; the Transwestern Pipeline Company pipeline, owned by a wholly-owned subsidiary of Enron Corporation, which also runs from the Southwest producing basins to the southern California border; the pipeline of PG&E Gas Transmission – Northwest, which runs from Alberta, Canada to the Oregon-California border at Malin; and the Kern River Gas Transmission Company pipeline (the "Kern River Pipeline"), which runs from Opal, Wyoming to Kern County, California. A fifth interstate pipeline, that of Mojave Pipeline Company (the "Mojave Pipeline"), which is owned indirectly by Defendant El Paso, received gas from both Defendant El Paso and from Transwestern Pipeline Company at the Mojave Transfer Line just east of Topock, and transports that gas to delivery points in and around Kern County, California.

101.    Apart from the Kern River and Mojave Pipelines, these interstate pipelines deliver natural gas to border delivery points, such as those located in Topock, Arizona and Malin, Oregon, where they transfer the natural gas to the intrastate natural gas transmission systems owned and operated by California LDCs, such as Southern California Gas Company ("SoCal Gas") and Pacific Gas and Electric Company ("PG&E"). These border delivery points or gates are commonly referred to by the name of the company operating the delivery point and the border point location – *e.g.*, So Cal Topock, PG&E Topock, SoCal Ehrenberg. The intrastate pipeline system delivers natural gas to consumers and end-users throughout California.

102.    The Mojave Pipeline and the Kern River Pipeline can also access Southern California natural gas markets though SoCal Gas's intrastate pipeline system *via* the Hector and Wheeler Ridge Interconnections. Similarly, PG&E's intrastate Line 300, also known as the Baja Path, can transport natural gas from the El Paso, Transwestern, Kern River and Mojave natural

gas pipelines to Northern and Southern California, and along with PG&E's Line 400/401, can also transport Canadian natural gas from the PG&E Gas Transmission – Northwest Pipeline to Southern California through PG&E's interconnection with the SoCal Gas system at Wheeler Ridge. In addition, the Kern River and Mojave Pipelines can transport natural gas from El Paso and other interstate pipelines directly to end-users in California.

103.    Together, the four major interstate pipelines have, in the aggregate, firm transmission capacity to deliver approximately 7 Bcf/d of natural gas to California as follows: (a) the El Paso pipelines have capacity to delivery approximately 3.2 Bcf/d; (b) the Transwestern pipeline has capacity to delivery approximately 1.1 Bcf/d; (c) the PG&E Gas Transmission -- Northwest pipeline has capacity to delivery approximately 1.9 Bcf/d; and (d) the Kern River pipeline has capacity to delivery approximately 0.7 Bcf/d.

104.    However, due to complex interconnections of the various pipeline systems and construction design at the gates, the aggregate delivery capacity of the four interstate pipelines exceeds California's capacity to receive natural gas (the "utility takeaway capacity") at the border delivery gates. This inability to accommodate all of the deliverable capacity of natural gas limits the amount of natural gas that interstate pipelines can deliver to the intrastate pipeline system.

105.    The inability of the California utility takeaway capacity at the gates to match the interstate pipeline delivery capacity is most apparent at California's Southeast border delivery points, where the El Paso Natural Gas Company's pipelines deliver natural gas. Specifically, the El Paso Natural Gas Company pipelines are designed to delivery approximately 2.27 Bcf/d of natural gas to four delivery points in the Topock vicinity (SoCal Topock, PG&E Topock, Mojave Topock, and Southwest Topock) and the SoCal Ehrenberg delivery point. The Transwestern pipeline also has the capacity to deliver approximately 340 MMcf/d of gas to PG&E Topock. The takeaway capacity at the Topock gates, however, is about 2.1 Bcf/d, resulting in a basic system imbalance of approximately 500 MMcf/d. Some sources indicate that the basic system imbalance at these Southeast delivery points is closer to 600 MMcf/d, after taking into account specific intrastate natural gas delivery/flow factors.

106.   In addition to this system imbalance, the practical net takeaway capacity for natural gas delivered by the El Paso pipelines at the four Topock gates is further reduced because of the complex intrastate interconnections among PG&E's intrastate Line 300, Mojave, Kern River and Transwestern pipelines and the Wheeler Ridge Interconnection to SoCal Gas's intrastate pipeline system.  For example, when the Kern River pipeline is full and the Transwestern delivers its capacity to Topock, the ability of the intrastate lines to take natural gas delivered by the El Paso pipelines to various Topock points is further reduced.

107.   Depending on fluctuating conditions on any given day, the delivery capacity from the El Paso lines exceeds the available takeaway capacity at the Topock and Ehrenberg gates by anywhere from 500 MMcf/d to 1 Bcf/d.

108.   Prior to 1990, the entire reserved or "firm" capacity for distribution within California of the natural gas delivered by the interstate pipelines serving California was controlled by the state-regulated natural gas local distribution utilities, SoCal Gas and PG&E.  During that time, SoCal Gas and PG&E "bundled" the price of natural gas with the price for transportation of the gas into one amount that was charged to their customers.

109.   In the mid-1980's and early 1990's, pursuant to legislation and resulting orders issued by FERC and the California Public Utilities Commission ("PUC"), the industry "unbundled" the price of natural gas from the price of transportation.  Unbundling allowed LDCs and large industrial users the option of directly purchasing natural gas at a commodity price, separately and independently from interstate and intrastate charges for transportation of that gas.  The purchase of natural gas at one price and separate payment of interstate transportation at another price is known as "unbundling."

110.   For most of the 1990's, due to competition in the natural gas market at the wellhead (or producing basins) and in the transportation of natural gas to California, consumers in California benefited from fair and reasonable natural gas prices, natural gas transportation prices and natural gas market-based derivative prices.  The California border prices reflected the price of natural gas (typically priced on the New York Mercantile Exchange ("NYMEX") open

1  public market) plus the "basic differential" (often referred to in the trade by the abbreviated term

2  "basis"), i.e., the difference between the NYMEX commodity price (always quoted at Henry's

3  Hub, a location near the Texas/Louisiana border) and the price of the gas commodity delivered to

4  the California Market including the pipeline transportation cost of moving the gas from the

5  producing basin to the California border.

6       111.   By the late 1990's there was excessive interstate pipeline capacity into California.

7  In 1999, there was an average of two billion cubic feet per day (two Bcf/d) of excess interstate

8  pipeline capacity into California.  At times, because of this over-capacity, the basis differential

9  portion of the price of "bundled" natural gas in California was less than zero.  Much of this

10  excess pipeline capacity remains today.

11       112.   Thus, prior to 1999, "basis" amounts for California remained competitive with

12  "basis" amounts in other regions because pipeline capacity ("supply") remained greater than

13  demand.  This free and open competition resulted in prices for natural gas delivered into

14  California to California consumes that were competitively priced with natural gas outside

15  California.

16       113.   This action arises from the Defendant's conspiracy to manipulate the spot price

17  and basis differential of natural gas with respect to the California market thereby enabling

18  Defendants to reap exorbitant and illicit profits by gouging natural gas purchasers.

19      **C.**    **The California Natural Gas Market**

20       114.   In 1999, California consumed about 6.2 billion cubic feet per day ("bc/d") of

21  natural gas.

22       115.   Approximately 83% of that natural gas was imported from out-of-state,

23  specifically from basins in Western Canada, the Rocky Mountains, and the Anadarko, Permian,

24  and San Juan basins in the Southwest United States.  Traders, marketers and end-users of natural

25  gas relied principally on out-of-state gas to meet the demands of California producers.

26       116.   System imbalances and complex pipeline interconnections make Topock, Arizona

27  the key swing delivery point, where the short-term changes in California's natural gas supply and

28  24

demand manifest themselves. Topock caters to changes in short-term and daily demand for natural gas, thus it is also the key delivery point for California's marginal supply of natural gas. The prices for natural gas in the Topock "spot market" reflect these short-term changes in supply and demand.

117. Transactions in the Topock spot market allocate the marginal flow of natural gas to the California market, and set the price for natural gas purchases in connection with the California market. While other spot markets exist for the sale of natural gas to California, such as those at California's Northwest border delivery point at Malin and the Southern California delivery point at Ehrenberg, Topock is the benchmark market and its prices provide the basis on which prices are set in these other markets. For example, PG&E sets prices at its Malin gate based on the Topock spot market. In addition, the price of natural gas in other transactions involving purchasers in California is indexed to the prices in the Topock spot market. Accordingly, changes in natural gas prices in the Topock spot market impact natural gas prices throughout California.

118. Spot market trading consists of two types of short term trade transactions: "Bidweek" transactions and daily/weekly transactions. Bidweek transactions are held at the end of each month, usually five business days prior to the pipelines' deadlines for submitting nominations. The bulk of "baseload" trading in the spot market occurs during Bidweek. Baseload is the natural gas nominated to flow for the upcoming month. The second category of trading, daily/weekly trading, is generally conducted on a daily or weekly basis and dictates short term flow of natural gas within the month. Transactions in these two markets are not mutually exclusive. Purchasers buy natural gas during Bidweek and then may resell any unused portion in the weekly or daily market.

119. The majority of the short term trading volume in these border spot markets occurs in the Topock spot market. During the Class Period, a substantial amount of the trading occurred through the electronic trading platform owned and operated by EOL, a wholly-owned subsidiary of Enron Corporation. Other electronic trading platforms, such as the Inter-Continental

1    Exchange ("ICE") and Dynegy Direct also operated during the Class Period.  Defendants and

2    their co-conspirators placed wash trades on these platforms as well.

3          **D.      California Natural Gas Trading.**

4          120.    Typically, California utilities and non-core users (generally individuals and

5    entities that purchase natural gas pursuant to contract rather than subscription, such as large

6    industrial users and electricity generators) buy bundled natural gas either at the California border

7    in the daily spot or bidweek market or at the production basins.  They arrange for transportation

8    to the California border by one of the four interstate pipelines.

9          121.    Historically, the spot prices for natural gas at the California delivery points

10   correlated highly with prices at producing basins and at Henry Hub, the largest of the Nation's

11   natural gas hubs.  In turn, because of this high correlation, participants generally looked to the

12   NYMEX (where natural gas futures and options for delivery of gas at the Henry Hub are traded)

13   for pricing information.  In addition, since the late 1980's, natural gas price indices published by

14   the trade press were a central tool for disseminating wholesale natural gas market price

15   information, asset valuation, and financial and physical transactions.

16         122.    Contracts for the sale of natural gas in California are typically tied to the reported

17   daily spot and bidweek market index prices published by *Gas Daily, Inside FERC*

18   (published by Platts Natural Gas Products), *Natural Gas Intelligence* ("*NGI*") (published by

19   Intelligence Press), and *Natural Gas Week* ("NGW") (published by Energy Intelligence Group).

20         123.    These index prices are also used for settling the pricing used in many financial

21   derivative instruments in the California natural gas market, such as swaps, options, forwards, and

22   basin-to-border price basis transactions.  For example, Reliant was the Los Angeles Department

23   of Water and Power ("LADWP")'s gas supplier.  Under the contract, LADWP was responsible

24   for providing Reliant with estimates of its gas needs.  LADWP made a monthly baseload

25   nomination and subsequent daily wing nominations, and Reliant delivered the gas to LADWP.

26   The price LADWP paid for its baseload nominations was based on the *NGI* monthly index.  The

27   price LADWP paid for its spot gas was based on the *Gas Daily* daily midpoint price.

28                                          26

124.    Companies use financial swaps and other instruments to mitigate risks they face from the differences in prices at various delivery locations. They also trade "basis differentials" in order to speculate on those differences. Because companies take positions based on the difference between the gas price at two points, they can profit if they can affect the basis differential by moving one of the prices up and/or moving the other price down.

E.    **Defendants Engaged in False Reporting.**

125.    In general, the agencies that publish the indices do so primarily by surveying and gathering natural gas prices though interviews on the telephone or through faxes with various market participants. The indices themselves are computed by using a volume-weighted average of natural gas transactions reported by the participants. One such agency, Platts, for example, collects information on price, volume, and sometimes counter-parties. Platts then sorts the prices from high to low, looks for outliers, and cross-checks with the counter-parties as possible. NGW reports weekly and monthly bid-week natural gas prices. Its price indices use a volume-weighted average of individual natural gas spot transactions reported to its staff by participants. *NGW* requires that each company that it surveys provide both price and volume for each reported trade. It states that it acquires price data from market participants with varying interests in order to ensure accuracy. Intelligence Press, which publishes *Daily Gas Price Index* ("*Daily GPI*") and *Weekly Gas Price Index* ("*Weekly GPI*"), computes the indices by obtaining data used in setting natural gas prices *via* a daily telephone and fax survey of industry representatives. Its source base consists of more than 300 participants from all sectors of the natural gas industry including producers, marketers, intrastate pipelines industrial end-users, and utilities. In the survey, it asks its participants whether they purchased or sold any gas, and if so, for what period, into which pipeline(s) or at what city gate, and at what price and volume. Data gathered in the survey are used in calculating both the *Weekly GPI* and the *Daily GPI* spot market prices.

126.    The published indices, which were based on a survey of physical natural gas prices and transactions between participants, provides the benchmark for the pricing of transactions in California's natural gas market.

27

127.   Published price indices serve as the basis for a huge volume of financial derivative trading.  When index prices are manipulated (up or down), financial derivative products are not priced properly, market participants lose faith in financial markets, and the cost of risk management increases.

128.   Part of Defendants' and their co-conspirators' scheme to manipulate natural gas prices was to provide false information to natural gas trade indices.  Defendants and their co-conspirators employed a variety of false reporting techniques to manipulate the indices, including: falsifying trades, reporting wash trades, falsely reporting the prices at which trades had taken place, selectively reporting their own trades, falsely reporting inflated volumes of trades at preferred prices, and falsely reporting trades they had seen on EOL as their own, further magnifying the impact of those trades on the indices.

129.   Defendants and their co-conspirators engaged in significant amounts of false reporting in the California natural gas market.  For example, Dynegy, Williams, CMS and El Paso have admitted that their energy trading businesses furnished false natural gas price information to industry publications.

130.   Long-term gas supply contracts are typically linked to one or more of the published price indices.  As a result of the higher prices reported in the price indices, Plaintiffs and the class paid more for natural gas than they would have absent Defendants' and their co-conspirators' illegal conduct.

**F.   Defendants Engaged in Wash Trades.**

131.   Defendants and their co-conspirators also agreed to engage in wash transactions by which they bought and sold the same natural gas and natural gas "basis" swaps and other commodities at the same price on the same day.  There was no economically rational business purpose for these wash trades.  By engaging in wash trades, Defendants and their co-conspirators made a fictional supply and demand for natural gas and natural gas transportation into California.  The wash trades were communications of collusive price information, and allowed Defendants and their co-conspirators to manipulate the trade press indices of prices used to determine basis

1    swaps settlement amounts.

2    132.   Wash trading, which is barred on exchanges by the Commodities Futures Trading

3    Commission ("CFTC"), essentially involves false trades in which counter-parties do deals that

4    balance out financially in order to accomplish something else, boosting trading volumes for

5    example.

6    133.   Defendants and their co-conspirators engaged in wash trades with the purpose and

7    effect of unfairly and unlawfully setting and maintaining inflated, bundled natural gas prices and

8    natural gas basis swap derivative settlement prices, and thereby colluded to increase the basis

9    differential throughout California and cause all prices of which it was a component, including

10    bundled natural gas prices to increase, enabling Defendants and their co-conspirators to sell their

11    excess natural gas at the supra-competitive prices, reaping enormous profits.

12    134.   Defendants and their co-conspirators engaged in significant amounts of wash

13    trading in the California natural gas market. For example, during January 2000 through October

14    2001, Sempra Trading conducted 245 wash transactions in natural gas with EOL; Reliant

15    conducted over 440; and Coral and its affiliates conducted nearly 150. In addition, PanCanadian

16    publicly acknowledged that it engaged in over $1 Billion in wash trading in natural gas with

17    Reliant. Duke settled with the SEC charges that it too engaged in natural gas wash trades.

18    135.   Following inquiries from Platts, Reliant admitted participating in conducing 45

19    Bcf of natural gas wash trades during 2001. Reliant named CMS Markets and Trading as its

20    primary counter-party, but it said it also did wash trades with Public Service Co. of Colorado,

21    Merchant Energy Group of the Americas, and EnCana Energy Services.

22    136.   EnCana admitted that its energy trading arm engaged in about $1.1 Billion worth

23    of wash trades with Reliant.

24    **G.   EnronOnline Facilitated Wash Trades.**

25    137.   Late in 1999, Enron developed an electronic trading platform, EOL, for trading a

26    variety of commodities, including natural gas delivered to California. EOL's platform was a

27    "one-to-many" type of trading platform. Through this platform, Enron was the "one" who

28    29

bought or sold natural gas from or to the "many" who traded it. Those authorized by EOL to trade did so by logging on EOL's website. EOL maintained a continuous bid and offer price to buy or sell natural gas. It was a counter-party to every transaction conducted on its platform. EOL made the trading rules.

138.   Significantly for California natural gas trading, EOL offered the SoCal/Topock point for trading on a spot basis. All participants in the natural gas market in California, particularly the Defendants, were aware of the significance of the SoCal/Topock gas delivery point. This swing delivery point on the El Paso pipeline system traditionally served as the benchmark for setting the price of natural gas in all of California. The contracts for SoCal/Topock gas traded at EOL did not have a requirement for actual delivery of gas. That is, they could expire and be settled for cash changing hands rather than gas flowing.

139.   EOL's system for trading natural gas in California enabled the forging of purely financial deals that did not have to be related to the actual cost of supplies and deliveries of natural gas. In addition, EOL's platform enabled the execution of wash trades, or transactions that give the appearance of sales and purchases, but which are initiated without the intent to make a *bona fide* transaction and which generally do not result in any actual change in ownership or the trader's market position. Moreover, the settlement process was controlled by EOL and was not based on actual cash transactions for physical gas delivery.

140.   As such EOL's system was ripe for abuse and manipulation of gas prices in California through the trading of derivatives. Financial transactions resulted in overall demand (financial plus physical) that exceeded the available supply of gas at SoCal/Topock and magnified the shortage of gas. In turn, when participants reported the excessive transaction conducted at EOL to the trade press who published the indices, they skewed the computation of the indices in favor of the financial transactions. The indices were manipulated higher through excessive financial trading and other strategies, such as wash trades.

141.   The success of a "one-to-many" platform, such EOL's natural gas trading platform, necessarily requires the cooperation and aid of other participants.

30

1    142.    Because of the sheer magnitude of the trading that occurred at the EOL platform

2  during the Class Period, the prices reported by the Defendants and other participants to Platts,

3  NGI and other trade publishers for the computation of the indices was in fact the EOL price for

4  each trading point. As such, the reported indices were nothing but the manipulated EOL prices.

5  As a result, during the Class Period, spot, bidweek, and index-related natural gas transactions in

6  California were conducted at prices manipulated by Defendants and their co-conspirators.

7    143.    In addition to transactions of spot gas at the SoCal delivery point, EOL traded

8  swap transactions for natural gas linked to index prices. For example, between August and

9  November 2000 alone, nearly 10,000 swap transactions based on the NGI SoCal Index were

10  traded on EOL. During the same period, EOL also traded over 4,000 basis swap transactions

11  linked to prices at the Permian and San Juan basins that delivered gas to the SoCal/Topock

12  delivery point. The underlying quantity of gas for each swap transaction was over 100 MMcf.

13  Combined with the value of the swap transactions, on any given day during the Class Period, the

14  dollar value of trading and open positions at EOL relating to the SoCal/Topock delivery point

15  easily dwarfed the value of the gas that actually flowed through the gate.

16    **H.    Reliant's Churning and The Enron-Reliant Netting Agreement.**

17    144.    Reliant had a special scheme to manipulate the California natural gas markets by

18  buying and selling many times its natural gas needs in quick bursts on the EOL trading platform

19  at Topock. The rapid purchases and corresponding sales over a short period of time is a

20  technique known as "churning." This was another way in which the defendants raised the price

21  of natural gas. The other Defendants and their co-conspirators knew that the frequent Reliant

22  trades caused false and supra-competitive prices, but they nevertheless reported these prices to

23  the trade press in order to yield higher index prices. The netting agreement between Reliant and

24  Enron was part of the agreement among Defendants and their co-conspirators to raise natural gas

25  prices, as were all of the wash trades.

26    145.    The plan worked as follows: Enron would adjust its purchase and sale prices on

27  the EOL platform according to the perceived market conditions. Enron knew that Reliant

28                                                    31

1    engaged in significant and rapid trading on EOL. Despite the fact that Enron knew Reliant was

2    simply creating a false perception of high demand through its practice of churning, EOL would

3    still increase the prices at which it would offer to buy and sell gas, as if the false perception of

4    high demand were in fact true.

5        146.    The churning significantly and artificially raised the price of natural gas traded on

6    EOL and resulted in substantial volatility for natural gas prices on EOL. When Reliant churned,

7    traders perceived an increase in the purchases and sales at Topock and corresponding increases in

8    prices quoted for the purchases and sales on EOL. Reliant's churning on EOL effectively moved

9    the entire market price of natural gas, because transactions on EOL served as the main source by

10    which gas prices were reported to the daily price indices such as Gas Daily.

11        147.    Reliant also sought to protect its profits and trading positions by limiting the

12    likelihood that its transactions would be cut, if it purchased more natural gas than was actually

13    available. Notably, the amount of natural gas which could be taken away from the El Paso

14    pipeline system at Topock into the SoCal Gas pipeline ("take away capacity") is 540,000 MMBtu

15    per day.  Due at least in part to the actions of Defendants and their co-conspirators, the pipeline

16    capacity at Topock was insufficient to serve all of those wishing to purchase and sell gas at

17    Topock during the Class Period. As a direct result of the lack of capacity, El Paso pipeline

18    shippers would be forced to cut volume which they wished to purchase and sell. The lowest

19    priced gas was generally cut first.

20        148.    Reliant, as a significant purchaser of natural gas for its own needs including

21    supplying gas to the Los Angeles Department of Water and Power ("LADWP"), wanted to

22    ensure that it always had a sufficient supply of natural gas even if it was paying the lowest price

23    and should have been the first to be cut. To minimize the risk of having its gas trades cut, Reliant

24    secretly entered into an oral "netting agreement" with Enron. The netting agreement allowed for

25    all of Reliant's purchases for a given day to be averaged into one price. Because Reliant's many

26    purchases in a given day varied from some of the lowest bids to some of the highest bids, the

27    secret netting agreement ensured that most or all of the bids would be executed by setting them

28

1  all at an average price that was, at most times, near the average market price. In other words,

2  Reliant's bids would not appear to be the lowest of the day and therefore, were rarely subject to

3  cuts. The secret netting agreement between Reliant and Enron alleviated any fear that Reliant's

4  trading practices would leave it without gas for its own use.

5         149.   A second important feature of the secret netting agreement was that all purchases

6  by Reliant that were inevitably sold back to the EOL platform were immune from cuts all

7  together.  This aspect of the secret netting agreement left Reliant with greater profits from the

8  sale of natural gas and ensured that Reliant would always have a sufficient supply. As stated

9  above, all of Reliant's purchases from the EOL platform would be taken together to form a

10 volume-weighted average price.  Likewise, all of Reliant's sales to the EOL platform would be

11 combined in the same way. The matching amounts of sales and purchases would first be netted

12 out against each other, leaving the difference (i.e., profit) to be paid to Reliant. Thus, the secret

13 netting agreement actually gave Reliant an incentive to churn.

14       150.   Although the other defendants may or may not have been directly aware of the

15 Reliant—Enron netting agreement, that agreement was entered into and implemented pursuant to

16 the common conspiratorial plan of all defendants, so that all defendants are equally liable for it.

17 **I.**    **Defendants Conspired to Avoid Competing with Each Other in the**

18       **Pricing and Sale of Bundled Natural Gas In California.**

19       151.   Beginning in at least 1999, Defendants and their co-conspirators agreed not to

20 compete with each other in the pricing and sale of bundled natural gas in California, in the

21 pricing and sale of interstate gas transportation contracts into California in the secondary (or

22 replacement) market, and in the pricing and sale of the derivatives known as "basis swaps"

23 derived from California natural gas market prices.  Defendants and their co-conspirators daily

24 exchanged price information and used private, unregulated computer software programs and

25 websites collusively to establish at artificially high levels the Defendants' and their co-

26 conspirators' basis swap settlement amounts and bundled natural gas prices.

27       152.   Each Defendant falsely reported price, volume and/or trading information

28

concerning natural gas transactions for anticompetitive purposes while knowing that other

defendants and market participants similarly engaged in false reporting practices to manipulate

the price indices.  Present and former traders from various defendants have acknowledged that

they engaged in false reporting to price indices knowing that others were engaged in such false

reporting, and because they knew that their competitors were doing so.  Each defendant

manifested a conscious commitment to a common design and scheme to manipulate the natural

gas indices.  Following are some examples.

### AEP

153.    On October 9, 2002, defendant AEP announced that several of its employees

involved in natural gas trading and marketing had "provided inaccurate price information for use

in indexes compiled and published by the trade publications."  Among other things, an AEP

executive directed traders to alter the prices and volumes of trades that AEP had transacted and

to report fictitious trading activity.  AEP falsely reported information that it knew or had reason

to believe would be beneficial to its trading positions.

154.    After AEP admitted to false reporting, the CFTC sued AEP and defendant AEPES

for knowingly delivering false, misleading or knowingly inaccurate information concerning

natural gas trades in an attempt to manipulate the price of natural gas. In connection with a

settlement of that proceeding, AEP and defendant AEPES admitted having submitted to Inside

FERC between November 2000 and July 2002, reports that "contained knowingly inaccurate

data, including incorrect volumes and/or prices, fictitious trades, or incomplete reports of actual

trades."

### Aquila Merchant Services

155.    On January 28, 2004, the CFTC entered an Order finding that, from at least

January 1999 through May 2002, defendant AMS knowingly made false reports concerning the

existence of, pricing of, and volume for natural gas transactions to certain reporting firms in

order to manipulate published indices on natural gas prices for various pipeline hubs throughout

the United States.  AMS was fined $26,500,000.  AMS and its subsidiaries and affiliates engaged

34

1    in a significant number of wash trades on EOL for delivery in California.

2    **CMS**

3    156.    On November 4, 2002, CMS announced that CMS MS&T and CMS Field

4    Services had provided inaccurate trading data to natural gas price indices. Among other things,

5    CMS executives pressured traders to report inaccurate prices to affect the index price. For

6    example, one CMS executive directed a trader to create a spreadsheet of fictitious trades to be

7    sent to Inside FERC. Similarly, executives instructed traders to modify the reported prices of

8    trades actually executed. Through false reporting, CMS intended to manipulate the natural gas

9    price indices so it could profit on financial derivative products.

10    157.    Since admitting to false reporting, CMS and its subsidiaries have been the

11    subjects of regulatory action. On November 25, 2003, the CFTC entered an Order finding that

12    CMS MS&T and CMS Field Services had, from at least November 2000 through September

13    2002, knowingly made false reports concerning the existence of, pricing of, and volume for

14    natural gas transactions to certain reporting firms in order to manipulate published indices on

15    natural gas prices for various pipeline hubs throughout the United States. CMS MS&T and CMS

16    Field Services were fined $16,000,000. CMS and its subsidiaries and affiliates engaged in a

17    significant number of wash trades on EOL for delivery in California. On March 17, 2004, the

18    Securities and Exchange Commission ("SEC") entered an Order finding that CMS Energy and

19    the Controller of CMS MS&T had made false reports concerning CMS Energy's revenues in

20    2000 and 2001 through the use of undisclosed wash sales of natural gas.

21    **Coral**

22    158.    Coral acknowledged that its traders reported not only volumes of actual trades to

23    which Coral was a party, but also volumes of trades that its traders heard about in the market or

24    had seen on electronic trading platforms such as EOL. As a result, Coral inaccurately skewed

25    market indices by magnifying the volume of trades that had actually taken place and

26    misrepresenting trades observed in the market as its own.

27    159.    During the Class Period, several traders at Coral's West Trading Desk falsely

28    35

reported thousands of individual fixed-price, physical, baseload natural gas trades to *Inside*

*FERC* and *NGI* as Coral trades, when in fact those trades had been executed by other companies.

Such inaccurate trading data was reported for at least nine locations, including Southern

California, PG&E City gate, PG&E Topock, Malin, El Paso Permian Basin, San Juan Basin,

Rockies and Northwest Pipeline.

      160.    In addition, on a monthly basis at least one trader at Coral's West Trading Desk

circulated to various other Coral traders an "Index Directions" e-mail, which directed those

traders to report natural gas trading data to IFERC and NGI in a manner that would benefit

Coral's revenues. The Index Directions e-mail attached a spreadsheet which included three

columns of information for each location at which trades occurred. The first column included the

trader's estimate of what the index would publish as the price for each location. The remaining

columns were titled "Up" and "Down". The word "Good" in green-colored font or "Bad" in red-

colored font appeared in the "Up" and "Down" columns for each location. The words "Good"

and "Bad" were used to designate whether an index's publishing a price above or below the

estimated price would positively or negatively impact Coral's revenues. At least one Index

Directions e-mail included the text, "Please see the attached spreadsheet about where we should

report indexes." In response to the Index Directions e-mails, Coral's West Trading Desk traders

overwhelmingly reported trades at inflated volumes in such a manner as to positively affect

Coral's revenues.

      161.    On July 28, 2004, the CFTC entered an Order finding that defendant Coral, from

at least January 2000 through September 2002, had knowingly made false reports concerning

price and volume data to certain reporting firms on natural gas trades that had never been

executed, reported executed trades with false price and/or volume data, and failed to report

certain actual trades. Coral was fined $30,000,000. Coral and its affiliates also engaged in a

significant number of wash trades of natural gas on EOL for delivery to California.

**Duke**

      162.    According to an analysis of DETM's transactions for the western United States

36

1   including California, at least 8 percent of DETM's trades reported to monthly publications

2   contained false price and/or volume information, and at least 22 percent of DETM's trades

3   reported to daily publications contained false price and/or volume information. DETM falsified

4   price and volume information to benefit the trading positions of DETM and its affiliates.  In

5   addition, DETM inaccurately calculated the volume-weighted averages, which it reported to *Gas*

6   *Daily*, by merely averaging its high and low trades each day, rather than volume-weighting all

7   trades each day.

8         163.    DETM has been the subject of federal investigation.  On September 17, 2003, the

9   CFTC entered an Order finding that DETM had, from at least January 2000 through August

10   2002, knowingly made false reports concerning the existence of, pricing for, and volume for

11   natural gas transactions to certain reporting firms in order to manipulate published indices on

12   natural gas prices for various pipeline hubs throughout the United States.  DETM was fined

13   $28,000,000.  DETM and its affiliates also engaged in a significant number of wash trades of

14   natural gas on EOL for delivery to California.

15         **Dynegy**

16         164.    On September 22, 2002, Dynegy announced that fifteen of its employees had

17   reported false data to national gas trade indices. Dynegy primarily inflated the volume of trades

18   that it reported to daily indices such as Gas Daily, and identified fabricated trades to achieve a

19   predetermined and inaccurate "average" range of trades in its reports to monthly indices such as

20   *Inside FERC* and *NGI*.

21         165.    Dynegy executives pressured traders to report false information that benefited the

22   positions of certain trading desks. For example, the heads of various Dynegy trading desks

23   instructed traders to report non-existent transactions to price indices, to inflate volumes in

24   reported trades, and to report false prices. Commenting on the practice of false reporting in the

25   natural gas industry and Dynegy in particular, the head of one trading desk told a trader, "this is

26   how the game is played and you need to play it too." On another occasion, the same supervisor

27   demanded that a trader revise a trading report to "make the volume 2 or 3 times greater" and

28                               37

adjust the price range of the trades.

166.    Despite having engaged in very few actual fixed-price trades, Dynegy, through its traders, falsely reported Dynegy's participation in a wide array of fixed-price trades solely to be included in the monthly index published by Inside FERC. In the words of one Dynegy trader, although it was "widely known" that "there were no fixed-price physical deals at some locations," Dynegy executives pressured traders to falsely report fixed-price trading data so the company would appear in the index. By appearing in the index, Dynegy was also able to manipulate the price of natural gas.

167.    To enhance Dynegy's status as a participant in the natural gas market, Dynegy traders reported to Gas Daily and Inside FERC trades that they had "observed" on electronic databases including EOL and ICE, but had not actually transacted.

168.    Dynegy also conspired with other natural gas companies, including West Coast Power, to act as a counter-party to certain false trades and to report offsetting trades.  DMET used the procedure described in the following e-mail to create the appearance that Dynegy was engaged in actual trades:

> Enron owns the index. Unless we start increasing our volumes we are going to continue to take pain on the cash index. I will get you the contact for [the reporting firm]. I would suggest representing yourself as [W]est [C]oast [LLC]…We can show offsetting transactions on our activity.

169.    By coordinating its efforts with other natural gas companies, Dynegy sought to make sure that the gas indices did not detect its false trades.

170.    Since admitting to false reporting, Dynegy has been the subject of federal investigation. On December 18, 2002, the CFTC entered an order finding that defendants Dynegy Marketing and West Coast Power had, from at least January 2000 through June 2002, knowingly made false reports concerning the existence of, pricing for, and volume for natural gas transactions to certain reporting firms in order to manipulate published indices on natural gas prices for various pipeline hubs throughout the United States.  Dynegy Marketing and West Coast Power were jointly fined $5,000,000.  Dynegy Marketing and its affiliates also engaged in

38

a significant number of wash trades of natural gas on EOL for delivery to California. Certain of Dynegy Marketing's traders, including at least Michelle Valencia, have been indicted by the federal government for allegedly participating in a conspiracy between Dynegy and El Paso Merchant Energy to report false information concerning natural gas trades to index publications.

**El Paso**

171.  On November 8, 2002 and January 13, 2003, defendant El Paso Merchant Energy announced that it had misreported natural gas trading data to published indices. Before October 2000 and from November 2000 through December 2001, El Paso Merchant Energy reported trading data according to its trading position or "book bias." El Paso Merchant Energy skewed its price reports in an effort to manipulate the published price index to favor the company's financial position. Accordingly, El Paso Merchant Energy would report high prices when it held a long position and low prices when it held a short position.

172.  Several former El Paso Merchant Energy natural gas traders have been indicted and pleaded guilty to knowingly reporting false information concerning natural gas trades to *Inside FERC* at various times in 2000 and 2001. By reporting this false data on behalf of El Paso Merchant, the former traders intended to and did affect the published index price of natural gas.

173.  Since admitting to false reporting, El Paso and El Paso Merchant Energy have been the subjects of federal investigation. On March 26, 2003, the CFTC entered an Order finding that defendant El Paso Merchant Energy had, from at June 2000 through at least November 2001, knowingly made false reports concerning the existence of, pricing for, and volume for natural gas transactions to certain reporting firms in order to manipulate published indices on natural gas prices for various pipeline hubs throughout the United States. Defendants El Paso and El Paso Merchant Energy were jointly fined $20,000,000. El Paso Merchant Energy and its affiliates also engaged in a significant number of wash trades of natural gas on EOL for delivery to California. In addition, certain employees and agents of El Paso or its subsidiaries and affiliates have been indicted by the federal government for allegedly reporting false information concerning natural gas trades to index publications during the relevant period. In

connection with these indictments, it is alleged that the head of gas trading at El Paso directed employees of El Paso Merchant Energy to report trades inaccurately to industry publications. Certain of these agents, including Todd Geiger, William Ham, Dallas D. Dean, Donald Guilbault and Christopher Bakkenkist, have pleaded guilty to charges of reporting false trades or false information to publishers of price indices.

**Reliant**

174.    Reliant reported inaccurate data to daily and monthly natural gas indices. In reporting to daily price indices, such as Gas Daily and NGI, Reliant provided information not only as to its own trades, but also as to trades between other energy companies observed in the market. As a consequence of Reliant's reporting, the volumes of trades published in the daily price indices were greater than actually occurred.

175.    Reliant also fabricated trading data that it reported to monthly price index *Inside FERC*. Reliant reported fictitious, rather than use actual trades, using the following three-step process. First, Reliant's traders established a "consensus" range of bid-week trades. Second, an analyst decided upon the midpoint of that consensus range. Third, according to Reliant, "the analyst would generate a list of prices – all falling within the consensus range – and volumes that arithmetically led to a weighted average at the consensus midpoint." The result of this process was to manipulate the natural gas indices by misstating gas trading volumes. Indeed, Reliant's overstatements of gas trades were, on average, 100 percent above actual volumes trades.

176.    On November 25, 2003, the CFTC entered an Order finding that defendant Reliant Energy Services had, from at February 1999 through May 2002, knowingly made false reports concerning the existence of, pricing for, and volume for natural gas transactions to certain reporting firms in order to manipulate published indices on natural gas prices for various pipeline hubs throughout the United States. RES was fined $18,000,000. RES and its affiliates also engaged in a significant number of wash trades of natural gas on EOL for delivery to California.

**WD Energy and EnCana**

177.    On July 28, 2003, the CFTC entered an Order finding that defendant WD Energy

1  had, from at least June 2000 through at least August 2001, knowingly made false reports

2  concerning the existence of, pricing for, and volume for natural gas transactions to certain

3  reporting firms in order to manipulate published indices on natural gas prices for various pipeline

4  hubs throughout the United States.  WD Energy was fined $20,000,000.  WD Energy and its

5  affiliates also engaged in a significant number of wash trades of natural gas on EOL for delivery

6  to California.

7          **Williams**

8          178.    On October 25, 2002, Williams announced that it had reported inaccurate

9  information regarding natural gas trades to trade indices. Specifically, Williams acknowledged

10  that it had reported gas trades to Inside FERC at greater volumes than actually occurred.

11          179.    On December 17, 2004, Thomas J. Pool ("Pool"), the basis trader for Williams'

12  West Desk for natural gas trading from August 1998 through October 2002, admitted to

13  conspiring "to report fictitious trades to Inside FERC and to NGI for the purpose of manipulating

14  the published index prices to increase the value or profitability of Williams' natural gas

15  positions."  Pool explained, "[b]y reporting false trades, I intended to influence the price

16  published by Inside FERC and NGI at each location for which I reported.  To the extent that my

17  false trades were included in the index calculations, the published index prices did not reflect the

18  legitimate forces of supply and demand."

19          180.    Pool described how he was instructed by a Williams executive to report false

20  trading data to industry publications:

21                  To achieve the goals of the conspiracy, most of the trades I
                    reported were deliberately fabricated. At the end of each bid week,
22                  the physical traders would orally inform me of their actual fixed
                    price, baseload trades and I would list these trades in an Excel
23                  spreadsheet. Then I would add fictitious trades to the spreadsheet
                    to achieve the desired weighted average price at each location for
24                  which I reported to the index publications. My supervisor taught
                    me how to arrange the collection of false trades on this spreadsheet
25                  to look like a random sampling that would appear credible to the
                    publications. Finally, I would fax or e-mail the completed
26                  spreadsheet to Inside FERC and NGI. For the false trades I

27

28                                                41

included in the spreadsheet, the reported prices and volumes did
not represent any actual trades executed by Williams during the
relevant bid week. I knew that the publications were soliciting only
fixed price, baseload trades executed by Williams during bid week.
On at least one occasion when my reported trades were questioned
by Inside FERC's Chief Editor, I concealed the fact that I had
reported fictitious trades.

181.    Pool acknowledged having successfully manipulated the index prices of natural

gas in several locations, including SoCal City gate and the San Juan Basin, as reported in Inside

FERC in February 2001. Moreover, Pool noted that, by falsely reporting trades, he "attempted to

skew the published index prices in the direction that would result in a benefit to one or more

entities within the Williams Companies."

182.    Since admitting to false reporting, defendants Williams and WEMT have been the

subject of regulatory action. On July 29, 2003, the CFTC entered an Order finding that defendant

WEMT had, from at least January 2000 through at least June 2002, knowingly made false reports

concerning the existence of, pricing for, and volume for natural gas transactions to certain

reporting firms in order to manipulate published indices on natural gas prices for various pipeline

hubs throughout the United States. Defendants Williams and WEMT were jointly fined

$20,000,000. WEMT and its affiliates also engaged in a significant number of wash trades of

natural gas on EOL for delivery to California.

## Xcel and e prime

183.    On January 28, 2004, the CFTC entered an Order against defendants Xcel and e

prime, finding that e prime, Inc., from at least April 2000 through September 2002, knowingly

made false reports concerning the existence of, pricing for, and volume for natural gas

transactions to certain reporting firms in order to manipulate published indices on natural gas

prices for various pipeline hubs throughout the United States. e prime was fined $16,000,000. e

prime and its affiliates also engaged in a significant number of wash trades of natural gas on EOL

for delivery to California.

**J.    The Conspiracy to Restrict Capacity.**

184.    The El Paso Defendants and the Sempra Defendants entered into a conspiracy in

42

the late 1990s to restrict natural gas pipeline capacity, restrict output of natural gas, and generally not to compete with each other, thereby raising prices of natural gas to Plaintiffs, class members, and all natural gas consumers in California.

185.   Prior to deregulation in the 1990s, industrial and commercial gas customers such as plaintiffs and the members of the class in this case were essentially captive customers of SoCal Gas, SDG&E, and PG&E, which serves Northern California.  While SoCal Gas and SDG&E monopolized intrastate natural gas distribution in Southern California, EPNG's pipeline was the dominant interstate supplier of natural gas into California.  With deregulation, these monopolies faced the threat of competition.

186.   In 1992, Tenneco, Inc., the then-independent predecessor of defendant EP Tennessee, completed the Kern River pipeline from Wyoming to Kern County, California. Tenneco also planned two new pipelines that would bypass SoCal Gas and SDG&E.  One, called the Altamont pipeline, would run from Canada to the northern end of the Kern River pipeline in Wyoming; this would be accompanied by an expansion of the Kern River pipeline to directly serve industrial customers in Southern California and Baja California in Mexico.  The other, called the Yuma Lateral Pipeline, would run from Yuma, Arizona through Baja California to the Pacific coast, to be joined by connectors into Baja California at Rosarito, and Southern California.  El Paso also planned a Yuma-Lateral-Baja pipeline expansion, and SoCal Gas and SDG&E also planned service to Rosarito.  Both the planned Tenneco and El Paso Yuma Lateral Baja projects would have had significant cost advantages over the competing proposal from SoCal Gas and SDG&E, and would have resulted in lower rates for natural gas customers, as well as increased capacity to protect against price spikes caused by natural gas shortages.  SoCal Gas (through its affiliate Pacific Interstate Offshore Company) and El Paso also had competing proposals to develop a gas pipeline from Mexico to a planned power plant near El Paso, Texas called Samalayuca II.

187.   With this competitive backdrop and facing an uncertain future, eleven senior executives of SoCal Gas, SDG&E, and EPNG met at the Embassy Suites hotel near the Phoenix

airport on September 25, 1996.  The president and a vice president of EPNG attended, as did the

president and a vice president of SoCal Gas and an executive vice president of SGD&E.  No

attorneys were present.  According to one of the participants, Al Clark of El Paso, the purpose of

the meeting was to "get together and see if there were some mutually beneficial business

opportunities" the companies could pursue "in the form of a joint venture or something."

188.     The participants in the Phoenix meeting hatched an unlawful conspiracy designed

to protect and entrench both SoCal Gas's and SDG&E's historic market power over intrastate

natural gas distribution in Southern California, and El Paso's historic domination of the interstate

transportation of natural gas into California.

189.     Following the Phoenix meeting and pursuant to an agreement reached at that

meeting, SoCal Gas dropped any effort to continue with the Samalayuca project with which they

had been competing with El Paso, even though SoCal Gas had a significant competitive cost

advantage over El Paso on that project.

190.     At the same time and pursuant to the same agreement, El Paso stopped competing

on a northern Mexico pipeline to Rosarito, even though El Paso had a competitive advantage

over SoCal Gas and SDG&E on that project.  At first, the competing parties tried to make a joint

bid, but when the Mexican government determined that this "joint bid" was merely a front for

collusion, So Cal Gas and SDG&E simply dropped out and ceded the project to El Paso.

191.     The participants in the September 1996 Phoenix meeting also agreed that their

companies would not oppose two pending mergers that would have the effect of further reducing

competition between them and in the market generally.  First, in June 1996, El Paso had

announced a planned merger with its competitor, Tenneco, which was to be effective in

December 1996.  At the Phoenix meeting, El Paso's executives lobbied their counterparts at

SoCal Gas not to oppose the merger.  SoCal Gas agreed to make no opposition, even though it

would have been in SoCal Gas's independent interest to do so, since the El Paso-Tenneco merger

threatened to create and ultimately did create a stronger potential competitor for SoCal Gas in

natural gas transmission.  Second, SoCal Gas and SDG&E themselves planned to merge to form

44

what became Sempra. Although that merger was not announced publicly until October 1996, SoCal gave El Paso advance warning at the Phoenix meeting, and secured El Paso's agreement not to oppose that merger, in an obvious quid pro quo for SoCal's agreement not to oppose the El Paso-Tenneco merger.

192.    At the time of its merger with El Paso, Tenneco had secured the necessary permits to begin construction of the Altamont pipeline, which would have connected the Kern River pipeline to Canada. In order to kill this project, El Paso sold its newly-acquired interest in Altamont to Nova in 1997, for minimal consideration. As El Paso and Sempra anticipated, Nova decided to forego the project and let the permits lapse, because it would have competed with another pipeline in which Nova had an interest. Thus, another competing pipeline was eliminated, and El Paso's and Sempra's hold on the market further strengthened.

193.    After the Phoenix meeting, according to an El Paso participant, representatives of Sempra and El Paso would periodically (every three to six months) meet to discuss their common "problems" and "how our pipeline facilities are interconnected at the California border." For example, in June 2000, representatives of SoCal Gas and El Paso met to create a plan to withhold interstate capacity, and manipulate and reduce natural gas storage levels. The El Paso-Sempra conspiracy restricted gas transportation capacity into California, and caused increased natural gas prices for Plaintiffs, class members, and California consumers.

### K.    The El Paso Bid-Rigging Scheme.

194.    The El Paso defendants are comprised of two separate and distinct groups of entities with a common parent, El Paso Corporation. The first group is the "El Paso Pipeline Defendants", which include EPNG and Mojave Pipeline. The El Paso Pipeline Defendants, during the relevant period, owned and operated, directly or through affiliates and subsidiaries which they controlled, over 40% of the natural gas pipeline capacity into California. The second group, the "El Paso Merchant Defendants" includes El Paso Merchant Energy, L.P., the successor to the former El Paso Marketing, and EP Tennessee, the successor to the former El Paso Merchant Energy Group.   El Paso Merchant Defendants are marketers and traders of

1   natural gas, and are unregulated.  The pipeline operations of the El Paso Pipeline Defendants are

2   partially regulated by FERC.

3          195.    The El Paso Pipeline Defendants are required by law to deal at arm's length and in

4   a non-discriminatory manner with their affiliated but unregulated Merchant defendants, in the

5   same way that they deal with the unaffiliated marketing companies with whom the Merchant

6   defendants theoretically compete.  The Pipeline defendants, and all companies that operate

7   natural gas pipelines, are also prohibited by law from selling "bundled" natural gas in the spot

8   market, i.e., bundling transportation cost, which the FERC regulates, with the cost of the

9   commodity itself, which FERC does not regulate.  This is because pipeline companies have

10  market power over transportation and could exploit that market power to gain an unfair

11  competitive advantage over marketers and other sellers of the commodity itself.  Because of

12  these prohibitions and because of the way their companies are structured, the El Paso Pipeline

13  Defendants and the El Paso Merchant Defendants do not share a unity of interest, and anti-

14  competitive combinations between them are not immunized by the doctrine of *Copperweld v.*

15  *Independence Tube Corp.,* 467 U.S. 752 (1984).

16         196.    The El Paso Pipeline Defendants and the El Paso Merchant Defendants combined

17  and conspired with each other and with third parties in order to raise the natural gas prices

18  charged by the unregulated Merchant Defendants, thereby causing spot prices for natural gas sold

19  by El Paso and all other defendants to be unlawfully raised.

20         197.    There was greater pipeline capacity during the relevant period for delivery of

21  natural gas to the California border than there was capacity to take that gas and deliver it

22  intrastate.  The El Paso defendants collusively exploited and exacerbated this imbalance.  First,

23  El Paso Merchant acquired excess, additional unneeded takeout pipeline capacity for itself

24  through a bid-rigged auction.  When this was added to the existing takeout requirements of

25  California public utilities (LDCs) and other large end-users holding long-term contracts, there

26  was not nearly enough natural gas available to meet demand, and to make up the difference, the

27  LDCs and end-users, despite their long-term contracts, were forced to buy large quantities of

28                                                46

1   natural gas on the unregulated and far more expensive spot market, where El Paso Merchant and

2   others with deliverable supplies sold that gas to them at highly inflated prices.  Because natural

3   gas prices throughout California are impacted by the spot market prices, particularly at Topock,

4   the result was to drive up prices far above competitive levels for Plaintiffs and Class Members as

5   well.  From at least March 2000 through May 2001, the El Paso Defendants were able to

6   manipulate the supply of natural gas to California in this manner, thereby greatly increasing

7   prices.

8        198.    For most of the 1990s, competition at the wellhead, or producing basins (e.g., the

9   Permian, Anadarko and San Juan Basins in the Southwestern United States), and competition in

10  the transportation of natural gas resulted in fair and reasonable natural gas prices to California

11  consumers.  The basis differential was generally correlated to the transportation cost of moving

12  the gas commodity from the Southwest producing basins to the California border.  When the firm

13  (uninterruptible) capacity on the pipelines was not fully utilized by shippers, the pipeline

14  companies offered it as interruptible capacity at discounted rates, which also helped to keep the

15  delivered price of natural gas at the California border competitive.  Thus, the pipeline companies

16  such as EPNG and Mojave were in direct competition with marketers and traders such as El Paso

17  Merchant.  This resulted in relatively low basis differentials for natural gas delivered to

18  California, and natural gas to consumers was priced competitively compared with the rest of the

19  country.

20       199.    SoCal Gas and PG&E were contractually liable to EPNG and others to take the

21  full amount of the natural gas delivered to California by EPNG and Transwestern, which

22  normally was more than they could use.  They were therefore forced during the 1990s to

23  relinquish or turn-back capacity to EPNG and Transwestern, subject to the payment of

24  surcharges.  This turned-back or excess capacity on the EPNG pipeline system was

25  approximately 1,220 MMcf/d of firm capacity.  Under an arrangement with El Paso in 1997

26  approved by the California PUC, this excess capacity was divided into three blocks.

27       200.    Whereas previously this excess capacity had operated to keep prices lower, as

28                                                47

would be expected in a competitive market, the El Paso Defendants devised a scheme by early 2000 to manipulate and withhold this excess capacity from competition, in order to drive up prices. The key to this scheme was to ensure that El Paso's unregulated marketing affiliate, El Paso Merchant, received the bulk of EPNG's available firm transportation capacity.

201.   EPNG purported to conduct an "open bidding season" or "open bidding" in February 2000 for the 1,220 MMcf/d of available firm capacity on the EPNG pipeline which was scheduled to be available from March 1, 2000 through May 31, 2001. However, the bidding was rigged in favor of El Paso Merchant.

202.   The surplus 1,220 MMcf/d capacity, categorized as Block I, II and III, was scheduled to be available from March 1, 2000, through May 1, 2001. Block I carried a primary firm capacity right to nominate 462.4 Mmcf/fd natural gas for delivery to Topock and Ehrenberg, but did not carry any primary rights to receive natural gas from the Andarko, San Juan or Permian basins. Block II carried a right to nominate 593 Mmcf/d to Topock, and also carried a primary right to receive natural gas from the Andarko, San Juan and Permian basins. Block II rights could also be recalled by shippers serving Northern California if the capacity was not utilized. Block III carried firm capacity rights to nominate 193 Mmcf/d of natural gas for delivery at any California border point and included primary rights to receive natural gas from the San Juan Basin.

203.   As a part of the auction process, EPNG had three pro forma contracts, one each for the Block I, II and III firm capacity rights. These pro forma contracts would be entered into between EPNG and the successful bidder or bidders at the conclusion of the open season auction. These pro forma contracts were the same as other contracts EPNG had entered into with other shipper who already had firm capacity agreements with EPNG.

204.   Prior to accepting bids, Defendant El Paso Natural Gas company announced that it would not accept bids generating less than $37.5 million of aggregate revenues and that a bid for the total amount of capacity on all three Blocks of capacity would prevail over bids for individual Block capacity rights. This minimum bid requirement necessitated a price for the "turned-back

capacity" well above the then-current market value of the capacity. This put arm's -length bidders at a severe disadvantage, as the total amount of available capacity was so large that it was unlikely that any non-El Paso bidder could afford or would have a need for the total amount. In contrast, since El Paso already controlled the excess capacity, by transferring it to El Paso Merchant, it would keep control in-hours. This capacity was enough to meet one-sixth of the daily natural gas demand of California.

205.    In the "open bidding season," the only entity that bid for the entire capacity offered was an "El Paso" entity. Although the prevailing market conditions in February 2000 did not warrant a bid anywhere near $37.5 million, on the last day of the open season El Paso Merchant—Defendant El Paso's affiliate—submitted an aggregate bid of $38.5 million for all three Blocks of available capacity. El Paso Merchant Energy made its bid with the express approval and authorization of El Paso, after officers of El Paso, El Paso Merchant and EPNG, the pipeline, shared information about the bid.

206.    In addition, shortly before the open season, in separate transactions, El Paso Merchant had also acquired additional firm capacity rights to 156 MMcf/d of firm capacity on the El Paso system and 65 MMcf/d of firm capacity on the Transwestern Pipeline. Therefore, after the open season auction, El Paso Merchant controlled 1.44 Bcf/d of firm capacity rights to deliver natural gas to the California border.

207.    Although there were 24 other bidders for rights to various Blocks of the offered capacity, the El Paso Merchant bid was the only aggregate bid for all three Blocks of capacity. The aggregate amount of the 24 other bids totaled only about $17.5 million—over $20 million less than the bid by El Paso Merchant.

208.    El Paso Merchant was also able to make its successful over-market bid because other bidders were unaware of another unfair advantage that Defendants El Paso, El Paso and the other El Paso Defendants had provided to their affiliate. While the arm's-length bidders knew that they could use this available capacity to access the Mojave Pipeline at Topock, and pay Mojave Pipeline's rates to transport their gas to the Wheeler Ridge Interconnection, they also

49

knew that for the previous 18 months, Mojave Pipeline's discounted interruptible transportation rate had been $.04/MMBtu. However, what none of the other bidders knew was that during the middle of the "open season," El Paso Merchant had secretly negotiated a new discounted rate on the Mojave Pipeline, which is affiliated with EPNG and El Paso Merchant, to Wheeler Ridge of $.02/MMBtu for quantities above 100,000 MMBtu/d, a discounted rate that would be effective from March 1, 2000 through May 31, 2001, the entire 15 months of the new contract offered in the open season.

209.   Indeed, Robin Cox, El Paso Merchant Vice President, contacted Harvey Rodman, a Mojave executive, on February 7, 2000, and on February 9, 2000, to negotiate this discounted rate. In those conversations, Cox and Rodman discussed a discount with a guaranteed minimum volume of transportation. Rodman asked Cox what his desired rate would be and, after Cox suggested a rate, agreed to it. Thus, the discounted rate would be two cents for volume over 100,000 MMBtu, three cents for volume between 50,000 and 100,000 MMBtu, and four cents for volume under 50,000 MMBtu. After they agreed to such discount, Cox requested that Rodman not publicize such discount, and stated that El Paso Merchant would not "officially" request such discount until after the open bidding season was closed. Rodman agreed.

210.   Only twelve minutes after the second conversation on February 9, 2000, Robin Cox wrote an internal email with the subject line titled "Mojave Discount," regarding the discounts on the Mojave line. The email said, "Mojave is willing to offer [discounted rates] . . . I will not officially request this discount until next Wednesday (February 16, 2000) assuming we win capacity. After it is posted it will be avail[a]ble to everyone." These discounts are significant because Block II of the surplus capacity rights does not allow the owner to nominate natural gas to the SoCal Topock gate. The Mojave line, however, can transport natural gas from the El Paso pipelines to the Wheeler ridge Interconnection, that can then deliver natural gas into SoCal's marketing territory. By routing the natural gas from Block II through the Mojave line, the Block II owner can essentially end-run the Block II/SoCal Topock restraints. Therefore, the secretly negotiated discounts enabled El Paso Merchant to bid above the true market value for the

unsubscribed capacity on the El Paso pipelines. Plaintiffs are informed and believe that the availability of the discounts was not disclosed to other bidders until after the bidding was completed.

211.    Accordingly, an illegal agreement was reached during the open bidding season for a discount for El Paso Merchant which allowed it to hedge its risk on transportation costs in advance of bidding to control the subject capacity. There was an agreement to hold the discount until the contract was awarded to El Paso Merchant. This was blatant collusion to keep secret a discount for transportation on the Mojave Pipeline until the open bidding season ended. Further, the discount actually received by El Paso Merchant after it was awarded the El Paso contract was identical to that requested in the subject conversations.

212.    On February 15, 2000, El Paso announced that it had accepted El Paso Merchant's $38.5 million bid over the other bids. Thereafter, on February 18, 2000, Mojave Pipeline announced the discounted transportation rate, which was at least nine days after the secret negotiations between Cox and Rodman and three days after El Paso Merchant was awarded the excess capacity and open bidding closed. Not coincidentally, it was also announced that the discounted rate would be effective starting March 1, 2000, the same day as the start date for the El Paso-El Paso Merchant contract, and would last 15 months, or until May 31, 2001, which was the end date of the contract.

213.    Following the completion of the auction, El Paso and El Paso Merchant executed the three pro forma contracts for the Block I, II and III capacity rights. With the execution of these contracts with El Paso Merchant, EPNG now had entered into contracts for the entire transmission capacity on both its north and south pipelines feeding into California. The holders of these firm capacity contracts, which included El Paso Merchant, had the rights to nominate and schedule gas for delivery from receipt points located upstream on the El Paso system in the San Juan, Permian and Andarko basins to the downstream Southern California delivery points at SoCal Ehrenberg, Socal Topock, PG&E Topock and Mojave Topock. The receipt point at the San Juan Basin was economically the most desirable upstream transaction point on the El Paso

51

system.

214.   This secret and illegal agreement, engaged in by the El Paso defendants, was contrary to standards which require affiliates to function independently of each other. Under law, the employees of the marketing arm, El Paso Merchant, and the employees of the pipeline, Mojave, were to function independently, and essentially operate as separate companies. Thus, El Paso Merchant and Mojave Pipeline's secret negotiations were in direct violation of standards set to keep affiliates independent of each other.

215.   On March 26, 2001, the New York Times reported it had obtained sealed documents on file with the FERC, one of which quoted an executive at El Paso Merchant saying that the pipeline deal would give them "more control" of gas markets and the "ability to influence" the physical market. The documents also stated that El Paso Merchant would profit by increasing the basis or difference between the prices of natural gas at the producing basins and at the California border delivery points. El Paso Merchant stood to make an additional $2.4 million for every one-cent increase in basis.

216.   Prior to the open season auction for the Block I, II and III firm capacity contracts on the El Paso Natural Gas Pipeline, El Paso Merchant Energy held firm capacity rights to 156 Mmcf/d on the El Paso system. Following the execution of three contracts with EPNG for the Block I, II and III firm capacity, El Paso Merchant Energy held firm capacity rights to transport nearly 1.38 bcf/day of natural gas on the El Paso Natural Gas Pipeline.

217.   Owners of firm capacity rights on EPNG pipelines nominate and schedule natural gas to be received from different receiving points in the Southwest basins and delivered to California's southwest border points near Topock and Ehrenberg, Arizona. Shippers on the EPNG pipelines can nominate and schedule gas from primary and alternate receipt points, as well to primary and alternate delivery points. The complexity of nominating and scheduling gas from different primary and alternate receipt points to different primary and alternate delivery points on the EPNG pipelines system is well known in the industry.

218.   The nomination and scheduling of natural gas transportation on the El Paso

52

Natural Gas Pipeline system is further complicated because the intrastate pipeline system in California cannot accommodate all of the natural gas designated for delivery via the interstate lines, causing a system imbalance. For example, the SoCalGas Topock delivery point is the most economically desirable delivery point for natural gas into California from the El Paso Natural Gas system. It is over-nominated by nearly three times. Nominations to flow gas were nearly 1500 MMcfd, while the takeaway capacity at the SoCalGas Topock gate was only 540 MMcf/d. Similarly, parties who hold firm capacity rights contracts with EPNG, including El Paso Merchant Energy, also over nominated and scheduled for gas to be brought in from the San Juan basin, the most economically desirable receipt point for natural gas flowing into California. In addition, market conditions were further complicated because the Kern River and Transwestern pipelines could also deliver gas to the PG&E Topock gate, where the El Paso Natural Gas system also delivers gas.

219.    To clear these imbalances and mismatches in nominations and scheduling, EPNG conducts a prorationing among all the contract holders of firm capacity on its system. The practice of prorating had been followed by EPNG for a number of years and is also well known in the natural gas industry. EPNG used unfair prorationing methods to determine how much, to which delivery point, and to which parties' accounts gas would be received and delivered on a daily basis.

220.    As a result of the pro-rationing, EPNG reduced the amount of gas it would deliver for all parties who had nominated gas for delivery with it on a daily basis. In other words, when nominations to deliver natural gas at a particular delivery point exceed the gate's takeaway capacity, EPNG allocated the firm capacity rights held by the different parties on a pro rata basis to match the gate's takeaway capacity. For example, even though SoCalGas may nominate its entire 540 MMcf/d for delivery to SoCal Topock gate, through proration, it may only receive half that amount or less if other shoppers also nominated the same amount of gas to be delivered to the same point. Due to massive over nominations of both firm and interruptible natural gas transportation, the EPNG system became unreliable and unpredictable. The prorationing method

53

1   created uncertainly with respect to the rights of the parties with firm transportation contract—no

2   shopper on the EPNG system could accurately predict how much gas they would receive at the

3   California border.

4         221.   At all relevant times, both EPNG and El Paso Merchant Energy knew that if El

5   Paso Merchant Energy acquired a large chunk of firm capacity on the EPNG system, the pro-

6   rationing would result in a significant amount of gas delivered for El Paso Merchant Energy's

7   account at the Southern California border.  The bid-rigging of the open season auction, and the

8   ensuing contract between EPNG and El Paso Merchant Energy, enabled El Paso Merchant

9   Energy to acquire a dominant position in the market  for "swing" or daily gas deliverable to

10  California.  By obtaining additional capacity in the rigged open season, El Paso Merchant

11  acquired a greater prorated share of natural gas t the California border points.  As a result, El

12  Paso controlled more natural gas than it required for its own use.

13        222.   Other natural gas purchasers in California, however, did not receive all the natural

14  gas they required.  Instead, these purchasers suffered a shortfall in supply because of the prorated

15  allocation process.  To accommodate their own or their customers' needs, California natural gas

16  purchasers must buy additional natural gas in the spot markets.  During these periods of high

17  demand, El Paso Merchant steps in and resells its excess natural gas in the spot markets at

18  inflated prices.

19        223.   As a result of the sham bidding process described above, El Paso Merchant, at all

20  relevant times, held primary rights to a significant portion of firm capacity serving Southern

21  California.  These capacity rights granted El Paso Merchant market power over the supply of

22  natural gas entering California at the Southwest border and in the benchmark Topock spot

23  market.  El Paso Merchant also thereby gained particularly tight control over the critical SoCal

24  Topock gate, which is economically the most desirable entry point for natural gas delivered to

25  California.  The conditions were such that, according to a July 31, 2000 report in Gas Daily, even

26  if a shipper received a little bit of gas at Topock, it meant "big money."

27        224.   Natural gas delivered to Southern California is important because the Kern River

28  54

1    Pipeline and the PG&E Gas Transmission—Northwest pipeline are fully subscribed and have

2    been running at 100% load factor since 1994, and natural gas received by these pipelines comes

3    from basins in the Rocky Mountains and Canada. Kern River and PG&E Gas Transmission—

4    Northwest serve as base load supplies of natural gas to California and are not a source of

5    marginal or elastic supplies. Since 1998, the Transwestern pipeline has also been running at full

6    capacity. As a result, gas supplies from these pipelines cannot be increased in response to price

7    increases.

8          225.    In addition, natural gas storage facilities located in Southern California require

9    access to SoCal's intrastate system and pipelines delivering gas to Northern California have

10   limited access to SoCal's system. The EPNG system, on the other hand, can deliver natural gas

11   to Northern California through PG&E's intrastate gas delivery system. For this reason, the El

12   Paso Natural Gas system, delivering natural gas into Southern California, has been the "swing"

13   pipeline providing supplies to California since at least 1998. The natural gas market at the

14   Southern California-Arizona border, particularly where the EPNG system delivers gas, sets the

15   price throughout California.

16         226.    In papers filed with the California Public Utilities commission, EPNG has

17   acknowledged the importance of its two pipelines as the "Swing pipelines" servicing California;

18   the importance of Southern California border price for natural gas in determining the price of

19   natural gas in California; and the importance of the gas delivered through its system in

20   establishing the price. EPNG also stated in these papers that the Southern California border price

21   for delivered gas is the market clearing price for California. According to its own analysis, each

22   $0.01 MMBtu increase in the Southern California border price results in about a $5.1 million

23   increase in the cost of natural gas in Northern California. The price leadership of the Topock

24   spot market was used by EPNG in evaluating competition between capacity holders on its

25   pipeline system.

26         227.    Trading of natural gas at the Topock delivery point was active on a daily basis at

27   all relevant times. According to a July 31, 2000 report in Natural Gas Intelligence, the "quantity

28                                                    55

of basis and financial transactions is heavily weighed towards Topock." Topock natural gas trading also got exclusive treatment on EOL, which, at all relevant times, was the major electronic trading system for natural gas transactions. Natural Gas Intelligence quoted traders commenting that, "Everyone who does business [in natural gas] in the West is looking at EOL" and "you always have a Topock buyer at [EOL]."

228.    Trading in the Topock spot market consists of two short-term segments: "Bidweek" and daily/weekly transactions. Bidweek is held at the end of each month, usually five business days prior to the pipelines' deadlines for submitting nominations, when the bulk of "baseload" trading in the spot market occurs. Baseload is the natural gas nominated to flow for the upcoming month. The second category of trading is generally conducted on a daily or weekly basis and dictates short-term flow of natural gas within one month. Transactions in these markets are not mutually exclusive, however. A purchaser could buy natural gas during Bidweek and then resell any unused portion in the weekly or daily market.

229.    Approximately 20% of California's daily natural gas supply is bought and sold in these border spot markets. The majority of the short-term trading volume occurs in the Topock spot market.

230.    In addition to being the marginal market for natural gas entering California, at least one Topock gate, PG&E Topock, also serves Northern California on a priority basis. Therefore, natural gas may flow from Topock throughout California and influence prices statewide.

231.    As a result of Defendants' secretly negotiated discounts and bid-rigging scheme, El Paso Merchant Energy acquired a significant share of the physical supply of natural gas delivered to California's Southwest border, which it then sold on the spot market. By controlling a substantial portion of deliverable natural gas, El Paso Merchant thereby controlled prices and suppressed competition in the Topock spot market. The other capacity holders, whose allocations were reduced, suffered a shortfall in their own requirements and were forced to purchase natural gas in the Topock spot market to make up for the deficiencies.

232.     Due to this prorationing at California's Southwest border, and the fact that the demand for natural gas is relatively inelastic, purchasers with a supply shortfall must buy enough natural gas to meet demand at any price.  In inelastic markets such as these, one participant that controls a sizeable percentage of supply can manipulate the market and cause price spikes.  By maintaining control over a substantial percentage of the deliverable natural gas in the Topock spot market, Defendants had the market power to control prices and to surpass competition.

233.     Defendants were able to further exercise control over the Topock spot market and thereby raise the benchmark price of natural gas delivered to California to astronomical levels. On November 22, 2000, when the demand for natural gas in California increased and when natural gas storage levels fell significantly, EPNG further allowed El Paso Merchant Energy to upgrade its Block 1 contract such that El Paso Merchant Energy was able to increase its priority shipping rights for an additional 100 MMcf/d of gas at the Topock delivery points at the expense of other shippers.  This upgrade was not specified in the earlier pro forma contract that EPNG had used at the time of the open season auction.  As a result of the upgrade, the amount of gas delivered to Southern California for El Paso Merchant Energy's account went up, as the gas delivered for the other shippers' accounts went down.

234.     El Paso Merchant Energy immediately utilized its upgraded rights to sell more bundled gas.

235.     In the prorationing scenario, the upgrade of El Paso Merchant Energy's rights further rendered firm and interruptible capacity unreliable.  On the other hand, bundled gas delivered at the border was reliable – it assured delivery.  El Paso Merchant Energy was solidly positioned to make substantial sales of bundled natural gas at the Southern California border on a daily basis.  Shortly after the contract upgrade, on December 12, 2000, spot natural gas prices at Topock hit a high of $59.42 per MMbtu – up from $2.84 just before El Paso Merchant Energy acquired the firm capacity.

236.     The Topock prices during the Class Period have far exceeded the national benchmark prices at the Henry Hub in Louisiana and the New York Mercantile Exchange

(NYMREX), where natural gas futures trade prices of natural gas at the wellheads in the Southwest basins closely follow the prices at the Henry Hub and the NYMEX. The basis, or the difference in the prices at the well heads in the Southwest basins and at the Topock gates, is generally dictated by the cost of transportation. In fact, at times, the prices at Topock have been lower than at the wellheads due to pipeline companies offering discounted transportation rates.

237. The average basis spread has historically been about 25 to 50 cents per MMBtu. During the Class Period, however, the basis for Bidweek prices exceeded $7/MMBtu. In the daily spot market, the basis spread spiked above $50/MMBtu in December 2000, and remained extremely volatile, varying from $6/MMBtu to $20/MMBtu during any given day. Even at $6, this basis spread was substantially greater than ever before. These increases are extremely costly to consumers. The California Energy Commission estimates that even a basis spread increase of $2/MMBtu costs California ratepayers approximately $15 million per day.

238. Because El Paso Merchant controlled significant quantities of natural gas at the Topock border points, it had the ability to control and manipulate prices for the marginal supply of natural gas coming into California. Since Topock is the benchmark market, high prices there result in high prices at all border points and increased natural gas prices throughout California.

239. Thus, Defendants El Paso Merchant and Mojave Pipeline had unfairly and anti-competitively negotiated a secret discounted downstream transportation price for the sole benefit of the El Paso defendants, which ultimately, along with the illegal conduct of the other defendants described above, contributed to substantial natural gas price increases. These secret negotiations had the following effects: (1) they allowed El Paso Merchant to make a higher bid for the 1,200 MMBtu of capacity since they knew that their downstream transportation costs would be lower, (2) they allowed El Paso Merchant to reap the benefits of a discounted downstream transportation rate; (3) they allowed El Paso Merchant to control the swing supply of natural gas into California; and (4) they allowed the El Paso defendants to reap substantial profits by charging artificially inflated gas prices in California.

**L.** **The El Paso Settlement in the State Litigation Did Not Release The Claims Asserted Against El Paso in This Case.**

240. The El Paso defendants settled certain California state law claims asserted in the state court litigation entitled *Natural Gas Antitrust Cases I, II, III and IV*, JCCP Nos. 4221, 4224, 4226 & 4228 (Superior Court, County of San Diego), and thereby obtained a release of the California state law claims asserted in that case. Those released claims are not reasserted in this case. However, the El Paso state court settlement did not cover or release any claims, state or federal, of co-generators, which claims make up a significant portion of the class claims in this case. Moreover, the El Paso state court settlement, as a matter of law, could not and did not release the federal antitrust claims of any member of the Class in this case. Federal antitrust claims cannot be brought in state court, and under California law, in order for *res judicata* to apply to claims not raised in a prior proceeding, the court rendering the prior judgment must have had jurisdiction to hear such claims.

**M.** **Defendants' Unlawful Actions Caused The Extraordinary Price Increases During The California Energy Crisis.**

241. Natural gas spot prices at the Southern California border were historically high in the summer of 2000 and the winter of 2000-2001, and as a result, natural gas prices to Plaintiffs, class members, and California consumers were also historically high. The acts of all Defendants as set forth above caused these price increases. Defendants' unlawful, unfair and anti-competitive practices materially raised natural gas prices and natural gas transportation rates to and into California. In fact, Defendants' anti-competitive, unfair and unlawful conduct was so successful in increasing the basis differential to the California border that the California-Arizona border spot price for the natural gas commodity skyrocketed from an already historical high of slightly less than $6/MMBtu in November 2000, to more than $50/MMBtu in December 2000. Spot gas prices in the Southwestern United States producing basins generally remained below $10MMBtu during these months.

242. Natural gas spot prices at the Southern California border were also high relative to

Henry Hub prices and the prices at other major trading centers.  The extreme and persistent basis differentials experienced at the Southern California border are evidence of a conspiratorial natural gas market.

243.    In December 2000, natural gas prices reached levels of $68/MMbtu at the SoCal/Topock delivery point.  During that month, over 2400 transactions for over 20 Bcf of gas took place at EOL for the SoCal/Topock delivery point at prices ranging from a low of $12.5 per MMbtu to a high of $68 per MMBtu.  Traders bought over 12 Bcf of gas and sold about 8 Bcf of gas through EOL during the month, resulting in only 4 Bcf of net purchases.

244.    On December 11, 2000, the day natural gas prices for the SoCal/Topock delivery point reached the highest-ever level of $68 per MMbtu, traders at EOL bought 1.03 Bcf of gas and sold 0.860 Bcf of gas, resulting in net purchases of only 172 MMcf for the day.  Prices for all transactions for the day, however, were extremely volatile and ranged from $34 to $68 per MMbtu.

## ACTIVE CONCEALMENT

245.    Defendants actively and fraudulently concealed their unlawful schemes to avoid detection by numerous actions which tolled any applicable statute of limitations, including among other things:

    a.    engaging in false reporting to agencies which published gas prices;

    b.    engaging in wash trades to secretly increase the prices of natural gas;

    c.    engaging in undisclosed churning and secret netting agreements; and

    d.    falsely denying the existence of their conspiratorial activity.

## INJURY AND DAMAGES

246.    Plaintiffs and the Class suffered injury to their business or property as a direct, foreseeable, and proximate result of Defendants' unlawful, conspiratorial price fixing alleged herein.

247.    Plaintiffs and the Class were deprived of the benefits of freely set, competitive prices for natural gas.

248.    Defendants' unlawful conduct was the proximate cause of the artificial inflation of prices in the market for natural gas. On information and belief, such effect on the market price for natural gas was necessary, intended and foreseeable to Defendants when they acted unlawfully.

249.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class suffered damages and were injured in their business and property by purchasing natural gas at artificially high prices.

250.    Plaintiffs are unable to state their damages, and those of the Class, with precision at this time.

## OFFENSES CHARGED

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (Against All Defendants)

251.    Paragraphs 1-183 and 241-250 of this Complaint are incorporated by reference as if fully set forth herein.

252.    During the period of time covered by this Complaint, Defendants and their co-conspirators have entered into a horizontal price-fixing conspiracy by engaging in the California natural gas market price manipulation activities as described above. Such collusive activity has eliminated price competition between and among Defendants.

253.    The activities set forth above have caused injury to Plaintiffs and the members of the Class by eliminating price competition among Defendants and causing prices to be higher than such prices would have been in the absence of those activities.

254.    The foregoing contracts, combinations, and conspiracies among the Defendants, and the Defendants' conduct in furtherance thereof, were in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

255.    As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the members of the Class have sustained injury, including but not

limited to paying supra-competitive prices for natural gas and have thus been injured in their

business and property by reason of the violations of law alleged herein.

### SECOND CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT

### (Against All Defendants)

256.    Paragraphs 1-183 and 241-255 of this Complaint are incorporated by reference as

if fully set forth herein.

257.    Defendants and their co-conspirators engaged in an agreement, trust, contract,

combination or conspiracy to stabilize and maintain at supra-competitive levels the price of

natural gas sold into the State of California to members of the Class. The overt acts and practices

in furtherance of this alleged agreement, trust contract, combination or conspiracy, among others,

include the following:

a.    to create and carry out unreasonable restrictions on the free flow of the
       trade and commerce described above;

b.    to increase the price of natural gas sold into California; and

c.    to prevent or restrain competition for the sale of natural gas.

258.    The combination and conspiracy consisted of a continuing express or tacit

combination, agreement, understanding, and concert of action among Defendants and their co-

conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the price of

natural gas sold in the State of California at supra-competitive levels.

259.    For the purpose of forming and effectuating the aforesaid combination and

conspiracy, Defendants and their co-conspirators have done those things which they agreed and

conspired to do, including, among other things:

a.    raising, fixing, stabilizing, and maintaining the price of natural gas in
       California;

b.    engaging in wash trades in order to cause the price of natural gas to increase:

c.    reporting false prices to the natural gas indices; and

d.    discussing, exchanging, and deciding among themselves, and acting in agreement to raise the price of natural gas sold in the State of California.

260.    The combination and conspiracy has had the following effects, among others:

a.    buyers of natural gas were deprived of free and open competition in the market:

b.    the price of natural gas sold by Defendants and their co-conspirators were raised, fixed, and maintained at artificial and anticompetitive levels.

261.    As a direct and proximate result of Defendants' unlawful conduct. Plaintiffs and members of the Class have been injured in their business and property in that they paid more for natural gas than they otherwise would have paid in the absence of Defendant's unlawful conduct.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF CALIFORNIA BUSINESS

## & PROFESSIONS CODE, §§ 17200, *ET SEQ*

### (Against All Defendants)

262.    Paragraphs 1-183 and 241-261 of this Complaint are incorporated by reference as if fully set forth herein.

263.    Defendant's course of conduct, acts and practices described herein are in violation of the California Business & Professions Code, Section 17200, *et seq*. Defendants, and each of them, violated Section 17200, California Business & Professions Code, as primary violators, co-conspirators, and aiders and abettors of each others' conduct.

264.    The unlawful, unfair and deceptive business practices of Defendants, as alleged herein, injured members of the public in that Defendants' conduct restrained competition, caused Plaintiffs and the Class they represent to pay supra-competitive and artificially-inflated prices for natural gas, and made it likely that members of the public have been and will continue to be

deceived with respect to the manner in which the prices charged for natural gas have been set.

265.    As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendant' unfair competition.  Plaintiffs and the members of the Class are entitled to equitable relief, including restitution and/or disgorgement of all revenue, earnings, profits, and compensation which may have been obtained by Defendants as a result of such business practices, pursuant to Section 17200, *et seq.*, California Business & Professions Code.

### FOURTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

### (Against All Defendants)

266.    Paragraphs 1-183 and 241-265 of this Complaint are incorporated by reference as if fully set forth herein.

267.    As a result of the conduct alleged above, Defendants and each of them have been unjustly enriched at the expense of Plaintiffs and the members of the Class and the law thereby implies a contract by which Defendants must pay to Plaintiffs and the Class the amount by which, in equity and good conscience, the Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

### FIFTH CLAIM FOR RELIEF

### CONSTRUCTIVE TRUST

### (Against All Defendants)

268.    Paragraphs 1-183 and 241-267 of this Complaint are incorporated by reference as if fully set forth herein.

269.    Defendants will be unjustly enriched at Plaintiffs' expense if a constructive trust is not imposed on the assets of Defendants and the proceeds from the sale of any of those assets.

### SIXTH CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (Against the El Paso and Sempra Defendants Only)

270.     Paragraphs 1-30, 46-61, 66-67, 75-124, 184-193 and 241-250 of this Complaint are incorporated by reference as if fully set forth herein.

271.     This Claim for Relief is asserted against the El Paso and Sempra Defendants only.

272.     During the period of time covered by this Complaint, the El Paso and Sempra Defendants and their co-conspirators entered into a horizontal conspiracy by their agreement to restrict capacity and other activities in the California natural gas market as described above. Such collusive activity has eliminated price competition for natural gas in California.

273.     The activities set forth above have caused injury to Plaintiffs and the members of the Class by reducing the supply of natural gas and causing prices to be higher than such prices would have been in the absence of those activities.

274.     The foregoing contracts, combinations, and conspiracies among the El Paso and Sempra Defendants, and the El Paso and Sempra Defendants' conduct in furtherance thereof, were in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

275.     As a direct and proximate result of the El Paso and Sempra Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the members of the Class have sustained injury, including but not limited to paying supra-competitive prices for natural gas and have thus been injured in their business and property by reason of the violations of law alleged herein.

**SEVENTH CLAIM FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

**(Against the El Paso Defendants Only)**

276.     Paragraphs 1-30, 46-61, 75-124, and 194-250 of this Complaint are incorporated by reference as if fully set forth herein.

277.     This Claim for Relief is asserted against the El Paso Defendants only.

278.     During the period of time covered by this Complaint, the El Paso Defendants and their co-conspirators entered into an unlawful conspiracy by engaging in the bid-rigging scheme and other activities in the California natural gas market as described above. Such collusive activity has eliminated price competition for natural gas in California.

279.    The activities set forth above have caused injury to Plaintiffs and the members of the Class by eliminating price competition for natural gas and causing prices to be higher than such prices would have been in the absence of those activities.

280.    The foregoing contracts, combinations, and conspiracies among the El Paso Defendants, and the El Paso Defendants' conduct in furtherance thereof, were in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

281.    As a direct and proximate result of the El Paso Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the members of the Class have sustained injury, including but not limited to paying supra-competitive prices for natural gas and have thus been injured in their business and property by reason of the violations of law alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment, for themselves and the Class, against Defendants, jointly and severally, as follows:

On the First, Second, Third, Fourth, and Fifth Claims for Relief:

A.    Determining and declaring that this action may be maintained as a class action on behalf of the Class;

B.    Determining and declaring that Defendants have engaged in an unlawful contract, combination, and/or conspiracy constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    Determining and declaring that Defendants have engaged in an agreement, trust, contract, combination, and conspiracy in violation of California Business and Professions Code, section 16750(a), and that Plaintiffs and the members of the Class have been damaged and injured in their business and property as a result of this violation;

D.    Determining and declaring that the alleged combination and conspiracy among Defendants be adjudged and decreed to be an unreasonable restraint of trade in violation of the Cartwright Act;

E.    Determining and declaring that Defendants' conduct constitutes unlawful, unfair

66

1   and/or fraudulent business practices within the meaning of California's unfair competition law,

2   California Business and Professions Code, section 17200, *et seq.*;

3         F.      Determining and declaring that judgment be entered against Defendants, jointly

4   and severally, and in favor of Plaintiffs and the Class for damages, restitution, and disgorgement

5   of ill-gotten gains as allowed by law and equity as determined to have been sustained by them,

6   together with the costs of suit, including reasonable attorneys' fees;

7         G.      Determining and declaring that each of the Defendants, their successors, assigns,

8   subsidiaries, and transferees, and their respective officers, directors, agents, and employees, and

9   all other persons acting or claiming to act on behalf of them or in concert with them, be

10   perpetually enjoined and restrained from in any manner, directly or indirectly, continuing,

11   maintaining, or renewing the combination and conspiracy alleged herein;

12         H.      Awarding treble the amount of actual damages determined to have been sustained

13   by Plaintiffs and the Class as a result of the conduct of Defendants complained of herein as

14   provided by law, and that judgment be entered against each Defendant for the amount so

15   determined;

16         I.      Awarding to Plaintiffs and the Class statutory damages, punitive or exemplary

17   damages, attorneys' fees, costs and disbursements;

18         J.      Awarding to Plaintiffs and the Class pre- and post-judgment interest to the extent

19   allowed by law;

20         K.      Awarding to Plaintiffs and the Class equitable relief, including a judicial

21   determination of the rights and responsibilities of the parties in all practicable injunctive relief;

22         L.      Awarding to Plaintiffs and the Class equitable relief including restitution and/or

23   disgorgement of all revenues, earnings, profits, compensation and benefits which may have

24   unjustly enriched Defendants as a result of their wrongful conduct;

25         M.      Order that a constructive trust be imposed on the assets of all Defendants and the

26   proceeds from the sale of any of those assets; and

27         O.      Awarding to Plaintiffs and the Class costs of suit and such other and further relief

28

1    as the Court may deem just and proper under the circumstances.

2           On the Sixth and Seventh Claims for Relief:

3           P.     Determining and declaring that this action may be maintained as a class action on

4    behalf of the Class;

5           Q.     Determining and declaring that Defendants have engaged in unlawful contracts,

6    combinations, and/or conspiracies constituting an unreasonable restraint of trade in violation of

7    Section 1 of the Sherman Act;

8           R.     Determining and declaring that each of the Defendants, their successors, assigns,

9    subsidiaries, and transferees, and their respective officers, directors, agents, and employees, and

10   all other persons acting or claiming to act on behalf of them or in concert with them, be

11   perpetually enjoined and restrained from in any manner, directly or indirectly, continuing,

12   maintaining, or renewing the combinations and conspiracies alleged herein:

13          S.     Awarding treble the amount of actual damages determined to have been sustained

14   by Plaintiffs and the Class as a result of the conduct of Defendants complained of herein as

15   provided by law, and that judgment be entered against each Defendant for the amount so

16   determined:

17          T.     Awarding to Plaintiffs and the Class pre- and post-judgment interest to the extent

18   allowed by law;

19          U.     Awarding to Plaintiffs and the Class their attorneys' fees; and

20   . . .

21   . . .

22   . . .

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28                                                    68

1         V.     Awarding to Plaintiffs and the Class costs of suit and such other and further relief

2    as the Court may deem just and proper under the circumstances.

3

4    Dated: July 8, 2005                           Respectfully submitted,

5

6                                           By _____
                                           NATHAN REINMILLER

7                                         J. BRUCE ALVERSON (NV Bar No. 1339)
                                         NATHAN REINMILLER (NV Bar No. 6793)

8                                       ALVERSON TAYLOR MORTENSEN
                                            & SANDERS

9                                       7401 West Charleston Blvd.
                                         Las Vegas, NV 89117

10                                      Telephone:    (702) 384-7000
                                         Facsimile:    (702) 385-7000

11

12                                      Attorneys for Plaintiffs

13

14   MICHAEL J. BONI                  CRAIG C. CORBITT
     CHRISTINA DONATO SALER        JUDITH A. ZAHID
     KATE REZNICK                    ANNA C. CONLEY

15   KOHN, SWIFT & GRAF, PC        ZELLE, HOFMANN, VOELBEL, MASON
     One South Broad Street, Suite 2100      & GETTE, LLP

16   Philadelphia, PA 19107          44 Montgomery Street, Suite 3400
     Telephone:    (215) 238-1700    San Francisco, CA 94104

17   Facsimile:    (215) 238-1968    Telephone:    (415) 693-0700
                                       Facsimile:    (415) 693-0770

18   Co-Lead Counsel and

19   Attorneys for Plaintiff Utility Savings   Co-Lead Counsel and
     & Refund Services, LLP          Attorneys for Plaintiff Fairhaven Power Company

20   JEROLD B. HOFFMAN          SUSAN G. KUPFER
     MARC H. EDELSON           GLANCY BINKOW & GOLDBERG LLP

21   HOFFMAN & EDELSON        455 Market Street, Suite 1810
     65 W. Court Street           San Francisco, CA 94105

22   Doylestown, PA 18901        Telephone:    (415) 972-8160
     Telephone: (215) 230-8043     Facsimile:    (415) 972-8166

23   Facsimile: (215) 230-8735

24   Co-Lead Counsel and          Co-Lead Counsel and
     Attorneys for Plaintiff Utility Savings   Attorneys for Plaintiff Abelman Art Glass

25   & Refund Services, LLP

26

27

28                                     69

1
2
3
4

W. TIMOTHY NEEDHAM
JANSSEN, MALLOY. NEEDHAM,
MORRISON
    REINHOLTSEN & CROWLEY, LLP
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Telephone:   (707) 445-2071
Facsimile:   (707) 445-8305

FRANCIS O. SCARPULLA
LAW OFFICES OF FRANCIS O. SCARPULLA
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:   (415) 788-7210
Facsimile:   (415) 788-0707

5
6

Attorneys for Plaintiff Fairhaven Power
Company

Attorneys for Plaintiff Fairhaven Power
Company

7
8
9
10

JOSEF D. COOPER
COOPER & KIRKHAM, P.C.
655 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:   (415) 788-3030
Facsimile:   (415) 882-7040

MICHAEL P. LEHMANN
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA  94104
Telephone:   (415) 433-2070
Facsimile:   (415) 982-2076

11

Attorneys for Plaintiff Fairhaven Power
Company

Attorneys for Plaintiff Fairhaven Power
Company

12
13
14
15
16
17

GUIDO SAVERI
R. ALEXANDER SAVERI
LISA SAVERI
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111
Telephone:   (415) 217-6810
Facsimile:   (415) 217-6813

DENNIS STEWART
BLAKE M. HARPER
HULETT HARPER STEWART LLP
550 West C Street, Suite 1600
San Diego, CA  92101
Telephone:   (619) 338-1133
Facsimile:   (619) 338-1139

Attorneys for Plaintiff Utility Savings & Refund
Services, LLP

18

Attorneys for Plaintiff Abelman Art Glass

19
20
21
22
23
24
25
26
27
28

1                    **DEMAND FOR JURY TRIAL**

2          Pursuant to the Federal Rules of Civil Procedure, Rule 38(b), Plaintiffs and the Class

3 demand a trial by jury of all the claims asserted in this Complaint so triable.

4 Dated: July 8, 2005                    Respectfully submitted,

5

6                                  By
                                 NATHAN REINMILLER

7

8                                  J. BRUCE ALVERSON (NV Bar No. 1339)
                                 NATHAN REINMILLER (NV Bar No. 6793)
                                 ALVERSON TAYLOR MORTENSEN

9                                       & SANDERS
                                 7401 West Charleston Blvd.

10                                  Las Vegas, NV  89117
                                 Telephone:      (702) 384-7000

11                                  Facsimile:      (702) 385-7000

12                                  Attorneys for Plaintiffs

13

14 MICHAEL J. BONI                      CRAIG C. CORBITT
    CHRISTINA DONATO SALER         JUDITH A. ZAHID

15     KATE REZNICK                       ANNA C. CONLEY
    KOHN, SWIFT & GRAF, PC          ZELLE, HOFMANN, VOELBEL, MASON

16     One South Broad Street, Suite 2100        & GETTE, LLP
    Philadelphia, PA  19107            44 Montgomery Street, Suite 3400

17     Telephone:      (215) 238-1700        San Francisco, CA  94104
    Facsimile:      (215) 238-1968        Telephone:      (415) 693-0700

18                                   Facsimile:      (415) 693-0770

19     Co-Lead Counsel and
    Attorneys for Plaintiff Utility Savings    Co-Lead Counsel and
    & Refund Services, LLP            Attorneys for Plaintiff Fairhaven Power Company

20

21     JEROLD B. HOFFMAN           SUSAN G. KUPFER
    MARC H. EDELSON             GLANCY BINKOW & GOLDBERG LLP

22     HOFFMAN & EDELSON          455 Market Street, Suite 1810
    65 W. Court Street               San Francisco, CA  94105

23     Doylestown, PA 18901            Telephone:      (415) 972-8160
    Telephone: (215) 230-8043         Facsimile:      (415) 972-8166

24     Facsimile: (215) 230-8735

25     Co-Lead Counsel and              Co-Lead Counsel and
    Attorneys for Plaintiff Utility Savings    Attorneys for Plaintiff Abelman Art Glass
    & Refund Services, LLP

26

27

28                                    71

| | |
|---|---|
| 1 | W. TIMOTHY NEEDHAM<br>JANSSEN, MALLOY, NEEDHAM,<br>MORRISON<br>    REINHOLTSEN & CROWLEY, LLP<br>730 Fifth Street, Post Office Drawer 1288<br>Eureka, CA 95502<br>Telephone:    (707) 445-2071<br>Facsimile:    (707) 445-8305 | FRANCIS O. SCARPULLA<br>LAW OFFICES OF FRANCIS O. SCARPULLA<br>44 Montgomery Street, Suite 3400<br>San Francisco, CA 94104<br>Telephone:    (415) 788-7210<br>Facsimile:    (415) 788-0707 |

1 W. TIMOTHY NEEDHAM
FRANCIS O. SCARPULLA

2 JANSSEN, MALLOY, NEEDHAM,
MORRISON
LAW OFFICES OF FRANCIS O. SCARPULLA
44 Montgomery Street, Suite 3400

3     REINHOLTSEN & CROWLEY, LLP
730 Fifth Street, Post Office Drawer 1288
San Francisco, CA 94104
Telephone:    (415) 788-7210

4 Eureka, CA 95502
Telephone:    (707) 445-2071
Facsimile:    (707) 445-8305
Facsimile:    (415) 788-0707

5 Attorneys for Plaintiff Fairhaven Power
Company
Attorneys for Plaintiff Fairhaven Power
Company

6

7 JOSEF D. COOPER
MICHAEL P. LEHMANN

8 COOPER & KIRKHAM, P.C.
655 Montgomery Street, 17th Floor
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor

9 San Francisco, CA 94111
Telephone:    (415) 788-3030
San Francisco, CA 94104
Telephone:    (415) 433-2070

10 Facsimile:    (415) 882-7040
Facsimile:    (415) 982-2076

11 Attorneys for Plaintiff Fairhaven Power
Company
Attorneys for Plaintiff Fairhaven Power
Company

12

13 GUIDO SAVERI
R. ALEXANDER SAVERI
DENNIS STEWART
BLAKE M. HARPER

14 LISA SAVERI
SAVERI & SAVERI, INC.
HULETT HARPER STEWART LLP
550 West C Street, Suite 1600

15 111 Pine Street, Suite 1700
San Francisco, CA 94111
San Diego, CA 92101
Telephone:    (619) 338-1133

16 Telephone:    (415) 217-6810
Facsimile:    (415) 217-6813
Facsimile:    (619) 338-1139

17

18 Attorneys for Plaintiff Abelman Art Glass
Attorneys for Plaintiff Utility Savings & Refund
Services, LLP

19

20

21

22

23

24

25

26

27

28

72

3159012v1

## PROOF OF SERVICE

I hereby certify and declare under penalty of perjury that I am a citizen of the United States; am over the age of 18 years; am employed by Alverson, Taylor, Mortensen & Sanders; and that I served a true and correct copy of the foregoing **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND CALIFORNIA ANTITRUST LAWS** today by depositing the same in the United States mail with first-class postage thereon fully prepaid addressed to the following:

**PLAINTIFFS:**

| | |
|---|---|
| Craig C. Corbitt (Cal S.B. 83251)<br>Judith A. Zahid<br>Anna C. Conley<br>ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP<br>44 Montgomery Street, Suite 3400<br>San Francisco, CA 94104<br>Telephone:   (415) 693-0700<br>Facsimile:   (415) 693-0770<br>Email: ccorbitt@zelle.com | Josef D. Cooper<br>COOPER & KIRKHAM, P.C.<br>655 Montgomery Street, 17th Floor<br>San Francisco, CA 94111<br>Telephone:   (415) 788-2020<br>Facsimile:   (415) 882-7040<br>Email: coopkirk@aol.com |
| Michael P. Lehmann<br>THE FURTH FIRM<br>225 Bush Street, Suite 1500<br>San Francisco, CA 94104<br>Telephone:   (415) 433-2070<br>Facsimile:   (415) 982-2076<br>Email: michael@furth.com | Susan G. Kupfer<br>GLANCY BINKOW & GOLDBERG LLP<br>455 Market Street, Suite 1810<br>San Francisco, CA 94105<br>Telephone:   (415) 972-8160<br>Facsimile:   (415) 972-8166<br>Email: skupfer@glancylaw.com |
| Jerold B. Hoffman<br>Marc H. Edelson<br>Allan M. Hoffman<br>HOFFMAN & EDELSON LLC<br>45 W. Court Street<br>Doylestown, PA 18901<br>Telephone:   (215) 230-8043<br>Facsimile:   (215) 230-8735<br>Email: jhoffman@hofedlaw.com<br>Email: ahoffman@hofedlaw.com | Dennis Stewart<br>Blake M. Harper<br>Bridget Fogarty Gramme<br>HULETT HARPER STEWART LLP<br>550 West C Street, Suite 1600<br>San Diego, CA 92101<br>Telephone:   (619) 338-1133<br>Facsimile:   (619) 338-1139<br>Email: dstewart@hulettharper.com |
| W. Timothy Needham<br>JANSSEN, MALLOY, NEEDHAM, MORRISON REINHOLTSEN & CROWLEY, LLP<br>730 Fifth Street, Post Office Drawer 1288<br>Eureka, CA 95502<br>Telephone:   (707) 445-2071<br>Facsimile:   (707) 445-8305<br>Email: tneedham@janssenlaw.com | Michael J. Boni<br>Christina Donato Saler<br>Kate Reznick<br>KOHN SWIFT & GRAF PC<br>One South Broad Street, Suite 2100<br>Philadelphia, PA 19107<br>Telephone:   (215) 238-1700<br>Facsimile:   (215) 238-1968<br>Email: mboni@kohnswift.com |

| Guido Saveri | Francis O. Scarpulla |
|---|---|
| R. Alexander Saveri | LAW OFFICES OF FRANCIS O. |
| Lisa Saveri | SCARPULLA |
| SAVERI & SAVERI, INC. | 44 Montgomery Street, Suite 3400 |
| 111 Pine Street, Suite 1700 | San Francisco, CA 94104 |
| San Francisco, CA 94111 | Telephone:     (415) 788-7210 |
| Telephone:     (415) 217-6810 | Facsimile:     (415) 882-7040 |
| Facsimile:     (415) 217-6813 | Email: foslaw@pacbell.com |
| Email: guido@saveri.com | |

**DEFENDANTS:**

| John L. Henricks | J. Gregory Copeland |
|---|---|
| AKIN GUMP STRAUSS HAUER & FELD LLP | BAKER BOTTS LLP |
| 1700 Pacific Avenue, Suite 4100 | One Shell Plaza |
| Dallas, TX 75201 | 910 Louisiana Street |
| Telephone:     (214) 969-2800 | Houston, TX 77002-4994 |
| Facsimile:     (214) 969-4343 | Telephone:     (713) 229-1234 |
| Email: jhendricks@akingump.com | Facsimile:     (713) 229-1522 |
| *Attorneys for Defendant Centerpoint Energy Inc.* | Email: greg.copeland@bakerbotts.com |
| | *Attorneys for Defendants Reliant Energy Services, Inc.; Reliant Resources, Inc.* |
| Joel B. Kleinman | Jeffrey Shohet |
| DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP | DLA PIPER RUDNICK GRAY CARY US LLP |
| 2101 L Street, NW | 4366 Executive Drive, Suite 1100 |
| Washington, DC 20037-1526 | San Diego, CA 92121-2133 |
| Telephone:     (202) 785-9700 | Telephone:     (858) 677-1400 |
| Facsimile:     (202) 887-0689 | Facsimile:     (858) 677-1477 |
| Email: kleinmanj@dsmo.com | Email: jeffrey.shohet@dlapiper.com |
| *Attorneys for Defendants Duke Energy Trading & Marketing LLC; Duke Energy Corporation* | *Attorneys for Defendant Williams Companies, Inc.* |
| Joshua D. Lichtman | Richard P. Levy |
| FULBRIGHT & JAWORSKI LLP | GIBSON, DUNN & CRUTCHER, LLP |
| 555 South Flower Street, Suite 4100 | 333 South Grand Avenue |
| Los Angeles, CA 90017 | Los Angeles, CA 90071 |
| Telephone:     (213) 892-9200 | Telephone:     (213) 229-7000 |
| Facsimile:     (213) 892-9494 | Facsimile:     (213) 229-7520 |
| Email: jlichtman@fulbright.com | Email: rplevy@gibsondunn.com |
| *Attorneys for Defendant Coral Energy Resources LP* | *Attorneys for Defendant Sempra Energy Corp.* |

| | |
|---|---|
| Jonathan Abram<br>HOGAN & HARTSON LLP<br>555 Thirteenth Street, NW<br>Washington, D.C. 20004-1109<br>Telephone: (202) 637-5600<br>Facsimile: (202) 637-5910<br>Email: jlabram@hhlaw.com<br>*Attorneys for Defendant American Electric*<br>*Power Service Corporation* | David T. Peterson<br>MORGAN LEWIS & BOCKIUS LLP<br>300 South Grand Avenue, Suite 2200<br>Los Angeles, CA 90071-3132<br>Telephone: (213) 612-2500<br>Facsimile: (213) 612-2501<br>Email: dpeterson@morganlewis.com<br>*Attorneys for Defendant Xcel Energy Inc.* |
| Diane E. Pritchard<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA 94105-2482<br>Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522<br>Email: dpritchard@mofo.com<br>*Attorneys for Defendant El Paso Corporation* | Douglas R. Tribble<br>PILLSBURY WINTHROP SHAW<br>PITTMAN LLP<br>101 West Broadway, Suite 1800<br>San Diego, CA 92101<br>Telephone: (619) 234-5000<br>Facsimile: (619) 236-1995<br>Email: douglas.tribble@pillsburylaw.com<br>*Attorneys for Defendants Dynegy Holding*<br>*Co., Inc.; West Coast Power LLC* |
| Barry S. Hyman<br>William M. Hannay<br>Samantha C. Norris<br>SCHIFF HARDIN LLP<br>6600 Sears Tower<br>Chicago, IL 60606<br>Telephone: (312) 258-5500<br>Facsimile: (312) 258-5600<br>Email: bhyman@schiffhardin.com<br>*Attorneys for Defendants Dynegy, Inc., and*<br>*Dynegy Marketing & Trade* | Mark E. Haddad<br>SIDLEY AUSTIN BROWN & WOOD LLP<br>555 West 5th Street, 40th Floor<br>Los Angeles, CA 90013<br>Telephone: (213) 896-6000<br>Facsimile: (213) 896-6600<br>Email: hskinazi@sidley.com<br>*Attorney for Defendant CMS Energy*<br>*Corporation* |
| Alan Z. Yudkowsky<br>STROOCK & STROOCK & LAVAN LLP<br>2029 Century Park East, Suite 1800<br>Los Angeles, CA 90067-3086<br>Telephone: (310) 556-5800<br>Facsimile: (310) 556-5959<br>Email: ayudkowsky@stroock.com<br>*Attorneys for Sempra Energy Trading Corp.* | Robert A. Sacks<br>SULLIVAN & CROMWELL LLP<br>1888 Century Park East, 21st Floor<br>Los Angeles, CA 90067-1725<br>Telephone: (310) 712-6600<br>Facsimile: (310) 712-8800<br>Email: sacksr@sullcrom.com<br>*Attorneys for Defendants Encana*<br>*Corporation; WD Energy Services, Inc.* |

Dated this 8th day of July, 2005.

By: _____

An employee of Alverson, Taylor, Mortensen & Sanders