UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WESTERN STATES WHOLESALE | ) | MDL Docket No. 1566 |
| NATURAL GAS ANTITRUST | ) | |
| LITIGATION | ) | Base Case File No. CV-S-03-1431 |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *Arandell Corp., et al. v. Xcel Energy, Inc., et al.* | ) | Case No.: CV-S-07-1019-PMP (PAL) |
| *(Western District of Wisconsin Case* | ) | |
| *No. 07-C-0076-C)* | ) | |
| | ) | |

---

## SECOND AMENDED COMPLAINT

---

The plaintiffs Arandell Corporation, Merrick's, Inc., Safety-Kleen Systems, Inc., and Sargento Foods Inc., on behalf of themselves and all others similarly situated, by their attorneys, for their second amended complaint, allege as follows:

1.      This is a class action pursuant to the Wisconsin Antitrust Act (Wis. Stat. ch. 133), brought by and on behalf of Wisconsin commercial entities (businesses, industrial operations and institutions, including schools, colleges and hospitals) that purchased natural gas between January 1, 2000 and October 31, 2002 (the "Relevant Time Period").

### NATURAL GAS AND WISCONSIN COMMERCE

2.      Each year, Wisconsin consumes over 350,000,000 thousand cubic feet (Mcf) of natural gas. That translates (depending on the price) to an expense to the Wisconsin economy of between 1.75 and 3.5 billion dollars per year, in a state that has a total gross domestic product

**EXHIBIT A**

(total value of goods and services produced in the state) of only 215 billion dollars per year. During the Relevant Time Period, Wisconsin consumed over one billion Mcf of natural gas.

3.      Natural gas plays a primary role in the Wisconsin economy, as it is used as a heating fuel for many buildings, generates a substantial percentage of the electricity consumed, and is the primary energy source for many industries (including such major Wisconsin industries as the metal working, food processing, brewing and dairy processing industries).  As President Bush said in speech given in Appleton, Wisconsin in 2004, "[n]atural gas is absolutely vital for many manufacturers in Wisconsin."

4.      Wisconsin produces no natural gas.  All natural gas consumed in Wisconsin is produced elsewhere.  Additionally, most companies that trade in natural gas, including trading natural gas that is consumed in Wisconsin, do not have their principal places of business or trading desks located in Wisconsin.  Because of this, a conspiracy relating to natural gas prices has a greater impact on Wisconsin commerce than such a conspiracy would have on commerce in many other states.  A conspiracy to manipulate natural gas prices, while economically benefiting the economies of some other states—such as Texas, Oklahoma and other states where producers and traders of natural gas tend to concentrate—has only negative consequences in Wisconsin.

5.      The price manipulation conspiracy engaged in by the defendants during the Relevant Time Period had a profoundly negative impact on commercial entities in Wisconsin. For example, according to the Energy Information Agency, the city gate price for natural gas in Wisconsin increased from a price of $2.94 Mcf in January 2000, to a price of $9.92 Mcf in January 2001.  The average monthly price for natural gas commercial consumers in Wisconsin (including institutional consumers but not industrial consumers) increased from $5.03 per Mcf in

January 2000, to $11.05 per Mcf in January 2001.  On information and belief, this was a

historically unprecedented change in prices, which cannot be explained by a shortage of natural

gas, or an increase in demand for natural gas.   According to the Energy Information Agency,

this change in prices resulted in the average annual price for commercial consumers increasing

from a price per Mcf of $4.84 in 1999, to $6.32 in 2000, and then to $7.55 in 2001.  Because of

this, Wisconsin commercial consumers paid over one hundred million dollars more for natural

gas in just 2001 compared to 2000.  The conspiracy engaged in by the defendants also increased

price volatility in the natural gas market, which caused commercial entities in Wisconsin to incur

greater expenses associated with hedging natural gas costs.  The conspiracy injured Wisconsin

commercial entities in Wisconsin, including the plaintiffs, by among other things, depriving

them of the right and ability to make risk management, resource allocation and other financial

decisions relating to natural gas, in a full and free competitive market.

<u>**OVERVIEW OF PLAINTIFFS' CAUSES OF ACTION**</u>

6.      The plaintiffs allege in this case two causes of action, the first under Wis. Stat.

§ 133.14 (Wisconsin's "Full Consideration Antitrust Statute") and the second under Wis. Stat.

§ 133.18 (Wisconsin's "Treble Damages Antitrust Statute").

7.      Under the first cause of action, the plaintiffs seek a declaratory judgment that

certain natural gas contracts and agreements made during the Relevant Time Period are void

pursuant to Wis. Stat. § 133.14.  The grounds for such a ruling are that during the Relevant Time

Period the defendants were members of a conspiracy prohibited by Wis. Stat. § 133.03.

Specifically, the defendants are sellers of natural gas, and during the Relevant Time Period each

of them conspired to restrain trade or commerce relating to natural gas.  As such, the contracts or

agreements that relate to Wisconsin for the sale of natural gas that were made by the defendants

while in the conspiracy—which contracts or agreements were founded upon, were the result of, grew out of or were connected with the conspiracy, either directly or indirectly—are void pursuant to Wis. Stat. § 133.14. The plaintiffs request that the Court formally declare those contracts or agreements void pursuant to Wis. Stat. 806.04, Wisconsin's Uniform Declaratory Judgment Act.

8. Wis. Stat. § 133.14 further provides that because the defendants were members of a conspiracy prohibited by Wis. Stat. § 133.03, none of them may recover on, or benefit from, any such void contract. Furthermore, under the second sentence of Wis. Stat. § 133.14, the plaintiffs are entitled to recover from the defendants the payments they made for natural gas during the Relevant Time Period, to the full extent that the defendants benefited from those payments. Wis. Stat. § 133.03 and § 133.14 are remedial, punitive statutes, which were created by the Wisconsin legislature to deter companies from engaging in price collusion, so as to protect the free market system. The legislature wanted to deter price collusion so that the benefits of free market lower prices—which benefits can and should flow to the public—are not denied by unlawful collusion. Because the defendants violated Wis. Stat. § 133.03 and because those agreements are void under Wis. Stat. § 133.14, plaintiffs are entitled to recover from the defendants in this action the full amount of the payments the plaintiffs made for natural gas during the Relevant Time Period.

9. Under the second separate and independent cause of action, the plaintiffs allege that the defendants violated Wis. Stat. § 133.03. Specifically, the defendants are sellers of natural gas, and during the Relevant Time Period, the defendants violated Wis. Stat. § 133.03 by conspiring to restrain trade or commerce relating to natural gas. The plaintiffs were directly or indirectly injured by such conduct. As such, the plaintiffs are entitled pursuant to Wis. Stat.

§ 133.18 to recover three times the damages sustained by them from the defendants, reduced after trebling by any payments actually recovered by the plaintiffs under the plaintiffs' claim under Wis. Stat. § 133.14.

10.     Although the federal government, through the Federal Energy Regulatory Commission, regulates a small portion of sales of natural gas in the United States, the plaintiffs herein do not seek to recover damages for any sales the price of which is set via a regulatory procedure by the Federal Energy Regulatory Commission.  The natural gas transactions that are the subject of this case were deregulated pursuant to various statutory provisions (*see,* The Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3301(21) (1994) (first sales are defined in § 2(21)); Section 601(a)(1)(C) of the NGPA, as amended by the Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60) (no FERC jurisdiction over first sales); The Energy Policy Act of 1992, 15 U.S. Code § 3431 and pursuant to Federal Energy Regulatory Commission Order No. 547, 61 FERC 61281 (November 30, 1992), Order No. 636, 57 FERC 30939 (April 8, 1992, and Order No. 636-A, 57 FERC 36128 (August 12, 1992)).

## **PLAINTIFFS**

11.     Plaintiff Arandell Corporation is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Menomonee Falls, Wisconsin.  Arandell Corporation is a leading printer of catalogs for retailers.

12.     Plaintiff Merrick's, Inc. is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Middleton, Wisconsin.  Merrick's, Inc. is a leading manufacturer and processor of baby animal feed products.

13.     Plaintiff Safety-Kleen Systems, Inc. is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Plano, Texas, and

operations in several localities in Wisconsin.  Safety-Kleen Systems, Inc. is a leading provider of environmental and recycling services and products.  During the Relevant Time Period, Safety-Kleen Systems, Inc. purchased natural gas from defendant Northern States Power Company.

14.     Plaintiff Sargento Foods Inc. is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Plymouth, Wisconsin. Sargento Foods Inc. is a leading processor and distributor of cheese.

15.     Plaintiff Ladish Co., Inc. is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Cudahy, Wisconsin.  Ladish designs and manufactures high-strength forged and cast metal components for aerospace and industrial markets.  It is one of the largest users of natural gas in the state of Wisconsin, each year purchasing several million dollars worth of natural gas for its operations.  During the Relevant Time Period, Ladish purchased natural gas from defendants Reliant Energy Services, Inc. (d/b/a "Reliant Energy") and CenterPoint (d/b/a "CenterPoint Energy"), also known as CenterPoint Energy Marketing, Inc., CenterPoint Energy Gas Services, Inc., and Reliant Energy Retail, Inc.

## **DEFENDANTS**

### A.     **The ONEOK Defendants:  ONEOK Inc. and ONEOK Energy Marketing and Trading Company, L.P.**

16.     Defendant ONEOK Inc. is a Delaware corporation which has its principal place of business in Tulsa, Oklahoma. ONEOK Inc. wholly owns defendant ONEOK Energy Marketing and Trading Company, L.P., and other affiliates or divisions that regularly sold natural gas consumed in Wisconsin, and to Wisconsin businesses.  On information and belief, grounds exist for disregarding the corporate fiction between ONEOK Inc. and its subsidiary ONEOK Energy Marketing and Trading Company, L.P. based on such cases as *Weibke v. Richardson & Sons,*

*Inc.*, 83 Wis. 2d 359, 363, 265 N.W.2d 571(1978); *Consumer's Co-op. of Walworth County v. Olsen*, 142 Wis. 2d 465, 476, 419 N.W.2d 211 (1988); *Cemetery Services, Inc. v. Wisconsin Dept. of Regulation and Licensing*, 221 Wis. 2d 817, 827, 586 N.W.2d 191 (Ct. App. 1998); and *Conservatorship of Prom v. Sumitomo Rubber Industries, Ltd.*, 224 Wis. 2d 743, 760-61, 592 N.W.2d 657 (Ct. App. 1999).   ONEOK Inc. buys, sells, transports, and stores natural gas, including its own and its affiliates' production, in the United States and in Wisconsin.

17.     Defendant ONEOK Inc. directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.   ONEOK Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.   On information and belief,  during the Relevant Time Period ONEOK either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.   In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, ONEOK Inc.'s officers or directors, including "Senior Management Team" member Christopher R. Skoog, President of ONEOK Energy Marketing and Trading Company, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold.   During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, ONEOK Inc.'s officers or directors, including "Senior Management Team" member Christopher R. Skoog, President of

ONEOK Energy Marketing and Trading Company, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as ONEOK Energy Marketing and Trading Company, L.P., in the United States and in Wisconsin.

18.     Personal jurisdiction exists over ONEOK Inc. based upon the activities of its corporate affiliates, in particular ONEOK Energy Marketing and Trading Company, L.P., that traded and sold natural gas in the United States and to Wisconsin-based companies during the Relevant Time Period.  ONEOK, Inc. and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.  In October, 2002, ONEOK, Inc. and ONEOK Energy Marketing and Trading, L.P., paid $3 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting of natural gas prices during the time period from at least July 2000 to October 2002.

19.     Defendant ONEOK Energy Marketing and Trading Company, L.P., is a Delaware limited partnership in good standing and has its principal place of business in Tulsa, Oklahoma. ONEOK Energy Marketing and Trading Company, L.P., is wholly owned and controlled by defendant ONEOK, Inc. concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy, one or more officers or directors of ONEOK, Inc., including "Senior Management Team" member

Christopher R. Skoog, President of ONEOK Energy Marketing and Trading Company, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which ONEOK Energy Marketing and Trading Company, L.P. sold in Wisconsin and elsewhere.   ONEOK Energy Marketing and Trading Company, LP., buys, sells, stores, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

**B.     The Williams Defendants:  The Williams Companies, Inc., Williams Power Company, Inc. (f/n/a Williams Energy Marketing & Trading) and Willams Merchant Services Company, Inc.**

20.     Defendant The Williams Companies, Inc. is a Delaware corporation in good standing and has its principal place of business in Tulsa, Oklahoma.  The Williams Companies, Inc. wholly owns and controls Williams Power Company, Inc., Williams Merchant Services Company, Inc. and other affiliates or divisions that regularly sold natural gas consumed in Wisconsin, and to Wisconsin businesses.   On information and belief, grounds exist for disregarding the corporate fiction between The Williams Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*  The Williams Companies, Inc. through its affiliates, buys, sells and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

21.     Defendant The Williams Companies, Inc. directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  On information and belief, during the Relevant Time Period The Williams Companies, either

directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information. The Williams Companies, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period. In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, The Williams Companies, Inc.'s officers or directors, such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin. During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, The Williams Companies, Inc.'s officers or directors, such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as Williams Power Company, Inc. and Williams Merchant Services Company, Inc. in the United States and in Wisconsin.

22.      Personal jurisdiction exists over The Williams Companies, Inc. based upon the activities of its corporate affiliates, in particular Williams Merchant Services Company, Inc. and Williams Power Company, Inc., that traded and sold natural gas in the United States and to Wisconsin companies during the Relevant Time Period. The Williams Companies, Inc. and its affiliates consistently have presented a common corporate image to customers in the United

States and in Wisconsin through their marketing efforts and materials.  William E. Hobbs,

President and Chief Executive Officer of Williams Power Company, Inc., is "Senior Officer" of

The Williams Companies, Inc.  The Williams Companies, Inc. and Williams Power Company,

Inc. Company paid $20 million in civil penalties in July, 2003 to the United States Commodity

Futures Trading Commission to settle charges of attempting to manipulate natural gas price

indices.  On December 17, 2004, a former trader of Williams Energy Marketing & Trading

Company, Thomas J. Pool, pled guilty to conspiring with other Williams' traders to provide false

natural gas price data to reporting firms from mid-1998 through mid-2002 for the purpose of

manipulating monthly price indices of natural gas.  As part of his plea agreement he admitted

that he had the ability to influence the market price of natural gas in interstate commerce, that the

published index price of natural gas was artificial in that it did not reflect the legitimate forces of

supply and demand, that his conduct was the cause of the artificial price, and that he intended to

cause the artificial price.  Mr. Pool admitted that most of the trades he reported while an

employee of Williams were deliberately fabricated.  Mr. Pool admitted creating fictitious natural

gas trades at the behest of his supervisor.

23.    On May 20, 2005, another former trader of Williams Energy Marketing &

Trading Company, Brion Scott McKenna, pled guilty to conspiring with other Williams' traders

to provide false natural gas price data to reporting firms, *Inside FERC's Gas Market Report* and

*NGI's Bidweek Survey*, from September, 2000 to June 30, 2002 for the purpose of manipulating

published index prices of natural gas in the West Coast, East Coast, Gulf Coast and Rocky

Mountain regions of the United States.  Mr. McKenna admitted in his Plea Agreement to

successfully manipulating the index prices of natural gas on February 1, 2001 at the following

locations: Columbia Gas Transmission Corp. at Appalachia; Florida Gas Transmission Co.

pipeline at Zones 2 and 3; Natural Gas Pipeline Co. of America pipeline at Louisiana; Transcontinental Gas Pipeline Corp. at Zone 2; and Transco Zone 6 Market Center.   Mr. McKenna admitted in his Plea Agreement that by reporting false trades, he intended to influence the price published by *Inside FERC* and *NGI* at each location for which he reported, and to the extent that his false trade information was included in the respective index calculations, the published index prices did not reflect the legitimate forces of supply and demand.   Mr. McKenna admitted that most of the trades he reported were deliberately fabricated, and that he would routinely circulate a spreadsheet containing fictitious trades for input from other traders.   Mr. Thomas Pool, another Williams trader, has admitted as part of his plea agreement that he was trained and directed by his supervisors to undertake and cover-up the manipulation of natural gas prices.   In February 2006, Williams Power Company, Inc. agreed to pay $50 million to the Justice Department to settle claims relating to its artificially jacking up natural gas prices in 2000 and 2001.   In its agreement with the Justice Department, Williams Power Company, Inc. acknowledged responsibility for the actions of its former employees in its energy trading operation.   In 2006 Williams Power Company, Inc. also agreed to pay $290 million to resolve a class action lawsuit alleging that the company improperly booked millions of dollars in profits for its energy marketing and trading division during the Relevant Time Period.   In 2006 Williams Power Company, Inc.'s former trader and operations manager Daryl Brown pleaded guilty in connection with a scheme to manipulate prices.   Brown pleaded guilty to one count of manipulation of the price of a commodity in interstate commerce in violation of the Commodity Exchange Act, admitting that throughout the Relevant Time Period he conspired to report false trades to Platts' *Inside FERC's Gas Market Report* and to NGI's *Bidweek Survey* in order to affect published indexes.

24.     Defendant Williams Merchant Services Company, Inc., is a Delaware corporation in good standing and has its principal place of business in Tulsa, Oklahoma. Williams Merchant Services Company, Inc. is wholly owned and controlled by its parent company, The Williams Companies, Inc. a Delaware corporation with headquarters in Tulsa, Oklahoma. Williams Merchant Services Company, Inc. wholly owns and controls Williams Power Company, Inc. Williams Merchant Services Company, Inc. is wholly owned and controlled by The Williams Companies, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy.   During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, one or more officers or directors of The Williams Companies, Inc., such as William E. Hobbs, President and Chief Executive Officer of Williams Power Company, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Williams Merchant Services Company, Inc. or its affiliate Williams Power Company, Inc. sold in Wisconsin and elsewhere.  Williams Merchant Services Company, Inc. buys, sells, stores and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

25.     Defendant Williams Power Company, Inc. (f/k/a Williams Energy Marketing & Trading) is a Delaware corporation in good standing and has its principal place of business in Tulsa, Oklahoma.  Defendant Williams Power Company, Inc. is wholly owned and controlled by Williams Merchant Services Company, Inc., which in turn is wholly owned and controlled by its parent, defendant The Williams Companies, Inc.  Defendant Williams Power Company, Inc. is

wholly owned and controlled by defendants, Williams Merchant Services Company, Inc. and
The Williams Companies, Inc., concerning both the conduct of its business generally within
Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements,
contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in
furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and
conspiracy, officers and directors of The Williams Companies, Inc. and Williams Merchant
Services Company, Inc., such as William E. Hobbs, President and Chief Executive Officer of
Williams Power Company, Inc., made strategic marketing policies and decisions concerning
natural gas and the reporting of natural gas trade information to reporting firms for use in the
calculation of natural gas price indices that affected the market prices of natural gas which
Williams Power Company, Inc. sold in Wisconsin and elsewhere.  Defendant Williams Power
Company, Inc. buys, sells, and transports natural gas, including its own or its affiliates'
production, in the United States and in Wisconsin.

### C.  The AEP Defendants:  American Electric Power Company and AEP Energy Services, Inc.

26.      Defendant American Electric Power Company is a New York corporation in good
standing and has its principal place of business in Columbus, Ohio.  The American Electric
Power Company wholly owned and controlled during the Relevant Time Period its subsidiary
AEP Energy Services, Inc., an Ohio corporation with its principal place of business in Columbus,
Ohio.  On information and belief, grounds exist for disregarding the corporate fiction between
The AEP Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,*
and *Conservatorship of Prom.*  Defendant American Electric Power Company buys, sells and
transports electricity and natural gas, including its own and its affiliates' production, in the
United States and in Wisconsin.

27.     Defendant American Electric Power Company, directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  On information and belief, during the Relevant Time Period American Electric Power Company, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  American Electric Power Company's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, American Electric Power Company's officers or directors agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, American Electric Power Company's officers or directors, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as AEP Energy Services, Inc. According to a FERC Report, American Electric Power Company and AEP Energy Services, Inc. traders were instructed by their superiors to adjust the prices and volumes of trades they had

made and, in some cases, to report trades that never occurred, because it was common practice in the industry.

28.     Personal jurisdiction exists over American Electric Power Company based upon the activities of its corporate affiliates, in particular AEP Energy Services, Inc., that sold natural gas in the United States and in Wisconsin during the Relevant Time Period.  AEP Energy Services, Inc. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.  American Electric Power Company, and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

29.     Defendant AEP Energy Services, Inc. is an Ohio corporation in good standing and has its principal place of business in Columbus, Ohio.  AEP Energy Services, Inc. is wholly owned and controlled by its parent, American Electric Power Company, an Ohio corporation with headquarters in Columbus, Ohio.  AEP Energy Services, Inc. is wholly owned and controlled by defendant American Electric Power Company concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful agreements, one or more officers or directors of American Electric Power Company, Inc. made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which AEP Energy Services, Inc. sold.  AEP Energy Services, Inc. bought, sold and transported natural gas during the Relevant Time Period, including its own or its

affiliates' production, in the United States and in Wisconsin. In September 2005 the CFTC filed a civil action against Joseph Foley, a former trader employed by American Electric Power Company and AEP Energy Services, Inc. The complaint alleges that from November 2000 through September 2002, Foley engaged in a pervasive and widespread scheme involving his directing those he supervised to deliver to market index publishers false reports concerning natural gas trades. As part of Foley's scheme, at one of the trading desks owned by either American Electrical Power Company or its affiliate AEP Energy Services, Inc., the traders maintained electronic spreadsheets entitled "IFERC Bogus" and "Joe Mama" to record false trades. American Electrical Power Company or AEP Energy Services, Inc. rewarded Foley for the funds he brought into the companies based on his reporting false trades, awarding him over $2 million in bonus compensation in 2002. In January 2005, American Electric Power Company and AEP Energy Services, Inc. paid $30 million in civil penalties to the CFTC to settle charges of false reporting and attempted manipulation of natural gas prices. AEP Energy Services, Inc. also paid $30 million in civil penalties to the United States Department of Justice while acknowledging and accepting responsibility for submitting knowingly inaccurate trade information for its Gulf Natural Gas Trading Desk, and for two other trading desks covering the Northeast and Mid-Continent regions.

30. Personal jurisdiction exists over AEP Energy Services, Inc. based upon its sales of natural gas in the United States and in Wisconsin during the Relevant Time Period. AEP Energy Services, Inc. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.

31.     Defendant American Electric Power Company, Inc. is liable for the debts and obligations of its wholly owned subsidiary AEP Energy Services, Inc.  Throughout the Relevant Time Period, American Electric Power Company, Inc. was aware of the illegal behavior being engaged in by its subsidiary, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding hundreds of millions of dollars in profits from its subsidiary to its consolidated financials.  Shortly after the subsidiary's illegal behavior became public, on October 10, 2002, American Electric Power Company, Inc.'s Chairman, President and CEO E. Linn Draper announced "a significant down sizing of our trading and marketing operations" (*i.e.,* AEP Energy Services, Inc.).  On information and belief, the way in which the subsidiary was created and capitalized, and the parent company's moves discontinuing operations, have left the subsidiary with insufficient assets to pay the judgment that was foreseeable when American Electric Power Company, Inc. first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiary.

> **D.     The Duke Defendants:  Duke Energy Carolinas, LLC (f/k/a Duke Energy Corporation) and Duke Energy Trading and Marketing Company, L.L.C.**

32.     Defendant Duke Energy Carolinas, LLC (f/k/a Duke Energy Corporation) is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During all relevant times Duke Energy Corporation wholly owned and controlled its subsidiary, Duke Energy Trading and Marketing Company, L.L.C., a Delaware limited liability corporation with its principal place of business in Houston, Texas.  On information and belief, grounds exist for disregarding the corporate fiction between the Duke Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*  Duke Energy Corporation wholly owned and controlled Duke Energy Trading and Marketing Company,

L.L.C., and other affiliates that regularly sold natural gas consumed in Wisconsin, and to Wisconsin businesses.

33.     Defendant Duke Energy Corporation directly and through affiliates it dominated and controlled, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. Duke Energy Corporation's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period Duke Energy Corporation, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Duke Energy Corporation's officers or directors agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Duke Energy Corporation's officers or directors made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as Duke Energy Trading and Marketing Company, L.L.C., in the United States and in Wisconsin.

34.    Personal jurisdiction exists over Duke Energy Carolinas, LLC, Corporation based upon the activities of its corporate affiliates, in particular Duke Energy Trading and Marketing, L.L.C., that traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period.  Duke Energy Corporation and/or its affiliate Duke Energy Trading and Marketing, L.L.C., entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.  Duke Energy Corporation and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin, through their marketing efforts and materials.   In September, 2003, Duke Energy Corporation and Duke Energy Trading and Marketing, L.L.C. paid $28 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

35.    Defendant Duke Energy Trading and Marketing Company, L.L.C. is a Delaware limited liability corporation registered as a foreign corporation in Wisconsin, with its principal place of business in Houston, Texas.  Duke Energy Trading and Marketing Company, L.L.C. is wholly owned and controlled by its parent, Duke Energy Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Duke Energy Trading and Marketing Company, L.L.C. marketed natural gas to customers across North America.  Duke Energy Trading and Marketing Company, L.L.C. is wholly owned and controlled by defendant Duke Energy Corporation concerning both the conduct of its business relating to the Wisconsin market and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and

conspiracy, one or more officers or directors of Duke Energy Corporation made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Duke Energy Trading and Marketing Company, L.L.C. sold in Wisconsin and elsewhere. In February 2005, the Commodity Futures Trading Commission filed a civil action in the United States District Court for the Southern District of Texas, against Michael Whitney, a former energy trader of Duke Energy Trading and Marketing Company, alleging that Whitney submitted or caused to be submitted false or misleading or knowingly inaccurate price and volume information to *Gas Daily* and other price compilers, concerning natural gas transactions which he executed between June, 2001 and August, 2002. Duke Energy Trading and Marketing Company, L.L.C. buys, sells, stores, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

36. In February 2005, pursuant to a grand jury investigation the United States indicted former Duke executives Timothy Kramer and Todd Reid on 20 counts of conspiracy, circumvention of controls and falsification of books, wire fraud, violation of honest services act, and mail fraud relating to natural gas trades occurring during the Relevant Time Period. Timothy Kramer was Vice President of Financial Portfolio Management for Duke Energy and an officer of Duke Energy Trading and Marketing Company, L.L.C., and several other Duke Energy subsidiaries. Todd Reid was Senior Vice President of Duke Energy Trading and Marketing Company, L.L.C., and also an officer of several other subsidiaries of Duke Energy. During the Relevant Time Period, Kramer and Reid engaged in what was known as a "round trip trades" or "sleeve trades," which are pre-arranged transactions involving natural gas contracts whereby there is a simultaneous purchase and sale of natural gas between the same parties, for the same

volume and term, at the same price, with no contemplation of the payment of money by either party.  For the year 2001, a year in which Kramer and Reid made numerous round trip and sleeve trades, Duke Energy paid bonuses (in cash and in Duke Energy stock) of $5,000,000 to Reid and $4,000,000 to Kramer.  The indictment indicates that from March 2001 to August 2002, Kramer and Reid knowingly did combine, conspire and agree with each other and other unknown persons to commit wire fraud, and that as part of their conspiracy between themselves and other unknown persons they caused the execution of over 500 false round trip natural gas trades.  The precise identity of the unknown persons who conspired and agreed with Kramer and Reid is unknown to the plaintiffs, but on information and belief, they are the defendants and the non-defendant co-conspirators named below.  In large part based on Kramer and Reid's actions, Duke Energy's earnings for the last three quarters of 2001 and first quarter of 2002 overstated earnings by approximately $54 million.

37.    Defendant Duke Energy Carolinas, LLC (f/k/a Duke Energy Corporation) is liable for the debts and obligations of its wholly owned subsidiary Duke Energy Trading and Marketing Company, L.L.C.  AEP Energy Services, Inc.  Throughout the Relevant Time Period, Duke Energy Corporation was aware of the illegal behavior being engaged in by its subsidiary, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding hundreds of millions of dollars in profits from its subsidiary to its consolidated financials.  Shortly after the subsidiary's illegal behavior became public, on April 11, 2003, Duke Energy Corporation's President and CEO Fred Fowler announced the closing of all Duke proprietary trading groups.  On information and belief, the way in which the subsidiary was created and capitalized, and the parent company's moves discontinuing operations, and relating to discontinuing operations, have left the subsidiary with

insufficient assets to pay the judgment that was foreseeable when Duke Energy Corporation first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiary.

### E. The Dynegy Defendants: Dynegy Inc. and Dynegy GP Inc. DMT Holdings, L.P. (d/b/a Dynegy Marketing & Trade)

38.     Defendant Dynegy Inc. is an Illinois corporation in good standing with its principle place of business in Houston Texas.  Dynegy Inc. wholly owns and controls Dynegy GP Inc. DMT Holdings, L.P. (d/b/a Dynegy Marketing & Trade), a Colorado general partnership in good standing with its principal place of business in Houston, Texas. Dynegy Marketing & Trade is wholly owned and controlled by its general partners, DMT Holdings, L.P. and Dynegy GP Inc.  On information and belief, grounds exist for disregarding the corporate fiction between the Dynegy Defendants based on the rules normally relating to partnerships and such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*  Dynegy Marketing & Trade was one of the largest natural gas marketers in the United States and in 2001, Dynegy Marketing & Trade's natural gas sales averaged 8.2 billion cubic feet per day. Dynegy Marketing & Trade regularly conducted business in Wisconsin during the Relevant Time Period. Dynegy Marketing & Trade entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.

39.     Defendant Dynegy Marketing & Trade made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  Dynegy Marketing & Trade's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on

commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period Dynegy Marketing & Trade, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.   In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Dynegy Marketing & Trade's officers or directors, such as Stephan W. Bergstrom and Dan W. Ryser, and employees, such as Michelle Valencia, a former senior trader, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Dynegy Marketing & Trade's officers or directors, such as Stephan W. Bergstrom and Dan W. Ryser, and employees, such as Michelle Valencia, a former senior trader, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Dynegy Marketing & Trade sold in Wisconsin and elsewhere, and those policies and decisions were implemented on an operational level by Dynegy Marketing & Trade's employees.

40.     On September 25, 2002, Dynegy announced that 15 of its employees had engaged in reporting false data to price compilers.  Dynegy Marketing & Trade's employees have stated the manner by which they reported trades to industry publications was similar to the way in which it was done at their previous companies, and that this illegal practice was "common practice in the industry" during the Relevanat time period.

41.     In July 2005, acting on the results of a grand jury investigation, the United States indicted former Dynegy Marketing & Trade natural gas trader Michelle Marie Valencia and former El Paso Corporation trader Greg Singleton, alleging that they—in conspiracy with each other and with other unknown persons—made numerous false reports of natural gas trades to index publishers.  The precise identity of the other unknown persons who were involved in the conspiracy are currently unknown to the plaintiffs, but on information and belief, they are the defendants and the non-defendant co-conspirators named below.  The indictment of Valencia and Singleton indicates that the false information they reported to publications affected and tended to affect index prices, and thereby the price of natural gas in countless transactions all across the United States, which potentially cost consumers of natural gas great sums of money.  As part of the conspiracy alleged in the indictment, Singleton and Valencia discussed what trades they did and did not intend to report to index publications, they agreed to report at least one trade between El Paso and Dynegy that was not real, they agreed not to report one or more natural gas trades between Dynegy and El Paso that were in fact real trades, and they caused other employees of Dynegy and El Paso to report fictitious gas trades to *NGI* and *Inside FERC*.  In a second superseding indictment relating to Valencia filed in March 2006, the United States alleged that when Valencia reported false information to *Inside FERC* and *Natural Gas Intelligence* in 2000 and 2001, she affected and tended to affect index prices, and thereby the price of natural gas paid by consumers.  In August 2006, Valencia of Dynegy was convicted of seven counts of wire fraud relating to reporting false natural gas trades, and Singleton of El Paso was convicted of a count of wire fraud relating to reporting false natural gas trades.

42.     In December, 2002, Dynegy Marketing & Trade and West Coast Power LLC, paid $5 million in civil penalties to the United States Commodity Future Trading Commission to

settle charges of false reporting and attempted manipulation of natural gas prices.  The charges included that Dynegy Marketing & Trade and West Coast Power LLC conspired together to report false offsetting trades.  By reporting offsetting trades, the companies intended to make their false trades look more believable to the index publishers.

43.     Defendant Dynegy Inc. is liable for the debts and obligations of its wholly owned and controlled subsidiary Dynegy GP Inc. DMT Holdings, L.P. (d/b/a Dynegy Marketing & Trade).  Throughout the Relevant Time Period, Dynegy Inc. was aware of the illegal behavior being engaged in by its subsidiary, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding millions of dollars in profits from its subsidiary to its consolidated financials.  Shortly after the subsidiary's illegal behavior became public, on October 16, 2002, Dynegy Inc.'s interim CEO Dan Dienstbier announced that Dynegy Inc. was abandoning its merchant energy operation.  On information and belief, the way in which the subsidiary was created and capitalized, and the moves relating to discontinuing its operations,  have left the subsidiary with insufficient assets to pay the judgment that was foreseeable when Dynegy Inc. first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiary.

**F.      The El Paso Defendants:  El Paso Corporation and El Paso Marketing, L.P. (f/k/a El Paso Merchant Energy, L.P.)**

44.     Defendant El Paso Corporation is a Delaware corporation in good standing with its principal place of business in Houston, Texas.  El Paso consistently described itself during the Relevant Time Period as North America's leading provider of natural gas services.  El Paso Corporation wholly owns and controls its subsidiary, El Paso Marketing, L.P. (f/k/a El Paso Merchant Energy, L.P.), a Delaware limited partnership with its principal place of business in Houston, Texas. On information and belief, grounds exist for disregarding the corporate fiction

between the El Paso Defendants based on the rules relating to partnerships generally and such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.* El Paso Corporation buys, sells, stores, and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

45.    Defendant El Paso Corporation directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas. El Paso Corporation's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period El Paso Corporation, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, El Paso Corporation's officers or directors, such as Ralph Eads, Executive Vice President of El Paso, agreed to arrangements, contracts, agreements, and to a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, El Paso Corporation's officers or directors, such as Ralph Eads, Executive Vice President, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market

prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates, such as El Paso Merchant Energy, L.P., in the United States and in Wisconsin.

      46.    Personal jurisdiction exists over El Paso Corporation based upon the activities of its corporate affiliates, in particular El Paso Merchant Energy, L.P., that traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period.  El Paso Merchant Energy, L.P. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.  El Paso Corporation and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.  In March, 2003, El Paso Corporation and El Paso Merchant Energy, L.P., paid $20 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.  In November, 2004, three former natural gas traders of El Paso Merchant Energy, L.P., Donald E. Burwell, James P. Phillips, and Greg Singleton, were charged by the United States Department of Justice, U.S. Attorney's Office for the Southern District of Texas, based on a grand jury indictment, with conspiracy, false reporting, and wire fraud related to the transmission of allegedly inaccurate trade reports to industry price compilers which used the reported trades to calculate the index price of natural gas.  El Paso trader Todd Gelger was sentenced to two years in federal prison following his conviction for reporting false information related to natural gas trades.  El Paso trader Donald E. Burwell pled guilty in February 2006, to false reporting of natural gas trades.  In the indictment relating to Burwell the grand jury charged that he and other traders with whom he combined, conspired and agreed reported false trading information, which affected index prices, and thereby, the price of natural

gas in countless transactions around the country, and potentially cost consumers of natural gas great sums of money.

47.     In July 2005, acting on a grand jury investigation, the United States indicted former El Paso Corporation trader Greg Singleton, along with former Dynegy Marketing & Trade natural gas trader Michelle Marie Valencia, alleging that during the Relevant Time Period they engaged in a conspiracy—with each other and with other unknown persons—to make numerous false reports of natural gas trades to index publishers.  The precise identity of the other unknown persons who were involved in the conspiracy are currently unknown to the plaintiffs, but on information and belief, they are the defendants and the non-defendant co-conspirators named below.  Their indictment indicates that the false information they reported to publications affected and tended to affect index prices, and thereby the price of natural gas in countless transactions all across the United States, which potentially cost consumers of natural gas great sums of money.  As part of the conspiracy alleged in the indictment, they discussed what trades they did and did not intend to report to index publications, they agreed to report at least one trade between El Paso and Dynegy that was not real, they agreed not to report one or more natural gas trades between Dynegy and El Paso that were in fact real trades, and they caused other employees of Dynegy and El Paso to report fictitious gas trades to NGI and Inside FERC.  In August 2006, Valencia of Dynegy was convicted of seven counts of wire fraud relating to reporting false natural gas trades, and Singleton of El Paso was convicted of a count of wire fraud relating to reporting false natural gas trades.  In December 2003, El Paso trader Todd Geiger, a former vice president of El Paso, pled guilty to reporting 48 fake trades in November 2003 to the publication *Inside FERC*.  Geiger admitted in court that he knew the trades were false and that the index was used to price natural gas.  In October 2004, four former El Paso

Corporation natural gas traders (Christopher Bakkenist, Donald Guilbault, William Ham and Dallas Dean) each pleaded guilty to making false reports used to calculate the index price of natural gas during the Relevant Time Period.

48.     Defendant El Paso Merchant Energy, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas.  El Paso Merchant Energy, L.P. is wholly owned and controlled by its parent company, El Paso Corporation, a Delaware corporation with its principal place of business in Houston, Texas. El Paso Merchant Energy, L.P. is wholly owned and controlled by defendant El Paso Corporation concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of El Paso Corporation, such as Ralph Eads, Executive Vice President of El Paso Corporation and President of El Paso's Merchant Energy Group, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which El Paso Merchant Energy, LP. sold in Wisconsin and elsewhere. El Paso Merchant Energy, L.P. buys, sells and transports natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

**G.     The CMS Defendants:  CMS Energy Corporation (a/k/a CMS Energy), CMS Energy Resource Management Company (f/k/a CMS Marketing Services & Trading Company), and Cantera Gas Company, LLC (f/k/a CMS Field Services, Inc.)**

49.     Defendant CMS Energy Corporation is a Michigan corporation in good standing with its principal place of business in Jackson, Michigan.  CMS Energy Corporation wholly owned and controlled during the Relevant Time Period its subsidiary CMS Marketing Services

& Trading Company (n/k/a CMS Energy Resource Management Company), a Michigan corporation with its principal place of business in Houston, Texas.  CMS Energy Corporation wholly owned and controlled during the Relevant Time Period CMS Field Services, Inc. (n/k/a Cantera Gas Company, LLC), a Michigan corporation with its principal place of business in Tulsa, Oklahoma.  On information and belief, grounds exist for disregarding the corporate fiction between the CMS Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*  CMS Energy Corporation wholly owned and controlled CMS Marketing Services & Trading Company, CMS Field Services, Inc., and other affiliates or divisions that regularly conducted business in Wisconsin during the Relevant Time Period.

50.     Defendant CMS Energy Corporation, directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  CMS Energy Corporation's actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period CMS Energy Corporation, either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, CMS Energy Corporation's officers or directors, such as Victor J. Fryling, President and Chief Operating Officer, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas which its affiliates sold in

the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, CMS Energy Corporation's officers or directors, such as Victor J. Fryling, President and Chief Operating Officer, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which was sold, and those policies and decisions were implemented on an operational level by affiliates, such as CMS Marketing Services & Trading Company and CMS Field Services, Inc., in the United States and in Wisconsin.

51.     Personal jurisdiction exists over CMS Energy Corporation based upon the activities of its corporate affiliates, in particular CMS Marketing, Services & Trading Company and CMS Field Services, Inc., that traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period.  CMS Energy Corporation, either directly or through one of its affiliates,  entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.  CMS Energy Corporation and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.  In November, 2003, CMS Energy Corporation, CMS Marketing, Services & Trading Company, and CMS Field Services, Inc. paid $16 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

52.     Defendant CMS Marketing Services & Trading Company was a Michigan corporation registered as a foreign corporation in good standing in Wisconsin during the

Relevant Time Period with its principal place of business in Houston, Texas. CMS Marketing Services & Trading Company was wholly owned and controlled during the Relevant Time Period by its parent, CMS Energy Corporation, a Michigan corporation with its principal place of business in Jackson, Michigan. CMS Marketing Services & Trading Company was wholly owned and controlled by defendant CMS Energy Corporation concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy. During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of CMS Energy Corporation, such as Victor J. Fryling, President and Chief Operating Officer, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which CMS Marketing Services & Trading Company sold. CMS Marketing Services & Trading Company bought, sold and transported natural gas, including its own or its affiliates' production, during the Relevant Time Period in the United States and in Wisconsin.

53. Defendant Cantera Gas Company, LLC (f/k/a CMS Field Services, Inc., Inc.) at all relevant times was a Michigan corporation in good standing during the Relevant Time Period with its principal place of business in Tulsa, Oklahoma. CMS Field Services, Inc. was wholly owned and controlled during the Relevant Time Period by its parent, CMS Energy Corporation, a Michigan corporation with its principal place of business in Jackson, Michigan. CMS Field Services, Inc. changed its name after the Relevant Time Period to CMS Continental Natural Gas, Inc., and later to Cantera Gas Company, LLC. CMS Field Services, Inc. was wholly owned and controlled by defendant CMS Energy Corporation concerning both the conduct of its business

generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, one or more officers or directors of CMS Energy Corporation, such as Victor J. Fryling, President and Chief Operating Officer, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which CMS Field Services, Inc. and CMS Marketing Services & Trading Company sold.  On or about February 1, 2005, the Commodity Futures Trading Commission filed a civil action in United States District Court for the Northern District of Oklahoma, against Jeffrey A. Bradley (formerly the manager of marketing for CMS Field Services, Inc.), and Robert L. Martin (formerly the director of gas supply for CMS Field Services, Inc.) alleging that they conspired to submit false or misleading or knowingly inaccurate price and volume information to *Gas Daily* and other price compilers, between January, 2001 and October, 2002. In one telephone conversation between Bradley and Martin, these men "openly discussed a plan to 'make up some numbers and turn them into the reporting firms.'"  Further details regarding the conspiracy are set forth in *U.S. Commodity Futures Trading Commission v. Bradley,* 408 F. Supp. 2d 1214, 1221 (N.D. Okla. 2005)(decision denying defendants' motion to dismiss, based on the defendants' characterization of facts, which the court found at least in part "disingenuous, at best"); *U.S. Commodity Futures Trading Commission v. Bradley,* 2006 WL 2045847 (N.D. Okla.)(decision denying defendant Robert Martin's motion for summary judgment).  CMS Field Services, Inc. bought, sold, stored, and transported natural gas, including its own or its affiliates' production, during the Relevant Time Period in the United States and in Wisconsin.

**H.    The CenterPoint Defendants:  CenterPoint Energy, Inc., CenterPoint Energy Services, Inc. (f/k/a "CenterPoint Energy Marketing, Inc." and "Reliant Energy Retail, Inc."), Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.) and Reliant Energy Services, Inc.**

54.    Defendant CenterPoint Energy, Inc. is a Texas corporation in good standing with its principal place of business in Houston, Texas.  CenterPoint Energy, Inc. (f/k/a as Houston Industries, Inc.) and Reliant Energy, Inc. became the parent of defendants Reliant Energy Services, Inc. and Reliant Resources, Inc. as part of a corporate restructuring of Reliant Energy, Inc. in January, 2002.  CenterPoint Energy, Inc. wholly owns and controls Reliant Energy Services, Inc. and is responsible for its illegal acts.  On information and belief, grounds exist for disregarding the corporate fiction between the CenterPoint Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*  CenterPoint Energy, Inc., through its affiliates, buys and sells natural gas, including its own or its affiliates' production, in the United States and in Wisconsin.

55.    Defendant Reliant Energy, Inc. is a Delaware corporation in good standing with it principal place of business in Houston, Texas.  In April, 2004, Reliant Energy, Inc. officially changed its name from Reliant Resources, Inc.  Reliant Resources, Inc. wholly owned and controlled its subsidiary Reliant Energy Services, Inc. during the Relevant Time Period, a Delaware corporation with its principal place of business in Houston, Texas.  Reliant Energy, Inc., f/k/a Reliant Resources, Inc., buys, sells, and transports natural gas in the United States and in Wisconsin.

56.    Defendant Reliant Energy, Inc., f/k/a Reliant Resources, Inc., directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of

natural gas.  Reliant Energy, Inc., f/k/a Reliant Resources, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period Reliant Energy, Inc., either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Reliant Energy, Inc., f/k/a Reliant Resources, Inc.'s officers or directors, such as Joe Bob Perkins, Executive Vice President and Group President, Wholesale Businesses in 2000 and 2001, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Reliant Energy, Inc., f/k/a Reliant Resources, Inc.'s officers or directors, such as Joe Bob Perkins, Executive Vice President and Group President, Wholesale Businesses in 2000 and 2001, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which was sold, and those policies and decisions were implemented on an operational level by affiliates, such as Reliant Energy Services, Inc.

57.     Personal jurisdiction exists over Reliant Energy, Inc., f/k/a Reliant Resources, Inc. based upon the activities of its corporate affiliates, in particular Reliant Energy Services, Inc., that traded and sold natural gas in the United States and in Wisconsin during the Relevant Time

Period. Reliant Energy, Inc. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.  Reliant Energy, Inc., f/k/a Reliant Resources, Inc. and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

58.     Defendant Reliant Energy Services, Inc. is a Delaware corporation registered as a foreign corporation in good standing in Wisconsin during the Relevant Time Period with its principal place of business in Houston, Texas.  Reliant Energy Services, Inc. is wholly owned and controlled during the Relevant Time Period by its parent, Reliant Energy, Inc., f/k/a Reliant Resources, Inc., a Delaware corporation with its principal place of business in Houston, Texas. Reliant Energy Services, Inc. is wholly owned and controlled by defendant Reliant Resources, Inc. concerning both the conduct of it business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy.  Reliant Energy Services, Inc. buys, sells, and transports natural gas in the United States and in Wisconsin.  Reliant Energy Services, Inc. (d/b/a Reliant Energy) sold over $20 million worth of natural gas to plaintiff Ladish Co. Inc. during the Relevant Time Period.  On information and belief, during the Relevant Time Period Reliant Energy Services, Inc. sold natural gas to many other members of the class, both itself and through middlemen, for use in Wisconsin.  In November, 2003, Reliant Energy Services, Inc. paid an $18 million civil penalty to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices, including charges of wash sales.  The precise identity of the other parties that engaged in wash sales transactions with Reliant, are currently unknown to the plaintiffs, but on information and belief are the other defendants in this

action and the non-defendant co-conspirators named below.  In November, 2004, a former natural gas trader of Reliant Energy Services, Inc., Jerry A. Futch, was charged by the United States Department of Justice, U.S. Attorney's Office in the Southern District of Texas, based on a grand jury indictment for reporting false trades in 2000 and 2001 to industry price compilers which used the reported trades to calculate *Inside FERC*'s index price of natural gas.  In 2005, Futch pled guilty to one count of delivering knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas in interstate commerce.

59.    Defendant CenterPoint Energy, Inc. is liable for the debts and obligations of its wholly owned and controlled subsidiaries Reliant Energy, Inc. (f/k/a Reliant Resources, Inc.), Reliant Energy Services, Inc., CenterPoint Energy Services, Inc. (d/b/a "CenterPoint Energy," and f/ka/ CenterPoint Energy Marketing, Inc., CenterPoint Energy Gas Services, Inc., and Reliant Energy Retail, Inc.)  Throughout the Relevant Time Period, CenterPoint was aware of the illegal behavior being engaged in by its subsidiaries, had the power to and could have prevented the illegal behavior, and did nothing to stop the illegal behavior, while at the same time adding millions of dollars in profits from its subsidiaries to its consolidated financials.  Shortly after the subsidiaries illegal behavior became public, in March 2003, CenterPoint announced closure of its proprietary natural gas trading operation.  On information and belief, the way in which the subsidiaries were created and capitalized, and the parent company's moves relating to discontinuing operations, have left the subsidiaries with insufficient assets to pay the judgment that was foreseeable when CenterPoint Energy, Inc. first became aware of, or should have become aware of, the illegal behavior engaged in by its subsidiaries.

60.    CenterPoint Energy Services, Inc., d/b/a "CenterPoint Energy," is a corporation organized and existing under the laws of the State of Delaware, registered to do business in the

State of Wisconsin, with its principal place of business located at 1111 Louisiana, Houston, Texas. CenterPoint Energy Services, Inc. was formerly known as CenterPoint Energy Marketing, Inc., CenterPoint Energy Gas Services, Inc., and Reliant Energy Retail, Inc. During the Relevant Time Period, CenterPoint Energy Services, Inc. (d/b/a CenterPoint Energy) sold natural gas directly to the plaintiff Ladish Co., Inc. for use in Wisconsin, and to many other members of the class, both itself and through middlemen. Personal jurisdiction exists over CenterPoint Energy Services based upon its activities and on the activities of its corporate affiliates, that traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period. CenterPoint Energy Services, Inc., d/b/a "CenterPoint" and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

### I.  Coral Energy Resources, L.P.

61.     Defendant Coral Energy Resources, L.P. is a Delaware limited partnership in good standing with its principal place of business in Houston, Texas. Coral Energy Resources, L.P. is wholly owned and controlled by Coral Energy Holdings, L.P., and is an affiliate of Shell Oil Company, and Shell Trading Gas and Power Company. Coral Energy Resources, L.P. was one of the largest natural gas marketers in the United States and conducted natural gas marketing operations at eastern and western power and natural gas trading hubs for the Eastern and Western United States during the Relevant Time Period. Coral Energy Resources sells 100% of its parent companies' natural gas production. Coral Energy Resources, L.P. regularly conducts business in Wisconsin. Coral Energy Resources, L.P. entered into a long term GISB natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement.

62.     Defendant Coral Energy Resources, L.P. made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  Coral Energy Resources, L.P.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period.  On information and belief, during the Relevant Time Period Coral Energy Resources, L.P., either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.     In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Coral Energy Resources, L.P.'s officers, directors and/or employees agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas that its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Coral Energy Resources, L.P.'s officers, directors, and/or employees made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Coral Energy Resources, L.P. sold in Wisconsin and elsewhere, and those policies and decisions were implemented on an operational level by Coral Energy Resources, L.P.'s employees in the United States and in Wisconsin.  In July, 2004, Coral Energy Resources, L.P. paid $30 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of

natural gas prices.  In March 2005, Coral Energy Resources, L.P. agreed to pay $3.5 million to resolve a dispute with the CFTC regarding whether it had sufficiently investigated, or accurately reported the results of its investigation, into trader false reporting of trades to index publishers during the Relevant Time Period.   On information and belief, Coral and its affiliates engaged in nearly 150 wash trades during the Relevant Time Period.   In February 2005 the CFTC filed federal civil injunction actions against Dennette Johnson, Courtney Cubbison Moore, Robert Harp, Anthony Dizona, John Tracy and Kelly Dyer—all employees or former employees of Shell Trading Gas and Power Company—seeking to bar their attempting to manipulate the price of natural gas in interstate commerce by reporting biased information to price reporting companies.  Johnson, Moore, Harp, Dizona, Tracy and Dyer would regularly circulate an e-mail with directions to the traders to report prices in such a way that it would benefit either the positions of Shell Trading Gas and Power Company or Coral Energy Resources, L.P., to which the traders at Shell Trading Gas and Power Company provided services.   This was done with the intent to manipulate prices during the Relevant Time Period.   Further details regarding the conspiracy are set forth in *U.S. Commodity Futures Trading Commission v. Johnson,* 408 F. Supp. 2d 259 (S.D. Tex. 2005)(decision denying defendants' motion to dismiss).

**J.**     **The Xcel Defendants:  Xcel Energy, Inc., E prime Inc. and Northern States Power Company**

63.     Defendant Xcel Energy, Inc., is a Minnesota corporation in good standing with its principal place of business in Minneapolis, Minnesota.  Xcel Energy, Inc., wholly owned and controlled during the Relevant Time Period its subsidiary, E prime Inc., a Colorado corporation with its principal place of business in Denver, Colorado, its subsidiary Northern States Power Company, a Wisconsin corporation with its principal place of business in Eau Claire, Wisconsin, and NRG Energy, Inc., a Delaware corporation with its principal place of business in

Minneapolis, Minnesota.  On information and belief, grounds exist for disregarding the corporate fiction between the Xcel Defendants based on such cases as *Weibke, Consumer's Co-op., Cemetery Services,* and *Conservatorship of Prom.*   Xcel Energy, Inc., and its affiliates or divisions engaged in energy marketing and trading, and transportation, storage, and marketing of natural gas in Wisconsin during the Relevant Time Period.

64.     Defendant Xcel Energy, Inc., during the Relevant Time Period was one of the largest power companies in the United States.  Xcel Energy, Inc. directly and through affiliates it owns and controls, made arrangements, contracts, and agreements, and entered into a combination and conspiracy between the defendants which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas.  Xcel Energy, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin, during the Relevant Time Period.  On information and belief, during the Relevant Time Period Xcel Energy, Inc., either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information.  In furtherance of such unlawful arrangements, contracts, agreements, and combination and conspiracy, Xcel Energy, Inc.'s officers or directors, agreed to arrangements, contracts, agreements, and a combination and conspiracy which prevented full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas which its affiliates sold in the United States and in Wisconsin.  During the Relevant Time Period and in furtherance of defendants' unlawful arrangements, contracts, agreements, and combination and conspiracy, Xcel Energy, Inc.'s officers or directors, made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting

firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which was sold, and those policies and decisions were implemented on an operational level by affiliates, such as E prime Inc., in the United States and in Wisconsin.

65.     Personal jurisdiction exists over Xcel Energy, Inc., based upon the activities of its corporate affiliates, in particular E prime Inc., Northern States Power Company and NRG Energy, Inc., which traded and sold natural gas in the United States and in Wisconsin during the Relevant Time Period.  Xcel Energy, Inc., and its affiliates consistently have presented a common corporate image to customers in the United States and in Wisconsin through their marketing efforts and materials.

66.     During the Relevant Time Period, Xcel Energy, Inc. owned and controlled NRG Energy, Inc. ("NRG").  NRG was formed in 1992 as a subsidiary of Northern States Power, which in 2000 was merged into New Century Energies, Inc., to form Xcel Energy, Inc.  In 2001, NRG was one of the largest power companies worldwide, and sold natural gas to companies located in Wisconsin.  In 2003, NRG commenced voluntary petitions under Chapter 11 of the bankruptcy code, and in November 2003, the bankruptcy court entered an order confirming NRG's plan of reorganization.  From at least August 2001 through May 2002 (*i.e.,* during the time NRG was owned and controlled by Xcel Energy, Inc.), NRG traders knowingly delivered false trade reports to price index compilers such as *Gas Daily* for the purpose of influencing the price of natural gas in interstate commerce.  In July 2004, the CFTC commenced an action against NRG seeking a permanent injunction precluding NRG from making false trade reports.

67.     Defendant E prime Inc. is a Colorado corporation in good standing with its principal place of business in Denver, Colorado.  E prime Inc. is wholly owned and controlled by its parent company, Xcel Energy, Inc., a Minnesota corporation with its principal place of

business in Minneapolis, Minnesota.  E prime Inc. is wholly owned and controlled by defendant Xcel Energy, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant Time Period and in furtherance of defendants' unlawful agreements, officers or directors of Excel Energy, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which E prime Inc. sold in Wisconsin and elsewhere.  E prime Inc. provided during the Relevant Time Period natural gas marketing, storage and risk management services to industrial, commercial, and utility energy users and also engaged in energy trading in the United States and in Wisconsin.  E prime Inc. entered into a long term GISB natural gas supply agreement with WE Energies (or one or more of its subsidiaries) during the Relevant Time Period, and on information and belief sold natural gas to WE Energies (or one or more of its subsidiaries) pursuant to that agreement.  In January, 2004, Xcel Energy, Inc., and E prime Inc., paid $16 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

68.     Defendant Northern States Power Company is a Wisconsin corporation with its principal place of business in Eau Claire Wisconsin.  Northern States Power Company is wholly owned and controlled by its parent company, Xcel Energy, Inc., a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Northern States Power Company is wholly owned and controlled by defendant Xcel Energy, Inc., concerning both the conduct of its business generally within Wisconsin and in particular its conduct in furtherance of defendants' unlawful arrangements, contracts, agreements, combination and conspiracy.  During the Relevant

Time Period and in furtherance of defendants' unlawful agreements, officers or directors of Excel Energy, Inc., made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas which Northern States Power Company sold in Wisconsin and elsewhere.  Northern States Power Company provided during the Relevant Time Period natural gas marketing, storage and risk management services to industrial, commercial, and utility energy users and also engaged in energy trading in the United States and in Wisconsin.   In January, 2004, Northern States Power Company affiliated companies Xcel Energy, Inc., and E prime Inc., paid $16 million in civil penalties to the United States Commodity Futures Trading Commission to settle charges of false reporting and attempted manipulation of natural gas prices.

## ALLEGATIONS COMMON TO ALL DEFENDANTS

69.    The unlawful arrangements, contracts, agreements, combination and conspiracy set forth in this Complaint have been committed by defendants and were ordered and performed by their officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of defendants' business or affairs.  At least by the summer of 2000, by their marketplace behavior and agreement as to pricing, defendants and the unnamed co-conspirators began and worked together to fraudulently increase the retail price of natural gas paid by commercial entities in Wisconsin.  This fraudulent agreement is evidenced by, among other things, the daily exchange of price information by and among defendants and the unnamed co-conspirators and the use of computer software programs and websites (including Enron Online) by defendants and the unnamed co-conspirators, to collusively and artificially inflate the retail price of natural gas paid by commercial entities in Wisconsin.  Traders at the

defendants knew during the Relevant Time Period that price information being posted on Enron Online was inaccurate information, and rather than disregard that information, or report the inaccuracies, the traders went along with Enron's inaccurate price postings, frequently passed along those inaccurate postings to price index publishers, and themselves reported new inaccurate trade information to the publishers of indices so as to manipulate market prices.

70.    In September 2002, five major traders and their companies, including defendants Dynegy Marketing & Trade, CMS Energy, Williams Energy Marketing & Trading, El Paso Merchant Energy, L.P., American Electric Power Company, admitted that they provided falsified information to *Gas Daily* and *Inside FERC*.  The purpose and effect of these actions was to collusively and artificially inflate the price of natural gas paid by commercial entities in Wisconsin above competitive levels, forcing commercial entity natural gas consumers in Wisconsin to pay much more for natural gas than they should have paid.

71.    Upon information and belief, defendants were in regular and virtually continuous contact with one another, including regular and extremely frequent communications with respect to the spot price of natural gas and natural gas futures contracts.

72.    Traders overstated prices to the reporting firms, which in turn published price data that incorporate the overstated prices.  This pervasive false reporting in the natural gas market fed into the marketplace over and over again.

73.    Defendants, directly or through their subsidiaries, affiliates, or agents, planned and executed a scheme designed to cause price instability and increase volatility in spot prices and thereby manipulate the price of natural gas futures.  Defendants' unlawful conduct produced exorbitant illegal profits.

74.     According to the CFTC, Platts' published indices had a financial impact upon billions of dollars worth of natural gas transactions during the Relevant Time Period.   Between November 2000 and October 2002, more than three-quarters of the trades some of the defendants submitted to Platts were knowingly false or misleading.

75.     Not all companies in the natural gas industry engaged in the illegal behavior in which the defendants engaged during the Relevant Time Period.   For instance, on information and belief, BP Energy Company was a major trader of natural gas in the United States during the Relevant Time Period, and established an effective program that ensured that the trading reports that BP Energy Company provided to publishers of price indices were accurate.   The illegal behavior engaged in by the defendants was neither inevitable, nor natural, but was instead the result of a conscious decision by the defendants to collusively manipulate the markets to their advantage.

76.     The behavior engaged in by the defendants that forms the basis of this suit was not routine business behavior, but was instead highly illegal behavior that has resulted in the criminal conviction or indictment of numerous industry insiders.   This illegal behavior, and the hundreds of millions of dollars in lucre that has flowed to the defendants during the Relevant Time Period due to their engaging and permitting this illegal behavior, was only possible because the defendants agreed to report their false trades to the industry publications and newsletters identified above, and to structure their contracts such that those contracts were pegged to the false reports contained in those publications and newsletters.   It was known in the natural gas producing and trading industry that these markets were subject to manipulation, and the defendants avoided taking steps to ensure that effective compliance and reporting programs were in place to prevent false reporting from occurring.   Traders and executives at the defendants

companies knew prior to the Relevant Time Period that false reporting could occur, knew early in the Relevant Time Period that Enron and many traders throughout the industry were engaging in false reporting, and rather than reporting such, or resisting such, agreed to go along with the practice, which caused substantial damages to the plaintiff class in this case.

77.     Various other persons, entities, companies and corporations not named as defendants, including some whose identities are presently unknown, participated as co-conspirators with defendants in the violations alleged herein and have made statements and performed acts in furtherance of those violations in the United States and elsewhere that had a direct, substantial, and reasonably foreseeable effect on commerce in Wisconsin.  The co-conspirators include, but are not limited to, Enron Energy Services, Inc. and Enron Power Marketing, Inc., which paid a $35 million civil penalty (May 2004) to the CFTC; Aquila Merchant Services, Inc., which paid a $26,500,000 civil penalty (June 2004) to the CFTC; Calpine Energy Services, L.P., which paid a $1.5 million civil penalty (January, 2004) to the CFTC; Cinergy Marketing & Trading, LP, which paid a $3 million civil penalty (November, 2004) to the CFTC; Dominion Resources, Inc., which paid a $4.25 million civil penalty (September 2006) to the CFTC; Entergy Koch Trading L.P., which paid $3 million civil penalty (January 2004) to the CFTC; WD Energy Services Inc., f/k/a EnCana Energy Services, Inc., which paid a $20 million civil penalty (July, 2003) to the CFTC; Enserco Energy, Inc., which paid a $3 million civil penalty (July, 2003) to the CFTC; Entergy Koch Trading, L.P., which paid a $3 million civil penalty (January, 2004) to the CFTC; Mirant Americas Energy Marketing, L.P., which paid a $12.5 million civil penalty (December, 2004) to the CFTC; NRG Energy, Inc.; Western Gas Resources, Inc., which paid a $7 million civil penalty (July 2004) to the CFTC;

Sempra Energy, including affiliate Sempra Energy Trading, and their respective officers, directors, and employees.

78.     The CFTC order relating to WD Energy Services indicates that at least one of WD Energy Services' employees discussed false reporting with traders at two other energy companies.  While the plaintiffs do not know the precise identity of the other two energy companies, on information and belief, those two companies are defendants in this case.

79.     Traders at Mirant Energy Marketing, L.P. conspired with one or more traders at Cinergy Corporation to make false reports of trades to market reporters so as to manipulate prices during the time period from January 2000 to early 2001.  Specifically, Michael Whalen (a trader with Cinergy) had a telephone conversation with Christopher McDonald (a trader with Americas Energy Marketing, L.P.), wherein they conspired about how they should report false trades to *Inside FERC* to manipulate market prices, and how to make such reports believable, with Whalen saying to McDonald "hey, do you want to fax me . . . exactly what you guys are going to write down so its more believable . . . I'll just write the exact opposite."  These actions lead the CFTC to file a civil federal injunctive action against Whalen and McDonald and other traders at Mirant.

80.     In another example, between May 2000 and October 2002, Matthew Reed, Darrell Danyluk and Shawn McLaughlin engaged in false reporting and attempted manipulation of natural gas prices while employed by Enserco Energy Services.  Reed continued to engage in coordinated false reporting after he left Enserco, and became a trader at Concord Energy LLC. While at Enserco, Reed in Colorado and Danyluk in Calgary coordinated on an almost daily basis how they wanted to report fictitious trades to numerous reporting firms, including *Gas Daily,* and *National Gas Intelligence*.  Reed and Danyluk called this their "double dipping"

scheme and perpetrated their scheme on reporting firms by portraying the Colorado and Calgary offices as separate trading operations when they were not.  These actions lead the CFTC to file a civil federal injunctive action against Reed, Danyluk, McLaughlin and Concord Energy, LLC in February 2005.

81.     While each of the two causes of action stated in this complaint are distinct and separate causes of action—with different elements and different available remedies—under each cause of action the plaintiffs allege that the defendants engaged in a conspiracy to manipulate prices as prohibited by Wis. Stat. § 133.03.  As stated in further detail above and below, the defendants during the Relevant Time Period did the following:

    a.   The defendants engaged in "wash sales."  A "wash sale" is an agreement by which Company A would agree with Company B that Company A would agree to sell a certain amount of natural gas at a certain price to Company B, and that in return Company B would sell roughly the same amount of natural gas at roughly the some price to Company A.  By doing this, Company A and Company B would create the illusion of higher demand, and a higher volume of sales, in the market place, and would thus achieve their objective of increasing or otherwise manipulate the price of natural gas sold in interstate commerce.

    b.   The defendants agreed with each other to and knowingly made false reports of natural gas trades to trade publications (such as *Gas Daily* and *Inside FERC*), knowing that those publications use those reports to report market prices and volumes, and knowing that by doing such they could manipulate markets to the detriment of natural gas buyers.

    c.   The defendants through the actions of their employees violated numerous criminal statutes which prohibit wash trades and which prohibit the false reporting of market information.

    d.   The illegal, criminal behavior of the defendants was widespread in the industry, and was well known to be occurring by traders in the industry throughout the Relevant Time Period.

## VENUE AND JURISDICTION

82.    Although there are several counties in Wisconsin in which venue in this matter would be appropriate and permitted, the resolution of this matter in Dane County, Wisconsin is appropriate and permitted by Wis. Stat. § 801.50 because Dane County is a County in which the claim arose, and one or more of the defendants do substantial business in Dane County, in that natural gas sold or traded by the defendants was consumed in Dane County.

83.    This Court has personal jurisdiction over the defendants consistent with the due process clause of the United States Constitution, and pursuant to Wis. Stat. § 801.05, because:

    a.   Pursuant to Wis. Stat. § 801.05(1), defendant Northern States Power Company is organized and exists pursuant to Wisconsin law.

    b.   Pursuant to Wis. Stat. § 801.05(1)(d), each of the defendants has engaged in substantial and not isolated activities within the State of Wisconsin.

    c.   Pursuant to Wis. Stat. 801.05(4), each of the defendants directly or through an agent thereof committed one or more acts or omissions outside of Wisconsin, which caused an injury to person or property within Wisconsin, and during the Relevant Time Period, the defendants (either directly or on their behalf by others) carried out solicitation or service

activities in Wisconsin, and natural gas sold or otherwise handled by the

defendants was used or consumed in Wisconsin.

    d.   Pursuant to Wis. Stat. § 801.05(5)(c), this action arises out of a promise

made to one or more of the plaintiffs, or to a third party for the benefit of

one or more of the plaintiffs, by a defendant to deliver or to receive in

Wisconsin natural gas.

    e.   Pursuant to Wis. Stat. § 801.05(5)(e), because this action relates to natural

gas actually received by one or more of the plaintiffs in Wisconsin from

one or more of the defendants.

## **RELEVANT STATUTORY SECTIONS**

84.    This case involves the following four sections in Wisconsin's Antitrust Statute

(Wis. Stat. ch. 133):  §§ 133.01, 133.03, 133.14 and 133.18.

85.    Wis. Stat. § 133.01 provides:

**Legislative intent.**

The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition.  It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition.  It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

86.    Wis. Stat. § 133.03 provides:

**Unlawful contracts; conspiracies.**

(1)   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal.

87.     Wisconsin's "Full Consideration Antitrust Statute, Wis. Stat. § 133.14,  provides:

**Illegal contracts void; recovery.**

All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by s. 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person.  Any payment made upon, under or pursuant to such contract or agreement to or for the benefit of any person may be recovered from any person who received or benefited from such payment in an action by the party making any such payment or the heirs, personal representative or assigns of the party.

88.     Wisconsin's "Treble Damages Antitrust Statute,"  Wis. Stat. § 133.18, in relevant part provides:

(1)  . . .  [A]ny person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefore and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees.

89.     Finally, Wisconsin's Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, provides: "Courts of record within their respective jurisdictions shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."

## CLASS ACTION

90.     Plaintiffs bring this action both on behalf of themselves and on behalf of a class consisting of all commercial entities (businesses, industrial operations and institutions, including schools, colleges and hospitals)  in Wisconsin that purchased natural gas for their own use or

consumption during the Relevant Time Period, except that the class does not include any federal government agencies, defendants or defendants' affiliates.

91.     This action is brought and may be properly maintained as a class action pursuant to Wis. Stat. § 803.08, which provides that "[w]hen the question before the court is one of a common or general interest of many persons or when the parties are very numerous and it may be impracticable to bring them all before the court one or more may sue or defend for the benefit of the whole."

92.     There exists questions of common and general interest to all members of the class, including, but not limited to:  (a) whether the defendants engaged in a conspiracy in violation of Wis. Stat. § 133.03; (b) whether the plaintiffs and those Wisconsin purchasers of natural gas similarly situated are entitled to a "full consideration" recovery pursuant to Wis. Stat. § 133.14; and (c) whether the plaintiffs and those Wisconsin purchasers of natural gas similarly situated are entitled to recover treble damage pursuant to Wis. Stat. § 133.18.  On information and belief the class is very numerous, numbering in the thousands, and it would be impractical to bring all members of the class before the Court.

93.     Plaintiffs are able to and will fairly represent the interests of the members of the class.

## COUNT I:  WIS. STAT. § 133.14 CLAIM

As and for their first cause of action, the plaintiffs allege as follows:

94.     The plaintiffs incorporate by reference the allegations in all of the preceding numbered paragraphs.

95.     The plaintiffs are commercial entities (including industrial and institutional entities) that have operations in Wisconsin.

96.     During the Relevant Time Period, the plaintiffs entered into agreements to purchase natural gas for use in Wisconsin.

97.     During the Relevant Time Period, the defendants were sellers of natural gas, and entered into contracts or agreements during the Relevant Time Period to sell natural gas for use or resale in Wisconsin.

98.     During the Relevant Time Period, the defendants were each a member of a conspiracy prohibited by Wis. Stat. § 133.03.

99.     While member(s) of a conspiracy prohibited by Wis. Stat. § 133.03, the defendants made agreements to sell natural gas which was purchased by one or more of the plaintiffs, and those agreements either directly or indirectly were the result of, grew out of or were connected with a violation of Wis. Stat. § 133.03.  Specifically, each of the defendants during the Relevant Time Period conspired to restrain trade or commerce relating to natural gas, and they received or benefited from the payments made by the plaintiffs pursuant to the plaintiffs' natural gas purchase agreements.  Plaintiffs, and members of the class, purchased natural gas from the defendants or their affiliated companies, and from their co-conspirators, and also from third-parties, "middlemen" that were not parties to the conspiracy alleged herein, which middlemen purchased natural gas from the defendants or their affiliated companies, and from their co-conspirators.

100.    The actions of the defendants resulted in the plaintiffs paying inflated prices for natural gas during the Relevant Time Period.  During the Relevant Time Period, natural gas prices in Wisconsin more than doubled.  The plaintiffs paid higher prices for natural gas than they otherwise would have paid if the defendants' conspiracy had not existed.  The actual product around which the conspiracy centered was sold to purchasers in Wisconsin.  The

conspiracy also injured members of the class in Wisconsin, including the plaintiffs, by among other things, depriving them of the right and ability to make risk management, resource allocation and other financial decisions relating to natural gas, in a full and free competitive market.

101.    Because of the defendants' conspiracy in violation of § 133.03, the contracts or agreements the defendants entered into during the Relevant Time Period, which contracts or agreements were founded upon, are the result of or which grew out of or is connected with the defendants' violation of Wis. Stat. § 133.03, are void under the first sentence of Wis. Stat. § 133.14.  Furthermore, under the second sentence of Wis. Stat. § 133.14, the plaintiffs are entitled to recover from the defendants in this action the payments they made upon, under or pursuant to those void contracts or agreements, which payments were made either directly to any of the defendants, or to or for the benefit of any defendant, if and as the defendants benefited from those payments.

## COUNT II:  WIS. STAT. § 133.18 CLAIM

As and for their second cause of action, the plaintiffs allege as follows:

102.    The plaintiffs incorporate by reference the allegations in all of the preceding numbered paragraphs.

103.    The defendants engaged in conduct prohibited by Wis. Stat. ch. 133.  Specifically, the defendants violated Wis. Stat. § 133.03 during the Relevant Time Period by making contracts or engaging in a combination or conspiracy in restraint of trade or commerce relating to natural gas.

104.     The plaintiffs were injured, directly or indirectly, by the defendants' violation of Wis. Stat. § 133.18, in that the plaintiffs paid higher prices for natural gas during the Relevant Time Period than they would have if the defendants had not violated Wis. Stat. § 133.03.

## DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs, on behalf of themselves and all others similarly situated, demand judgment in their favor and against defendants as follows:

A.     That the Court certify the class as described herein and permit this action to proceed as a class action with one or more of the plaintiffs named herein as the designated representatives of the class;

B.     A declaration pursuant to Wis. Stat. § 133.14 and Wis. Stat § 806.04 that the above described contracts and agreements that the defendants entered into during the Relevant Time Period are void, and further that the defendants are jointly and severally liable pursuant to Wis. Stat. § 133.14 to the plaintiffs for repayment of the amounts the plaintiffs paid for natural gas during the Relevant Time Period if and as the defendants benefited from those payments, in an amount to be determined at trial;

C.     Pursuant to Wis. Stat. § 133.18(1)(a), an award of three times the plaintiffs actual damages, in an amount to be determined at trial, reduced after trebling by any amount actually recovered under plaintiffs' § 133.14 claim for the same injury.

D.     An award of the costs and disbursements of this action, including class notice costs and interest;

E.     An award of attorneys' fees pursuant to Wis. Stat. § 133.18(1)(a), or as otherwise may be permitted by Wisconsin law, for the services herein rendered by class counsel;

F.      Pre-judgment and post-judgment interest in the full amount as may be permitted by law; and

G.      Any and all other relief to which plaintiffs are entitled, in equity or at law, under the laws of the State of Wisconsin.

## DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury of all issues so triable.

## REQUEST FOR EXPEDITED PROCEEDINGS

Wis. Stat. § 133.18(5) provides:

> Each civil action under this chapter and each motion or other proceeding in such action shall be expedited in every way and shall be heard at the earliest practicable date.

Pursuant to Wis. Stat. § 133.18(5), plaintiffs request that this action and all motions and proceedings in this action be expedited, consistent with the intent and remedial goals of the Wisconsin legislature as expressed in Wis. Stat. §§ 133.01 and 133.18(5).

Dated this ____ day of _____, 2007.

KOHNER, MANN & KAILAS, S.C.,
Attorneys for the Plaintiffs

By: _____
        Robert L. Gegios
        State Bar No. 1002906
        Alexander T. Pendleton
        State Bar No. 1011759
        William E. Fischer
        State Bar No. 1045725
        KOHNER, MANN & KAILAS, S.C.
        Barnabas Business Center
        4650 N. Port Washington Road
        Milwaukee, WI 53212-1059
        Telephone:    (414) 962-5110
        Facsimile:    (414) 962-8725

Co-Counsel:

R. Lawrence Ward
R. Daniel Boulware
Jennifer Gille Bacon
Gregory M. Bentz
SHUGHART, THOMSON &
KILROY, P.C.
120 West 12th Street
Kansas City, Missouri 64105
Telephone:      816-421-3355
Facsimile:      816-374-0509

Donald D. Barry
BARRY LAW OFFICES, L.L.C.
5340 S.W. 17th Street
Topeka, Kansas 66604
Telephone:      785-273-3153
Facsimile:      785-273-3159