UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | ) ) ) ) | MDL 1566 2:03-CV-01431-PMP-PAL BASE FILE |
| _____ | ) | |
| LEARJET, INC.; CROSS OIL REFINING & MARKETING, INC.; and TOPEKA UNIFIED SCHOOL DISTRICT 501 on behalf of themselves and all other similarly situated direct purchasers of natural gas in the State of Kansas, | ) ) ) ) ) ) ) | 2:06-CV-00233-PMP-PAL |
| Plaintiffs, | ) ) | ORDER RE: DEFENDANTS' MOTION TO DISMISS (Doc. #961) |
| v. | ) ) | |
| ONEOK, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

Presently before this Court is Specially Appearing Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #961)[1] with Joint Memorandum (Doc. #963). Defendants filed separate volumes of exhibits (Doc. #968, #974, #976) in support.[2] Plaintiffs filed Oppositions (Doc. #1080, #1083, #1106) and supporting appendices (Doc. #1081, #1084, #1125, #1126, #1142).  Defendants filed Replies (Doc. #1176, #1185, #1189).

---

[1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

[2] Defendants Reliant Energy, Inc. and Reliant Energy Services, Inc. also entered into a stipulation of fact (Doc. #1054) with Plaintiffs.

## I.  BACKGROUND

This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001.  Plaintiffs originally filed the above action in the District Court of Wyandotte County, Kansas.  (Notice of Removal, First Am. Compl. [2:06-CV-00233-PMP-PAL, Doc. #1].)  Defendants removed the case to the United States District Court for the District of Kansas.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.  (Letter dated June 14, 2006 [2:06-CV-0233-PMP-PAL, Doc. #41-1].)

In this litigation, Plaintiffs seek to recover damages on behalf of natural gas rate payers.  In the First Amended Complaint ("FAC"), Plaintiffs allege Defendants engaged in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers.  (First Am. Compl. at 30-32.)  Specifically, Plaintiffs allege Defendants knowingly delivered false reports concerning trade information and engaged in wash trades, in violation of Kansas Statutes Annotated § 50-101, et seq.  (Id.)

Plaintiff Learjet, Inc. ("Learjet") is a Delaware corporation with its principal place of business in Wichita, Kansas.  (Id. at 3.)  Plaintiff Cross Oil Refining & Marketing, Inc. ("Cross Oil") is a Delaware corporation with offices located in Kansas.  (Id.)  Plaintiff Topeka Unified School District 501 ("Topeka"), is a local government unit, organized under the laws of the State of Kansas with its headquarters in Kansas.  (Id. at 4.)  Plaintiffs allege they purchased natural gas directly from one or more Defendants, and from other natural gas sellers in the State of Kansas, during the years 2000-2002.  (Id. at 3-4.)

The FAC's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations.  The FAC does not allege the parent company Defendants themselves engaged

in natural gas trading and price reporting.  Rather, the FAC alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales in Kansas during the relevant time period.

Plaintiffs seek to establish personal jurisdiction over the parent company Defendants based on their out-of-forum activities directed at Kansas along with their subsidiaries' and affiliates' contacts within Kansas.  According to the FAC, the parent company Defendants dominated and controlled their respective subsidiaries and the parent company Defendants "entered into a combination and conspiracy . . . which tended to prevent full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas."  (Id. at 4, 7, 11, 13, 15, 17, 19, 23, 25-27.)  Plaintiffs allege the parent company Defendants intended their actions to have a direct, substantial, and foreseeable effect on commerce in the State of Kansas.  (Id. at 4, 7, 11, 13, 15, 17, 19, 23, 25-27.)  According to the FAC, the parent company Defendants "made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates . . . in the United States and in Kansas."  (Id. at 5, 7-8, 11, 13-14, 16-17, 20, 23, 25-28.)

Parent company Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc. now move to dismiss, arguing this Court lacks personal jurisdiction over them.  According to these Defendants, they conduct no business in Kansas and have no other contacts supporting general or specific jurisdiction.  Defendants also argue they cannot be subject to jurisdiction in Kansas based on their subsidiaries' contacts with the forum because their subsidiaries are not their agents or alter egos.  Defendants thus argue exercising personal jurisdiction in this case would violate constitutional due process requirements.

Plaintiffs respond that Defendants' subsidiaries have submitted to jurisdiction in Kansas and Defendants are subject to personal jurisdiction through agency and alter ego principles based on their subsidiaries' contacts with the forum.  Additionally, Plaintiffs request the Court defer ruling until after the magistrate judge resolves certain jurisdictional discovery disputes, or to delay ruling on the jurisdictional question until merits discovery is completed because the jurisdictional questions are intertwined with the merits.

## II. LEGAL STANDARDS

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  To meet this burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1) permitted under the applicable state's long-arm statute and (2) that the exercise of jurisdiction does not violate federal due process.  Id.  The Court must analyze whether personal jurisdiction exists over each defendant separately.  Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

Where the issue is before the Court on a motion to dismiss based on affidavits and discovery materials without an evidentiary hearing, the plaintiff must make "a prima facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid dismissal." Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1119 (9th Cir. 2002).  The Court accepts as true any uncontroverted allegations in the complaint and resolves any conflicts between the facts contained in the parties' evidence in the plaintiff's favor.  Id.  However, for personal jurisdiction purposes, a court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation omitted).

///

1         In diversity cases such as this, "a federal court applies the personal jurisdiction

2    rules of the forum state provided the exercise of jurisdiction comports with due process."

3    Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  However, "federal law is controlling

4    on the issue of due process under the United States Constitution."  Data Disc, Inc. v. Sys.

5    Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v.

6    Watts, 303 F.3d 1104, 1110 (9th Cir. 2002).  Therefore, the Court will apply law from the

7    United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is

8    appropriate under the Due Process Clause.  See In re Korean Air Lines Disaster of Sept. 1,

9    1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should]

10   be free to decide a federal claim in the manner it views as correct without deferring to the

11   interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir.

12   1993) (holding that "a transferee federal court should apply its interpretations of federal

13   law, not the constructions of federal law of the transferor circuit").

14        To satisfy federal due process standards, a nonresident defendant must have

15   "minimum contacts" with the forum state so that the assertion of jurisdiction does not

16   offend traditional notions of fair play and substantial justice.  Pebble Beach Co., 453 F.3d at

17   1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)).  A federal district

18   court may exercise either general or specific personal jurisdiction.  See Helicopteros

19   Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

20        To establish general personal jurisdiction, the plaintiff must demonstrate the

21   defendant has sufficient contacts to "constitute the kind of continuous and systematic

22   general business contacts that 'approximate physical presence.'"  Glencore Grain, 284 F.3d

23   at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th

24   Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433

25   F.3d 1199, 1207 (9th Cir. 2006)).  Courts consider such factors as whether the defendant

26   makes sales, solicits or engages in business in the state, serves the state's markets,

designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086.  "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n.9).

A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56.  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155.  "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." Id.  Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.

The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id.  In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." Id.  To satisfy the third element of this test, the plaintiff must establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable

effect" in the forum state is insufficient.  Id.  The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident."  Bancroft, 223 F.3d at 1087.

The second prong of the specific jurisdiction test requiring that the contacts constituting purposeful availment or purposeful direction give rise to the current action is measured in terms of "but for" causation.  Id. at 1088.  "If the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable."  Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir. 2008) (quotation omitted).

**A.  Alter Ego**

A "parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes."  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134.  However, a subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego.  Id.

To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a prima facie case that the two companies share "such unity of interest and ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice."  Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (quotation omitted).  To demonstrate a unity of interest warranting disregard of corporate separateness, the plaintiff must show the parent controls its subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent. Id. (quotation omitted).  Typically, this would involve showing the parent controls the subsidiary's internal affairs or daily operations.  Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980).

A parent corporation may be involved directly in certain aspects of its wholly owned subsidiary's affairs without subjecting itself to alter ego status.  For example, a

parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to its subsidiaries, and it may act as its subsidiary's guarantor.  <u>Doe</u>, 248 F.3d at 927-28.  Additionally, a parent may refer to its subsidiaries as divisions of the parent in annual reports.  <u>Id.</u> at 928.  Further, a parent may review and approve major decisions, place its own directors on the subsidiary's board, and share offices and staff with its wholly owned subsidiary without being considered its alter ego.  <u>Id.</u>; <u>Harris Rutsky & Co. Ins. Servs., Inc.</u>, 328 F.3d at 1135.

In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status."  <u>Harris Rutsky & Co. Ins. Servs., Inc.</u>, 328 F.3d at 1135 (quotation omitted).  Activities consistent with investor status include "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'"  <u>Doe</u>, 248 F.3d at 926 (quoting <u>United States v. Bestfoods</u>, 524 U.S. 61, 72 (1998)).

In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice.  The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally.  <u>Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.</u>, 736 F.2d 516, 524-25 n.12 (9th Cir. 1984).  For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent.  <u>Id.</u>  However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice.  <u>Id.</u> at 525.  Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil.  <u>Seymour v. Hull & Moreland Eng'g</u>, 605 F.2d 1105, 1113 (9th Cir. 1979).

///

An inability to collect on a judgment "does not, by itself, constitute an inequitable result."[3]
Id.

**B. Agency**

A subsidiary's contacts also may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum.  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134.  A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'"  Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)).  The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence.  Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment.  Id. at 929.  "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries."  Id. (quotation omitted).  The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one."  Gallagher v. Mazda Motor of Am., Inc.,

---

[3] Kansas employs a similar alter ego test.  Under Kansas law, corporations are alter egos "when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal."  Dean Operations, Inc. v. One Seventy Assocs., 896 P.2d 1012, 1016 (Kan. 1995).  Additionally, the party seeking to pierce the corporate veil must show that "allowing the legal fiction of separateness of the corporate structures results in an injustice.  The corporate entity may be disregarded where it is used as a mere subterfuge, as an implement for fraud or illegality, or to work an injustice, or where necessary to achieve equity."  Id. at 1020.

781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own."  Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981).  The Bulova court thus attributed the subsidiaries' contacts to the parent company.  Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate.  Sonora Diamond Corp. v. Superior Court, 99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000).  As the Sonora Diamond court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore."  Id.  But where the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company.  Id.

Likewise, in Doe, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical

operations, the parent would have conducted and controlled those operations.  Doe, 248 F.3d at 929.  The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States."  Id.

## III.  CMS CORPORATION

CMS Energy Corporation ("CMS") is a Michigan corporation with its principal place of business in Jackson, Michigan.  (Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), The CMS Defendants' App. of Facts in Supp. of the Joint Mot. to Dismiss for Lack of Pers. Juris. ["Sep. CMS App."], Ex. A at 1.)  CMS conducts no business and has never been qualified to do business in Kansas.  (Id.)  CMS has no office, mailing address, telephone number, bank account, or property in Kansas.  (Id.)  It has no employees in Kansas, has never paid taxes there, and has never directly advertised to Kansas residents.  (Id.)

CMS does not itself engage in natural gas trading, production, sales, purchases, distribution, or transportation.  (Id. at 1-2.)  CMS also does not report or publish natural gas trade information to any trade publication.  (Id.)  Rather, CMS is a holding company that owns subsidiaries operating in various sectors of the power and energy industries, two of which engage in natural gas trading and price reporting.  (Id. at 1-2, Ex. B at 1.)  One such indirect subsidiary is CMS Marketing, Services and Trading Company ("MST"), a Michigan corporation, that changed its name to CMS Energy Resource Management Company in 2004.  (Sep. CMS App., Ex. A at 2-3.)  MST is a subsidiary of CMS Enterprises Company, a wholly owned subsidiary of CMS.  (App. to Pls.' Joint Opp'n to CMS's Renewed Mot. to Dismiss for Lack of Pers. Juris (Doc. #1081) ["Pls.' CMS App."], Ex. B at 2.)  The other is CMS Field Services, Inc. ("Field Services"), a Michigan

corporation with its principal place of business in Oklahoma.  (Sep. CMS App., Ex. A at 3.)
In July 2003, Cantera Natural Gas, LLC purchased Field Services.  (Id. at 4.)  While CMS
owned it, Field Services was a wholly owned subsidiary of CMS Gas Transmission
Company, which is a wholly owned subsidiary of CMS Enterprises Company, a wholly
owned subsidiary of CMS.  (Pls.' CMS App., Ex. B at 2-3.)

CMS shared at least one officer or director position with MST and Field
Services.  For example, MST's President and Chief Operating Officer from 1999 to 2001
was a CMS officer.  (Pls.' CMS App., Ex. D at CMS-KS-001858.)  Field Services'
President from 1998 to 2001 also was a CMS officer.  (Id.)  MST, Field Services, and CMS
maintain separate bank accounts and separate books and records, however, CMS reports
Field Services' and MST's operations on CMS's consolidated financial reports.  (Sep. CMS
App., Ex. A at 2-4.)  CMS's primary source of cash is dividends and other distributions
from its subsidiaries.  (Pls.' CMS App., Ex. A at CMS-KS-003534.)  CMS did not make
financial guarantees on its subsidiaries' behalf, but CMS's wholly owned subsidiary, CMS
Enterprises Company, did.  (Sep. Vol. of Evid. in Supp. of the CMS Defs.' App. of Facts in
Supp. of the Joint Mot. to Dismiss for Lack of Pers. Juris. ["CMS Sep. Vol. Evid."] (Doc.
#976), Ex. 2 at 141; Pls.' CMS App., Ex. A at CMS-KS-003544, Ex. E at CMS-KS-002106,
Ex. G at CMS-KS-001130, CMS-KS-001146.)

CMS entered into Service and Management Agreements with Field Services and
MST under which CMS agreed to provide various services, including general
administrative services, accounting, statistical and financial, risk management, tax, internal
auditing, information management, legal communications, engineering, public affairs, and
human resources services.  (App. of Docs. Filed Under Seal (Doc. #1142) ["Ex. M"], Ex.
M, Service and Management Agreement.)  Pursuant to these agreements, Field Services and
MST appointed CMS as their "managing agent . . . to manage and direct the business" of
Field Services and MST "subject to the general supervision and control of the Board of

Directors and officers" of Field Services and MST, respectively.  (Id. at 5.)

CMS's powers under the agreements include establishing corporate polices and procedures with respect to all operations except those specifically excluded by the agreement, including making tax and regulatory filings; opening and closing bank accounts; purchasing and maintaining insurance; buying, selling, leasing or encumbering assets; employing, laying off, or dismissing employees; and conducting litigation.  (Id. at 5-6.)  The agreements precluded CMS from engaging in certain activities, such as selling, leasing or otherwise disposing of all of Field Services' or MST's assets; incurring indebtedness other than indebtedness to trade creditors in the ordinary course of business; forming partnerships or joint ventures; or taking any other "extraordinary corporate action," without prior approval of Field Services' or MST's boards of directors.  (Id. at 8.)  In exchange, Field Services and MST paid CMS an annual consulting fee and reimbursed CMS for direct expenses.  (Id. at 9.)

In addition to the Service Agreements, CMS entered into Royalty and Licensing Agreements with Field Services and MST pursuant to which Field Services and MST could use the CMS Energy trade name and service marks.  (Ex. M, Royalty and Licensing Agreement.)  In return, Field Services and MST agreed to pay a royalty fee.  (Id. at 3, C-1.)

In its 1999 annual report, CMS described itself as--

> a leading international integrated energy company acquiring, developing and operating energy facilities and providing energy services in major growth markets.  CMS Energy provides a complete range of international energy expertise from energy production to consumption.  CMS Energy intends to pursue its global growth by making energy investments that provide expansion opportunities for multiple CMS Energy businesses.

(Pls.' CMS App., Ex. C at CMS-KS-001006.)  Similarly, in its 2000 annual report, CMS described itself as "an integrated energy company with a strong asset base enhanced by an active marketing services and trading capability."  (Pls.' CMS App., Ex. D at CMS-KS-001795.)  CMS has stated that its "vision" was to be "an integrated energy company with a

strong asset base, supplemented with an active marketing, services and trading capability." (Pls.' CMS App., Ex. E at CMS-KS-002109.)

Additionally, CMS has stated that it "intends to integrate the skills and assets of its business units to obtain optimal returns and to provide expansion opportunities." (Id.; see also Pls.' CMS App., Ex. C at CMS-KS-001006 (stating CMS "intends to use its marketing, services and trading business to improve the return on CMS Energy's other business assets").) In a 2001 filing with the Securities and Exchange Commission ("SEC"), CMS stated that it "intends to use CMS MST to focus on wholesale customers such as municipals, cooperative electric companies and industrial and commercial customers." (Pls.' CMS App., Ex. E at CMS-KS-002072.) CMS also stated that it, "through its subsidiary CMS MST, engages in trading activities." (Id. at CMS-KS-002162.)

In its 2000 annual report, CMS identifies certain market risks to which it is exposed including "interest rates, currency exchange rates, and certain commodity and equity security prices." (Pls.' CMS App., Ex. D at CMS-KS-001874.) In response to these risks, CMS has implemented an "enterprise-wide" risk management policy. (Id.) The policy is implemented by CMS's Risk Committee which "review[s] the corporate commodity position and ensure[s] that net corporate exposures are within the economic risk tolerance levels established by the Board of Directors." (Id.) The Risk Committee is comprised of CMS business unit managers and is chaired by CMS's Chief Risk Officer. (Pls.' CMS App., Ex. E at CMS-KS-002107.)

CMS controls commodity-related risk primarily through its Risk Management Policy. (Ex. M, CMS Energy Risk Management Policy.) CMS's Board of Directors has "ultimate authority" over the Risk Management Policy. (Id. at 6.) Determination of the "levels and types of risk" CMS will accept lies within the Executive Oversight Committee's authority. (Id.) The Executive Oversight Committee consists of CMS's Chief Executive Officer, President and Chief Operating Officer, and Senior Vice President and Chief

Financial Officer.  (Id. at 3.)  MST's President has the responsibility of "authoriz[ing] the individuals within [MST] responsible for executing derivative transactions on its behalf and on behalf of CMS Energy and . . . establish[ing] appropriate trading limits for said individuals."  (Id.)  These limits are subject to approval by the CMS Risk Committee.  (Id.)  The Risk Committee is comprised of CMS's Senior Vice President and Chief Financial Officer, the president of each business unit, CMS's Vice President of Risk Management, and other individuals representing departments with certain transactional authority.  (Id. at 4.)

The Risk Management Policy assigns to each business unit an amount of dollars the Risk Committee has authorized to be at risk known as "VaR."  (Id. at 12.)  VaR is "the total dollars that the business unit could expect to lose, in one day's time, if energy commodity prices move in a magnitude equal to historical observations against the business unit."  (Id.)  Each business unit must monitor and report its operations to the Risk Management Group to ensure it does not exceed its allotted VaR.  (Id.)  The Risk Management Group consists of certain individuals within CMS Enterprises Company responsible for collecting and reporting all of CMS's business units' books into a single portfolio.  (Id. at 4.)  The business unit must take action to correct violations of this limit within one or two days or the Risk Management Group will provide notice to the Executive Oversight Committee, which notifies the Authorized Trading Group of what action must be taken to correct the violation.  (Id. at 12.)  The Authorized Trading Group is the "entity within CMS Energy authorized to negotiate for and enter into derivative agreements" on CMS's behalf.  (Id. at 2.)  The Risk Management Policy assigns this responsibility to MST.  (Id.)

The Risk Management Policy contains similar constraints for earnings at risk for each business unit as well as limits designed to minimize the total financial loss CMS or its business units may incur.  (Id. at 13.)  Should those limits be reached, "all activity related to

that transaction, book of transactions or the business unit entering into said transaction shall immediately cease and no new transactions will be entered into unless specifically authorized by the [Executive Oversight Committee]." (Id.)  The business unit may not resume business activity until authorized by the Executive Oversight Committee. (Id.)

The Executive Oversight Committee establishes that portion of CMS's earnings which may be exposed to energy commodity risk. (Id. at 18.)  The Risk Committee then allocates this limit across the various business units. (Id.)  Should CMS's earnings at risk exceed the set amount, the Risk Management Group "immediately" notifies the Authorized Trading Group, the Risk Committee, and the Executive Oversight Committee. (Id. at 20.)  Within twenty-four hours, the Risk Management Group and the Authorized Trading Group must recommend actions to correct the situation. (Id.)  Within forty-eight hours of receiving the recommendation, the Executive Oversight Committee directs the Risk Management Group and Authorized Trading Group of what actions to take. (Id.)  While CMS set overall limits, each subsidiary "operate[s] their businesses how they see fit within those parameters." (CMS Sep. Vol. Evid., Ex. 2 at 113.)

The Risk Management Policy requires each business unit to create its own aggregate risk reports on a daily basis. (Ex. M, Risk Management Policy at 6, 12.)  These reports are provided to the head of the business unit and CMS's Vice President for Risk Management. (Id.)  Under the policy, CMS was to perform an audit at least annually to ensure compliance. (Id. at 14.)  Violations of the policy are grounds for terminating an employee. (Id. at 17.)  In 2001 and 2002, CMS "identified a number of deficiencies in MST's systems of internal accounting controls." (Pls.' CMS App., Ex. A at CMS-KS-003560.)  In response, CMS senior management and the CMS Audit Committee responded by replacing some personnel, deploying additional accounting personnel, and implementing changes to MST's internal accounting controls. (Id.)

///

16

In filings with the SEC, CMS disclosed that it had notified appropriate governmental authorities "that some employees at CMS MST and CMS Field Services appeared to have provided inaccurate information regarding natural gas trades to various energy industry publications which compile and report index prices.  CMS Energy is cooperating with investigations by the Commodity Futures Trading Commission, Department of Justice and [the Federal Energy Regulatory Commission] regarding this matter."  (Id.)  In 2005 filings with the SEC, CMS indicated that MST engaged in "round-trip trading transactions (simultaneous, prearranged commodity trading transactions in which energy commodities were sold and repurchased at the same price)," and the Department of Justice was investigating CMS.  (Pls.' CMS App., Ex. I at CMS-KS-010797.)  CMS also disclosed that, pursuant to existing indemnification policies, it was advancing legal defense costs to two former Field Services employees in a civil injunction action filed by the Commodity Futures Trading Commission ("CFTC").  (Id. at CMS-KS-010798.)

In November 2003, MST and Field Services entered into a settlement with the CFTC.  (Pls.' CMS App., Ex. B.)  The CFTC found that from November 2000 through September 2002, MST and Field Services reported false natural gas trade information to price and volume reporting firms.  (Id. at 2-3.)  Under the settlement, MST and Field Services agreed to cease and desist from further violations and to pay a $16 million penalty.  (Id. at 5.)  Additionally, MST, Field Services, CMS, and Cantera Natural Gas, Inc. agreed to cooperate with the investigation, by, among other things, preserving records, fully complying with inquiries or requests for records, producing witnesses, and assisting in locating prior employees.  (Id. at 6-7.)  CMS, MST, and Field Services also agreed not to make any public statement denying the CFTC's findings.  (Id. at 7.)

By October 2002, Field Services ceased submitting natural gas price reports to trade publications.  (Sep. CMS App., Ex. C at 5.)  In January 2003, MST sold a major

portion of its wholesale natural gas trading book to a third party.  (Pls.' CMS App., Ex. A at CMS-KS-003478.)  By 2003, CMS had "eliminated virtually all of the business of [MST]."  (Pls.' CMS App., Ex. J at CMS-KS-008608.)  After that time, MST's remaining business "focuses on buying the fuel needed by [CMS's] domestic independent power plants and selling the uncontracted energy they produce."  (Id.)

Plaintiffs do not contend this Court may assert personal jurisdiction over CMS based on CMS's own contacts with Kansas.  (Pls.' Joint Opp'n to CMS Energy Corporation's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1080) at 4-5.)  Consequently, CMS is subject to personal jurisdiction in Kansas only if the forum acts of its subsidiaries, Field Services and/or MST, are attributable to it through alter ego or agency principles.[4]

**A.  Alter Ego**

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on MST or Field Services being CMS's alter ego.  CMS indirectly wholly owns both subsidiaries.  The companies did not share offices and had only one overlapping officer or director.  CMS did not make financial guarantees on MST's or Field Services' behalf.  The companies maintained separate books and records.  Although MST and Field Services were permitted to use the CMS trade name and service marks, they had to pay a royalty fee to do so.

Under the Services and Management Agreements, CMS provided corporate services to MST and Field Services and acted as the subsidiaries' managing agent.  However, MST and Field Services contractually were required to pay for those services, and CMS's activities were subject to the control of the subsidiaries' boards of directors.  The Services and Management Agreements set forth certain actions CMS could not undertake as managing agent without the prior written approval of the subsidiaries' boards

---

[4] The Court will assume that if Field Services' and/or MST's forum-related acts are attributable to CMS, the Kansas long-arm statute is satisfied.

of directors. Such restrictions are inconsistent with alter ego status.

CMS's promulgation of general policies for its subsidiaries is consistent with its indirect investor status. CMS, as an investor up the corporate chain, is entitled to monitor Field Services' and MST's performance and limit the risk to its investment that it is willing to accept. Consequently, any daily reporting of information from Field Services and MST to CMS is in accord with CMS's investor oversight role. No evidence suggests CMS gave daily control commands to Field Services or MST. Rather, the record demonstrates that, consistent with its investor status, CMS set general policies and guidelines regarding certain overall limits, such as limits on VaR and earnings at risk. Plaintiffs present no evidence that CMS played a role in the day-to-day conduct of Field Services' and MST's operational business. For example, with respect to natural gas trading, while CMS set overall limits on certain metrics, CMS had no role in making the day-to-day decisions of who Field Services or MST was to trade with, when, for what amount of natural gas, and at what price. Although the Risk Management Policy permitted CMS to cease any subsidiary business activity when certain limits were exceeded, Plaintiffs present no evidence CMS ever did so, much less that it did so on a daily basis with respect to Field Services and MST. Plaintiffs also present no evidence CMS had any role in Field Services' or MST's price reporting to indices.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiffs contend it would be unjust to permit CMS to reap the benefits of Field Services' and MST's alleged unlawful behavior by enjoying profits from its indirect subsidiaries' trading activities while escaping liability for their alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, CMS must have had some fraudulent intent at Field Services' or MST's inception or some later abuse of the corporate form such that

failing to treat the entities as one would be inequitable.  Plaintiffs present no evidence Field

Services or MST was undercapitalized at its inception.  Further, the fact that the two

companies operated as legitimate businesses for years suggests a lack of fraudulent intent or

perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiffs' fear that they may not be able to collect on a judgment in this action

against Field Services or MST does not constitute fraud or injustice to support piercing the

corporate veil.  The Court therefore finds Plaintiffs have not met their burden of

establishing Field Services or MST is CMS's alter ego, and the Court will not attribute

these subsidiaries' contacts with Kansas to CMS for purposes of determining personal

jurisdiction based on alter ego principles.

**B.  Agency**

Plaintiffs have failed to establish a prima facie case that Field Services or MST

was CMS's general agent in Kansas.  CMS's business is not purely a holding company in

the sense that it does not passively hold stock in companies from an unrelated range of

businesses.  CMS describes itself as an integrated energy company and has referred to the

synergistic benefits of its trading business line with the business lines of other subsidiaries it

owns.

Although CMS identifies natural gas trading and marketing as one of its business

segments, Plaintiffs have not established that Field Services' or MST's sales of natural gas

in Kansas were sufficiently important to CMS that if Field Services or MST did not make

the sales in Kansas, CMS would have done so itself.  CMS did not conduct any operational

business itself.  Natural gas trading activity was a separate business segment operated

through an indirect subsidiary.  Further, CMS subsequently sold Field Services, and MST

ceased natural gas trading and reporting, suggesting that these subsidiaries' trading

activities were not sufficiently important to CMS that it would perform the activities itself if

its indirect subsidiaries did not do so on its behalf.

Moreover, Plaintiffs have presented no evidence that Field Services' and MST's natural gas sales in Kansas in particular were sufficiently important to CMS's business that CMS would have performed the sales in Kansas itself absent its subsidiaries' representation in the forum.  See Modesto City Schs., 157 F. Supp. 2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F. Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States).  Consequently, Plaintiffs have not shown that Field Services' or MST's Kansas natural gas sales played a significant role in CMS's "'organizational life'" such that it acted as a substitute for CMS in the forum.  Bulova Watch Co., Inc., 508 F. Supp. at 1344.  The Court therefore will not attribute Field Services' and MST's Kansas contacts to CMS under agency principles.[5]

---

[5]  The result would be the same under general Kansas agency law.  In Kansas, an agent has express authority if "the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act."  Mohr v. State Bank of Stanley, 734 P.2d 1071, 1075 (Kan. 1987) (quotation omitted).  An agent has implied authority if "from the facts and circumstances of the particular case, it appears there was an implied intention to create an agency; in which event, the relation may be held to exist, notwithstanding either a denial by the alleged principal or whether the parties understood it to be an agency."  Id. (quotation omitted).  Where an agent lacks actual authority, either express or implied, an agent may possess apparent or "ostensible" agency.  Town Ctr. Shopping Ctr., LLC v. Premier Mortg. Funding, Inc., 148 P.3d 565, 569 (Kan. Ct. App. 2006).  "An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent."  Id. (quotation omitted).  To determine whether an agent had apparent authority, the court considers the principal's intentional acts or words to a third party and whether those acts or words "reasonably induced the third party to believe that an agency relationship existed."  Id. (citing Mohr, 734 P.2d at 1076).

Here, Plaintiffs have presented evidence that CMS delegated to MST the authority to conduct derivative trading on CMS's behalf under the Risk Management Policy.  However, Plaintiffs have presented no evidence MST engaged in derivative transactions in Kansas pursuant to this authority.  Additionally, Plaintiffs have presented a comment in an SEC filing that CMS engages in trading activity "through" MST.  The statement is not an express authorization for MST to sell natural gas on CMS's behalf as CMS's agent with authority to bind CMS.  Rather, it describes CMS's business line

The Court will not attribute Field Services' or MST's contacts with the forum to CMS, and CMS has no contacts of its own sufficient to support personal jurisdiction.  The Court therefore will grant CMS's motion to dismiss for lack of personal jurisdiction.

## IV.  DUKE ENERGY CAROLINAS, LLC

Duke Energy Carolinas, LLC ("DEC") is a North Carolina limited liability company formerly known as Duke Energy Corporation, a North Carolina corporation. (Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), Separate App. of Facts Regarding Duke Energy Carolinas, LLC ["Sep. DEC App."], Ex. A at 1.)  Duke Energy Corporation converted to a limited liability company and renamed itself DEC in April 2006.  (Renewed Mot. to Dismiss for Lack of Pers. Juris. (Doc. #872) ["DEC Mot."], Ex. A at 2.)  DEC primarily engages in the business of generating, transmitting, distributing, and selling electric energy in North and South Carolina.  (Id. at 3.)

DEC does not maintain offices, conduct business, own property, or maintain a bank account in Kansas.  (Sep. DEC App., Ex. A at 2, Ex. C at 2, Ex. D at 2.)  DEC has not applied for or received a certificate of authority to transact business in Kansas and has no registered agent for service of process in Kansas.  (Sep. DEC App., Ex. B at 2.)

DEC wholly owns Duke Capital Corporation, which in turn wholly owns Pan Energy Corp.  (App. to Pls.' Joint Opp'n to Duke Energy Carolinas, LLC's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1084) ["Pls.' DEC App."], Ex. F.)  Pan Energy Corp. wholly owns Duke Energy Services, Inc., which wholly owns Duke Energy Natural Gas Corporation.  (Id.)  Duke Energy Natural Gas Corporation wholly owns DETMI

operationally conducted through its subsidiary.  Plaintiffs present no other evidence that CMS expressly delegated trading authority on CMS's behalf to MST.  As to apparent agency, Plaintiffs have presented evidence that CMS permitted Field Services and MST to use the "CMS" name and logo in marketing natural gas in Kansas.  However, Plaintiffs have presented no evidence that anyone relied on an apparent agency relationship between CMS and Field Services or MST.

Management, Inc.  (Id.)  DETMI Management, Inc. owns a sixty percent interest in Duke

Energy Trade and Marketing, LLC ("DETM"), a Defendant in this action and the subsidiary

whose contacts with Kansas Plaintiffs seek to attribute to DEC.  (DEC Mot., Ex. C at 2.)

Mobil Natural Gas, Inc. ("MNGI"), an indirect subsidiary of Exxon Mobil Corporation,

owns the other forty percent of DETM.  (Id. at 2-3.)

DETM was created in 1996 as a Delaware limited liability company pursuant to a

limited liability company agreement and limited partnership agreement.  (Pls.' DEC App.,

Ex. E at 34-35; App. of Docs. Filed Under Seal (Doc. #1125) ["Sealed DEC App."], Ex. L

at DEMDL000383; DEC Separate Vol. of Evid. in Supp. of the Separate App. of Facts

Regarding Duke Energy Carolinas, LCC (Doc. #968) ["DEC Separate Vol. Evid."], Ex. 7.)

The company now known as DETM originally was called PanEnergy Trading and

Marketing Services, LLC, and was created by an agreement between PTMSI Management,

Inc. and MNGI.  (DEC Separate Vol. Evid., Ex. 7 at 1, 6, 7, 10.)  PTMSI Management,

Inc.'s parent company at the time was PanEnergy Corp.  (Id. at 7, 10.)  PanEnergy Corp.

was acquired by Duke Energy Corporation in 1997 and PanEnergy Trading and Marketing

Services, LLC was renamed to DETM.  (DEC Separate Vol. Evid., Ex. 9 at 2.)  DETM is

engaged in the purchase and sale of natural gas and electricity at wholesale.  (DEC Mot.,

Ex. C at 3.)  DETM concedes personal jurisdiction in this action.  (Pls.' DEC App., Ex. A at

2.)

DETM is run by a Management Committee consisting of three representatives

from the Duke Energy side and two representatives from the Exxon Mobil side.  (Sealed

DEC App., Ex. L at DEMDL000400.)  The Management Committee acts through the

delegation of certain responsibilities and authority to the managing member, which in 2001

and 2002 was DETMI Management, Inc.  (Id.)  Although DETMI Management, Inc. was

the managing member, and through its majority status on the committee could outvote the

MNGI members on certain matters, the limited liability company agreement mandated that

23

some actions required unanimous approval by the Management Committee.  (DEC Separate Vol. Evid., Ex. 7 at 17, 24, 26-27.)  In at least one instance, the MNGI members refused to agree to a business plan supported by the DETMI Management, Inc. members.  (Pls.' DEC App., Ex. E at 67-69.)

No DEC director serves as an officer or director for DETM.  (DEC Mot., Ex. A at 4.)  In DEC's 2000 annual report, DEC identified a "management team" which includes Jim W. Mogg ("Mogg"), Chief Executive Officer of Duke Energy Field Services; Kirk B. Michael ("Michael"), Vice President and Chief Financial Officer for Finance and Planning; James Donnell ("Donnell"), President and Chief Executive Officer for Duke Energy North America; and Ronald Green ("Green"), President and Chief Executive Officer for Duke/Fluor Daniel.  (Pls.' DEC App., Ex. B at DEMDL001901.)  Mogg, Michael, Donnell, and Green were members of the DETM Management Committee at one point or another. (Sealed DEC App., Ex. L at DEMDL001702, DEMDL001706, DEMDL001711.)

DEC and DETM maintain separate corporate records.  (DEC Mot., Ex. A at 4.) DEC provided corporate services to DETM, including administering employee health insurance, human resources, computer technology, legal services, and credit risk management.  (Pls.' DEC App., Ex. A at 4-5.)  Throughout the relevant time period, DETM regularly used, and was permitted to use, the "Duke Energy" and "Mobil" logos.  (Id. at 5.) DETM did not have any agency agreements or power of attorney for DEC, and did not register to do business on DEC's behalf in Kansas during the relevant time period.  (Id.)

DETM was financed through a $150 million funding facility, of which DETMI Management, Inc. provided sixty percent and MNGI funded the other forty percent.  (DEC Separate Vol. Evid., Ex. 3 at 35.)  In DETM's financial statements, it twice indicated that DEC was responsible for providing operational interest-free contributions, on a proportionate basis with Exxon Mobil, to fund DETM's operations.  (Sealed DEC App., Ex. L at DEMDL00383, DEMDL00400.)  According to Richard McGee ("McGee"), former

general counsel for energy services for DEC and current president of DEC's international

business, these statements were a mistake, as PanEnergy Corp., not DEC, is responsible for

making contributions under the funding facility agreement.  (Pls.' DEC App., Ex. E at 6,

138-40.)  DEC's consolidated financial reports reflected sixty percent of DETM's profits

and losses during the relevant time period.  (Pls.' DEC App., Ex A at 6.)

DEC describes itself, collectively with its subsidiaries, as "an integrated energy

and energy services provider with the ability to offer physical delivery and management of

both electricity and natural gas throughout the U.S. and abroad."  (Pls.' DEC App., Ex. B at

DEMDL001846.)  DEC provides these services through various "business segments," one

of which includes DETM's natural gas trading.  (Id.)  DEC describes its business strategy as

"develop[ing] integrated energy businesses in targeted regions where Duke Energy's

extensive capabilities in developing energy assets, operating electricity, natural gas and

NGL plants, optimizing commercial operations and managing risk can provide

comprehensive energy solutions for customers and create superior value for shareholders."

(Id.)

DEC has created "[c]omprehensive risk management polices" to monitor and

manage market, commodity price, credit, and other risks to which DEC and its subsidiaries

are exposed.  (Id. at DEMDL001854-55.)  As part of its risk management policies, DEC

monitors certain metrics, such as value-at risk ("VAR") and daily earnings at risk ("DER")

on a daily basis.  (Id. at DEMDL001855.)  DEC has several committees which perform risk

management, including the Corporate Risk Management Committee, the Energy Risk

Management Committee, and the Financial Risk Management Committee.  (Pls.' DEC

App., Ex. E at 80.)  DEC appointed the members of each of these committees.  (Id.)

Through these polices and committees, DEC sets overall risk guidelines for its subsidiaries.

For example, DEC adopted a Code of Business Ethics which applied to every

DEC subsidiary.  (Pls.' DEC App., Ex. J, Ex. E at 100-01.)  This policy mandated

compliance with applicable antitrust laws.  (Pls.' DEC App., Ex. J at 12.)  This policy was implemented and supervised by DEC's Corporate Compliance Committee.  (Id. at 15.)  The Corporate Compliance Committee was responsible for updating the code, establishing education programs for employees about ethics and compliance issues, providing guidance under the code, monitoring and auditing compliance, reporting periodically to management and the Audit Committee of DEC's Board of Directors, and reporting violations to the appropriate governmental authorities.  (Id.)  DETM either incorporated this policy by reference or adopted a similar policy.  (Pls.' DEC App., Ex. E at 115-16.)

DEC also has a Corporate Credit Risk policy.  (Sealed DEC App., Ex. L at DEMDL001382, DEMDL001388.)  Under this policy, DEC's Chief Risk Officer chairs the Risk Management Committee.  (Id.)  The Risk Management Committee meets at least monthly and is responsible for reviewing business trends and credit exposure, monitoring compliance with the policy, identifying where new policies are needed, and ensuring "consistent and mutually reinforcing credit and market risk management strategies through various corporate risk policies and associated guidelines for implementing policy."  (Id.)  The policy also sets forth the duties of the Chief Credit Officer, which includes the ability to "stop business activity that would increase credit exposure, as is necessary, to protect Duke Energy's balance sheet."  (Id.)  The Chief Credit Officer reports to the Chief Risk Officer.  (Id.)

DEC has a Corporate Risk Management Committee consisting of DEC's chief financial officer and DEC Policy Committee members.  (Id. at DEMDL001488.)  This Committee establishes "comprehensive risk management policies to monitor and control identified risks."  (Id.)  DEC's Corporate Risk Management Committee delegates some responsibilities to the Energy Risk Management Committee and the Financial Risk Management Committee, but retains oversight responsibilities.  (Id.)  The Energy Risk Management Committee has responsibility for overseeing energy risk management

practices and recommending energy commodity exposure limits, subject to approval by the Corporate Risk Management Committee.  (Id.)  The Financial Risk Management Committee is responsible for managing risks related to interest rates, foreign currency, and credit.  (Id.)

Within DETM, "[u]ltimate risk control responsibility resides with the DETM Management Committee."  (Id. at DEMDL001489.)  The DETM Management Committee oversees the risk management and control function and approves policies and controls for DETM.  For example, DETM adopted its own Risk Management and Trading Policies and Controls.  (Id. at DEMDL001484.)  DETM's Management Committee "delegates the day-to-day overview of the risk management and control function" to the DEC Energy Risk Management Committee.  (Id. at DEMDL001489.)  "However, overall responsibility for DETM's performance targets, business plans and approved risk levels remains with the Management Committee."  (Id.)  Although DETM's Risk Management and Trading Policies and Controls states that the Management Committee delegates "day-to-day overview" to the DEC Energy Risk Management Committee, it describes the Energy Risk Management Committee's functions as meeting "at least monthly" to establish risk management policies, controls, and practices, and overseeing and approving excesses of overall limits.  (Id. at DEMDL001489-90.)  When it comes to operational control, the policy vests that authority in DETM Senior Management.  (Id. at DEMDL001490.)  DETM Senior Management is responsible for "[d]evelopment of trading strategies; [a]ctive management of trading within overall limits; [a]llocation of limits to traders and/or books; [e]nforcing the risk control environment; [a]dvocating new limits and products; and [a]dvocating exceptions or revisions to policy when appropriate."  (Id.)  Beneath DETM Senior Management, the origination and trading groups actually conduct the transactions with customers.  (Id.)

///

DEC's Energy Risk Management Committee is not responsible for managing energy price risk for DETM.  (DEC Separate Vol. Evid., Ex. 10 at DEMDL001569.)  Instead, DETM manages its own energy price risk pursuant to its own risk management policy.  (Id.)  However, that policy is subject to approval by the Corporate Risk Management Committee.  (Id.)  In similar fashion, DETM decides whether to extend credit, subject to the Financial Risk Committee's Credit Quality Guidelines.  (Id. at DEMDL001495.)  According to McGee, DEC's risk management policies "would have applied to DETM only to the extent that . . . the management committee of DETM had adopted a policy that was similar to this or [DETMI,] in discharging its responsibilities as a managing member of DETM . . . adopt[ed] policies that it saw fit in connection with discharging those duties."  (Pls.' DEC App., Ex. E at 100.)  These policies "were either largely consistent with or in some cases maybe identical to some of" DEC's policies.  (Id.)

At a July 2000 DETM management committee meeting, the MNGI representative expressed some concern that certain personnel now working for DETM would be shared between DETM and Duke Energy North America, LLC.  (Sealed DEC App., Ex. L at DEMDL001707.)  Specifically, the MNGI representative was concerned that because DETM senior managers "would have dual responsibilities, working for both DETM and Duke Energy or Duke affiliates, [they] would face conflicts because their compensation is based on performance of two entities with differing Duke ownership shares."  (Id.)  At a September 2001 DETM management committee meeting, the Exxon Mobil representative "objected to the way the business had been run including a perceived lack of separation between [Duke Energy North America] and DETMI."  (Id. at DEMDL001718.)

In May 2002, DETM's outside auditor, Deloitte & Touche, sent a letter to the DETM management committee highlighting certain areas of concern.  (Id. at DEMDL002687.)  Among the concerns Deloitte & Touche highlighted was that DETM's operations were "highly integrated into the overall strategy of Duke Energy North America

('DENA').  There are instances where the distinctiveness between DETM and other affiliates of its owners could be enhanced."[6]  (Id. at DEMDL002692.)

In September 2003, the CFTC entered into a settlement with DETM regarding allegations that DETM manipulated the natural gas market.  (DEC Mot., Ex. F.)  The CFTC found that from January 2000 through August 2002, DETM's Houston office reported to price reporting firms false price and volume information regarding natural gas transactions.  (Id. at 2-3.)  As part of the settlement, DETM agreed to cease and desist from any future violations, and agreed to pay a $28 million fine.  (Id. at 5.)  Additionally, both DETM and Duke Energy Corporation (DEC's predecessor) agreed to cooperate in any future investigations arising out of this investigation, to preserve records, to produce documents when requested, and to provide assistance in locating and contacting any prior employees.  (Id.)  DETM and Duke Energy Corporation also agreed not to publicly deny the CFTC's findings of fact.  (Id. at 6.)  DEC attorneys and senior executives participated in internal investigations into DETM's price reporting activities.  (Pls.' DEC App., Ex. A at 6.)

In April 2003, DEC announced that two of its subsidiaries, Duke Energy North America and Duke Energy Merchants, would cease proprietary trading of natural gas and power.  (DEC Mot., Ex. G.)  DETM also ceased speculative natural gas trading in 2003.  (Pls.' DEC App., Ex. A at 5.)  After that time, DETM continued to buy and sell natural gas "for the purpose of meeting and hedging its obligations to supply gas-fired power plants owned by Duke Energy North America, Inc. and other affiliates and to meet natural gas supply commitments it has made."  (Id.)  By the end of 2004, DEC "made substantial progress on winding down" the DETM joint venture with Exxon Mobil, and had "completed or signed transactions to sell about 90 percent of that business."  (Pls.' DEC

---

[6]  DEC objects to the admission of the Deloitte & Touche letter as inadmissible hearsay. Because consideration of the letter does not affect the outcome of this decision, the Court will deny DEC's objection.

App., Ex. G.)

Plaintiffs concede they are not contending this Court may assert personal jurisdiction over DEC based on DEC's own contacts with Kansas.  (Pls.' Joint Opp'n to Duke Energy Carolinas, LLC's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1083) at 5.)  Consequently, DEC is subject to personal jurisdiction in Kansas only if the forum acts of its subsidiary, DETM, are attributable to it through alter ego or agency principles.[7]

**A.  Alter Ego**

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on DETM being DEC's alter ego.  DEC indirectly owns only sixty percent of DETM.  DETM thus is neither DEC's direct subsidiary nor its wholly owned subsidiary.  The companies did not share offices and had virtually no overlapping officers or directors.  That other officers and directors of other DEC subsidiaries may have overlapped or that DEC identified certain DETM Management Committee members as part of an overall "management team" does not indicate a lack of separateness between DEC and DETM.  Likewise, the fact that MNGI and/or Deloitte & Touche perceived a possible lack of separateness between DETM and Duke Energy North America does not establish a lack of separateness between DETM and DEC.  Nor does the possibility that DEC was responsible for making contributions under the funding facility or that DEC provided corporate services, such as legal or human resources support.

Plaintiffs have presented no evidence that DEC controlled DETM's daily operations.  Under the limited liability company agreement, DETMI Management, Inc. was the managing agent, not DEC.  And as to DETMI Management, Inc., it did not have complete control over DETM as the MNGI representatives' approval was required for any material decisions.  In at least one instance, DETMI Management, Inc. was unable to

---

[7]  The Court will assume that if DETM's forum-related acts are attributable to DEC, the Kansas long-arm statute is satisfied.

implement the business plan it desired because it could not obtain the approval of the

MNGI representatives on the Management Committee.

DEC's promulgation of general policies for its subsidiaries is consistent with its

indirect investor status.  DEC, as an investor up the corporate chain, is entitled to monitor

DETM's performance.  Consequently, any daily reporting of information from DETM to

DEC is in accord with DEC's investor oversight role.  No evidence suggests DEC gave

daily control commands to DETM or even to DETMI Management, Inc.  Rather, the record

demonstrates that, consistent with its investor status, DEC set general policies and

guidelines regarding best policies and practices, as well as certain overall limits, such as

limits on credit risk.  However, DEC's broad policies applied to DETM only to the extent

DETM's Management Committee adopted those policies, in whole or in part, through

DETMI Management, Inc.'s status as a majority member.

Moreover, DETM's delegation of certain risk management oversight to DEC's

Energy Risk Management Committee does not demonstrate daily control.  The Energy Risk

Management Committee meets "at least monthly," and is responsible for establishing risk

managing practices and controls, monitoring daily reports, and overseeing and approving

any excesses of a risk limit.  (Sealed DEC App., Ex. L at DEMDL001490.)  The Energy

Risk Management Committee thus established broad guidelines under which DETM

operated and became involved, if ever, only when overall limits were exceeded.  Actual

operational decisions, such as developing trading strategy, actively managing trading within

overall limits, allocating limits among traders, and enforcing risk control, were the

responsibility of DETM Senior Management.

Further, with respect to DETM's day-to-day conduct of its business within these

guidelines, Plaintiffs present no evidence DEC had any role.  For example, with respect to

natural gas trading, while DEC set overall limits on certain metrics, DEC had no role in

making the day-to-day decisions of who DETM was to trade with, when, for what amount

of natural gas, and at what price.  Plaintiffs also present no evidence DEC had any role in DETM's price reporting to indices.  Plaintiffs present evidence that DEC policies granted DEC's chief credit officer with veto power over any DETM business activity, but Plaintiffs present no evidence that authority ever was exercised over DETM generally or particularly with respect to any natural gas trades in Kansas or anywhere else.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil.  Plaintiffs contend it would be unjust to permit DEC to reap the benefits of DETM's alleged unlawful behavior by enjoying profits from DETM's trading activities while escaping liability for DETM's alleged misconduct.  However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil.  Rather, DEC must have had some fraudulent intent at DETM's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable.  Plaintiffs present no evidence DETM was undercapitalized at its inception. DEC was not involved in forming DETM and became its indirect parent through DEC's acquisition of DETM's ultimate parent, PanEnergy Corp.  Further, the fact that DETM operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiffs' fear that it may not be able to collect on a judgment in this action against DETM does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiffs have not met their burden of establishing DETM is DEC's alter ego, and the Court will not attribute DETM's contacts with Kansas to DEC for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

Plaintiffs have failed to establish a prima facie case that DETM was DEC's general agent in Kansas.  DEC's primary business is the generation and supply of electricity

to end users in North and South Carolina.  DEC also acts as a holding company, but it is not purely a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses.  DEC has described itself as a "an integrated energy and energy services provider with the ability to offer physical delivery and management of both electricity and natural gas throughout the U.S. and abroad."  (Pls.' DEC App., Ex. B at DEMDL001846.)

In practice, DEC itself does not perform these activities beyond the generation and transmission of electricity in North and South Carolina, but holds the shares of various subsidiaries which either engage in those activities or which in turn own subsidiaries which perform those business operations.  Among these business operations was DEC's North American Wholesale Energy business segment, which included DETM's natural gas-related activities.  (Id.)

Although DEC identifies natural gas trading and marketing as one of its business segments, Plaintiffs have not established that DETM's sales of natural gas in Kansas were sufficiently important to DEC that if DETM did not make the sales in Kansas, DEC would have done so itself.  DEC's primary business was electricity generation and transmission in North and South Carolina.  Natural gas trading activity was a separate, fragmented component of one of DEC's other business segments operated through an indirect, partially owned subsidiary.  Further, the fact that DETM subsequently ceased natural gas trading in 2003 suggests that DETM's trading activities were not sufficiently important to DEC that it would perform the activities itself if DETM did not do so on its behalf.

Moreover, Plaintiffs have presented no evidence that DETM's natural gas sales in Kansas in particular were sufficiently important to DEC's business that DEC would have performed the sales in Kansas itself absent its subsidiary's representation in the forum.  See Modesto City Schs., 157 F. Supp. 2d at 1135; Bulova Watch Co., Inc., 508 F. Supp. at 1344.  Consequently, Plaintiffs have not shown that DETM's Kansas natural gas sales

played a significant role in DEC's "'organizational life'" such that it acted as a substitute for DEC in the forum.[8]  Bulova Watch Co., Inc., 508 F. Supp. at 1344.  The Court therefore will not attribute DETM's Kansas contacts to DEC for personal jurisdiction purposes based on agency principles.

The Court will not attribute DETM's contacts with the forum to DEC, and DEC has no contacts of its own sufficient to support personal jurisdiction.  The Court therefore will grant DEC's motion to dismiss for lack of personal jurisdiction.

**V.  RELIANT ENERGY, INC.**

Defendant Reliant Energy, Inc. ("REI") is a Delaware corporation with its principal place of business in Texas.  (Def. Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #869), Ex. A ["Jines Decl."] at 2.)  REI as it currently exists came into being in response to changes in Texas regulatory laws.  (Id.)  The company formerly known as Reliant Energy, Incorporated divided itself into CenterPoint Energy, Inc. ("CenterPoint") and Reliant Resources, Inc. ("RRI").  (Id.)  After CenterPoint divested itself of its RRI stock, the two companies became separate entities and RRI changed its name to REI, the Defendant in this action.  (Id. at 2-3.)  Under the Master Separation Agreement resulting in RRI's existence as a separate entity, RRI agreed that it would indemnify, defend, and hold harmless Reliant Energy, Incorporated, and in certain cases, that it would cause its subsidiaries to do so as well, for liabilities arising out of RRI and its subsidiaries' business operations, including business operations that pre-dated the agreement.  (App. of Docs. Filed Under Seal ["Sealed REI App."] (Doc. #1126), Ex. E at REILJ012883, Ex. F at REILJ009719.)

---

[8]  The result would be the same under general Kansas agency law.  Plaintiffs present no evidence of any manifestation by DEC to DETM that DETM may act on DEC's account.  Although Plaintiffs have presented evidence DEC permitted DETM to market natural gas using the "Duke Energy" name and logo, Plaintiffs have not presented any evidence that any third party relied on an apparent agency between DEC and DETM.

REI is a holding company that does not itself buy, sell, or transport natural gas, nor does it report natural gas prices to any price reporting firms or price index publishers. (Jines Decl. at 3-4; Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), Reliant Energy, Inc.'s App. in Supp. of Its Mots. to Dismiss for Lack of Pers. Juris. ["REI App."], Ex. B at 2.)  REI does not have any offices, employees, property, bank accounts, phone listings, or mailing addresses in Kansas.  (REI App., Ex. C at 2, Ex. D at 2, Ex. E at 2.)  REI has never sold or traded natural gas in Kansas.  (REI App., Ex. B at 2, Ex. F at 2.)  REI paid taxes in Kansas in 2001 and 2002 for business done in Kansas by its subsidiary, Reliant Energy Solutions, LLC.  (Sealed REI App., Ex. D at 122-23; REI App., Ex. F at 2.)  REI did so because under relevant state and federal tax law, Reliant Energy Solutions, LLC is disregarded for tax purposes, requiring REI to file the returns in its own name.  (REI App., Ex. F at 2.)  Other than advertising in publications available nationwide, REI has not directed advertising specifically towards Kansas.  (REI App., Ex. G at 2.)

REI has a wholly owned subsidiary, Reliant Energy Services, Inc. ("RES"). (Jines Decl. at 3.)  RES formerly was known as NorAm Energy Services, Inc., and it already existed as a subsidiary of NorAm Energy Corp. when a company called Houston Industries Incorporated acquired NorAm Energy Corp. in 1997.  (REI & RES's Stip. of Fact in Connection With Pers. Juris. Disc. (Doc. #1054) ["Stip."] at 2.)  In 1999, Houston Industries Incorporated changed its name to Reliant Energy, Incorporated and NorAm Energy Services, Inc. changed its name to RES.  (Id.)  On December 31, 2000, RES became REI's wholly owned subsidiary through the Master Separation Agreement between REI and Centerpoint.  (Id.)

RES concedes personal jurisdiction in Kansas.  (Id.)  However, RES did not have any agency agreements or powers of attorney for REI, nor did it register or file as a foreign corporation to do business in Kansas on REI's behalf.  (Id. at 3.)

REI and RES share physical offices in Texas.  (Sealed REI App., Ex. D at 163-64.)  REI and its subsidiaries, including RES, share some common officers and directors.  (Sealed REI App., Ex. B.)  For example, Michael Jines ("Jines") was an officer for REI, RES, and several other REI subsidiaries, including some for which he could not recall the subsidiary's name.  (Sealed REI App., Ex. D at 15-19, 107-110.)  At his deposition, Jines stated his duties and responsibilities as an officer and director of those subsidiaries would be "no different" than his duties and responsibilities as REI's general counsel.  (Id. at 119-20.)  As RES's one hundred percent owner, REI nominates and elects the directors for RES.  (Id. at 88-89.)

At the present time, REI and RES have no employees of their own.  (Id. at 248, 288-89.)  Rather, Reliant Energy Corporate Services ("RECS"), an REI subsidiary, acts as the payroll entity for REI and all of its subsidiaries.  (Id. at 9-10.)  RECS employs personnel who provide services to REI and RES.  (Id. at 10.)  For example, lawyers employed by RECS provide legal services to REI and all of its subsidiaries.  (Id. at 111-13.)  RECS also provides accounting, finance, legal, human resources, and facilities management services to REI and its subsidiaries.  (Id. at 20.)  As part of these services, RECS prepares separate financial documents, including tax filings, for RES.  (Id. at 56-57, 267.)  REI permitted RES to use the "Reliant Resources" and "Reliant Energy" trademarks and trade names during the relevant period.  (Stip. at 3.)

In terms of financial dealings between REI and its subsidiaries, the subsidiaries are funded by borrowing from or receiving equity capital infusions from REI.  (Sealed REI App., Ex. D at 239-40.)  In turn, REI receives either loan repayments or dividends when money is transferred from the subsidiaries to REI.  (Id. at 291-92.)  REI received dividends from RES during the relevant time period.  (Stip. at 4.)  In some circumstances, REI provides guarantees to third parties in transactions involving REI subsidiaries.  (Sealed REI App., Ex. D at 204-05.)  REI agreed to be RES's guarantor when RES's counterparties

required it.  (Stip. at 2.)  In setting forth its financial guarantee policy, REI (then RRI)

described RES as a "business unit."  (Sealed REI App., Ex. H at REILJ010083.)

Although describing itself as a holding company, REI does not passively hold

stock in its subsidiaries and leave them to operate on their own.  Rather, REI establishes

overall policies and guidelines for its subsidiaries, establishes a capital structure, and issues

consolidated financial reports.  (Sealed REI App., Ex. D at 131.)  Among the guidelines

REI requires its subsidiaries to follow is a policy for best principles and practices.  (Sealed

REI App., Ex. I at REILJ012703.)  This policy requires compliance with applicable laws

and regulations, and requires that all transactions be for a bona fide business purpose and be

reported accurately.  (Id.)  The best practices policy prohibits wash sales and fictitious

transactions.  (Id. at REILJ012704.)  This policy applied to RES during the relevant period.

(Sealed REI App., Ex. N at 93.)

Additionally, REI sets certain risk control limits on its subsidiaries.  For example,

REI set limits on RES's value at risk ("VAR").  (Sealed REI App., Ex. F at REILJ009749.)

REI's board of directors sets the overall limit on VAR.  (Id.)  The Audit Committee of

REI's board meets at least three times a year to approve the risk control organization

structure, approve the overall risk control policy, monitor compliance with trading limits,

and review risk control issues.  (Id. at REILJ009752.)

REI also has a Risk Oversight Committee consisting of REI and subsidiary

officers which allocates VAR to various business segments, including RES.  (Sealed REI

App., Ex. M at 17, Ex. F at REILJ009752.)  The Risk Oversight Committee meets at least

monthly to monitor compliance, review daily position reports for trading and marketing

activity, recommend to REI's board of directors adjustments to trading limits, approve new

trading activity, monitor information systems related to risk management, and place

guidelines and limits on hedging activity.  (Sealed REI App., Ex. F at REILJ009752-53.)

Management for each business segment then allocates risk limits among individual traders

within the limits set by the Risk Oversight Committee.  (Id. at REILJ009754.)  RES

allocates VAR to its "head book traders" who in turn authorize other traders to execute

trades.  (Sealed REI App., Ex. M at 17.)  Thus, the VAR limit set by REI was "an overall

limit."  (Sealed REI App., Ex. N at 155.)  RES would engage in multiple transactions in one

day, and the limit set by REI was evaluated against the net result of a set of RES's

transactions or activities.  (Id.)

        REI oversight of its subsidiaries includes daily reporting of mark-to-market

valuation,[9] VAR, and "other risk measurement metrics."  (Sealed REI App., Ex. L.)  RES's

VAR is reported daily to REI's Risk Oversight Committee.  (Sealed REI App., Ex. M at

17.)  Additionally, violations of any risk limits are reported to the business segment

management as well as to the appropriate committees.  (Sealed REI App., Ex. F at

REILJ009754.)  While the reports from the subsidiary to the various committees may occur

daily, communications from REI down to the subsidiaries occurs "only to the extent that the

activity ended up in a violation."  (Sealed REI App., Ex. N at 156.)  For example, if RES

exceeded its VAR limit, an REI officer may inform RES management and inquire as to

what RES management intended to do to correct the situation.  (Id.)  However, "in terms of

the day-to-day buying and selling of gas or power, [REI officers have] limited or no

interaction."  (Id.)

        In November 2003, the CFTC entered into a settlement with RES regarding the

CFTC's allegations that RES violated the Commodities Exchange Act.  (Decl. of William

E. Fischer (Doc. #1104), Ex. B, Jines Ex. 4.)  According to the settlement, the CFTC found

RES's Houston offices made false price reports regarding natural gas transactions from

1999 through May 2002.  (Id. at 4-5.)  Additionally, the CFTC found RES engaged in wash

trades in 2000.  (Id. at 6-7.)  As part of the settlement, RES and REI agreed to entry of the

---

[9] "Mark-to-market" means the value of a contract relative to current market prices.  (Sealed
REI App., Ex. N at 128.)

order finding violations, as well as requiring RES to cease and desist from its misconduct, imposing an $18 million civil penalty on RES, and requiring RES and REI to undertake certain activities.  (Id. at 7-9.)  Specifically, REI agreed to cooperate with the CFTC in the future, including preserving and producing records regarding the reporting of price or trade volumes in natural gas transactions and producing RES and REI employees to provide assistance in any trial, proceeding, or investigation related to the CFTC's investigation.  (Id. at 8-9.)  Additionally, REI agreed not to make any public statements denying the CFTC's findings in the order.  (Id. at 9.)  Jines represented both RES and REI relating to the CFTC's investigation and the terms of the CFTC's order.  (Sealed REI App., Ex. D at 41-44.)

RES stopped speculative gas trading in March 2003.  (Stip. at 3.)  Since then, RES "has continued to buy and sell natural gas for the purpose of meeting and hedging its obligations to supply gas-fired power plants owned by Reliant Energy Power Generation, Inc. and other RES affiliates, and to meet gas supply commitments it has made."  (Id.)

Plaintiffs concede they are not contending this Court may assert personal jurisdiction over REI based on REI's own contacts with Kansas.  (Pls.' Joint Opp'n to Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1106) at 4-5.)  Consequently, REI is subject to personal jurisdiction in Kansas only if the forum acts of its subsidiary, RES, are attributable to it through alter ego or agency principles.[10]

**A.  Alter Ego**

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on RES being REI's alter ego.  REI provided financing to RES and in return received loan repayments and/or dividends, but no evidence in the record suggests REI failed to maintain corporate formalities or to properly document these loans and capital contributions.  Rather, the evidence indicates RECS prepared separate books and records for RES and REI.

---

[10]  The Court will assume that if RES's forum-related acts are attributable to REI, the Kansas long-arm statute is satisfied.

REI's conduct in acting as a guarantor for RES also does not support an alter ego finding, and the evidence presented on this point suggests the opposite. REI had in place specific policies regarding when it would consider acting as its subsidiary's guarantor, suggesting that the two corporations and their counterparties viewed the two as separate entities not liable for the other's obligations except where they contractually agreed to such an arrangement. Further, REI's reference to RES as a "business unit" in a report does not suggest RES was REI's mere instrumentality. Nor does the fact that the two companies shared office space and staff.

REI's oversight of RES is consistent with the parent's investor status. As one hundred percent owner of RES's shares, REI was entitled to nominate and elect RES's board of directors. Additionally, REI is entitled as an investor to monitor RES's performance. Consequently, the daily reporting of information from RES to REI is consistent with REI's investor oversight role. Although REI received daily reporting from RES, no evidence suggests REI gave daily control commands to RES. Rather, the record demonstrates that, consistent with its investor status, REI set general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as the limit on VAR. However, when it came to RES's day-to-day conduct of its business within these guidelines, REI had little to no role. For example, with respect to natural gas trading, while REI set overall limits on certain metrics, REI had no role in making the day-to-day decisions of who RES was to trade with, when, for what amount of natural gas, and at what price. Only when RES exceeded REI's overall limits would REI become involved by inquiring of its subsidiary what it intended to do to correct any violations. Plaintiffs also present no evidence REI had any role in RES's price reporting to indices.

Finally, Plaintiffs' reference to the Master Separation Agreement does not support a finding of alter ego. That RRI/REI agreed with Reliant Energy, Incorporated that it and its subsidiaries would assume liability for those business operations which would

remain with RRI/REI post-separation does not mean REI agreed it would waive personal jurisdiction with respect to claims made by other persons not a party to that contract, or that it, as opposed to the relevant subsidiary, was liable for any particular claim.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiffs contend it would be unjust to permit REI to reap the benefits of RES's alleged unlawful behavior by enjoying profits from RES's trading activities while escaping liability for RES's alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, REI must have had some fraudulent intent at RES's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable. Plaintiffs present no evidence RES was undercapitalized at its inception. RES was formed years before REI became its parent company, and thus REI was not even involved in capitalizing RES at its inception. Further, the fact that RES operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiffs' fear that they may not be able to collect on a judgment in this action against RES does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiffs have not met their burden of establishing RES is REI's alter ego, and the Court will not attribute RES's contacts with Kansas to REI for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

Plaintiffs have failed to establish a prima facie case that RES was REI's general agent in Kansas. REI's business is not purely as a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses. REI (then RRI) has described itself as a "provider of electricity and energy services with a focus on

the competitive segments of the electric power industry in the United States and Europe."

(Sealed REI App., Ex. K at REILJ009826.)  REI describes its business as acquiring,

developing, and operating electric power generation facilities; trading and marketing power,

natural gas, and other energy-related commodities; and providing retail electric services in

Texas.  (Id.)  REI has asserted in public filings that its--

> trading, marketing, and risk management skills complement [its]
> generation positions.  The combination provides greater scale and skill
> associated with the management of our fuel and power positions,
> sophisticated commercial insights and an understanding of the key
> regions in which we participate, and a wider range of ways in which
> we participate in the market and are able to meet customer needs.

(Id.)

In practice, REI itself does not perform these activities, but, as Jines stated in his

deposition, REI "holds the shares of the different subsidiaries that are actually engaged in

the different business operations of [REI]."  (Sealed REI App., Ex. D at 129-30.)  Among

those business operations was REI's "wholesale" group, which included a variety of

subsidiaries involved in wholesale-related activities, including RES's natural gas-related

activities.  (Id. at 285-86.)

Although REI identifies natural gas trading and marketing as one of its business

lines, Plaintiffs have not established that RES's sales of natural gas in Kansas were

sufficiently important to REI that if RES did not make the sales in Kansas, REI would have

done so itself.  As the California Court of Appeal found in evaluating this same question

involving a similar lawsuit against REI and RES in California, "[t]his portion of the energy

business appears to be sufficiently fragmentary so that [REI] could have operated without

the assistance of RES."  Reliant Energy, Inc. v. Superior Court, No. D049988, 2007 WL

4329488, at *18 (Cal. Ct. App. 2007) (unpublished).  Further, the fact that REI

subsequently ceased "proprietary trading activities" due to a significant trading loss arising

from "the extreme volatility in natural gas prices" suggests that RES's trading activities

were not sufficiently important to REI that it would perform the activities itself if RES did not do so on its behalf.  (Sealed REI App., Ex. G.)

Moreover, Plaintiffs have presented no evidence that RES's natural gas sales in Kansas in particular were sufficiently important to REI's business that REI would have performed the sales in Kansas itself absent its subsidiary's representation in the forum.  See Modesto City Schs., 157 F. Supp. 2d at 1135; Bulova Watch Co., Inc., 508 F. Supp. at 1344.  Consequently, Plaintiffs have not shown that RES's Kansas natural gas sales played a significant role in REI's "'organizational life'" such that it acted as a substitute for REI in the forum.  Bulova Watch Co., Inc., 508 F. Supp. at 1344.

The Court acknowledges that the California Court of Appeal upheld a state trial court's ruling that RES was REI's agent in California for natural gas trading activity during the relevant time period.  Reliant Energy, Inc., 2007 WL 4329488, at *17.  Although arising out of the same factual background and involving the same parent and subsidiary, the ruling is distinguishable on several grounds.  The evidence presented to the California state court indicated REI had several significant contacts with California whereas Plaintiffs concede REI has no contacts with Kansas, as reflected in the evidence before this Court.  According to the evidence in Reliant, REI owned another subsidiary that had purchased natural-gas-fueled power plants located in California.  Id. at *2.  Additionally, REI obtained a certificate of qualification to do business and designated an agent for service of process in California, acted as guarantor on seven agreements between RES and California utilities, engaged in a marketing campaign in the state, subleased a small office in Sacramento which was used by a lobbyist, and employed an individual who allegedly engaged in illegal churning and wash trades in California.  Id. at *3-4.

In accord with this Court's ruling, the California Court of Appeal specifically rejected RES was REI's agent under the same test the Ninth Circuit employs to determine whether a subsidiary is its parent's agent for personal jurisdiction purposes.  Compare id. at

*17-18, with Doe, 248 F.3d at 928.  The California Court of Appeal referred to this test as the "representative services doctrine."  Reliant Energy, Inc., 2007 WL 4329488, at *17-18. While finding RES was not REI's agent under the representative services doctrine, the Reliant court concluded RES was REI's agent in California under general agency principles based on REI's control over RES.  Id. at *15-17.  Although not calling it the "representative services doctrine," the Ninth Circuit has set forth that test as the applicable one for due process purposes.  The California Court of Appeal's reference to other agency principles goes beyond the applicable agency test for exercising personal jurisdiction consistent with due process as set forth in controlling precedent for this Court.

Moreover, in making its finding under general agency principles, the California Court of Appeal relied on evidence not presented to this Court and not relevant to REI's contacts with Kansas.  For example, the Reliant court considered the fact that RES made a daily report to REI of the California power plant's hedging activities, "regarding the coordination of power generation and supply of natural gas," and RES's trading activities impacted that supply of natural gas.  Id. at *16.  Additionally, evidence in the record permitted an inference that the employee who allegedly engaged in wash trades and churning in California was an REI (then RRI) employee.  Id.

The California Court of Appeal also found REI's setting and raising of overall limits such as VAR to be significant evidence of REI's daily control of RES.  However, as explained above, the evidence before this Court indicates REI sets overall limits but does not involve itself in RES's day-to-day decisions as to what actions to take within those limits.  That RES violated those limits and requested a higher limit, to which REI agreed, is not evidence of day-to-day control.  It is evidence of a change in the overall limit under which RES was to perform its day-to-day operations.

To the extent the setting and changing of VAR and other limits constitutes day-to-day control, Plaintiffs have not demonstrated that REI's setting or altering of overall

limits on any metric constituted day-to-day interference with RES's sales in Kansas. Plaintiffs have presented no evidence that REI's oversight impacted RES's daily decisions regarding whether, when, to whom, in what volume, or at what price RES decided to sell natural gas in Kansas.  While daily oversight of trading activities may have been significant in the Reliant case where an employee of REI or one of its subsidiaries allegedly engaged in illegal trading activity in California, REI's daily oversight mechanisms as presented to this Court do not suggest a significant level of control over RES's Kansas sales activity. Because Plaintiffs have not established a prima facie case that RES acted as REI's agent in Kansas, the Court will not attribute RES's Kansas contacts to REI on this basis.[11]

The Court will not attribute RES's contacts with the forum to REI, and REI has no contacts of its own sufficient to support personal jurisdiction.  The Court therefore will grant REI's motion to dismiss for lack of personal jurisdiction.

## VI.  REQUEST FOR DEFERRED DECISION

Plaintiffs suggest that because the personal jurisdiction question is intertwined with the merits, the Court should defer ruling on the personal jurisdiction issue until after merits discovery is completed.  Plaintiffs rely on Data Disc, Inc., 557 F.2d at 1285 n.2. However, Data Disc, Inc. states that where the jurisdictional issues are intertwined with the merits, the Court may require the plaintiff to establish "only . . . a prima facie showing of jurisdictional facts with affidavits and perhaps discovery materials."  Id.  As the Court is considering the personal jurisdiction issue on the basis of affidavits and documentary evidence without holding an evidentiary hearing, the Court is following Data Disc, Inc. by holding Plaintiffs to this standard, and is not requiring Plaintiffs to meet the higher burden

---

[11]   The result would be the same under general Kansas agency law.  Plaintiffs have presented no evidence of any express or implied manifestation from REI to RES that RES may act as REI's agent in Kansas.  As to apparent agency, Plaintiffs have presented evidence that REI permitted RES to use the "Reliant" name and logo in marketing natural gas in Kansas.  However, Plaintiffs have presented no evidence that anyone relied on an apparent agency relationship between REI and RES.

of demonstrating personal jurisdiction by a preponderance of the evidence, as Plaintiffs would have to do at an evidentiary hearing or at trial.  Id.

Moreover, Plaintiffs have not convinced the Court that further discovery would produce a different result.  Although Plaintiffs contend DEC obstructed jurisdictional discovery regarding its participation in the conspiracy, DEC provided Plaintiffs with every DEC document which DEC provided to the CFTC in conjunction with the CFTC's investigation of DETM's natural gas trading activity in the relevant time period.  (Mem. of Defs. Duke Energy Carolinas, LLC & Duke Energy Trading & Marketing, LLC in Opp'n to Pls.' Mot. to Compel Disc. (Doc. #935) ["Opp'n to Mot. Compel"], Ex. B at 2; Tr. of Proceedings (Doc. #1138) at 55.)  The documents provided to the CFTC consisted almost entirely of DETM documents.  (Opp'n to Mot. Compel, Ex. B at 2; Tr. of Proceedings at 55.)  The only DEC documents consisted of general risk management policies and board of director meeting minutes, which DEC has provided to Plaintiffs.  (Opp'n to Mot. Compel, Ex. B at 2; Tr. of Proceedings at 55-56.)

REI also answered Plaintiffs' discovery on the issue of conspiracy as it relates to REI.  REI had no documents related to communications between REI and the other Defendants about natural gas prices and had no documents in which REI directed a subsidiary's communications, price reporting, or trading.  (Partial Tr. (Doc. #1128) at 49-50.)  REI objected to the extent that Plaintiffs sought every communication made by its subsidiary, RES, to other alleged co-conspirators.  Such communications would not demonstrate REI's participation in a conspiracy, and thus would not demonstrate REI was a member of a conspiracy directed at Kansas.[12]

///

_____

[12] CMS objected to discovery related to the conspiracy theory.  The Court is unable to determine from the record whether CMS searched its own records and advised Plaintiffs it had no responsive documents as its co-Defendants have done.

The Court has denied Plaintiffs' motion to compel discovery raising these issues. (Pls.' Mot. to Compel Disc. from Def. CMS Energy Corp. (Doc. #904); Pls.' Mot. to Compel Disc. from Def. CMS Energy Corp. (Doc. #906); Pls.' Mot. to Compel Disc. from Defs. Duke Energy Carolinas, LLC & Duke Energy Trading & Marketing, LLC (Doc. #898) & Mem. in Supp. (Doc. #899); Pls.' Mot. to Compel Disc. from Def. Reliant Energy, Inc. (Doc. #910) & Mem. in Supp. (Doc. #911); Order (Doc. #1240).)  Plaintiffs seek further discovery on the conspiracy theory of personal jurisdiction, a theory of questionable legitimacy.  See Chirila v. Conforte, 47 F. App'x 838, 842, 2002 WL 31105149, at *3 (9th Cir. 2002) (unpublished).  In any event, nothing suggests further discovery will establish Defendants CMS, DEC, or REI participated in a conspiracy targeting known Kansas residents.  The Court therefore will decline Plaintiffs' request to defer the personal jurisdiction issue to be resolved with the merits.

**VII.  CONCLUSION**

IT IS THEREFORE ORDERED that Specially Appearing Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #961) is hereby GRANTED.  Defendants CMS Energy Corporation, Duke Energy Carolinas, LLC, and Reliant Energy, Inc. are hereby dismissed from this action for lack of personal jurisdiction.


DATED: February 23, 2009


_____
PHILIP M. PRO
United States District Judge