1

2

3

4                        UNITED STATES DISTRICT COURT

5                              DISTRICT OF NEVADA

6                                    * * *

IN RE: WESTERN STATES          )      MDL 1566
7   WHOLESALE NATURAL GAS          )      2:03-CV-01431-PMP-PAL
ANTITRUST LITIGATION           )      BASE FILE
8   _____ )
                                   )
9   HEARTLAND REGIONAL MEDICAL     )
CENTER, et al.,                )      2:07-CV-00987-PMP-PAL
10                                  )
                Plaintiffs,    )
11                                  )
v.                             )
12                                  )      ORDER RE: DEFENDANT'S MOTION
                                   )      TO DISMISS (Doc. #1291)
ONEOK, INC., et al.,           )
13                                  )
                Defendants.    )
14   _____ )

15           Presently before this Court is Defendant Reliant Energy, Inc.'s Motion to Dismiss

16   for Lack of Personal Jurisdiction (Doc. #1291).[1]  Plaintiffs filed an Opposition (Doc.

17   #1451) and supporting exhibits (Doc. #1452, #1473).  Defendant filed a Reply (Doc.

18   #1486).[2]

19   I.      BACKGROUND

20           A.  Procedural Background

21           This case is one of many in consolidated Multidistrict Litigation arising out of the

22   energy crisis of 2000-2001.  Plaintiffs originally filed the above action in the Circuit Court

23   of Buchanan County, Missouri.  (Notice of Removal, Compl. [2:07-CV-00987-PMP-PAL,

24   _____

25           [1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

26           [2] Defendants Reliant Energy, Inc., Reliant Energy Services, Inc., and Plaintiffs also entered into
a stipulation of fact (Doc. #1446) and a stipulation to utilize jurisdictional discovery produced in the
related cases (Doc. #1420).

Doc. #1].)  Defendants removed the case to the United States District Court for the Western District of Missouri.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.  (Conditional Transfer Order [2:06-CV-1351-PMP-PAL, Doc. #8].)

In this litigation, Plaintiffs seek to recover damages on behalf of natural gas rate payers.  In the Complaint, Plaintiffs allege Defendants engaged in anti-competitive activities with the intent to manipulate and artificially increase or control the price of natural gas for consumers.  (Am. Compl. (Doc. #1260) at 28-37.)  Specifically, Plaintiffs allege Defendants knowingly delivered false reports concerning trade information and engaged in wash trades, in violation of Missouri Antitrust Law, R.S. Mo. § 416.010, et seq. (Id.)

Plaintiffs Heartland Regional Medical Center and Prime Tanning Corp. are Missouri non-profit companies with their principal places of business in Missouri.  (Id. at 3.)  Plaintiffs allege they purchased natural gas directly from one or more Defendants, and from other natural gas sellers in the State of Missouri, during the past six years.  (Id.)  According to the Complaint, Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Missouri.  (Id. at 3-27.)

The Amended Complaint's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations.  The Amended Complaint does not allege the parent company Defendants themselves engaged in natural gas trading and price reporting.  Rather, the Amended Complaint alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales

1    in Missouri during the relevant time period.

2         Plaintiffs seek to establish personal jurisdiction over the parent company

3    Defendants based on their out-of-forum activities directed at Missouri along with their

4    subsidiaries' and affiliates' contacts within Missouri.  According to the Amended

5    Complaint, the parent company Defendants dominated and controlled their respective

6    subsidiaries and the parent company Defendants "entered into a combination and

7    conspiracy . . . which tended to prevent full and free competition in the trading and sale of

8    natural gas, or which tended to advance or control the market prices of natural gas."  (Id. at

9    3, 6, 10, 12, 14, 16, 18, 22, 24-25.)  Plaintiffs allege the parent company Defendants

10   intended their actions to have a direct, substantial, and foreseeable effect on commerce in

11   the State of Missouri.  (Id. at 4, 6, 10, 12, 14-16, 18, 22, 24-25.)  According to the Amended

12   Complaint, the parent company Defendants "made strategic marketing policies and

13   decisions concerning natural gas and the reporting of natural gas trade information to

14   reporting firms for use in the calculation of natural gas price indices that affected the market

15   prices of natural gas, and those policies and decisions were implemented on an operational

16   level by affiliates . . . in the United States and in Missouri."  (Id. at 4, 7, 10-11, 13, 15-16,

17   19, 22, 24-26.)

18        Defendant Reliant Energy, Inc. ("REI") now moves to dismiss, arguing this Court

19   lacks personal jurisdiction over it.  According to REI, it conducts no business in Missouri

20   and has no other contacts supporting general or specific jurisdiction.  REI also argues it

21   cannot be subject to jurisdiction in Missouri based on its subsidiary's contacts with the

22   forum because its subsidiary is not its agent or alter ego.  REI thus argues exercising

23   personal jurisdiction in this case would violate constitutional due process requirements.

24        Plaintiffs respond that REI's subsidy has submitted to jurisdiction in Missouri

25   and REI is subject to personal jurisdiction through agency and alter ego principles based on

26   its subsidiary's contacts with the forum.  Additionally, Plaintiffs request the Court defer

ruling until after the magistrate judge resolves certain jurisdictional discovery disputes, or to delay ruling on the jurisdictional question until merits discovery is completed because the jurisdictional questions are intertwined with the merits.

### B.  Facts Related to Personal Jurisdiction

Defendant REI is a Delaware corporation with its principal place of business in Texas.  (Def. Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1291), Ex. A ["Jines Decl."] at 1.)  REI as it currently exists came into being in response to changes in Texas regulatory laws.  (Id. at 1-2.)  The company formerly known as Reliant Energy, Incorporated divided itself into CenterPoint Energy, Inc. ("CenterPoint") and Reliant Resources, Inc. ("RRI").  (Id. at 2.)  After CenterPoint divested itself of its RRI stock, the two companies became separate entities and RRI changed its name to REI, the Defendant in this action.  (Id.)  Under the Master Separation Agreement resulting in RRI's existence as a separate entity, RRI agreed that it would indemnify, defend, and hold harmless Reliant Energy, Incorporated, and in certain cases, that it would cause its subsidiaries to do so as well, for liabilities arising out of RRI and its subsidiaries' business operations, including business operations that pre-dated the agreement.  (Notice of Filing Docs. Under Seal ["Sealed App."] (Doc. #1473), Ex. E at REILJ012883, Ex. F at REILJ009719.)

REI is a holding company that does not itself buy, sell, or transport natural gas, nor does it report natural gas prices to any price reporting firms or price index publishers. (Jines Decl. at 1, 3; Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), Reliant Energy, Inc.'s App. in Supp. of Its Mots. to Dismiss for Lack of Pers. Juris. ["REI App."], Ex. B at 2.)  REI does not have any offices, employees, property, bank accounts, phone listings, or mailing addresses in Missouri.  (Jines Decl. at 3-4.)  REI does not pay taxes in Missouri and has never sold or traded natural gas in Missouri.  (Id.)  Other

than advertising in publications available nationwide, REI has not directed advertising specifically towards Missouri.  (Id.)

REI has a wholly owned subsidiary, Reliant Energy Services, Inc. ("RES"). (Jines Decl. at 3.)  RES formerly was known as NorAm Energy Services, Inc., and it already existed as a subsidiary of NorAm Energy Corp. when a company called Houston Industries Incorporated acquired NorAm Energy Corp. in 1997.  (REI & RES's Stip. of Fact in Connection With Pers. Juris. Disc. (Doc. #1446) ["Stip."] at 2.)  In 1999, Houston Industries Incorporated changed its name to Reliant Energy, Incorporated and NorAm Energy Services, Inc. changed its name to RES.  (Id.)  On December 31, 2000, RES became REI's wholly owned subsidiary through the Master Separation Agreement between REI and Centerpoint.  (Id.)

RES concedes personal jurisdiction in Missouri.  (Id. at 2.)  However, RES did not have any agency agreements or powers of attorney for REI, nor did it register or file as a foreign corporation to do business in Missouri on REI's behalf.  (Id. at 4.)

REI and RES share physical offices in Texas.  (App. to Heartland's Opp'n to Reliant's Mot. to Dismiss for Lack of Pers. Juris (Doc. #1452), Ex. B ["Jines Dep."] at 163-64.)  REI and its subsidiaries, including RES, share some common officers and directors.  (Sealed App., Exs. C, D.)  For example, Michael Jines ("Jines") was an officer for REI, RES, and several other REI subsidiaries, including some for which he could not recall the subsidiary's name.  (Jines Dep. at 15-19, 107-110.)  At his deposition, Jines stated his duties and responsibilities as an officer and director of those subsidiaries would be "no different" than his duties and responsibilities as REI's general counsel.  (Id. at 119-20.)  As RES's one hundred percent owner, REI nominates and elects the directors for RES.  (Id. at 88-89.)

At the present time, REI and RES have no employees of their own.  (Id. at 248, 288-89.)  Rather, Reliant Energy Corporate Services ("RECS"), an REI subsidiary, acts as

the payroll entity for REI and all of its subsidiaries.  (Id. at 9-10.)  RECS employs personnel who provide services to REI and RES.  (Id. at 10.)  For example, lawyers employed by RECS provide legal services to REI and all of its subsidiaries.  (Id. at 111-13.)  RECS also provides accounting, finance, legal, human resources, and facilities management services to REI and its subsidiaries.  (Id. at 20.)  As part of these services, RECS prepares separate financial documents, including tax filings, for RES.  (Id. at 56-57, 267.)  REI permitted RES to use the "Reliant Resources" and "Reliant Energy" trademarks and trade names during the relevant period.  (Stip. at 4.)

In terms of financial dealings between REI and its subsidiaries, the subsidiaries are funded by borrowing from or receiving equity capital infusions from REI.  (Jines Dep. at 239-40.)  In turn, REI receives either loan repayments or dividends when money is transferred from the subsidiaries to REI.  (Id. at 291-92.)  REI received dividends from RES during the relevant time period.  (Stip. at 4.)  In some circumstances, REI provides guarantees to third parties in transactions involving REI subsidiaries.  (Jines Dep. at 204-05.)  REI agreed to be RES's guarantor when RES's counterparties required it.  (Stip. at 2.)  In setting forth its financial guarantee policy, REI (then RRI) described RES as a "business unit."  (Sealed App., Ex. H at REILJ010083.)  REI acted as RES's guarantor on a contract with Aquila Energy Marketing Corporation, a company with a Missouri address.  (Sealed App., Ex. R.)

Although describing itself as a holding company, REI does not passively hold stock in its subsidiaries and leave them to operate on their own.  Rather, REI establishes overall policies and guidelines for its subsidiaries, establishes a capital structure, and issues consolidated financial reports.  (Jines Dep. at 131.)  Among the guidelines REI requires its subsidiaries to follow is a policy for best principles and practices.  (Sealed App., Ex. I at REILJ012703.)  This policy requires compliance with applicable laws and regulations, and requires that all transactions be for a bona fide business purpose and be reported accurately.

(Id.)  The best practices policy prohibits wash sales and fictitious transactions.  (Id. at REILJ012704.)  This policy applied to RES during the relevant period.  (Sealed App., Ex. N at 93.)

Additionally, REI sets certain risk control limits on its subsidiaries.  For example, REI set limits on RES's value at risk ("VAR").  (Sealed App., Ex. F at REILJ009749.)  REI's board of directors sets the overall limit on VAR.  (Id.)  The Audit Committee of REI's board meets at least three times a year to approve the risk control organization structure, approve the overall risk control policy, monitor compliance with trading limits, and review risk control issues.  (Id. at REILJ009752.)

REI also has a Risk Oversight Committee consisting of REI and subsidiary officers which allocates VAR to various business segments, including RES.  (Sealed App., Ex. M at 17, Ex. F at REILJ009752.)  The Risk Oversight Committee meets at least monthly to monitor compliance, review daily position reports for trading and marketing activity, recommend to REI's board of directors adjustments to trading limits, approve new trading activity, monitor information systems related to risk management, and place guidelines and limits on hedging activity.  (Sealed App., Ex. F at REILJ009752-53.)  Management for each business segment then allocates risk limits among individual traders within the limits set by the Risk Oversight Committee.  (Id. at REILJ009754.)  RES allocates VAR to its "head book traders" who in turn authorize other traders to execute trades.  (Sealed App., Ex. M at 17.)  Thus, the VAR limit set by REI was "an overall limit." (Sealed App., Ex. N at 155.)  RES would engage in multiple transactions in one day, and the limit set by REI was evaluated against the net result of a set of RES's transactions or activities.  (Id.)

///

///

///

REI oversight of its subsidiaries includes daily reporting of mark-to-market valuation,[3] VAR, and "other risk measurement metrics."  (Sealed App., Ex. L.)  RES's VAR is reported daily to REI's Risk Oversight Committee.  (Sealed App., Ex. M at 17.)  Additionally, violations of any risk limits are reported to the business segment management as well as to the appropriate committees.  (Sealed App., Ex. F at REILJ009754.)  While the reports from the subsidiary to the various committees may occur daily, communications from REI down to the subsidiaries occurs "only to the extent that the activity ended up in a violation."  (Sealed App., Ex. N at 156.)  For example, if RES exceeded its VAR limit, an REI officer may inform RES management and inquire as to what RES management intended to do to correct the situation.  (Id.)  However, "in terms of the day-to-day buying and selling of gas or power, [REI officers have] limited or no interaction."  (Id.)

In November 2003, the Commodity Futures Trading Commission ("CFTC") entered into a settlement with RES regarding the CFTC's allegations that RES violated the Commodities Exchange Act.  (Decl. of William E. Fischer (Doc. #1104), Ex. B, Jines Ex. 4.)  According to the settlement, the CFTC found RES's Houston offices made false price reports regarding natural gas transactions from 1999 through May 2002.  (Id. at 4-5.)  Additionally, the CFTC found RES engaged in wash trades in 2000.  (Id. at 6-7.)  As part of the settlement, RES and REI agreed to entry of the order finding violations, as well as requiring RES to cease and desist from its misconduct, imposing an $18 million civil penalty on RES, and requiring RES and REI to undertake certain activities.  (Id. at 7-9.)  Specifically, REI agreed to cooperate with the CFTC in the future, including preserving and producing records regarding the reporting of price or trade volumes in natural gas transactions and producing RES and REI employees to provide assistance in any trial, proceeding, or investigation related to the CFTC's investigation.  (Id. at 8-9.)  Additionally,

---

[3] "Mark-to-market" means the value of a contract relative to current market prices.  (Sealed App., Ex. N at 128.)

REI agreed not to make any public statements denying the CFTC's findings in the order.

(Id. at 9.)  Jines represented both RES and REI relating to the CFTC's investigation and the

terms of the CFTC's order.  (Jines Dep. at 41-44.)

RES stopped speculative gas trading in March 2003.  (Stip. at 3; Sealed App., Ex.

G.)  Since then, RES "has continued to buy and sell natural gas for the purpose of meeting

and hedging its obligations to supply gas-fired power plants owned by Reliant Energy

Power Generation, Inc. and other RES affiliates, and to meet gas supply commitments it has

made."  (Stip. at 3.)

## II.        PERSONAL JURISDICTION

"When a defendant moves to dismiss for lack of personal jurisdiction, the

plaintiff bears the burden of demonstrating that the court has jurisdiction over the

defendant."  Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  To meet this

burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1)

permitted under the applicable state's long-arm statute and (2) that the exercise of

jurisdiction does not violate federal due process.  Id.  The Court must analyze whether

personal jurisdiction exists over each defendant separately.  Harris Rutsky & Co. Ins.

Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

Where the issue is before the Court on a motion to dismiss based on affidavits

and discovery materials without an evidentiary hearing, the plaintiff must make "a prima

facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid

dismissal."  Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114,

1119 (9th Cir. 2002).  The Court accepts as true any uncontroverted allegations in the

complaint and resolves any conflicts between the facts contained in the parties' evidence in

the plaintiff's favor.  Id.  However, for personal jurisdiction purposes, a court "may not

assume the truth of allegations in a pleading which are contradicted by affidavit."

Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation

omitted).

In diversity cases such as this, "a federal court applies the personal jurisdiction rules of the forum state provided the exercise of jurisdiction comports with due process." Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  However, "federal law is controlling on the issue of due process under the United States Constitution."  Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110 (9th Cir. 2002).  Therefore, the Court will apply law from the United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is appropriate under the Due Process Clause.  See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (holding that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").

To satisfy federal due process standards, a nonresident defendant must have "minimum contacts" with the forum state so that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice.  Pebble Beach Co., 453 F.3d at 1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)).  A federal district court may exercise either general or specific personal jurisdiction.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

To establish general personal jurisdiction, the plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that 'approximate physical presence.'"  Glencore Grain, 284 F.3d at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006)).  Courts consider such factors as whether the defendant

makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086. "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n.9).

A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155. "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." Id. Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.

The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id. In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." Id. To satisfy the third element of this test, the plaintiff must

establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable effect" in the forum state is insufficient.  Id.  The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident."  Bancroft, 223 F.3d at 1087.

The second prong of the specific jurisdiction test requiring that the contacts constituting purposeful availment or purposeful direction give rise to the current action is measured in terms of "but for" causation.  Id. at 1088.  "If the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable."  Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir. 2008) (quotation omitted).

Plaintiffs are not contending this Court may assert personal jurisdiction over REI based on REI's own contacts with Missouri.  (Pls.' Opp'n to Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1451) at 3.)  Consequently, REI is subject to personal jurisdiction in Missouri only if the forum acts of its subsidiary, RES, are attributable to it through alter ego or agency principles.[4]

**A.  Alter Ego**

A "parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes."  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134.  However, a subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego.  Id.

To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a prima facie case that the two companies share "such unity of interest and ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice."  Doe v. Unocal Corp., 248 F.3d

---

[4]  The Court will assume that if RES's forum-related acts are attributable to REI, the Missouri long-arm statute is satisfied.

915, 926 (9th Cir. 2001) (quotation omitted).  To demonstrate a unity of interest warranting

disregard of corporate separateness, the plaintiff must show the parent controls its

subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent.

Id. (quotation omitted).  Typically, this would involve showing the parent controls the

subsidiary's internal affairs or daily operations.  Kramer Motors, Inc. v. British Leyland,

Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980).[5]

A parent corporation may be involved directly in certain aspects of its wholly

owned subsidiary's affairs without subjecting itself to alter ego status.  For example, a

parent may provide financing to its subsidiary so long as it maintains corporate formalities

and properly documents loans and capital contributions to its subsidiaries, and it may act as

its subsidiary's guarantor.  Doe, 248 F.3d at 927-28.  Additionally, a parent may refer to its

subsidiaries as divisions of the parent in annual reports.  Id. at 928.  Further, a parent may

review and approve major decisions, place its own directors on the subsidiary's board, and

share offices and staff with its wholly owned subsidiary without being considered its alter

ego.  Id.; Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135.

///

---

[5]  Missouri employs a similar alter ego test.  Under Missouri law, "when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it, then the court will disregard the corporate form if to retain it would result in injustice." East Attucks Cmty. Housing, Inc. v. Old Republic Sur. Co., 114 S.W.3d 311, 321-22 (Mo. Ct. App. 2003) (quotation omitted).  The party seeking to pierce the corporate veil must show such "complete domination" that "the corporate entity as to this transaction had at the time no separate mind, will or existence of its own."  Real Estate Investors Four, Inc. v. Am. Design Group Inc., 46 S.W.3d 51, 56 (Mo. Ct. App. 2001) (quotation omitted).  Additionally, the party seeking to pierce must show the corporation used such control to commit a fraud or wrong, to violate statutory or other positive legal duties, or to perpetrate a dishonest and unjust act in contravention of plaintiff's legal rights.  Id. Finally, the party must show "[t]he control and breach of duty" proximately caused the injury.  Id. (quotation omitted).  To the extent Missouri would look to the law of the state of incorporation to determine alter ego status, see In re Bridge Info. Sys., Inc., 325 B.R. 824, 830-31 (Bankr. E.D. Mo. 2005), Delaware has similar requirements.  See Maloney-Refaie v. Bridge at Sch., Inc., 958 A.2d 871, 881 (Del. Ch. 2008); In re Sunstates Corp. Shareholder Litig., 788 A.2d 530, 534 (Del. Ch. 2001).

In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status." Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135 (quotation omitted). Activities consistent with investor status include "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'" Doe, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 61, 72 (1998)).

In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice. The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally. Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524-25 n.12 (9th Cir. 1984). For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent. Id. However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice. Id. at 525. Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil. Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979). An inability to collect on a judgment "does not, by itself, constitute an inequitable result." Id.

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on RES being REI's alter ego. REI provided financing to RES and in return received loan repayments and/or dividends, but no evidence in the record suggests REI failed to maintain corporate formalities or to properly document these loans and capital contributions. Rather, the evidence indicates RECS prepared separate books and records for RES and REI.

///

14

REI's conduct in acting as a guarantor for RES also does not support an alter ego finding, and the evidence presented on this point suggests the opposite.  REI had in place specific policies regarding when it would consider acting as its subsidiary's guarantor, suggesting that the two corporations and their counterparties viewed the two as separate entities not liable for the other's obligations except where they contractually agreed to such an arrangement.  Further, REI's reference to RES as a "business unit" in a report does not suggest RES was REI's mere instrumentality.  Nor does the fact that the two companies shared office space and staff.

REI's oversight of RES is consistent with the parent's investor status.  As one hundred percent owner of RES's shares, REI was entitled to nominate and elect RES's board of directors.  Additionally, REI is entitled as an investor to monitor RES's performance.  Consequently, the daily reporting of information from RES to REI is consistent with REI's investor oversight role.  Although REI received daily reporting from RES, no evidence suggests REI gave daily control commands to RES.  Rather, the record demonstrates that, consistent with its investor status, REI set general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as the limit on VAR.  However, when it came to RES's day-to-day conduct of its business within these guidelines, REI had little to no role.  For example, with respect to natural gas trading, while REI set overall limits on certain metrics, REI had no role in making the day-to-day decisions of who RES was to trade with, when, for what amount of natural gas, and at what price.  Only when RES exceeded REI's overall limits would REI become involved by inquiring of its subsidiary what it intended to do to correct any violations.  Plaintiffs also present no evidence REI had any role in RES's price reporting to indices.

Finally, Plaintiffs' reference to the Master Separation Agreement does not support a finding of alter ego.  That RRI/REI agreed with Reliant Energy, Incorporated that it and its subsidiaries would assume liability for those business operations which would

remain with RRI/REI post-separation does not mean REI agreed it would waive personal

jurisdiction with respect to claims made by other persons not a party to that contract, or that

it, as opposed to the relevant subsidiary, was liable for any particular claim.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have

not established a fraud or injustice would result if the Court failed to pierce the corporate

veil.  Plaintiffs contend it would be unjust to permit REI to reap the benefits of RES's

alleged unlawful behavior by enjoying profits from RES's trading activities while escaping

liability for RES's alleged misconduct.  However, the alleged illegal price manipulation

cannot itself constitute the fraud or injustice necessary to pierce the corporate veil.  Rather,

REI must have had some fraudulent intent at RES's inception or some later abuse of the

corporate form such that failing to treat the entities as one would be inequitable.  Plaintiffs

present no evidence RES was undercapitalized at its inception.  RES was formed years

before REI became its parent company, and thus REI was not even involved in capitalizing

RES at its inception.  Further, the fact that RES operated as a legitimate business for years

suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate

structure on the parent's part.

Plaintiffs' fear that they may not be able to collect on a judgment in this action

against RES does not constitute fraud or injustice to support piercing the corporate veil.

The Court therefore finds Plaintiffs have not met their burden of establishing RES is REI's

alter ego, and the Court will not attribute RES's contacts with Missouri to REI for purposes

of determining personal jurisdiction based on alter ego principles.

**B.  Agency**

A subsidiary's contacts also may be imputed to its parent for personal jurisdiction

purposes where the subsidiary is the parent's general agent in the forum.  Harris Rutsky &

Co. Ins. Servs., Inc., 328 F.3d at 1134.  A subsidiary is its parent's agent for purposes of

attributing its forum-related contacts to the parent if the subsidiary "performs services that

are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)).  The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence.  Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment.  Id. at 929.  "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries."  Id. (quotation omitted).  The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one."  Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own."  Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981).  The Bulova court thus attributed the subsidiaries' contacts to the parent company.  Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate.  <u>Sonora Diamond Corp. v. Superior Court</u>, 99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000).  As the <u>Sonora Diamond</u> court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore."  <u>Id.</u>  But where the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company.  <u>Id.</u>

Likewise, in <u>Doe</u>, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical operations, the parent would have conducted and controlled those operations.  <u>Doe</u>, 248 F.3d at 929.  The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States."  <u>Id.</u>

Plaintiffs have failed to establish a prima facie case that RES was REI's general agent in Missouri.  REI's business is not purely as a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses.  REI (then RRI) has described itself as a "provider of electricity and energy services with a focus on the competitive segments of the electric power industry in the United States and Europe." (Sealed App., Ex. K at REILJ009826.)  REI describes its business as acquiring, developing, and operating electric power generation facilities; trading and marketing power, natural gas, and other energy-related commodities; and providing retail electric services in

Texas.  (Id.)  REI has asserted in public filings that its--

> trading, marketing, and risk management skills complement [its] generation positions.  The combination provides greater scale and skill associated with the management of our fuel and power positions, sophisticated commercial insights and an understanding of the key regions in which we participate, and a wider range of ways in which we participate in the market and are able to meet customer needs.

(Id.)

In practice, REI itself does not perform these activities, but, as Jines stated in his deposition, REI "holds the shares of the different subsidiaries that are actually engaged in the different business operations of [REI]."  (Jines Dep. at 129-30.)  Among those business operations was REI's "wholesale" group, which included a variety of subsidiaries involved in wholesale-related activities, including RES's natural gas-related activities.  (Id. at 285-86.)

Although REI identifies natural gas trading and marketing as one of its business lines, Plaintiffs have not established that RES's sales of natural gas in Missouri were sufficiently important to REI that if RES did not make the sales in Missouri, REI would have done so itself.  As the California Court of Appeal found in evaluating this same question involving a similar lawsuit against REI and RES in California, "[t]his portion of the energy business appears to be sufficiently fragmentary so that [REI] could have operated without the assistance of RES."  Reliant Energy, Inc. v. Superior Court, No. D049988, 2007 WL 4329488, at *18 (Cal. Ct. App. 2007) (unpublished).  Further, the fact that REI subsequently ceased "proprietary trading activities" due to a significant trading loss arising from "the extreme volatility in natural gas prices" suggests that RES's trading activities were not sufficiently important to REI that it would perform the activities itself if RES did not do so on its behalf.  (Sealed App., Ex. G.)

Moreover, Plaintiffs have presented no evidence that RES's natural gas sales in Missouri in particular were sufficiently important to REI's business that REI would have

performed the sales in Missouri itself absent its subsidiary's representation in the forum. See Modesto City Schs., 157 F. Supp. 2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F. Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States). Consequently, Plaintiffs have not shown that RES's Missouri natural gas sales played a significant role in REI's "'organizational life'" such that it acted as a substitute for REI in the forum. Bulova Watch Co., Inc., 508 F. Supp. at 1344.

The Court acknowledges that the California Court of Appeal upheld a state trial court's ruling that RES was REI's agent in California for natural gas trading activity during the relevant time period. Reliant Energy, Inc., 2007 WL 4329488, at *17. Although arising out of the same factual background and involving the same parent and subsidiary, the ruling is distinguishable on several grounds. The evidence presented to the California state court indicated REI had several significant contacts with California whereas Plaintiffs concede REI has little to no contacts with Missouri, as reflected in the evidence before this Court. According to the evidence in Reliant, REI owned another subsidiary that had purchased natural-gas-fueled power plants located in California. Id. at *2. Additionally, REI obtained a certificate of qualification to do business and designated an agent for service of process in California, acted as guarantor on seven agreements between RES and California utilities, engaged in a marketing campaign in the state, subleased a small office in Sacramento which was used by a lobbyist, and employed an individual who allegedly engaged in illegal churning and wash trades in California. Id. at *3-4.

In accord with this Court's ruling, the California Court of Appeal specifically rejected RES was REI's agent under the same test the Ninth Circuit employs to determine whether a subsidiary is its parent's agent for personal jurisdiction purposes. Compare id. at

*17-18, with Doe, 248 F.3d at 928.  The California Court of Appeal referred to this test as the "representative services doctrine."  Reliant Energy, Inc., 2007 WL 4329488, at *17-18. While finding RES was not REI's agent under the representative services doctrine, the Reliant court concluded RES was REI's agent in California under general agency principles based on REI's control over RES.  Id. at *15-17.  Although not calling it the "representative services doctrine," the Ninth Circuit has set forth that test as the applicable one for due process purposes.  The California Court of Appeal's reference to other agency principles goes beyond the applicable agency test as for exercising personal jurisdiction consistent with due process set forth in controlling precedent for this Court.

Moreover, in making its finding under general agency principles, the California Court of Appeal relied on evidence not presented to this Court and not relevant to REI's contacts with Missouri.  For example, the Reliant court considered the fact that RES made a daily report to REI of the California power plant's hedging activities, "regarding the coordination of power generation and supply of natural gas," and RES's trading activities impacted that supply of natural gas.  Id. at *16.  Additionally, evidence in the record permitted an inference that the employee who allegedly engaged in wash trades and churning in California was an REI (then RRI) employee.  Id.

The California Court of Appeal also found REI's setting and raising of overall limits such as VAR to be significant evidence of REI's daily control of RES.  However, as explained above, the evidence before this Court indicates REI sets overall limits but does not involve itself in RES's day-to-day decisions as to what actions to take within those limits.  That RES violated those limits and requested a higher limit, to which REI agreed, is not evidence of day-to-day control.  It is evidence of a change in the overall limit under which RES was to perform its day-to-day operations.

To the extent the setting and changing of VAR and other limits constitutes day-to-day control, Plaintiffs have not demonstrated that REI's setting or altering of overall

limits on any metric constituted day-to-day interference with RES's sales in Missouri. Plaintiffs have presented no evidence that REI's oversight impacted RES's daily decisions regarding whether, when, to whom, in what volume, or at what price RES decided to sell natural gas in Missouri.  While daily oversight of trading activities may have been significant in the Reliant case where an employee of REI or one of its subsidiaries allegedly engaged in illegal trading activity in California, REI's daily oversight mechanisms as presented to this Court do not suggest a significant level of control over RES's Missouri sales activity.  Because Plaintiffs have not established a prima facie case that RES acted as REI's agent in Missouri, the Court will not attribute RES's Missouri contacts to REI on this basis.[6]

### C. Request for Deferred Decision

Plaintiffs suggest that because the personal jurisdiction question is intertwined with the merits, the Court should defer ruling on the personal jurisdiction issue until after merits discovery is completed.  Plaintiffs rely on Data Disc, Inc., 557 F.2d at 1285 n.2. However, Data Disc, Inc. states that where the jurisdictional issues are intertwined with the merits, the Court may require the plaintiff to establish "only . . . a prima facie showing of jurisdictional facts with affidavits and perhaps discovery materials."  Id.  As the Court is

---

[6]  The result would be the same under general Missouri agency law.  In Missouri, a principal is bound by his agent's acts where the agent has actual authority, either express or implied, or apparent authority.  Lynch v. Helm Plumbing & Elec. Contractors, Inc., 108 S.W.3d 657, 660 (Mo. Ct. App. 2002).  Implied actual authority arises when a reasonable person would interpret the principal's words or conduct to mean the principal desired the agent to act on the principal's behalf.  Id.  A principal may be bound where an agent acts with apparent authority if the principal manifested his consent to the exercise of such authority, the third party "had reason to believe, and actually believed, the agent possessed such authority," and the third party "changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal."  Id. (quotation omitted).

Here, Plaintiffs have presented no evidence of any express or implied manifestation from REI to RES that RES may act as REI's agent in Missouri.  As to apparent agency, Plaintiffs have presented evidence that REI permitted RES to use the "Reliant" name and logo in marketing natural gas in Missouri.  However, Plaintiffs have presented no evidence that anyone relied on an apparent agency relationship between REI and RES.

considering the personal jurisdiction issue on the basis of affidavits and documentary

evidence without holding an evidentiary hearing, the Court is following <u>Data Disc, Inc.</u> by

holding Plaintiffs to this standard, and is not requiring Plaintiffs to meet the higher burden

of demonstrating personal jurisdiction by a preponderance of the evidence, as Plaintiffs

would have to do at an evidentiary hearing or at trial.  <u>Id.</u>

Moreover, Plaintiffs have not convinced the Court that further discovery would

produce a different result.  Plaintiffs and REI agreed to utilize the jurisdictional discovery

produced in the consolidated cases.  REI answered the other Plaintiffs' discovery on the

issue of conspiracy as it relates to REI.  REI had no documents related to communications

between REI and the other Defendants about natural gas prices and had no documents in

which REI directed a subsidiary's communications, price reporting, or trading.  (Partial Tr.

(Doc. #1128) at 49-50.)  REI objected to the extent that Plaintiffs sought every

communication made by its subsidiary, RES, to other alleged co-conspirators.  Such

communications would not demonstrate REI's participation in a conspiracy, and thus would

not demonstrate REI was a member of a conspiracy directed at Missouri.  The Court has

denied Plaintiffs' motion to compel discovery raising these issues.  (Pls.' Mot. to Compel

Disc. from Def. Reliant Energy, Inc. (Doc. #910) & Mem. in Supp. (Doc. #911); Order

(Doc. #1240).)  The Court therefore will decline Plaintiffs' request to defer the personal

jurisdiction issue to be resolved with the merits.

The Court will not attribute RES's contacts with the forum to REI, and REI has

no contacts of its own sufficient to support personal jurisdiction.  The Court therefore will

grant REI's motion to dismiss for lack of personal jurisdiction.

///

///

///

///

**III.      CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #1291) is hereby GRANTED.  Defendant Reliant Energy, Inc. is hereby dismissed from this action for lack of personal jurisdiction.

DATED: February 23, 2009

_____
PHILIP M. PRO
United States District Judge