1

2

3

4                             UNITED STATES DISTRICT COURT

5                                  DISTRICT OF NEVADA

6                                          * * *
   IN RE: WESTERN STATES              )     MDL 1566
7  WHOLESALE NATURAL GAS              )     2:03-CV-01431-PMP-PAL
   ANTITRUST LITIGATION               )     BASE FILE
8  _____)
                                      )
9  HEARTLAND REGIONAL MEDICAL         )
   CENTER, et al.,                    )
10                                    )     2:07-CV-00987-PMP-PAL
                   Plaintiffs,        )
11                                    )
   v.                                 )
12                                    )     ORDER RE: DEFENDANT'S MOTION
                                      )     TO DISMISS (Doc. #1295)
   ONEOK, INC., et al.,               )
13                                    )
                   Defendants.        )
14 _____)

15          Presently before this Court is Specially Appearing Defendant CMS Energy

16 Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #1295).[1]  Plaintiffs

17 filed an Opposition (Doc. #1448) and supporting exhibits (Doc. #1449, #1472).  Defendant

18 filed a Reply (Doc. #1489).

19 **I.        BACKGROUND**

20          **A.  Procedural Background**

21          This case is one of many in consolidated Multidistrict Litigation arising out of the

22 energy crisis of 2000-2001.  Plaintiffs originally filed the above action in the Circuit Court

23 of Buchanan County, Missouri.  (Notice of Removal, Compl. [2:07-CV-00987-PMP-PAL,

24 Doc. #1].)  Defendants removed the case to the United States District Court for the Western

25 District of Missouri.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer

26

_____

[1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.  (Conditional Transfer Order [2:06-CV-1351-PMP-PAL, Doc. #8].)

In this litigation, Plaintiffs seek to recover damages on behalf of natural gas rate payers.  In the Complaint, Plaintiffs allege Defendants engaged in anti-competitive activities with the intent to manipulate and artificially increase or control the price of natural gas for consumers.  (Am. Compl. (Doc. #1260) at 28-37.)  Specifically, Plaintiffs allege Defendants knowingly delivered false reports concerning trade information and engaged in wash trades, in violation of Missouri Antitrust Law, R.S. Mo. § 416.010, et seq. (Id.)

Plaintiffs Heartland Regional Medical Center and Prime Tanning Corp. are Missouri non-profit companies with their principal places of business in Missouri.  (Id. at 3.)  Plaintiffs allege they purchased natural gas directly from one or more Defendants, and from other natural gas sellers in the State of Missouri, during the past six years.  (Id.)  According to the Complaint, Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Missouri.  (Id. at 3-27.)

The Amended Complaint's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations.  The Amended Complaint does not allege the parent company Defendants themselves engaged in natural gas trading and price reporting.  Rather, the Amended Complaint alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales in Missouri during the relevant time period.

///

Plaintiffs seek to establish personal jurisdiction over the parent company Defendants based on their out-of-forum activities directed at Missouri along with their subsidiaries' and affiliates' contacts within Missouri.  According to the Amended Complaint, the parent company Defendants dominated and controlled their respective subsidiaries and the parent company Defendants "entered into a combination and conspiracy . . . which tended to prevent full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas."  (Id. at 3, 6, 10, 12, 14, 16, 18, 22, 24-25.)  Plaintiffs allege the parent company Defendants intended their actions to have a direct, substantial, and foreseeable effect on commerce in the State of Missouri.  (Id. at 4, 6, 10, 12, 14-16, 18, 22, 24-25.)  According to the Amended Complaint, the parent company Defendants "made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates . . . in the United States and in Missouri."  (Id. at 4, 7, 10-11, 13, 15-16, 19, 22, 24-26.)

Defendant CMS Energy Corporation ("CMS") now moves to dismiss, arguing this Court lacks personal jurisdiction over it.  According to CMS, it conducts no business in Missouri and has no other contacts supporting general or specific jurisdiction.  CMS also argues it cannot be subject to jurisdiction in Missouri based on its subsidiaries' contacts with the forum because its subsidiary is not its agent or alter ego.  CMS thus argues exercising personal jurisdiction in this case would violate constitutional due process requirements.

Plaintiffs respond that CMS's subsidiaries have submitted to jurisdiction in Missouri and CMS is subject to personal jurisdiction through agency and alter ego principles based on its subsidiaries' contacts with the forum.  Additionally, Plaintiffs

request the Court to delay ruling on the jurisdictional question until merits discovery is completed because the jurisdictional questions are intertwined with the merits.

### B.  Facts Related to Personal Jurisdiction

CMS Energy Corporation ("CMS") is a Michigan corporation with its principal place of business in Jackson, Michigan.  (Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, & Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. #963), The CMS Defendants' App. of Facts in Supp. of the Joint Mot. to Dismiss for Lack of Pers. Juris. ["Sep. CMS App."], Ex. A at 1.)  CMS conducts no business and has never been qualified to do business in Missouri.  (Specially Appearing Def. CMS Energy Corp.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1295) ["CMS Mot."], Ex. 1 at 2.)  CMS has never had a registered agent for service of process in Missouri.  (Id.)  CMS has no office, mailing address, telephone number, bank account, or property in Missouri.  (Id.)  It has no employees in Missouri, has never paid taxes there, and has never directly advertised to Missouri residents.  (Id.)

CMS does not itself engage in natural gas trading, production, sales, purchases, distribution, or transportation.  (Id. at 2.)  CMS also does not report or publish natural gas trade information to any trade publication.  (Id.)  Rather, CMS is a holding company that owns subsidiaries operating in various sectors of the power and energy industries, two of which engage in natural gas trading and price reporting.  (Id. at 1-3; Sep. CMS App., Ex. B at 1.)  One such indirect subsidiary is CMS Marketing, Services and Trading Company ("MST"), a Michigan corporation, that changed its name to CMS Energy Resource Management Company in 2004.  (CMS Mot., Ex. 1 at 2-3.)  MST is a subsidiary of CMS Enterprises Company, a wholly owned subsidiary of CMS.  (App. to Pls.' Joint Opp'n to CMS's Renewed Mot. to Dismiss for Lack of Pers. Juris (Doc. #1081) ["Pls.' CMS App."], Ex. B at 2.)  The other is CMS Field Services, Inc. ("Field Services"), a Michigan corporation with its principal place of business in Oklahoma.  (CMS Mot., Ex. 1 at 4.)  In

July 2003, Cantera Natural Gas, LLC purchased Field Services.  (Id. at 5.)  While CMS owned it, Field Services was a wholly owned subsidiary of CMS Gas Transmission Company, which is a wholly owned subsidiary of CMS Enterprises Company, a wholly owned subsidiary of CMS.  (Pls.' CMS App., Ex. B at 2-3.)

CMS shared at least one officer or director position with MST and Field Services.  For example, MST's President and Chief Operating Officer from 1999 to 2001 was a CMS officer.  (App. to Heartland's Opp'n to CMS's Renewed Mot. to Dismiss for Lack of Pers. Juris (Doc. #1449) ["Heartland App."], Ex. D at CMS-KS-001858.)  Field Services' President from 1998 to 2001 also was a CMS officer.  (Id.)  MST, Field Services, and CMS maintain separate bank accounts and separate books and records, however, CMS reports Field Services' and MST's operations on CMS's consolidated financial reports.  (Sep. CMS App., Ex. A at 2-4.)  CMS's primary source of cash is dividends and other distributions from its subsidiaries, from which CMS reaped millions of dollars.  (Heartland App., Ex. A at CMS-KS-003534, Ex. E at CMS-KS-2103.)  CMS did not make financial guarantees on its subsidiaries' behalf, but CMS's wholly owned subsidiary, CMS Enterprises Company, did.  (Sep. Vol. of Evid. in Supp. of the CMS Defs.' App. of Facts in Supp. of the Joint Mot. to Dismiss for Lack of Pers. Juris. ["CMS Sep. Vol. Evid."] (Doc. #976), Ex. 2 at 141; Heartland App., Ex. A at CMS-KS-003544, Ex. E at CMS-KS-002106, Ex. G at CMS-KS-001130, CMS-KS-001146.)

CMS entered into Service and Management Agreements with Field Services and MST under which CMS agreed to provide various services, including general administrative services, accounting, statistical and financial, risk management, tax, internal auditing, information management, legal communications, engineering, public affairs, and human resources services.  (App. of Docs. Filed Under Seal (Doc. #1142) ["Ex. M"], Ex. M, Service and Management Agreement.)  Pursuant to these agreements, Field Services and MST appointed CMS as their "managing agent . . . to manage and direct the business" of

1  Field Services and MST "subject to the general supervision and control of the Board of

2  Directors and officers" of Field Services and MST, respectively.  (Id. at 5.)

3         CMS's powers under the agreements include establishing corporate polices and

4  procedures with respect to all operations except those specifically excluded by the

5  agreement, including making tax and regulatory filings; opening and closing bank accounts;

6  purchasing and maintaining insurance; buying, selling, leasing or encumbering assets;

7  employing, laying off, or dismissing employees; and conducting litigation.  (Id. at 5-6.)  The

8  agreements precluded CMS from engaging in certain activities, such as selling, leasing, or

9  otherwise disposing of all of Field Services' or MST's assets; incurring indebtedness other

10 than indebtedness to trade creditors in the ordinary course of business; forming partnerships

11 or joint ventures; or taking any other "extraordinary corporate action," without prior

12 approval of Field Services' or MST's boards of directors.  (Id. at 8.)  In exchange, Field

13 Services and MST paid CMS an annual consulting fee and reimbursed CMS for direct

14 expenses.  (Id. at 9.)

15         In addition to the Service Agreements, CMS entered into Royalty and Licensing

16 Agreements with Field Services and MST pursuant to which Field Services and MST could

17 use the CMS Energy trade name and service marks.  (Ex. M, Royalty and Licensing

18 Agreement.)  In return, Field Services and MST agreed to pay a royalty fee.  (Id. at 3, C-1.)

19         In its 1999 annual report, CMS described itself as--

20         a leading international integrated energy company acquiring,
           developing and operating energy facilities and providing energy
21         services in major growth markets.  CMS Energy provides a complete
           range of international energy expertise from energy production to
22         consumption.  CMS Energy intends to pursue its global growth by
           making energy investments that provide expansion opportunities for
23         multiple CMS Energy businesses.

24 (Heartland App., Ex. C at CMS-KS-001006.)  Similarly, in its 2000 annual report, CMS

25 described itself as "an integrated energy company with a strong asset base enhanced by an

26 active marketing services and trading capability."  (Heartland App., Ex. D at CMS-KS-

001795.)  CMS has stated that its "vision" was to be "an integrated energy company with a strong asset base, supplemented with an active marketing, services and trading capability." (Heartland App., Ex. E at CMS-KS-002109.)

Additionally, CMS has stated that it "intends to integrate the skills and assets of its business units to obtain optimal returns and to provide expansion opportunities." (Id.; see also Heartland App., Ex. C at CMS-KS-001006 (stating CMS "intends to use its marketing, services and trading business to improve the return on CMS Energy's other business assets"), Ex. G at CMS-KS-001083 ("CMS Energy intends to use CMS MST to enhance performance of CMS Energy assets, such as gas reserves and power plants.").)  In a 2001 filing with the Securities and Exchange Commission ("SEC"), CMS stated that it "intends to use CMS MST to focus on wholesale customers such as municipals, cooperative electric companies and industrial and commercial customers." (Heartland App., Ex. E at CMS-KS-002072.)  CMS also stated that it, "through its subsidiary CMS MST, engages in trading activities." (Id. at CMS-KS-002162.)

In its 2000 annual report, CMS identifies certain market risks to which it is exposed including "interest rates, currency exchange rates, and certain commodity and equity security prices." (Heartland App., Ex. D at CMS-KS-001874.)  In response to these risks, CMS has implemented an "enterprise-wide" risk management policy. (Id.)  The policy is implemented by CMS's Risk Committee which "review[s] the corporate commodity position and ensure[s] that net corporate exposures are within the economic risk tolerance levels established by the Board of Directors." (Id.)  The Risk Committee is comprised of CMS business unit managers and is chaired by CMS's Chief Risk Officer. (Heartland App., Ex. E at CMS-KS-002107.)

CMS controls commodity-related risk primarily through its Risk Management Policy. (Ex. M, CMS Energy Risk Management Policy.)  CMS's Board of Directors has "ultimate authority" over the Risk Management Policy. (Id. at 6.)  Determination of the

"levels and types of risk" CMS will accept lies within the Executive Oversight Committee's authority.  (Id.)  The Executive Oversight Committee consists of CMS's Chief Executive Officer, President and Chief Operating Officer, and Senior Vice President and Chief Financial Officer.  (Id. at 3.)  MST's President has the responsibility of "authoriz[ing] the individuals within [MST] responsible for executing derivative transactions on its behalf and on behalf of CMS Energy and . . . establish[ing] appropriate trading limits for said individuals."  (Id.)  These limits are subject to approval by the CMS Risk Committee.  (Id.)  The Risk Committee is comprised of CMS's Senior Vice President and Chief Financial Officer, the president of each business unit, CMS's Vice President of Risk Management, and other individuals representing departments with certain transactional authority.  (Id. at 4.)

The Risk Management Policy assigns to each business unit an amount of dollars the Risk Committee has authorized to be at risk known as "VaR."  (Id. at 12.)  VaR is "the total dollars that the business unit could expect to lose, in one day's time, if energy commodity prices move in a magnitude equal to historical observations against the business unit."  (Id.)  Each business unit must monitor and report its operations to the Risk Management Group to ensure it does not exceed its allotted VaR.  (Id.)  The Risk Management Group consists of certain individuals within CMS Enterprises Company responsible for collecting and reporting all of CMS's business units' books into a single portfolio.  (Id. at 4.)  The business unit must take action to correct violations of this limit within one or two days or the Risk Management Group will provide notice to the Executive Oversight Committee, which notifies the Authorized Trading Group of what action must be taken to correct the violation.  (Id. at 12.)  The Authorized Trading Group is the "entity within CMS Energy authorized to negotiate for and enter into derivative agreements" on CMS's behalf.  (Id. at 2.)  The Risk Management Policy assigns this responsibility to MST.  (Id.)

The Risk Management Policy contains similar constraints for earnings at risk for each business unit as well as limits designed to minimize the total financial loss CMS or its business units may incur.  (Id. at 13.)  Should those limits be reached, "all activity related to that transaction, book of transactions or the business unit entering into said transaction shall immediately cease and no new transactions will be entered into unless specifically authorized by the [Executive Oversight Committee]."  (Id.)  The business unit may not resume business activity until authorized by the Executive Oversight Committee.  (Id.)

The Executive Oversight Committee establishes that portion of CMS's earnings which may be exposed to energy commodity risk.  (Id. at 18.)  The Risk Committee then allocates this limit across the various business units.  (Id.)  Should CMS's earnings at risk exceed the set amount, the Risk Management Group "immediately" notifies the Authorized Trading Group, the Risk Committee, and the Executive Oversight Committee.  (Id. at 20.)  Within twenty-four hours, the Risk Management Group and the Authorized Trading Group must recommend actions to correct the situation.  (Id.)  Within forty-eight hours of receiving the recommendation, the Executive Oversight Committee directs the Risk Management Group and Authorized Trading Group of what actions to take.  (Id.)  While CMS set overall limits, each subsidiary "operate[s] their businesses how they see fit within those parameters."  (CMS Sep. Vol. Evid., Ex. 2 at 113.)

The Risk Management Policy requires each business unit to create its own aggregate risk reports on a daily basis.  (Ex. M, Risk Management Policy at 6, 12.)  These reports are provided to the head of the business unit and CMS's Vice President for Risk Management.  (Id.)  Under the policy, CMS was to perform an audit at least annually to ensure compliance.  (Id. at 14.)  Violations of the policy are grounds for terminating an employee.  (Id. at 17.)  In 2001 and 2002, CMS "identified a number of deficiencies in MST's systems of internal accounting controls."  (Heartland App., Ex. A at CMS-KS-003560.)  In response, CMS senior management and the CMS Audit Committee responded

by replacing some personnel, deploying additional accounting personnel, and implementing changes to MST's internal accounting controls.  (Id.)

In filings with the SEC, CMS disclosed that it had notified appropriate governmental authorities "that some employees at CMS MST and CMS Field Services appeared to have provided inaccurate information regarding natural gas trades to various energy industry publications which compile and report index prices.  CMS Energy is cooperating with investigations by the Commodity Futures Trading Commission, Department of Justice and [the Federal Energy Regulatory Commission] regarding this matter."  (Id.)  In 2005 filings with the SEC, CMS indicated that MST engaged in "round-trip trading transactions (simultaneous, prearranged commodity trading transactions in which energy commodities were sold and repurchased at the same price)," and the Department of Justice was investigating CMS.  (Heartland App., Ex. I at CMS-KS-010797.)  CMS also disclosed that, pursuant to existing indemnification policies, it was advancing legal defense costs to two former Field Services employees in a civil injunction action filed by the Commodity Futures Trading Commission ("CFTC").  (Id. at CMS-KS-010798.)

In November 2003, MST and Field Services entered into a settlement with the CFTC.  (Heartland App., Ex. B.)  The CFTC found that from November 2000 through September 2002, MST and Field Services reported false natural gas trade information to price and volume reporting firms.  (Id. at 2-3.)  Under the settlement, MST and Field Services agreed to cease and desist from further violations and to pay a $16 million penalty.  (Id. at 5.)  Additionally, MST, Field Services, CMS, and Cantera Natural Gas, Inc. agreed to cooperate with the investigation, by, among other things, preserving records, fully complying with inquiries or requests for records, producing witnesses, and assisting in locating prior employees.  (Id. at 6-7.)  CMS, MST, and Field Services also agreed not to make any public statement denying the CFTC's findings.  (Id. at 7.)

///

By October 2002, Field Services ceased submitting natural gas price reports to trade publications.  (Sep. CMS App., Ex. C at 5.)  In January 2003, MST sold a major portion of its wholesale natural gas trading book to a third party.  (Heartland App., Ex. A at CMS-KS-003478.)  By 2003, CMS had "eliminated virtually all of the business of [MST]."  (Heartland App., Ex. J at CMS-KS-008608.)  After that time, MST's remaining business "focuses on buying the fuel needed by [CMS's] domestic independent power plants and selling the uncontracted energy they produce."  (Id.)

The parties now dispute the significance of these contacts under the Missouri long-arm statute. The parties also dispute whether this Court's exercise of personal jurisdiction over CMS would violate constitutional due process requirements.

## II.        PERSONAL JURISDICTION

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  To meet this burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1) permitted under the applicable state's long-arm statute and (2) that the exercise of jurisdiction does not violate federal due process. Id.  The Court must analyze whether personal jurisdiction exists over each defendant separately.  Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

Where the issue is before the Court on a motion to dismiss based on affidavits and discovery materials without an evidentiary hearing, the plaintiff must make "a prima facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid dismissal." Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1119 (9th Cir. 2002).  The Court accepts as true any uncontroverted allegations in the complaint and resolves any conflicts between the facts contained in the parties' evidence in the plaintiff's favor. Id.  However, for personal jurisdiction purposes, a court "may not

assume the truth of allegations in a pleading which are contradicted by affidavit."

Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation omitted).

In diversity cases such as this, "a federal court applies the personal jurisdiction rules of the forum state provided the exercise of jurisdiction comports with due process." Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  However, "federal law is controlling on the issue of due process under the United States Constitution."  Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110 (9th Cir. 2002).  Therefore, the Court will apply law from the United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is appropriate under the Due Process Clause.  See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (holding that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").

To satisfy federal due process standards, a nonresident defendant must have "minimum contacts" with the forum state so that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice.  Pebble Beach Co., 453 F.3d at 1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)).  A federal district court may exercise either general or specific personal jurisdiction.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

To establish general personal jurisdiction, the plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that 'approximate physical presence.'"  Glencore Grain, 284 F.3d at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th

Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006)).  Courts consider such factors as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086.  "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum."  Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n.9).

A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56.  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."  Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum."  Pebble Beach Co., 453 F.3d at 1155.  "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum."  Id.  Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum.  Id. at 1155-56.

The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum.  Id.  In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3)

caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state."  Id.  To satisfy the third element of this test, the plaintiff must establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable effect" in the forum state is insufficient.  Id.  The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident."  Bancroft, 223 F.3d at 1087.

The second prong of the specific jurisdiction test requiring that the contacts constituting purposeful availment or purposeful direction give rise to the current action is measured in terms of "but for" causation.  Id. at 1088.  "If the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable."  Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir. 2008) (quotation omitted).

Plaintiffs are not contending this Court may assert personal jurisdiction over CMS based on CMS's own contacts with Missouri.  (Pls.' Opp'n to CMS Energy Corp.'s Mot. to Dismiss for Lack of Pers. Juris (Doc. #1448) at 3.)  Consequently, CMS is subject to personal jurisdiction in Missouri only if the forum acts of its subsidiaries, MST and Field Services, are attributable to it through alter ego or agency principles.[2]

**A.  Alter Ego**

A "parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes."  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134.  However, a subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego.  Id.

To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a prima facie case that the two companies share "such unity of interest and

---

[2] The Court will assume that if MST's and/or Field Services' forum-related acts are attributable to CMS, the Missouri long-arm statute is satisfied.

ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice." Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (quotation omitted).  To demonstrate a unity of interest warranting disregard of corporate separateness, the plaintiff must show the parent controls its subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent. Id. (quotation omitted).  Typically, this would involve showing the parent controls the subsidiary's internal affairs or daily operations.  Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980).[3]

A parent corporation may be involved directly in certain aspects of its wholly owned subsidiary's affairs without subjecting itself to alter ego status.  For example, a parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to its subsidiaries, and it may act as its subsidiary's guarantor.  Doe, 248 F.3d at 927-28.  Additionally, a parent may refer to its subsidiaries as divisions of the parent in annual reports.  Id. at 928.  Further, a parent may review and approve major decisions, place its own directors on the subsidiary's board, and share offices and staff with its wholly owned subsidiary without being considered its alter

_____

[3] Missouri employs a similar alter ego test.  Under Missouri law, "when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it, then the court will disregard the corporate form if to retain it would result in injustice." East Attucks Cmty. Housing, Inc. v. Old Republic Sur. Co., 114 S.W.3d 311, 321-22 (Mo. Ct. App. 2003) (quotation omitted).  The party seeking to pierce the corporate veil must show such "complete domination" that "the corporate entity as to this transaction had at the time no separate mind, will or existence of its own."  Real Estate Investors Four, Inc. v. Am. Design Group Inc., 46 S.W.3d 51, 56 (Mo. Ct. App. 2001) (quotation omitted).  Additionally, the party seeking to pierce must show the corporation used such control to commit a fraud or wrong, to violate statutory or other positive legal duties, or to perpetrate a dishonest and unjust act in contravention of plaintiff's legal rights. Id. Finally, the party must show "[t]he control and breach of duty" proximately caused the injury. Id. (quotation omitted).  To the extent Missouri would look to the law of the state of incorporation to determine alter ego status, see In re Bridge Info. Sys., Inc., 325 B.R. 824, 830-31 (Bankr. E.D. Mo. 2005), Michigan has similar requirements.  See Bitar v. Wakim, 572 N.W.2d 191, 192 (Mich. 1998); Rymal v. Baergen, 686 N.W.2d 241, 252 (Mich. Ct. App. 2004).

ego.  Id.; Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135.

In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status."  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135 (quotation omitted).  Activities consistent with investor status include "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'"  Doe, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 61, 72 (1998)).

In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice.  The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally.  Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524-25 n.12 (9th Cir. 1984).  For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent.  Id.  However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice.  Id. at 525.  Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil.  Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979).  An inability to collect on a judgment "does not, by itself, constitute an inequitable result."  Id.

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on MST or Field Services being CMS's alter ego.  CMS indirectly wholly owns both subsidiaries.  The companies did not share offices and had only one overlapping officer or director.  CMS did not make financial guarantees on MST's or Field Services' behalf.  The companies maintained separate books and records.  Although MST and Field Services were

permitted to use the CMS trade name and service marks, they had to pay a royalty fee to do so.

Under the Services and Management Agreements, CMS provided corporate services to MST and Field Services and acted as the subsidiaries' managing agent. However, MST and Field Services contractually were required to pay for those services, and CMS's activities were subject to the control of the subsidiaries' boards of directors. The Services and Management Agreements set forth certain actions CMS could not undertake as managing agent without the prior written approval of the subsidiaries' boards of directors. Such restrictions are inconsistent with alter ego status.

CMS's promulgation of general policies for its subsidiaries is consistent with its indirect investor status. CMS, as an investor up the corporate chain, is entitled to monitor Field Services' and MST's performance and limit the risk to its investment that it is willing to accept. Consequently, any daily reporting of information from Field Services and MST to CMS is in accord with CMS's investor oversight role. No evidence suggests CMS gave daily control commands to Field Services or MST. Rather, the record demonstrates that, consistent with its investor status, CMS set general policies and guidelines regarding certain overall limits, such as limits on VaR and earnings at risk. Plaintiffs present no evidence that CMS played a role in the day-to-day conduct of Field Services and MST's operational business. For example, with respect to natural gas trading, while CMS set overall limits on certain metrics, CMS had no role in making the day-to-day decisions of who Field Services or MST was to trade with, when, for what amount of natural gas, and at what price. Although the Risk Management Policy permitted CMS to cease any subsidiary business activity when certain limits were exceeded, Plaintiffs present no evidence CMS ever did so, much less that it did so on a daily basis with respect to Field Services and MST. Plaintiffs also present no evidence CMS had any role in Field Services' or MST's price reporting to indices.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiffs contend it would be unjust to permit CMS to reap the benefits of Field Services' and MST's alleged unlawful behavior by enjoying profits from its indirect subsidiaries' trading activities while escaping liability for their alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, CMS must have had some fraudulent intent at Field Services' or MST's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable. Plaintiffs present no evidence Field Services or MST was undercapitalized at its inception. Further, the fact that the two companies operated as legitimate businesses for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

Plaintiffs' fear that they may not be able to collect on a judgment in this action against Field Services or MST does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiffs have not met their burden of establishing Field Services or MST is CMS's alter ego, and the Court will not attribute these subsidiaries' contacts with Missouri to CMS for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

A subsidiary's contacts also may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39

F.3d 1398, 1405 (9th Cir. 1994)).  The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence.  Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment.  Id. at 929.  "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries."  Id. (quotation omitted).  The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one."  Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own."  Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981).  The Bulova court thus attributed the subsidiaries' contacts to the parent company.  Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate.  Sonora Diamond Corp. v. Superior Court,

99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000).  As the <u>Sonora Diamond</u> court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore."  <u>Id.</u>  But where the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company.  <u>Id.</u>

Likewise, in <u>Doe</u>, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical operations, the parent would have conducted and controlled those operations.  <u>Doe</u>, 248 F.3d at 929.  The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States."  <u>Id.</u>

Plaintiffs have failed to establish a prima facie case that Field Services or MST was CMS's general agent in Missouri.  CMS's business is not purely a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses.  CMS describes itself as an integrated energy company and has referred to the synergistic benefits of its trading business line with the business lines of other subsidiaries it owns.

Although CMS identifies natural gas trading and marketing as one of its business segments, Plaintiffs have not established that Field Services' or MST's sales of natural gas in Missouri were sufficiently important to CMS that if Field Services or MST did not make the sales in Missouri, CMS would have done so itself.  CMS did not conduct any operational business itself.  Natural gas trading activity was a separate business segment

operated through an indirect subsidiary.  Further, CMS subsequently sold Field Services, and MST ceased natural gas trading and reporting, suggesting that these subsidiaries' trading activities were not sufficiently important to CMS that it would perform the activities itself if its indirect subsidiaries did not do so on its behalf.

Moreover, Plaintiffs have presented no evidence that Field Services' and MST's natural gas sales in Missouri in particular were sufficiently important to CMS's business that CMS would have performed the sales in Missouri itself absent its subsidiaries' representation in the forum.  See Modesto City Schs., 157 F. Supp. 2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F. Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States).  Consequently, Plaintiffs have not shown that Field Services' or MST's Missouri natural gas sales played a significant role in CMS's "'organizational life'" such that it acted as a substitute for CMS in the forum.  Bulova Watch Co., Inc., 508 F. Supp. at 1344.  The Court therefore will not attribute Field Services' and MST's Missouri contacts to CMS under agency principles.[4]

---

[4] The result would be the same under general Missouri agency law.  In Missouri, an agency relationship, whether actual or apparent, exists when "the credible facts, taken as a whole, fairly disclose that a party is acting for or is representing another by the latter's authority." Motorsport Mktg., Inc. v. Wiedmaier, Inc., 195 S.W.3d 492, 498 (Mo. Ct. App. 2006) (quotation omitted).  An agent has apparent authority when (1) the principal has manifested his consent to the agent exercising such authority or knowingly permitted the agent to exercise such authority; (2) a third person acting in good faith, "had reason to believe, and actually believed, the agent possessed such authority;" and (3) the third person "relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal." Id. (quotation omitted).

Here, Plaintiffs have presented evidence that CMS delegated to MST the authority to conduct derivative trading on CMS's behalf under the Risk Management Policy.  However, Plaintiffs have presented no evidence MST engaged in derivative transactions in Missouri pursuant to this authority.  Additionally, Plaintiffs have presented a comment in an SEC filing that CMS engages in trading activity "through" MST.  The statement does not fairly disclose MST was authorized to sell natural gas

**C.  Request for Deferred Decision**

Plaintiffs suggest that because the personal jurisdiction question is intertwined with the merits, the Court should defer ruling on the personal jurisdiction issue until after merits discovery is completed.  Plaintiffs rely on Data Disc, Inc., 557 F.2d at 1285 n.2.  However, Data Disc, Inc. states that where the jurisdictional issues are intertwined with the merits, the Court may require the plaintiff to establish "only . . . a prima facie showing of jurisdictional facts with affidavits and perhaps discovery materials."  Id.  As the Court is considering the personal jurisdiction issue on the basis of affidavits and documentary evidence without holding an evidentiary hearing, the Court is following Data Disc, Inc. by holding Plaintiffs to this standard, and is not requiring Plaintiffs to meet the higher burden of demonstrating personal jurisdiction by a preponderance of the evidence, as Plaintiffs would have to do at an evidentiary hearing or at trial.  Id.

The Court has denied motions to compel by Plaintiffs in the consolidated actions raising similar issues.  (Pls.' Mot. to Compel Disc. from Def. CMS Energy Corp. (Doc. #904); Pls.' Mot. to Compel Disc. from Def. CMS Energy Corp. (Doc. #906); Pls.' Mot. to Compel Disc. from Defs. Duke Energy Carolinas, LLC & Duke Energy Trading & Marketing, LLC (Doc. #898) & Mem. in Supp. (Doc. #899); Pls.' Mot. to Compel Disc. from Def. Reliant Energy, Inc. (Doc. #910) & Mem. in Supp. (Doc. #911); Order (Doc. #1240).)  Plaintiffs seek further discovery on the conspiracy theory of personal jurisdiction, a theory of questionable legitimacy.  See Chirila v. Conforte, 47 F. App'x 838, 842, 2002 WL 31105149, at *3 (9th Cir. 2002) (unpublished).  In any event, nothing suggests further

---

on CMS's behalf as CMS's agent with authority to bind CMS.  Rather, it describes CMS's business line operationally conducted through its subsidiary.  Plaintiffs present no other evidence that CMS expressly delegated trading authority on CMS's behalf to MST.  As to apparent agency, Plaintiffs have presented evidence that CMS permitted Field Services and MST to use the "CMS" name and logo in marketing natural gas in Missouri.  However, Plaintiffs have presented no evidence that anyone relied on an apparent agency relationship between CMS and Field Services or MST.

discovery will establish Defendant CMS participated in a conspiracy targeting known Missouri residents.  The Court therefore will decline Plaintiffs' request to defer the personal jurisdiction issue to be resolved with the merits.

**III.      CONCLUSION**

IT IS THEREFORE ORDERED that Specially Appearing Defendant CMS Energy Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #1295) is hereby GRANTED.  Defendant CMS Energy Corporation is hereby dismissed from this action for lack of personal jurisdiction.

DATED: February 23, 2009

_____
PHILIP M. PRO
United States District Judge