UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | | |
|---|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | ) ) ) ) ) | MDL 1566 2:03-CV-01431-PMP-PAL BASE FILE |
| ARANDELL CORP., et al., Plaintiffs, v. XCEL ENERGY, INC., et al., Defendants. | ) ) ) ) ) ) ) ) ) ) | 2:07-CV-01019-PMP-PAL ORDER RE: DEFENDANT'S MOTION TO DISMISS (Doc. #929) |

Presently before this Court is Defendant Dynegy Illinois Inc.'s Motion to Dismiss (Doc. #929).[1] Plaintiffs filed an Opposition (Doc. #1245) and supporting exhibits (Doc. #1089, #1092, #1097, #1131, #1180, #1246, #1498). Plaintiffs also filed a supplement to their opposition (Doc. #1271). Defendant Dynegy Illinois Inc. filed a Reply (Doc. #1281) with supporting declarations (Doc. #1282, #1284).

Also before the Court is Plaintiffs' Motion to Supplement Record in Response to Dynegy Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #1495). Defendant Dynegy Illinois Inc. filed an Opposition (Doc. #1507). Plaintiffs filed a Reply (Doc. #1516).

///

///

---

[1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

**I.        BACKGROUND**

      **A.  Procedural Background**

      This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001.  Plaintiffs originally filed this action in the Circuit Court, Dane County, Wisconsin.  (Notice of Removal [Doc. #2 in 2:07-CV-01019-PMP-PAL], Compl.)  Defendants removed the case to the United States District Court for the District of Wisconsin.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.

      Plaintiffs Arandell Corporation, Merrick's, Inc., Safety-Kleen Systems, Inc., Sargento Foods, Inc., and Ladish Co., Inc. are Wisconsin corporations.  (Corrected Second Am. Compl. [Doc. #190 in 2:07-CV-01019-PMP-PAL][2] at 5-6.)  According to the Corrected Second Amended Complaint ("SAC"), Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Wisconsin.  (Id. at 6-51.)  In this litigation, Plaintiffs allege Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers.  (Id.)  Specifically, Plaintiffs allege Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices and engaging in wash trades, in violation of Wisconsin Statutes chapter 133.  (Id.)

      The SAC asserts two causes of action.  Count one arises under Wisconsin Statutes § 133.14, which voids contracts to which an antitrust conspirator is a party and

---

[2] Plaintiffs' Second Amended Complaint is located at docket number 847 in the base file. Plaintiffs filed the Corrected Second Amended Complaint only in the individual case file.

2

allows recovery of payments made pursuant to such a contract.  (Id. at 54-56.)  Count two seeks trebled actual damages under Wisconsin Statutes § 133.18 for Defendants' alleged antitrust violations.  (Id. at 56-57.)

The SAC's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations.  The SAC does not allege the parent company Defendants themselves engaged in natural gas trading and price reporting.  Rather, the SAC alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales in Wisconsin during the relevant time period.

Plaintiffs seek to establish personal jurisdiction over the parent company Defendants based on their out-of-forum activities directed at Wisconsin along with their subsidiaries' and affiliates' contacts within Wisconsin.  According to the SAC, the parent company Defendants dominated and controlled their respective subsidiaries and the parent company Defendants "entered into a combination and conspiracy . . . which tended to prevent full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas."  (Id. at 6-7, 9, 14-15, 18-19, 23, 26-27, 30-31, 35-36.)  Plaintiffs allege the parent company Defendants intended their actions to have a direct, substantial, and foreseeable effect on commerce in the State of Wisconsin.  (Id. at 7, 10, 15, 19, 23-24, 27, 31, 36.)  According to the SAC, the parent company Defendants "made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates . . . in the United States and in Wisconsin."  (Id. at 8, 10, 15, 19, 24, 27-28, 32, 36.)

///

Defendant Dynegy Illinois Inc. ("Dynegy") now moves to dismiss, arguing this Court lacks personal jurisdiction over Dynegy. According to Dynegy, it conducts no business in Wisconsin and has no other contacts supporting general or specific jurisdiction. Dynegy also argues it cannot be subject to jurisdiction in Wisconsin based on its subsidiary's contacts with the forum because its subsidiary is not its agent or alter ego, and Wisconsin would not support the conspiracy theory of jurisdiction. Dynegy thus argues personal jurisdiction does not exist under the Wisconsin long-arm statute, and even if it did, exercising personal jurisdiction in this case would violate constitutional due process requirements.

Plaintiffs respond that Dynegy's subsidiary has submitted to jurisdiction in Wisconsin and Dynegy is subject to personal jurisdiction based on agency and alter ego principles based on its subsidiary's contacts. Additionally, Plaintiffs argue that because Wisconsin's antitrust statutes contemplate imposing liability on an antitrust conspirator who performs acts outside of Wisconsin that have an impact in Wisconsin, the Court has personal jurisdiction over Dynegy under Wisconsin's long-arm statute.

**B.  Facts Related to Personal Jurisdiction**

Dynegy is an Illinois corporation with its principal place of business in Texas. (Mot. to Dismiss (Doc. #929), Decl. of Amy E. Jolley at 2.) Dynegy formerly was known as Dynegy Inc. until it changed to its current name in April 2007. (Id.) Dynegy is a holding company which does not itself engage in business operations. (Id.) Rather, it owns direct and indirect subsidiaries which operate in various sectors of the energy industry. (Id.)

Dynegy has never been qualified to do business in Wisconsin, has never paid taxes in Wisconsin, and has never itself engaged in natural gas trading, marketing, production, sales, or transportation in the state. (Id.) Dynegy has never reported natural gas price or volume data to any price reporting index anywhere, including Wisconsin. (Id. at 3.) Dynegy does not have an office, mailing address, telephone number, bank account,

4

employees, or property in Wisconsin.  (Id. at 2.)

Dynegy indirectly wholly owns Dynegy Marketing and Trade ("DMT"), a Colorado partnership.  (Decl. of William E. Fischer (Doc. #1246) ["Fischer Decl."], Ex. 1 at 27, 39.)  DMT's current partners are indirect wholly owned subsidiaries of Dynegy.  (Id. at 38, 49-50.)  During the relevant time period, DMT engaged in natural gas trading and price reporting activity.  (Fischer Decl., Ex. 5 at DYN-ARAN000486.)

Dynegy and DMT share overlapping officers.  (Fischer Decl., Ex. 1 at 10.)  The personnel who perform functions for Dynegy are employed by DMT, including Dynegy's officers and directors.  (Id. at 34.)  DMT provides accounting, legal, tax, human resources, and information technology services to Dynegy and to other Dynegy subsidiaries.  (Id. at 36, 110-11.)  Dynegy and DMT also share offices.  (Id. at 33.)  Employees are not segregated in the offices based on the legal entity for which they are performing services.  (Id. at 109.)  DMT used to charge the various business segments for these services but ceased doing so in 2006 when Dynegy focused on one industry, power generation.  (Id. at 111-12.)

In terms of financial dealings between DMT and Dynegy, DMT's financial data is included in consolidated reporting for Dynegy.  (Id. at 98.)  Dynegy issued two guarantees to third parties on DMT's behalf, neither of which related to DMT's activities in Wisconsin.  (Id. at 27; Fischer Decl., Ex. 2, attachs. 7, 8.)  The guarantees were designed to induce the third parties to do business with DMT.  (Fischer Decl., Ex. 2, attachs. 7, 8.)  DMT typically used its own cash to fund its operations as an ongoing commercial operational entity.  (Fischer Decl., Ex. 1 at 101.)  To the extent DMT had excess cash, it would issue a distribution to its general partners or send that money up the corporate chain to Dynegy Holdings, Inc.  (Id. at 101, 106.)  Dynegy Holdings, Inc. is the primary holder of external debt for Dynegy-related entities and is subject to certain limitations in credit facility agreements with third party lenders.  (Id. at 107.)  DMT employees in the treasury group perform a daily cash sweep of each subsidiary, including DMT, and deposit it into a

consolidated account where it is invested on a daily basis. (Id. at 108.)

DMT's general partners do not dispute personal jurisdiction in Wisconsin in this action.[3] DMT sold millions of dollars worth of natural gas to entities with Wisconsin addresses during the 2000 to 2002 time frame. For example, Wisconsin-based Integrys Energy Services ("Integrys") purchased millions of dollars worth of natural gas from DMT from 2000 to 2002. (Decl. of Sandy Roder (Doc. #1092); Notice of Filing of Docs. Under Seal (Doc. #1184) at INTSUB000004-5.) DMT also had a long term natural gas supply agreement with Wisconsin Gas LLC pursuant to which Wisconsin Gas LLC purchased millions of dollars worth of natural gas from 2000 to 2002. (Decl. of William E. Fischer (Doc. #1097), Second Decl. of James H. Voss at 2 & attach. 2.)

Wisconsin Public Service Corporation ("WPSC") also purchased over a million dollars worth of natural gas from DMT between 2000 and 2002. (Notice of Filing of Revised Decls. of Kristie J. Wiegand and Julie A. Baumgart (Doc. #1131), Decl. of Kristie J. Wiegand at 3; Notice of Filing of Docs. Under Seal (Doc. #1180) at WPSSUB000001-38.) In 1997, WPSC entered into a long term natural gas supply agreement with a company called Natural Gas Clearinghouse. (Notice of Filing of Docs. Under Seal (Doc. #1180) at WPSSUB000039-46.) In 1998, Natural Gas Clearinghouse sent a letter to WPSC announcing that it had changed its name to "Dynegy." (Id. at WPSSUB000047.) An undated letter on Dynegy, Inc. letterhead also announced the name

---

[3] Dynegy suggests Plaintiffs have not sued DMT, but instead sued only DMT's partners, Dynegy GP, Inc. and DMT Holding LP. Plaintiffs' Corrected Second Amended Complaint asserts claims against the Dynegy Defendants, described as Dynegy, Inc. and Dynegy GP Inc. DMT Holding LP (d/b/a Dynegy Marketing and Trade). (Corrected Second Am. Compl. (Doc. #190 in 2:07-CV-01019-PMP-PAL) at 38.) According to filings with the Colorado Secretary of State for statement of a trade name, Dynegy Marketing and Trade is the trade name for the "true name" of "Dynegy GP Inc. DMT Holding LP." (Fischer Decl., Ex. 2, attachs. 2, 3.) Dynegy GP Inc. and DMT G.P., LLC (successor to DMT Holdings, LP) filed Answers in this action admitting they are the general partners of DMT and that DMT conducted business in Wisconsin during the relevant time period, defined as January 1, 2000 through October 31, 2002. (Answer (Doc. #930) at 9; Answer (Doc. #931) at 9.)

change. (Id. at WPSSUB000048.)  In 1999, WPSC entered into a net-out agreement with Dynegy. (Id. at WPSSUB000049-50.)  Dynegy sent back to WPSC the executed original copy of the agreement under Dynegy, Inc. letterhead. (Id. at WPSSUB000051.)  In May 2000, the net-out agreement was changed to reflect DMT as the counterparty rather than Dynegy. (Id. at WPSSUB000054-58.)  A May 30, 2000 letter on Dynegy, Inc. letterhead stated that "our records show that we sold natural gas to you in the following states: IL, LA, MI, WI." (Id. at WPSSUB000059.)  WPSC sent payment for the natural gas sales to DMT. (Fischer Decl., Ex. 1 at 215.)

In filings with the Securities and Exchange Commission ("SEC"), Dynegy described itself as "a leading provider of energy and communications solutions to customers in North America, the United Kingdom and Continental Europe." (Fischer Decl., Ex. 5 at DYN-ARAN000486.)  Dynegy stated it is "a holding company that principally conducts all of its business through its subsidiaries." (Id. at DYN-ARAN000582.)  Dynegy set forth its business in four business segments, with DMT being one of them. (Id. at DYN-ARAN000574.)  In a 2001 SEC filing, Dynegy stated that it "sells natural gas under sales agreements that have varying terms and conditions intended to match seasonal and other changes in demand." (Fischer Decl., Ex. 6 at DYN-ARAN00611.)

In its SEC filings, Dynegy stated that it was subject to various risks including commodity price variability related to its marketing and trading businesses. (Fischer Decl., Ex. 5 at DYN-ARAN000486.)  Dynegy managed these and other risks through various risk control structures. (Fischer Decl., Ex. 6 at DYN-ARAN000653.)  An overview of Dynegy's risk management structure in a 2001 SEC filing placed at the top of this structure the Dynegy board of directors, which had "[u]ltimate responsibility for ensuring that risks are appropriately identified and managed." (Id. at DYN-ARAN000654.)  The board was solely responsible for approving the risk policy, and it delegated that authority to the Audit Committee of Dynegy's board. (Id.)  The Audit Committee performed its tasks primarily

through two committees: the Audit and Compliance Committee, which was responsible for planning and executing internal financial and operational audits, and the Executive Risk Committee, which set limits for investment, commodity, and financial risks. (Id.) The Executive Risk Committee was comprised of Dynegy's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, and Chief Risk Officer. (Id.)

Dynegy also had a Risk Committee which reviewed activities of existing businesses, new businesses and products, divisional market risk limits, business unit market risk limits, and currency and interest rate risk limits. (Id. at DYN-ARAN000655.) Dynegy placed limits on a segment and business unit basis. (Id.) Business unit managers then allocated that business unit's limits among individual traders or desks. (Id.) The Risk Committee reported to the Executive Risk Committee. (Id.) The Risk Committee was comprised of Dynegy officers and various business unit officers. (Decl. of William E. Fischer (Doc. #1498) ["Supp. Fischer Decl."], Ex. A at DYN-ARAN017592.)

Dynegy also had a Chief Risk Officer who headed an enterprise-wide risk control department. (Fischer Decl., Ex. 6 at DYN-ARAN000655.) This department assured adherence to the risk policy, monitored risk limits on a daily basis, and reported its results to the appropriate risk committees. (Id.; Supp. Fischer Decl., Ex. A at DYN-ARAN017594, DYN-ARAN017638.) The department also reported limit violations to the appropriate board and management committees as well as to business unit managers. (Fischer Decl., Ex. 6 at DYN-ARAN000655.) The department verified compliance through daily monitoring. (Supp. Fischer Decl., Ex. A at DYN-ARAN017638.) The department then produced its own daily Consolidated Report. (Id. at DYN-ARAN017639.) Limit violations were reported immediately to the Chief Risk Officer. (Id.)

The business units operated within the trading limits. (Id. at DYN-ARAN017598.) Dynegy's Risk Management and Control Policy from 1998 ("1998 Policy") stated that "[i]t is the effectiveness of the business units in developing,

implementing, measuring and adjusting risk management strategies that dictates the profitability of the unit." (Id. at DYN-ARAN017599.) The 1998 Policy gave business unit heads the authority to set and review individual trader limits. (Id.) "The heads of the business units are responsible for the risks undertaken within the confines of the risk control framework." (Id.; see also id. at DYN-ARAN017607 ("The Business Unit Leaders are responsible for the risks undertaken within the limits that have been authorized.").) Business unit leaders reviewed daily results and were "responsible for explanations of limit violations. Limits violations will require the next tiered level to produce a written response accepting the risk, otherwise the position which is violated, will be liquidated." (Id. at DYN-ARAN019603.) Business units prepared a Daily Position Report and submitted it to the risk control department. (Id. at DYN-ARAN017626.)

Under the 1998 Policy, the "Dynegy Board grant[ed] authorization, subject to the approved transaction limits, to negotiate, enter into and execute, for and on behalf of the Company, any and all contracts, agreements or other instruments in writing for or relating to the purchase, sale, transmission or capacity acquisition and the purchase and sale of: Natural Gas . . . ." (Id. at DYN-ARAN017598; see also id. at DYN-ARAN017601 ("The Risk Committee grants trading authorization to Dynegy traders.").) The 1998 Policy included a "Trader Authorization Form" which stated that the individual trader "has been authorized to act as a trader on behalf of Dynegy Inc., subject to all limitations and qualifications" set forth in the 1998 Policy. (Id. at DYN-ARAN017612.) All trading personnel had to acknowledge acceptance of the policy and violations could result in discipline, including termination. (Id. at DYN-ARAN017589.)

In July 2002, Dynegy approved a Risk Policy Statement ("2002 Policy Statement"). (Supp. Fischer Decl., Ex. D.) Under the 2002 Policy Statement, the Executive Risk Committee was responsible for determining overall risk exposure, including monitoring markets and business risks and allocating risk capital among business units. (Id.

9

at DYN-ARAN017744.) The Executive Risk Committee consisted of Dynegy and subsidiary officers, including DMT's president. (Id.) The Executive Risk Committee was to meet at least quarterly. (Id. at DYN-ARAN017745.) Business units were responsible for effectuating daily reporting to the risk control department. (Id.)

Under the 2002 Policy Statement, the Risk Committee had oversight responsibility for market risk exposure, risk management, and trading activities. (Id. at DYN-ARAN017746.) The Risk Committee was comprised of Dynegy officers and subsidiary officers, including DMT's president. (Id.) The Risk Committee met twice monthly. (Id.)

The Dynegy board of directors was responsible for appointing a Chief Risk Officer who reported to the Dynegy Board's Audit Committee. (Id. at DYN-ARAN017747.) The Chief Risk Officer monitored the risk tolerance standards, reported to the Audit Committee, set appropriate limits, assured compliance with the policy, performed independent risk analyses, performed independent risk and performance measurements, and communicated daily results to the Executive Risk Committee. (Id.) Like the 1998 Policy, the 2002 Policy Statement required daily reporting of certain risk management metrics. (Id. at DYN-ARAN017754-55.)

Under the 2002 Policy Statement, Dynegy "grant[ed] authorization, subject to the approved risk exposure and transaction limits, to negotiate, enter into and execute, for and on behalf of the Company, any and all contracts, agreements or other instruments in writing for or relating to the purchase, sale, transmission or capacity acquisition and the purchase and sale of: Natural Gas . . . ." (Id. at DYN-ARAN017750.) The 2002 Policy Statement required personnel with transaction authority to execute a Letter of Authorization "to reflect a written understanding of granted risk exposure as authorized under the guidelines of the Risk Policy Statement." (Id. at DYN-ARAN017758.)

///

In 2002, DMT entered into a settlement with the Commodity Futures Trading Commission ("CFTC") to settle charges that DMT violated the Commodity Exchange Act. (Fischer Decl., Ex. 2, attach. 4.)  According to the CFTC, DMT submitted fictitious price reports to price reporting firms.  (Id. at 2.)  Pursuant to the settlement, DMT agreed to cease and desist from further violations, and agreed to pay a $5 million penalty in conjunction with an affiliated entity.  (Id. at 6.)  DMT also agreed to cooperate with the CFTC's investigation and agreed not to publicly deny the CFTC's findings.  (Id. at 7.)

In October 2002, Dynegy announced that it had dismissed six employees and would discipline seven others for violations of company policy relating to inaccurate price reporting to price indices.  (Fischer Decl., Ex. 8.)  One DMT employee was indicted in federal court in Texas on charges of conspiracy, false reporting, and wire fraud.  (Fischer Decl., Ex. 2, attachs. 5, 6.)  In October 2002, a press release on Dynegy, Inc. letterhead announced it was exiting the marketing and trading business.  (Fischer Decl., Ex. 7.)  DMT thereafter ceased natural gas trading activities and currently purchases natural gas only to run operations.  (Fischer Decl., Ex. 1 at 144.)

The parties now dispute the significance of these contacts under the Wisconsin long-arm statute. The parties also dispute whether this Court's exercise of personal jurisdiction over Dynegy would violate constitutional due process requirements.

**II.     MOTION TO SUPPLEMENT RECORD**

Plaintiffs move to supplement the record to include exhibits produced by Dynegy as a result of this Court granting Plaintiffs' motion to compel further production of personal jurisdiction discovery materials from Dynegy.  Plaintiffs argue that because these documents were not available during briefing on the motion to dismiss, Plaintiffs should be permitted to supplement the record.  Dynegy responds that Plaintiffs unduly delayed their request to supplement the record, as Plaintiffs did not move to supplement the record until three months after Dynegy produced the documents.  Dynegy also argues the documents

present nothing new because Plaintiffs already argued Dynegy exercised day-to-day control over DMT through risk control procedures. Dynegy contends the supplemental materials show Dynegy was not involved in DMT's day-to-day affairs as Plaintiffs claim. Alternatively, Dynegy requests additional briefing for Dynegy to address the merits of Plaintiffs' supplemental factual argument.

The Court will grant Plaintiffs' motion to supplement the record. The Court granted Plaintiffs' motion to compel and Plaintiffs should be given the opportunity to present the produced evidence. Although Plaintiffs delayed in filing the supplement, Dynegy has not established prejudice as a result. Dynegy contends the documents add nothing new and presents responsive arguments in its opposition to the motion to supplement. The Court will not grant additional briefing.

### III.  PERSONAL JURISDICTION

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006). To meet this burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1) permitted under the applicable state's long-arm statute and (2) that the exercise of jurisdiction does not violate federal due process. Id. The Court must analyze whether personal jurisdiction exists over each defendant separately. Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

Where the issue is before the Court on a motion to dismiss based on affidavits and discovery materials without an evidentiary hearing, the plaintiff must make "a prima facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid dismissal." Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1119 (9th Cir. 2002). The Court accepts as true any uncontroverted allegations in the complaint and resolves any conflicts between the facts contained in the parties' evidence in

the plaintiff's favor.  Id.  However, for personal jurisdiction purposes, a court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation omitted).

In diversity cases such as this, "a federal court applies the personal jurisdiction rules of the forum state provided the exercise of jurisdiction comports with due process." Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  However, "federal law is controlling on the issue of due process under the United States Constitution."  Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110 (9th Cir. 2002).  Therefore, the Court will apply law from the United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is appropriate under the Due Process Clause.  See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (holding that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").

To satisfy federal due process standards, a nonresident defendant must have "minimum contacts" with the forum state so that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice.  Pebble Beach Co., 453 F.3d at 1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)).  A federal district court may exercise either general or specific personal jurisdiction.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

To establish general personal jurisdiction, the plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that 'approximate physical presence.'"  Glencore Grain, 284 F.3d

at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006)).  Courts consider such factors as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086.  "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n.9).

        A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56.  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

        Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155.  "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." Id.  Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.

        The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id.  In other words, the defendant "must have (1)

committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." Id. To satisfy the third element of this test, the plaintiff must establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable effect" in the forum state is insufficient. Id. The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident." Bancroft, 223 F.3d at 1087.

The second prong of the specific jurisdiction test requiring that the contacts constituting purposeful availment or purposeful direction give rise to the current action is measured in terms of "but for" causation. Id. at 1088. "If the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir. 2008) (quotation omitted).

A subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)). The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence. Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment. Id. at 929. "Where, on the other hand, the

15

subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." Id. (quotation omitted).  The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one." Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own." Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981).  The Bulova court thus attributed the subsidiaries' contacts to the parent company.  Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate.  Sonora Diamond Corp. v. Superior Court, 99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000).  As the Sonora Diamond court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore." Id.  But where the parent simply held the mining company as an investment, the subsidiary's forum-related

contacts could not be imputed to the parent company.  Id.

Likewise, in Doe, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical operations, the parent would have conducted and controlled those operations.  Doe, 248 F.3d at 929.  The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States."  Id.

Plaintiffs have established a prima facie case of personal jurisdiction over Dynegy.  Plaintiffs have presented evidence that Dynegy authorized DMT to act as its agent for natural gas sales.  The 1998 Policy and the 2002 Policy Statement each stated that Dynegy's board of directors granted authorization to traders to negotiate, enter into, and execute natural gas sales and purchases on Dynegy's behalf.  The 1998 Policy contained a "Trader Authorization Form" which stated that the individual trader "has been authorized to act as a trader on behalf of Dynegy, Inc., subject to all limitations and qualifications" set forth in the 1998 Policy.  (Supp. Fischer Decl., Ex. A at DYN-ARAN017612 (emphasis added).)  Dynegy sent a letter to WPSC on its own letterhead to confirm that Dynegy made sales to WPSC in several states, including Wisconsin.  This letter is further evidence that DMT engaged in natural gas sales in Wisconsin and elsewhere on Dynegy's behalf. Dynegy's express authorization for DMT traders to make natural gas transactions on its behalf is prima facie evidence that DMT's services, at least during the relevant period, were sufficiently important to Dynegy that if it did not have a representative to perform them, it would have done so itself.

While DMT's subsequent cessation of natural gas trading suggests the business line was not sufficiently important to Dynegy that it would have performed the activity

without DMT's assistance, Plaintiffs need present only a prima facie case of personal jurisdiction at this juncture. Dynegy's decision to compel each trader to acknowledge an express grant of trading authorization on behalf of Dynegy, rather than on behalf of DMT, suggests that at least during the relevant period, Dynegy considered natural gas trading sufficiently important to its "'organizational life'" to require an explicitly authorized agent to conduct the activity on its behalf. Bulova Watch Co., Inc., 508 F. Supp. at 1344. Having granted DMT traders agency authority to conduct natural gas sales on Dynegy's behalf, its agent's in-forum contacts are attributable to Dynegy. Dynegy does not dispute that if DMT's contacts are attributable to Dynegy, that it is subject to personal jurisdiction in the forum. DMT and its general partners have stipulated they are subject to general jurisdiction in Wisconsin. (Fischer Decl., Ex. 1 at 26.) The Court therefore will deny Dynegy's motion to dismiss for lack of personal jurisdiction.

## IV.     CONCLUSION

IT IS THEREFORE ORDERED that Dynegy Illinois Inc.'s Motion to Dismiss (Doc. #929) is hereby DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Supplement Record in Response to Dynegy Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #1495) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to File Under Seal (Doc. #1496) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Plaintiffs' Withdrawal of Motion for Leave to File Under Seal (Doc. #1497) is hereby GRANTED.

DATED: March 9, 2009

_____
PHILIP M. PRO
United States District Judge