1  Oliver S. Howard (Okla. Bar No. 4403)
   John Henry Rule (Okla. Bar No. 7824)
2  Craig A. Fitzgerald (Okla. Bar No. 15233)
   Amelia A. Fogleman (Okla. Bar No. 16221)
3  GABLEGOTWALS
   100 West Fifth Street, Suite 1100
4  Tulsa, Oklahoma 74103
   Telephone: (918) 595-4800
5  Facsimile:  (918) 595-4990
6
7  ***Attorneys for Defendant ONEOK Energy***
   ***Services Company, L.P.***
8
9              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA
10
11 IN RE: WESTERN STATES          )   MDL Docket No. 1566
   WHOLESALE NATURAL GAS          )
12 ANTITRUST LITIGATION,          )   Base Case No. 2:03-cv-01431-PMP-PAL
                                  )
13 _____ )
   THIS DOCUMENT RELATES TO:      )
14                                )
   _____ )
15 SINCLAIR OIL CORPORATION,      )
                                  )
16            Plaintiff,          )
                                  )
17 vs.                            )
                                  )
18 ONEOK ENERGY SERVICES COMPANY, )   Case No. 2:06-CV-0282-PMP-PAL
   L.P.,                          )
19                                )
                                  )
20            Defendant.          )
                                  )
21
22         **DEFENDANT'S MOTION FOR ATTORNEY'S FEES**
                **AND BRIEF IN SUPPORT**
23
24      Defendant ONEOK Energy Services Company, L.P. ("ONEOK") hereby requests that
25 the Court award judgment to ONEOK for the attorney's fees and client-reimbursed expenses that
26
27
28

{946415;2}                         - 1 -

it incurred in the successful defense of this action.[1]  In support of this Motion, ONEOK states as follows:

### I.       ONEOK is the Prevailing Party on Sinclair's State Law Claims

Sinclair filed this action seeking damages from ONEOK for natural gas that Sinclair purchased from ONEOK at allegedly inflated prices.  Sinclair based its state law claims upon multiple legal theories including breach of contracts for the purchase and sale of gas between ONEOK and Sinclair and alleged violations by ONEOK of various provisions of the Oklahoma State Antitrust and Consumer Protection Acts.

On July 18, 2011, the Court dismissed the eight state law claims alleged by Sinclair, leaving two federal claims (RICO and Sherman Act) as the only remaining claims between the parties, and judgment was entered in favor of ONEOK.  [Dkt. #1972].  ONEOK is therefore the prevailing party with respect to the state law claims.[2]

### II.      ONEOK is Entitled to Recover Attorney's Fees

Although ONEOK is the prevailing party, "[FRCP] 54(d)(2) creates a procedure but not a right to recover attorney's fees." *MRO Comm., Inc. v. Am. Tel. & Tel. Co.,* 197 F.3d 1276, 1280 (9th Cir. 1999).  In order to recover fees, another source of authority for such an award must exist. *Id.* at 1281.  In this case, Sinclair alleged four contract theories, each of which was based on three contracts.  At least two of those contracts provide the basis for awarding fees to ONEOK as the prevailing party.[3]

---

[1] On July 29, 2011, Sinclair Oil Corporation filed a motion seeking to stay the entirety of these proceedings, including motions for attorneys' fees and costs, until an appeal has been resolved regarding the claims dismissed by this Court's July 18, 2011 Order.  ONEOK is in agreement with Sinclair regarding the staying of proceedings in this case.  Nonetheless, in an effort to ensure that the filing deadline for attorney's fees under FED.R.CIV.P. 54(d)(2) is not missed, ONEOK submits this motion pending the Court's ruling on Sinclair's motion for stay.

[2] The Court directed the entry of final judgment as to Sinclair's state law claims. *See* July 18 Order, at 46-47 [Dkt. 1972].

[3] Sinclair alleges the existence of a third contract, but it has not produced the third contract in discovery.

### A.    The Parties Contractually Agreed to Attorney's Fees.

Sinclair alleged that ONEOK breached a Gas Exchange and Supply Agreement entered November 6, 1996.[4]  This contract, a copy of which is attached as Exhibit A, provides:

> In the event either party has to initiate any action to enforce its rights hereunder, then the prevailing party shall be entitled to recover its costs, including, but not limited to, its court costs and expenses and reasonable attorney's fees.

*See* Exhibit A, at 15.  The contract also contains a provision in which the parties selected Wyoming law to govern the agreement.  *Id.*  Wyoming routinely enforces contractual agreements awarding attorney's fees to the prevailing party of a dispute.  *See, e.g., Dewey v. Wentland,* 38 P.3d 402, 420 (Wyo. 2002); *Bowers Welding and Hotshot, Inc. v. Bromley,* 699 P.2d 299 (Wyo. 1985).  Therefore, ONEOK is entitled to an award of fees.

### B.    The Parties Consented to Oklahoma Law Which Provides for Attorney Fees.

Oklahoma law contains a statutory provision authorizing attorney's fee awards in actions such as this one.  Specifically, 12 Okla. Stat. § 936 provides as follows:

> <u>In any civil action</u> to recover for labor or services rendered, or <u>on</u> an open account, a statement of account, account stated, note, bill, negotiable instrument, or <u>contract relating to the purchase or sale of goods</u>, wares, or merchandise, unless otherwise provided by law or the contract which is the subject of the action, <u>the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs</u>. (Emphasis added).

This was an action for breach of a contract for the purchase and sale of natural gas.  Under Oklahoma law, a contract for the sale of natural gas is considered a contract for the sale of goods, 12A Okla. Stat. § 2-107(1), and is therefore subject to the attorney's fee provisions of § 936. *Roye Realty & Developing, Inc. v. Watson*, 2 P.3d 320, 329 (Okla. 1996).

---

[4] Although the agreement was originally between Sinclair and K N Marketing, Inc., the parties agree that ONEOK subsequently acquired KNMI's rights to the contract. *See* Complaint ¶ 2.

This Court had a previous occasion to apply § 936 in this action following ONEOK's motion to dismiss.  In ruling on ONEOK's subsequent motion for attorney's fees [2:06-CV-0282-PMP-PAL, Dkt. 62], the Court engaged in a choice of  law analysis that looked to Wyoming law to determine whether attorney fee awards were procedural or substantive.  *See,* Order dated August 3, 2006, at 3-4 [2:03-CV-01431-PMP-PAL, Dkt. 404].  Relying on *Smithco Engineering, Inc. v. Int'l Fabricators, Inc.,* 775 P.2d 1011 (Wyo. 1989), this Court determined that attorney's fee awards were procedural, and therefore should be governed by Wyoming law, rather than § 936.  Order dated August 3, 2006, at 4.  However, the Court did not have the opportunity to consider a fact critical to the analysis - a choice of law clause selecting Oklahoma as the governing law.

One of the three contracts under which Sinclair sues, the Base Gas Sales Agreement entered into between Sinclair and ONEOK on August 1, 1996, provides:

> The interpretation and performance of this contract shall be governed by the laws of the state of Oklahoma, excluding any conflict of laws rule which would apply the law of another jurisdiction.

*See* Exhibit B at 8. And this provision makes all the difference, as demonstrated in *Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency,* 174 F.3d 1115, 1121 (10th Cir. 1999).  In *Boyd,* the court considered the applicability of § 936 in an action brought in Oklahoma where the subject contract contained a Kansas choice of law clause.  After considering at length the choice of law principles determining the applicable procedural and substantive law, the Court focused its attention on the parties' contractual choice of law. "Because parties are empowered to make contractual choice-of-law provisions, their expectations . . . are a significant factor in the determination of whether an issue is substantive or procedure for choice-of-law purposes." *Id.,*

at 1126.  The Court gave effect to the parties' expression of their choice of law and applied the law of Kansas, rather than Oklahoma.  *Id.,* at 27-28.

In the present case, the Court should follow the expectations of the parties, as expressed in the choice of law clause, and apply the law of Oklahoma with respect to an award of attorney's fees.  Any other result could frustrate parties who, knowing of Oklahoma's fee-shifting statutes, choose to ensure their applicability through a choice of law clause.  Moreover, applying Oklahoma law in accordance with the choice of law clause is consistent with *Smithco,* which did not involve a choice of law clause, and which recognized only that its law would be applied "[a]bsent something binding to the contrary."  *Smithco,* 775 P.2d at 1019.

For these reasons, as the prevailing party on Sinclair's contract claims, ONEOK is entitled to an award of its attorney's fees.

III.    **Amount of Fees Requested**

Rule 54 contemplates circumstances in which it is advisable to decide motions for attorney's fees in two steps, first determining "issues of liability for fees before receiving submissions on the value of such services."   FED.R.CIV.P.  54(d)(2)(C).   This is such a circumstance.  The Court's July 18 Order did not end this litigation because Sinclair's federal law claims remain.  ONEOK's detailed time records could reveal information about ONEOK's defense strategy and other thought processes of counsel.

To protect against this potential, ONEOK provides an estimate of its recoverable defense costs as authorized by Rule 54(d)(2)(B)(iii).   ONEOK estimates those costs to total approximately $450,000 to $500,000.  To the extent necessary, ONEOK requests that the Court enter an order excusing ONEOK from the requirements of District of Nevada LR 54-16 until it rules on Sinclair's liability for fees.

## IV.     Conclusion

For the reasons set for above, Defendant ONEOK Energy Services Company, L.P. respectfully requests that this Court determine that Sinclair must pay a reasonable attorney's fee to ONEOK pursuant to the contractual agreement between the parties and pursuant to 12 Okla. Stat. § 936.

Submitted this 1st day of August, 2011.

Respectfully submitted,


*/s/ Craig A. Fitzgerald*
Oliver S. Howard, Okla. Bar No. 4403
John Henry Rule, Okla. Bar No. 7824
Craig A. Fitzgerald, Okla. Bar No. 15233
Amelia A. Fogleman, Okla. Bar No. 16221
GABLEGOTWALS
1100 ONEOK Plaza
100 W. Fifth Street
Tulsa, OK  74103-4217
Phone: (918) 595-4800
Fax: (918) 595-4990

*Attorneys for Defendants, ONEOK Energy
Services Company, L.P.*


## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August, 2011, a true and correct copy of the foregoing ONEOK ENERGY SERVICE COMPANY'S MOTION FOR ATTORNEY'S FEES was electronically filed and served on all counsel properly registered to receive notice via the Court's CM/ECF system.


*/s/ Craig A. Fitzgerald*

## GAS EXCHANGE AND SUPPLY AGREEMENT

THIS GAS EXCHANGE AND SUPPLY AGREEMENT ("Agreement") is made and entered into this 6th day of November, 1996, by and between K N MARKETING, INC., a Colorado corporation, hereinafter referred to as "KNMI", and SINCLAIR OIL CORPORATION, a Wyoming corporation, hereinafter referred to as "Sinclair".

### WITNESSETH:

WHEREAS, this Agreement is being made pursuant to and in satisfaction of certain provisions of a Settlement Agreement executed between Sinclair Oil Corporation and KN Energy, Inc. on October 25, 1996 (the "Settlement Agreement"); and

WHEREAS, Sinclair owns and operates refinery facilities located near Sinclair, Wyoming, hereinafter referred to as the "Rawlins Plant", and near Casper, Wyoming, hereinafter referred to as the "Casper Plant" (together referred to as the "Plants") and has requirements for natural gas at the Plants; and

WHEREAS, Sinclair owns or has the right to certain natural gas to be produced from locations in the State of Wyoming, hereinafter referred to as the "Equity Gas", remote from the Rawlins Plant, and, in an effort to facilitate the delivery of natural gas to satisfy the requirements of its Rawlins Plant, Sinclair now desires to enter into an arrangement to exchange with KNMI the Equity Gas for other gas to be made available by KNMI at the Rawlins Plant; and

WHEREAS, Sinclair and KNMI are willing to enter into a gas exchange and supply arrangement to effect the transfer of the Equity Gas and third party gas to KNMI and the redelivery of a thermally equivalent quantity of gas (less fuel and unaccounted for gas) by KNMI to the Plants; and

WHEREAS, Sinclair is willing to dedicate to the exchange arrangement all of the Equity Gas.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, KNMI and Sinclair do hereby agree as follows:

1



## ARTICLE I
## GAS SUPPLY EXCHANGE

1.1    Sinclair will deliver, or cause to be delivered to KNMI, into the Equity Gas Receipts Points (as hereinafter defined) all of the Equity Gas and into the Third Party Receipt Points (as hereinafter defined) all third party gas purchased by Sinclair to meet the requirements of the Rawlins Plant. The Equity Gas is defined to mean the gas owned and/or controlled by Sinclair and produced from the locations more particularly described in Exhibit "A" attached hereto, and to be delivered into the Equity Gas Receipt Points. Sinclair contemplates that the total daily quantity of Equity Gas it will make available to KNMI at the Receipt Points will be approximately 4,000 MMBtu/day. The daily quantity of gas to be made available by Sinclair to KNMI at the Equity Gas Receipt Points will be nominated by Sinclair by individual Equity Gas Receipt Point (not to exceed the maximum daily quantity specified for each individual Equity Gas Receipt Point) in accordance with the nomination procedures set forth in Article III below.

1.2    Sinclair will deliver, or cause to be delivered to KNMI, into the Third Party Receipt Points (as hereinafter defined) all third party gas purchased by Sinclair to meet the requirements of the Casper Plant. The exchange of gas to serve the Casper Plant under this Agreement will commence March 1, 1997, and will continue thereafter on a year-to-year basis for the term of this Agreement, unless and until terminated by either party, upon thirty (30) days written notice of termination. The daily quantity of third party gas to be made available by Sinclair to KNMI will be nominated by Sinclair by individual Receipt Points (not to exceed the maximum daily quantity specified for each individual Receipt Point) in accordance with the nomination procedures set forth in Article III below.

1.3    KNMI will deliver, or cause to be delivered, to the Rawlins Plant Delivery Point and/or the Casper Plant Delivery Point, (as hereinafter defined), as applicable, a thermally equivalent quantity of gas equal to the quantity of Equity Gas or third party gas actually nominated and delivered, on behalf of Sinclair, to KNMI at the Receipt Points, less fuel and unaccounted for gas assessed by the transporting pipeline delivering KNMI's exchange gas to the Delivery Point. Sinclair will bear the fuel and unaccounted gas by providing the same to KNMI, in kind.

1.4    Sinclair dedicates to this Agreement, effective December 1, 1996, and for the term of this Agreement, all of the Equity Gas.

1.5    All third party gas purchased by Sinclair to meet the requirements of the Rawlins Plant will be delivered to KNMI at one or all of the Third Party Receipt Points for exchange hereunder.

2



## ARTICLE II
### RECEIPT POINTS AND DELIVERY POINT

2.1     The Equity Gas Receipt Points at which the Equity Gas will be delivered
to KNMI for exchange hereunder are the Transportation Receipt Points on the
interstate transmission system of Colorado Interstate Gas Company ("CIG") identified
by name and maximum daily receipt quantity ("MDRQ") as follows: (A) Granger
(Section 21 - T18N-R) - MDRQ is 1,000 MMBtu/day; (B) Red Desert (Section 9 - T19N-
R96W) - MDRQ is 1,000 MMBtu/day and (C) Echo Springs (Section 8- T20N-R92W) -
MDRQ is 2,500 MMBtu/day.  All of the foregoing Receipt Points are in Sweetwater
County, Wyoming. Any Equity Gas in excess of the MDRQ ("Excess Equity Gas") shall
be tendered to KNMI and then, KNMI, shall in its sole discretion accept or reject such
tender of Excess Equity Gas.  In the event KNMI rejects any or all Excess Equity Gas,
Sinclair is free to market at its sole discretion such Excess Equity Gas.

2.2     The Third Party Receipt Points at which the gas purchased by Sinclair
from third parties will be delivered to KNMI for exchange hereunder are:  (A)
Transportation Receipt Points on the interstate transmission system of  Colorado
Interstate Gas Company  ("CIG") east of Rawlins, Wyoming;  (B) Transportation
Receipt Points on the interstate transmission system of KN Interstate Gas Transmission
Co. ("KNI") east of Glenrock, Wyoming; or (C) All Transportation Receipt Points on the
intrastate transmission system of Northern Gas Company ("NGC").

2.3     The Equity Gas Receipt Points and Third Party Receipt Points may
collectively be hereinafter referred to as the "Receipt Points".

2.4     The Delivery Points at which KNMI will deliver to Sinclair the thermally
equivalent quantity of gas received by KNMI at the Receipt Points, less fuel and
unaccounted for gas, is at the inlet point at the Rawlins Plant (as defined in the second
Whereas clause of this Agreement and incorporated herein by reference) at which gas
can be delivered by either CIG and/or NGC to the Rawlins Plant (referred to as the
"Rawlins Plant Delivery Point") and at the Casper Plant (as defined in the second
Whereas of this Agreement and incorporated herein by reference) at which gas can be
delivered by NGC to the Casper Plant (referred to as the "Casper Plant Delivery
Point").

2.5     Sinclair will  be obligated, at its sole cost, to deliver or cause to be
delivered, to KNMI at the Receipt Points the Equity Gas and any third party gas.  KNMI
will be obligated, at its sole cost, to receive at the Receipt Points the quantity of gas
nominated by Sinclair and to have in place the requisite contractual arrangements to
receive the gas at the Receipt Points.  Subject to Sinclair's compliance with the
nomination procedures set forth in Article III below,  KNMI will be responsible for

3



coordinating the nominations o Sinclair with, and submitting the nominations of Sinclair to the transporting pipeline or p.pelines receiving such gas at the Receipt Points.

2.6     KNMI will be obligated, at its sole cost, to deliver or cause to be delivered to Sinclair at the Delivery Points the thermally equivalent quantity of exchange gas, subject to the payment by Sinclair to KNMI of the Exchange Differential Rate and Sinclair bearing the fuel and unaccounted for gas, in kind, as set forth in this Agreement .

## ARTICLE III
## NOMINATIONS

3.1     On or before the 15th day of each mon h prior the month of actual exchange of gas, Sinclair will submit to KNMI for pla.ming purposes only, Sinclair's best estimate of the daily quantity of gas it will need at the Plants and that it intends to nominate for delivery to KNMI at the Receipt Points. On or before the 2nd business day prior to the nomination deadline for the first of the month nominations, Sinclair will nominate the daily quantity of gas, by each individual Receipt Point, to be delivered to KNMI for exchange hereunder.  KNMI will nominate the quantity of thermally equivalent exchange gas to be delivered to Sinclair at the Delivery Points, as appropriate.

3.2     All nominations of gas to be made by either party hereunder will be consistent with and made in accordance with the nomination procedures of the transporting pipeline or pipelines receiving gas at the Receipt Points or the transporting pipeline or pipelines delivering gas to the Delivery Points as set forth in the respective Transportation Tariff of each transporting pipeline.

3.3     Revisions to nominations (other than Sinclair's planning nominations submitted to KNMI early in the month), whether prior to the month of the actual exchange of gas or during the month of the actual exchange of gas must be made, and will only be effective if made a minimum of four (4) hours in advance of the nomination deadline of the transporting pipeline delivering or receiving the nominated gas at the Delivery or Receipt Points and upon notice to the other party.  Notwithstanding the foregoing, neither party will be responsible for revisions to nominations not accepted by the receiving or delivering transporting pipeline; although Sinclair and KNMI will cooperate, in good faith, to effect revisions in nominations timely made by the other party.

3.4     All nominations will be submitted to the other party in accordance with the notice provisions set forth in Article X below.

3.5     In the event that Sinclair should tender for delivery at the Receipt Points a quantity of gas in excess of or less than the quantity of the Equity Gas or third party gas

4



nominated by Sinclair for exchange hereunder or accept at the Delivery Points a quantity of gas in excess of or less than the quantity nominated by KNMI for exchange hereunder, then Sinclair shall be solely liable for any imbalances fines, penalties or cash-out costs assessed against KNMI by the transporting pipeline receiving gas at the Receipt Point incurring the imbalance or by the transporting pipeline delivering gas to the Delivery Points in accordance with its published and approved Transportation Tariffs. Sinclair will reimburse KNMI for such imbalance fines, penalties and/or cash-out cost within ten (10) days of the receipt of by Sinclair of KNMI's invoice for such costs. Sinclair may require that KNMI's invoice will be accompanied by proof of payment of such costs by KNMI. Any imbalance fines, penalties or cash-out costs attributable to KNMI's failure to nominate consistent with this Agreement shall be the sole liability of KNMI.

### ARTICLE IV
### QUANTITY

4.1    The minimum quantity of gas (inclusive of Equity Gas and any third party gas) to be received by Sinclair at the Rawlins Plant Delivery Point for exchange hereunder will be a Minimum Annual Quantity of 1,551,250 MMBtu each Contract Year, hereinafter referred to as the "MAQ". In the event Sinclair fails to accept at the Rawlins Plant Delivery Point for use in its Rawlins Plant at the end of any Contract Year the MAQ, then Sinclair will be obligated to make up the Deficient Quantity. The Deficient Quantity will equal the difference between the MAQ and the actual total quantity of gas accepted at the Rawlins Plant Delivery Point for use in its Rawlins Plant during a Contract Year. The Deficient Quantity will be made up by Sinclair as follows:

(A)    Sinclair will deliver to KNMI at the Receipt Points the Deficient Quantity to be accepted at the Rawlins Plant Delivery Point for use at the Rawlins Plant during the succeeding Contract Year, which make-up quantity is in addition to the MAQ required to be accepted by Sinclair hereunder during that succeeding Contract Year.

(B)    In the event Sinclair fails to make up all or any part of a Contract Year's Deficient Quantity during the succeeding Contract Year in accordance with Paragraph 4.1 (A) above, then Sinclair will make to KNMI a lump sum, non-recoupable payment, equal to: the then escalated Exchange Differential Fee (as set forth in Paragraph 6.1 below) less $0.135 per MMBtu times the portion of a Contract Year's Deficient Quantity that Sinclair failed to make-up the succeeding Contract Year, hereinafter referred to as the Deficiency Payment. The Deficiency Payment will accrue interest retroactive to the end of the Contract Year for which the Deficient Quantity was incurred by Sinclair, at a rate of twelve percent (12%) per annum. The Deficiency Payment will be due and payable by Sinclair to KNMI within ten (10) days of the receipt by Sinclair of KNMI's invoice for the Deficiency Payment.



4.2     Sinclair and KNMI will use good faith efforts to deliver or cause to be delivered gas for exchange hereunder, including the delivery of the Sinclair Equity Gas or the delivery of any make-up gas by Sinclair pursuant to Paragraph 4.1 above, at a uniform daily quantity and each party will endeavor to avoid fluctuations in its delivery of gas to the other for exchange hereunder; provided, however, KNMI will never have an obligation to take receipt of a total daily quantity of gas at all of the Receipt Points in excess of 11,000 MMBtu/ day.  KNMI will have right under this Agreement to exchange and/or supply all of the requirements for gas at the Rawlins Plant.  In the event Sinclair has requirements at the Rawlins Plant in excess of 11,000 MMBtu/day and KNMI will not accept additional gas, then  Sinclair will be free to purchase and transport such gas requirements in excess of 11,000 MMBtu/day from third parties and KNMI's rights to exchange and supply the same under Article I and Article IX are not applicable.

## ARTICLE V
### QUALITY AND MEASUREMENT

5.1     All gas delivered to KNMI by Sinclair at the Receipt Points will meet the quality specifications imposed by the transporting pipeline receiving such gas at the Receipt Points in accordance with its applicable Transportation Tariffs.  All gas delivered by KNMI to Sinclair at the Delivery Points will meet the quality specifications imposed by the transporting pipelines delivering gas to the Delivery Points in accordance with its applicable Transportation Tariffs.

5.2     The measurement of the quantity of gas received and/or delivered at the Receipt Points and delivered at the Delivery Points, and the heating value of such gas shall be as determined by the transporting pipelines receiving the gas at the Receipt Points and  delivering the gas at the Delivery Points in accordance with its applicable Transportation Tariffs.

## ARTICLE VI
### FEES AND PAYMENT

6.1     For gas delivered by KNMI to the Rawlins Plant, Sinclair will pay to KNMI a monthly Exchange Differential Fee equal to $0.2005 per MMBtu for each MMBtu of exchange gas delivered by KNMI to Sinclair at the Rawlins Plant Delivery Point.  The Exchange Differential Fee will escalate at a rate of $0.01 each year commencing December 1, 1997 and each December 1 thereafter during the term of this Agreement. The Exchange Differential Fee shall mean the initial fee of $0.2005 during the first Contract Year commencing December 1, 1996 and the $0.2005, as escalated annually thereafter, for each succeeding Contract Year.

6.2     For gas delivered to the Casper Plant, Sinclair will pay to KNMI a monthly Exchange Differential Fee equal to $0.30 per MMBtu for each MMBtu of exchange gas

6



delivered by KNMI to Sinclair at the Casper Plant Delivery Point. Sixty (60) days before the end of each Contract Year for the Casper Plant, either party may request renegotiation of the Exchange Differential Fee applicable to the Casper Plant. If the parties cannot reach agreement on the new Exchange Differential Fee for the Casper Plant the exchange of gas under this Agreement as to be Casper Plant will automatically terminate at the end of the then current Contract Year. The Exchange Differential Fee for the Casper Plant shall mean the initial fee of $0.30 per MMBtu during the first Contract Year commencing March 1, 1997 and may be redetermined thereafter, for each succeeding Contract Year.

6.3   On or before the twenty-fifth (25th) day of each calendar month KNMI will invoice Sinclair for the amount of the Exchange Differential Fees for the exchange gas delivered by KNMI to Sinclair at the Delivery Points during the prior month. Sinclair will make payment to KNMI for the Exchange Differential Fees within ten (10) days of the receipt by Sinclair of KNMI's invoice for the Exchange Differential Fees. Should Sinclair fail to make timely payment of the Exchange Differential Fees interest will accrue in accordance with the provisions set forth in Article 10.2. Any amount owed to KNMI that is $50,000 or less may be made by check. Any amount owed to KNMI in excess of $50,000 will be made by wire transfer.

6.4   Should Sinclair deliver to KNMI at the Equity Gas Receipt Points a daily quantity of gas in excess of the daily gas requirements at the Rawlins Plant and Sinclair is otherwise unable to accept the receipt of the thermal equivalency at the Rawlins Plant, then KNMI agrees to purchase the excess quantity from Sinclair at a spot price equal to: the index price, per MMBtu, as published by McGraw-Hill in the first of the month publication of Inside F.E.R.C.'s Gas Market Report, under "Prices for Spot Gas Delivered to Pipelines" for CIG (Rocky Mountains). KNMI will make payment to Sinclair on or before the twenty-fifth (25th) day of the calendar month following the month the excess gas was delivered to KNMI for exchange hereunder. The requirement for the sale and purchase of such gas shall be limited to a term of five years commencing from December 1, 1996 and ending on November 30, 2001, and will be pursuant to the Natural Gas Purchase Agreement in the form attached hereto as Exhibit "B", entered into between Sinclair, as seller, and KNMI, as purchaser.

6.5   Except for (i) the Exchange Differential Fees to be paid by Sinclair to KNMI and Sinclair's obligation for fuel and unaccounted for gas, to be paid in kind, and (ii) the payment to be made by KNMI to Sinclair for excess gas, if any, the consideration to be paid by each party to the other for the exchange of gas supply pursuant to this Agreement shall be the reciprocal benefits to be derived by each party hereunder and the obligations to be assumed by each party under this Agreement.

7



## ARTICLE VII
### TERM

7.1     This Agreement (except for the provisions set forth herein in Articles I, VI, and IX) shall remain in full force and effect for a term of ten (10) years commencing December 1, 1996 and ending November 30, 2006; unless sooner terminated by either party as set forth in Paragraph 7.2 or 7.3 below.

7.2     As of ninety (90) days before the beginning of the sixth Contract Year (i.e. the Contract Year beginning December 1, 2001) and for the remainder of the primary term of this Agreement, KNMI will have the right to terminate this Agreement, for whatever reason, upon thirty (30) days advance written notice to Sinclair. Effective as of such termination date this Agreement will terminate and neither Sinclair nor KNMI will have any further rights or obligations hereunder.

7.3     During the ninety (90) day period before the beginning of the sixth Contract Year (i.e. the Contract Year beginning December 1, 2001) and during the ninety (90) day period before each succeeding Contract Year thereafter, Sinclair will have the right to elect to buy-out this Agreement by proving written Notice of Buy-Out to KNMI and within ten (10) days thereafter paying to KNMI a Buy-Out Payment. The Buy-Out Payment will equal the then Net Present Value (calculated using a twelve percent (12%) discount rate factor) of the amount determined by multiplying the then effective escalated Exchange Differential Fee (as set forth in paragraph 6.1 above) less $0.13 per MMBtu times the MAQ per Contract Year times the remaining number of Contract Years. Effective with Sinclair's Notification of Buy-Out and KNMI's receipt of the full amount of the Buy-Out Payment this Agreement will terminate and neither Sinclair nor KNMI will have any further rights or obligations hereunder.

7.4     For the purpose of this Agreement for the Rawlins Plant the first Contract Year will be the twelve (12) month period commencing December 1, 1996 and ending November 30, 1997, and each subsequent Contract Year will mean the twelve (12) month period commencing and ending each succeeding December 1 and November 30, respectively. For the purpose of this Agreement for the Casper Plant, the first Contract Year will be the twelve (12) month period commencing March 1, 1997, and ending the last day of February, 1998, and each subsequent Contract Year will mean the twelve (12) month period commencing and ending each succeeding March 1 and the last day of February, respectively.

8



## ARTICLE VIII
## RIGHT, TITLE AND INTEREST IN EXCHANGE GAS

8.1     Sinclair  hereby grants and conveys to KNMI all of Sinclair's right, title and interest in and to all gas delivered by Sinclair to KNMI at the Receipt Points, with the full right, power and authority by KNMI to consume, market or to sell to other parties or otherwise dispose of such gas as deemed appropriate by KNMI, at its sole discretion.

8.2     KNMI hereby grants and conveys to Sinclair all of KNMI's right, title and interest in and to the gas delivered by KNMI to Sinclair at the Delivery Point, with full right, power and authority by Sinclair to consume at the Plants.

## ARTICLE IX
## REQUIREMENTS FOR THE PLANTS

9.1     Sinclair commits to provide KNMI with a good faith opportunity for a period of five (5) years commencing from December 1, 1996 and ending on November 30, 2001, to sell to Sinclair the requirements for gas at the Rawlins Plant not satisfied through the exchange of the Equity Gas and all the requirements for gas at the Casper Plant.  The Casper Plant shall not be subject to the terms of this Article prior to March 1, 1997.  The provisions set forth in this Article IX shall remain in full force and effect for a term of five (5) years for the Rawlins Plant commencing December 1, 1996 and ending November 30, 2001, and for the Casper Plant, commencing March 1, 1997 and ending November 30, 2001.  In the event the quantity of Equity Gas, at any time, is not of a sufficient quantity to meet the requirements for gas at the Rawlins Plant and Sinclair elects to purchase additional third party gas to meet the requirements of the Rawlins Plant, and/or elects to purchase from third parties gas to meet the requirements of the Casper Plant, then Sinclair agrees to provide KNMI with a good faith opportunity to sell the full quantity of such gas to meet the requirements of the Plants.  Sinclair shall notify KNMI in writing of the quantity, term, pricing basis (fixed price, index price, Merc. price, etc.), deliverability (base load, swing or firm load, etc.), etc. on which KNMI should submit to Sinclair its offer to sell gas.  Within five (5) business days of KNMI's receipt of such notice from Sinclair, KNMI may submit to Sinclair KNMI's written offer to sell such gas.

9.2     Sinclair may accept or reject KNMI's proposal; provided, however, Sinclair may reject such proposal only if (i) Sinclair has received a bonafide third party offer to sell gas to Sinclair and the quantity, term, pricing basis, deliverability, etc. are consistent with the written notice provided by Sinclair to KNMI pursuant to paragraph 9.1, above; (ii) the third party gas will be delivered into one or all of the Third Party Receipt Points; and (iii) Sinclair makes a good faith determination based solely on the price, supply, reliability, etc. of such gas that the bonafide third party offer to sell gas is more advantageous to Sinclair than KNMI's offer to sell gas to Sinclair.  If KNMI elects

9

not to submit an offer to sell such gas requirements to Sinclair, then Sinclair will be free to pursue the purchase of such gas requirements from another party; provided, however, Sinclair will nonetheless remain obligated to exchange under this Agreement the MAQ for the Rawlins Plant each Contract Year.

9.3    The sale of gas by KNMI to Sinclair under this Article IX will be pursuant to a Natural Gas Sale Agreement, in the form attached hereto as Exhibit "C", to be entered into between KNMI as seller, and Sinclair, as purchaser.

**ARTICLE X**
**NOTICES**

10.1   Any notice concerning nominations or notices required in Article IX herein by either party to the other shall be in writing and shall be considered as duly delivered when received by the other party by US Mail or by facsimile as follows:

KNMI:
K N MARKETING, INC
P.O. Box 281304
Lakewood, Colorado 80228-8304
Attn: Gas Scheduling
Telephone #:(303) 763-3262
Facsimile #:(303) 763-3511

Sinclair:
Sinclair Oil Corporation
550 East South Temple
Salt Lake City, Utah 84102
P. O. Box 30825
Salt Lake City, Utah  84130-0825
Attention: Mr. H.C. Ouzts, Manager NGL and Supply
Telephone # (801) 524-2861
Facsimile # (801) 524-2848

Any invoice for payment or reimbursement by either party to the other shall be considered as duly delivered when received by the other party by US Mail as follows:

10

J06 P11   NOV 06 '96  15:42

**KNMI:**
K N MARKETING, INC
P.O. Box 281304
Lakewood, Colorado 80228-8304
Attn: <u>Gas Scheduling</u>
Telephone #:(303) 763-3262
Facsimile #:(303) 763-3511

All payments to KNMI will be made to the following addresses:

**PAYMENTS BY CHECK:**   Dept. #823
                        Denver, Colorado  80271-0823

**PAYMENTS BY WIRE:**   Wells Fargo Bank of Denver
                        Account # 76-18794
                        ABA # 1020 0001 8

**Sinclair:**
Sinclair Oil Corporation
550 East South Temple
Salt Lake City, Utah 84102
P. O. Box 30825
Salt Lake City, Utah  84130-0825
Attention: Inventory Accounting
Telephone # (801) 524-2700

All payments to Sinclair will be made by check to the above address.

Any other type of notice not described above or any demand by either party to the other shall be in writing and shall be considered as duly delivered when received by the other party by US Mail as follows:

**KNMI:**
K N MARKETING, INC
P.O. Box 281304
Lakewood, Colorado 80228-8304
Attn: <u>Gas Scheduling</u>
Telephone #:(303) 763-3262
Facsimile #:(303) 763-3511



Sinclair:
Sinclair Oil Corporation
550 East South Temple
Salt Lake City, Utah 84102
P. O. Box 30825
Salt Lake City, Utah  84130-0825
Attention: Legal Department
Telephone # (801) 524-2700

Either party shall have the right to change its address and/or telephone or facsimile numbers upon written advance notice to the other.

10.2   Except as otherwise provided for herein, any payment or reimbursement due either party by the other shall be due and payable ten (10) days after the date of the invoice.  Any payment due a party hereunder that is late shall bear interest on the unpaid amount at the then current prime rate of interest charged by the Wells Fargo Bank of Denver, per annum, plus two (2) percent, not to exceed any applicable maximum lawful rate.

10.3   Any errors in payment shall be corrected as soon as practicable and any payment due shall be without interest, so long as this payment if made within thirty (30) days of the date of discovery of the error.  Neither party shall be liable to the other for payment errors for the time period which exceeds two (2) years prior to the date of discovery of the error.

10.4   Either party shall have the right to examine at reasonable times those books, records, charts and data of the other to the extent necessary to verify the accuracy of any invoice, charge, computation, or any other provision of this Agreement.

## ARTICLE XI
## TAXES AND ROYALTY

11.1   As between Sinclair and KNMI, Sinclair will be responsible and liable for all production, severance, excise, ad valorem, processing, Btu and other taxes, imposed or levied by any state government or the federal government or any governmental agency on the gas delivered by Sinclair to KNMI at the Receipt Points, and KNMI will be responsible and liable for all production, severance, excise, ad valorem, processing, Btu and other taxes, imposed or levied by any state government or the federal government or any governmental agency on the gas delivered by KNMI to Sinclair at the Delivery Points.  Each party shall indemnify and hold harmless the other from any and all such charges, penalties, costs and expenses of whatever kind or nature arising from the failure to pay such taxes, including, but not limited to, the costs and expenses of any litigation and reasonable attorney's fees associated therewith.

12



**11.2** As between Sinclair and KNMI, Sinclair will be responsible and liable for any and all royalty or overriding royalty payments, or other payments due or which may become due to any party on the gas delivered by Sinclair to KNMI at the Receipt Points under the terms of any lease(s) or under the terms of any assignments, contracts, or any agreements affecting such gas, and KNMI will be responsible and liable for any and all royalty or overriding royalty payments, or other payments due or which may become due to an party on the gas delivered by KNMI to Sinclair at the Delivery Points under the terms of any lease(s) or under the terms of any assignments, contracts, or any agreements affecting such gas. Each party shall indemnify and hold harmless the other from any and all charges, loss, costs or expenses of whatsoever kind or nature arising from the failure to make any such payments, including, but not limited to, the costs and expenses of any litigation and reasonable attorney's fees associated therewith.

**11.3** The indemnifications under this Article shall survive any termination of this Agreement.

### ARTICLE XII
### TITLE AND AUTHORITY

**12.1** Sinclair warrants that it has good right and title to all gas delivered to KNMI at the Receipt Points, and KNMI warrants that it has good right and title to all gas delivered to Sinclair at the Delivery Points. Each party warrants that the gas is free and clear of all liens, encumbrances and claims, and that it has the right, power and authority to enter into this Agreement and to grant the rights, titles, benefits and interests created hereby. Each party shall indemnify and hold the other harmless from any and all claims, demands, losses, damages, expenses, liens, causes of action, suits and judgments arising out of or attributable to failure of title or adverse claims to ownership of gas.

### ARTICLE XIII
### FORCE MAJEURE

**13.1** The term "force majeure" as used in this Agreement, shall mean any cause or causes not reasonably within the control of the party claiming suspension and which, by the exercise of due diligence, such party is unable to prevent or overcome. Such term shall likewise include, but not be limited to: Acts of God; acts, omissions to act and or delays in action of federal, state or local government or any agency thereof; compliance with rules, regulations or orders of any governmental authority or any office, department, agency or instrumentality thereof; strikes, lockouts or other industrial disturbances; acts of the public enemy; wars; blockades; insurrections; riots; epidemics; landslides; lightning; earthquake; fires; storms; floods; washouts; winter weather, spring thaw or other inclement weather; civil disturbances; interruptions by

13



governmental or court orders; present and future valid orders of any regulatory body having jurisdiction; explosions; the interruption or suspension of the receipt or delivery of gas hereunder due to the inability, failure or refusal of any party not a party to this Agreement to receive or deliver such gas; breakage or accident to, or routine maintenance and repair of, machinery or lines or pipes, compressors or plants; well blowouts; freezing of wells, or lines of pipe, sudden partial or sudden entire failure of gas wells; failure to obtain materials and supplies due to governmental regulations; the inability of either party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, materials and supplies; permits and consents, and easements and/or rights-of-way.

13.2   In the event any party hereto is rendered, wholly or in part, by force majeure, unable to carry out its obligations under this Agreement due to any event of force majeure (other than to indemnify or to make payments of any amount due hereunder), it is agreed upon such party giving notice of such force majeure, in writing, which can be effected by facsimile, to the other party as soon as possible after the occurrence of the causes relied on, then the obligation of the party giving such notice, so far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused, but for no longer period, and such cause shall, so far as possible, be remedied with all reasonable dispatch; provided, however, that this provision shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing parties when such course is inadvisable at the discretion of the party hereto having the difficulty.

## ARTICLE XIV
## INDEMNIFICATION

14.1   Each of the parties hereto agrees that it will assume all risk and liability for the maintenance and operation of its respective property as to itself, its agents or employees, for any injury, including death, or damages resulting in any manner from the conduct in connection with installation, presence, maintenance and operation of its property and equipment hereunder, and shall indemnify and hold harmless the other party for any and all losses, suits, claims or actions, costs, damages, demands or expenses resulting at any time from any and all causes due to any act or omission of itself or its agents or employees.  The parties' indemnifications under this Article shall survive any termination of this Agreement.

## ARTICLE XV
## ASSIGNMENT

15.1   This Agreement, and the parties' respective rights and obligations hereunder, shall be binding upon and inure to the benefit of the parties hereto and their

14

respective successors and assigns. This Agreement, including, but without limitation, any and all renewals, extensions, amendments and/or supplements hereto, and all rights, title and interest contained herein shall not be assigned without the express written consent of the other party.

## ARTICLE XVI
### INTERPRETATION AND CONTROLLING LAW; CONSENT TO VENUE

16.1   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF WYOMING, EXCLUDING ANY CONFLICTS-OF-LAW, RULE, OR PRINCIPLES WHICH MIGHT REFER SUCH CONSTRUCTION TO THE LAWS OF ANOTHER STATE.

16.2   THE PARTIES AGREE AND CONSENT THAT ANY ACTION AT LAW, SUIT IN EQUITY OR OTHER JUDICIAL PROCEEDING BROUGHT FOR THE ENFORCEMENT OF THIS AGREEMENT OR ANY PROVISION THEREOF SHALL BE INSTITUTED ONLY IN THE COURTS LOCATED IN THE STATE OF WYOMING.

16.3   IN THE EVENT EITHER PARTY HAS TO INITIATE ANY ACTION TO ENFORCE ITS RIGHTS HEREUNDER, THEN THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER ITS COSTS, INCLUDING, BUT NOT LIMITED TO, ITS COURT COSTS AND EXPENSES AND REASONABLE ATTORNEY'S FEES.

## ARTICLE XVII
### REGULATION

17.1   This Agreement and the respective rights and obligations of the parties hereto are subject to all existing and future laws, statutes, rules, regulation, orders or directive, promulgated by and duly constituted state or federal governmental authority, regulatory body or commission having jurisdiction or control over the parties, their respective facilities or gas supply, this Agreement, or any of the provisions hereof.

## ARTICLE XVIII
### WAIVER

18.1   No waiver by either party of any default of the other party under this Agreement shall operate as a waiver of any subsequent default, whether of a like or a different character.

## ARTICLE XIX
## MODIFICATIONS AND AMENDMENTS

19.1   All modifications, amendments or changes to this Agreement, whether made simultaneously with or after the execution of this Agreement, shall be in writing, executed by all parties hereto.

## ARTICLE XX
## MISCELLANEOUS

20.1   The descriptive headings for the articles, sections, and paragraphs contained in this Agreement were construed and arranged for convenience only and shall not be considered to affect the meaning or interpretation of the provisions herein.

20.2   Any change in the provisions of this Agreement made subsequent to the date of execution hereof shall not be binding unless made by formal amendment executed in the same manner as this Agreement, and course of dealing and/or course of performance between the parties, and/or trade usage, shall not be considered in determining the meaning and intent of the terms and conditions stated herein.

20.3   This Agreement was drafted by all parties hereto.

20.4   This Agreement contains the entire agreement between the parties, and except as stated herein, there are no oral promises, agreements, or warranties, promises, obligations, assurances, or conditions precedent or otherwise, affecting it.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first stated above.

"SINCLAIR "
SINCLAIR OIL CORPORATION

BY: _____
Name: Peter M. Johnson
Title: Executive Vice President

"KNMI"
K N MARKETING, INC.

BY: _____
Name: Samuel H. Charlton, III
Title: Senior Vice President

16

## EXHIBIT "A"

### Sinclair Oil Corporation Equity Gas at Receipt Points and Wells

**Equity Gas Receipt Points**                           **Wells**

Granger

Blue Forest 13-2
Blue Forest 20-32
Blue Forest 22-11
Blue Forest 22-12
Blue Forest 22-13
Blue Forest 22-14
Blue Forest 30-5
Blue Forest 30-13
Blue Forest 31-5
Blue Forest 32-1
Blue Forest 32-2
Blue Forest 32-31
Blue Forest 32-33
Blue Forest 40-30
Blue Forest 44-19
Blue Forest 44-25
Monument Butte 21-29
Monument Butte 42-20
Federal 12-4

Red Desert

Great Divide 5-18
Great Divide 7-19
Great Divide 13

Echo Springs

Marathon-Standard Draw 1-2
Marathon-Standard Draw 12-2



## EXHIBIT "B"

## K N MARKETING, INC.
## NATURAL GAS PURCHASE AGREEMENT

|  |  |
|---|---|
| **BUYER:** | **DATE:** |
| K N Marketing, Inc.<br>370 Van Gordon Street<br>P. O. Box 281304<br>Lakewood, CO 80228-8304<br>Attn: Tom Williams<br><br>Phone: (303) 763-3625<br>Fax #: (303) 763-3511 | **SELLER:**<br><br>Sinclair Oil Corporation<br>550 East South Temple<br>P. O. Box 30825<br>Salt Lake City, Utah 84130-0825<br>Attn: H.C. Ouzts<br><br>Phone: (801) 524-2861<br>Fax #: (801) 524-2848 |

| QUANTITY |  |  |
|---|---|---|
| **TERM** |  |  |
| **PRICE** |  |  |
| **MEASURING PARTY** |  | **PAYMENT ADDRESS:** |
| **DELIVERY POINT(S)** |  | |

## SPECIAL PROVISIONS

Sale and purchase is on interruptible basis as defined herein.

| ☐ | THIS SALE IS SUBJECT TO THE TERMS ON THE BACK OF THIS DOCUMENT. DELIVERIES OF GAS BY SELLER CONSTITUTES AN ACCEPTANCE OF THE TERMS OF THE AGREEMENT. |
|---|---|
| ☐ | This represents the agreement reached between BUYER and SELLER |

| ☐ **BUYER** | **SIGNATURE:** |  |
|---|---|---|
| K N Marketing, Inc. | **TITLE:** | **DATE:** |
| ☐ **SELLER** | **SIGNATURE:** |  |
| Sinclair Oil Corporation | **TITLE:** | **DATE:** |



## TERMS AND CONDITIONS

**1. MINIMUM QUANTITIES:** Seller agrees to sell and Buyer agrees to purchase, on an "interruptible" basis, up to the quantity of natural gas identified quantity provision on the front of this agreement. "Interruptible" means Buyer or Seller has the right to stop, curtail or interrupt the purchase or sale of gas time and for any reason, including without limitation, market factors; provided, that as a condition precedent to stopping, curtailing or interrupting an "interruptible" transaction, the party desiring the change must notify the other party, and the parties will then cause any necessary nomination changes to be made to the transporters, in accordance with each transporter's requirements. The parties shall endeavor to insure that the quantity of natural gas dispatched is delivered and received at relatively constant rates.

**2. TRANSPORTATION:** Seller shall arrange the natural gas shipment(s) to the Delivery Point(s), and Buyer shall arrange the natural gas shipments thereafter. Buyer is responsible for any imbalance penalties caused by Buyer, and Seller is responsible for any imbalance penalties caused by Seller on transporting pipeline(s).

**3. MEASUREMENT AND HEATING VALUE:** Measurement of the quantity and the heating value of the natural gas purchased is to be made at the Delivery Point(s) by the Measuring Party in accordance with its procedures. Delivered MMBtu will be calculated or determined on a dry gross heating value basis. If the gas contains a water vapor content of seven pounds (7#) or less per 1,000,000 cubic feet, it will be deemed to be dry.

**4. QUALITY:** Buyer is not obligated to purchase any natural gas which is not merchantable, or does not meet all specifications required by the transporting pipeline(s).

**5. NOMINATIONS:** Buyer will nominate monthly purchase quantities to Seller. Buyer may submit its nominations to Seller in writing or by telephone or facsimile at the address and/or telephone/fax numbers stated herein. If Seller anticipates it is unable to deliver the nominated quantities, then Seller shall immediately notify Buyer so that Buyer can undertake to adjust to nominations to its gather and/or transporter. Seller will reimburse Buyer for gathering/transportation penalties or gas costs attributable to Seller's failure to deliver the nominated quantity.

**6. BILLINGS AND PAYMENTS:** Seller shall invoice Buyer on or before the fifteenth (15th) day of each month for the actual quantity delivered by Seller and received by Buyer in the prior month. Buyer will pay Seller within fifteen (15) days after receipt of Seller's invoice, but not earlier than the last day of the month following the month of delivery. If the payment date falls on a Saturday, Sunday, or legal holiday, payment will be made on the next business day. Buyer shall only pay Seller for the natural gas quantity dispatched by Buyer and delivered by Seller at the Delivery Point(s), as verified by the first transporting pipeline or by other mutually agreed upon verification method(s), and there is to be no retroactive reallocation of any quantity of natural gas (which has been confirmed and verified as having been received) following the month of delivery. Buyer shall have no obligation to make or disburse payments for the purchases hereunder to more than a single party.

**7. WARRANTIES AND LIMITATIONS OF LIABILITIES:** Seller warrants that it has the right to sell the natural gas delivered and that the natural gas from liens and adverse claims of any kind. Seller will save and hold Buyer harmless from all loss, damage and expense due to adverse claims against Buyer title of the natural gas delivered.

**8. TITLE, TAXES AND POSSESSION:** Title to the natural gas sold hereunder shall pass at the Delivery Point(s). Seller will pay or cause to be paid all royalties, taxes and other sums due on production and transportation of the natural gas prior to its delivery at the Delivery Point(s), at and after which Buyer is responsible for any taxes. Seller shall be in control and possession of the natural gas and responsible for any damage or injuries caused thereby until the natural gas is delivered to Buyer or Buyer's designee at the Delivery Point(s), except for injuries and damage caused by the negligence of Buyer. Buyer shall be in control and possession of the natural gas and responsible for any damage or injuries caused thereby after the natural gas is delivered at the Delivery Point(s), except for injuries and damage caused by the negligence of Seller.

**9. REGULATIONS:** This Agreement and the sale and purchase of gas hereunder are subject to all applicable governmental laws, orders, directives, rules, and regulations.

**10. FORCE MAJEURE:** Neither party is liable to the other for any failure to perform any provision or obligation of this agreement (except Buyer's obligation to pay for natural gas dispatched and delivered) if the failure is caused by, or results directly or indirectly from any act of God; federal, state or municipal legislation or regulation; fires, floods, storms or other natural occurrences; strikes, war, terrorism or accidents; the refusal or inability of any pipeline or local distribution company to accept natural gas for delivery or transport; or any similar cause beyond the control of the party failing to perform.

**11. ASSIGNMENT:** Neither party may assign its rights, obligations or interests in this agreement (except to an affiliate) without the written consent of the non-assigning party.

**12. AUDIT:** Either party shall have the right during the agreement's term and for two (2) years thereafter, at its sole expense and during normal working hours, to audit the other party's accounts and records and any other data that may reasonably from any act of God; that pertain to any business conducted between the parties under this agreement. At the conclusion of the two (2) year period, all items not then being challenged will be final.

**13. COMPLETE AGREEMENT:** The complete agreement between the parties is set out on the front and back of this agreement, and can only be amended in writing.

**14. CONFIDENTIALITY:** The parties shall keep the terms of this agreement confidential, except as may be required to effectuate transportation of the natural gas, or to meet the requirements of any law, or regulatory agency having jurisdiction over the matter for which information is sought.

**15. CHOICE OF LAW: THIS AGREEMENT WILL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF WYOMING, EXCEPT FOR ANY LAW WHICH WOULD REFER THE CONSTRUCTION OF THIS AGREEMENT TO THE LAWS OF ANOTHER STATE.**

**16. IF EITHER PARTY INITIATES LITIGATION TO ENFORCE ITS RIGHTS HEREUNDER, THEN THE PREVAILING PARTY WILL BE ENTITLED TO RECOVER REASONABLE ATTORNEYS FEES AND COSTS.**

## TERMS AND CONDITIONS

**1. MINIMUM QUANTITIES:** Seller agrees to sell and Buyer agrees to purchase, on an "interruptible" basis, up to the quantity of natural gas identified on the front of this agreement. "Interruptible" means Buyer or Seller has the right to stop, curtail or interrupt the purchase or sale of gas at any time and for any reason, including without limitation, market factors; provided, that as a condition precedent to stopping, curtailing or interrupting an "interruptible" transaction, the party desiring the change must notify the other party, and the parties will then cause any necessary nomination change to be made with the transporters, in accordance with each transporter's requirements. The parties shall endeavor to insure that the quantity of natural gas dispatched is delivered and received at relatively constant rates.

**2. TRANSPORTATION:** Seller shall arrange the natural gas shipment(s) to the Delivery Point(s), and Buyer shall arrange the natural gas shipments thereafter. Buyer is responsible for any imbalance penalties caused by Buyer, and Seller is responsible for any imbalance penalties caused by Seller on transporting pipeline(s).

**3. MEASUREMENT AND HEATING VALUE:** Measurement of the quantity and the heating value of the natural gas purchased is to be made at the Delivery Point(s) by the Measuring Party in accordance with its procedures. Delivered MMBtu will be calculated or determined on a dry gross heating value basis. If the gas contains a water vapor content of seven pounds (7#) or less per 1,000,000 cubic feet, it will be deemed to be dry.

**4. QUALITY:** Buyer is not obligated to purchase any natural gas which is not merchantable, or does not meet all specifications required by the transporting pipeline(s).

**5. NOMINATIONS:** Buyer will nominate monthly purchase quantities to Seller. Buyer may submit its nominations to Seller in writing or by telephone or facsimile at the address and/or telephone/fax numbers stated herein. If Seller anticipates it is unable to deliver the nominated quantities, then Seller shall immediately notify Buyer so that Buyer can undertake to adjust its nominations to its gather and/or transporter. Seller will reimburse Buyer for gathering/transportation penalties or gas costs attributable to Seller's failure to deliver the nominated quantity.

**6. BILLINGS AND PAYMENTS:** Seller shall invoice Buyer on or before the fifteenth (15th) day of each month for the actual quantity delivered by Seller and received by Buyer in the prior month. Buyer will pay Seller within fifteen (15) days after receipt of Seller's invoice, but not earlier than the last day of the month following the month of delivery. If the payment date falls on a Saturday, Sunday, or legal holiday, payment will be made on the next business day. Buyer shall only pay Seller for the natural gas quantity dispatched by Buyer and delivered by Seller at the Delivery Point(s), as verified by the first transporting pipeline or by other mutually agreed upon verification method(s), and there is to be no retroactive reallocation of any quantity of natural gas (which has been confirmed and verified as having been received) following the month of delivery. Buyer shall have no obligation to make or disburse payments for the purchases hereunder to more than a single party.

**7. WARRANTIES AND LIMITATIONS OF LIABILITIES:** Seller warrants that it has the right to sell the natural gas delivered and that the natural gas from liens and adverse claims of any kind. Seller will save and hold Buyer harmless from all loss, damage and expense due to adverse claims against Buyer for the title of the natural gas delivered.

**8. TITLE, TAXES AND POSSESSION:** Title to the natural gas sold hereunder shall pass at the Delivery Point(s). Seller will pay or cause to be paid all royalties, taxes and other sums due on production and transportation of the natural gas prior to its delivery at the Delivery Point(s), at and after which Buyer is responsible for any taxes. Seller shall be in control and possession of the natural gas and responsible for any damage or injuries caused thereby until the natural gas is delivered to Buyer or Buyer's designee at the Delivery Point(s), except for injuries and damage caused by the negligence of Buyer. Buyer shall be in control and possession of the natural gas and responsible for any damage or injuries caused thereby after the natural gas is delivered at the Delivery Point(s), except for injuries and damage caused by the negligence of Seller.

**9. REGULATIONS:** This Agreement and the sale and purchase of gas hereunder are subject to all applicable governmental laws, orders, directives, rules, and regulations.

**10. FORCE MAJEURE:** Neither party is liable to the other for any failure to perform any provision or obligation of this agreement (except Buyer's obligation to pay for natural gas dispatched and delivered) if the failure is caused by, or results directly or indirectly from any act of God; federal, state or municipal legislation or regulation; fires, floods, storms or other natural occurrences; strikes, war, terrorism or accidents; the refusal or inability of any pipeline or local distribution company to accept natural gas for delivery or transport; or any similar cause beyond the control of the party failing to perform.

**11. ASSIGNMENT:** Neither party may assign its rights, obligations or interests in this agreement (except to an affiliate) without the written consent of the non-assigning party.

**12. AUDIT:** Either party shall have the right during this agreement's term and for two (2) years thereafter, at its sole expense and during normal working hours, to audit the other party's accounts and records and any other data that may reasonably have a bearing on, or pertain to any business conducted between the parties under this agreement. At the conclusion of the two (2) year period, all items not then being challenged will be final.

**13. COMPLETE AGREEMENT:** The complete agreement between the parties is set out on the front and back of this agreement, and can only be amended in writing.

**14. CONFIDENTIALITY:** The parties shall keep the terms of this agreement confidential, except as may be required to effectuate transportation of the gas, or to meet the requirements of any law, or regulatory agency having jurisdiction over the matter for which information is sought.

**15. CHOICE OF LAW:** THIS AGREEMENT WILL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF WYOMING, EXCEPT FOR ANY LAW WHICH WOULD REFER THE CONSTRUCTION OF THIS AGREEMENT TO THE LAWS OF ANOTHER STATE.

**16.** IF EITHER PARTY INITIATES LITIGATION TO ENFORCE ITS RIGHTS HEREUNDER, THEN THE PREVAILING PARTY WILL BE ENTITLED

EXHIBIT "C"

K N MARKETING, INC.

NATURAL GAS SALE AGREEMENT

| | |
|---|---|
| **BUYER:** | **DATE:** |
| Sinclair Oil Corporation<br>550 East South Temple<br>P. O. Box 30825<br>Salt Lake City, UT 84130-0825<br>Attn: H.C. Curtis<br><br>Phone: (801) 524-2861<br>Fax #: (801) 524-2848 | **SELLER:**<br><br>K N Marketing, Inc.<br>370 Van Gordon Street<br>P. O. Box 281304<br>Lakewood, CO 80228-8304<br>Attn: Tom Williams<br><br>Phone: (303) 763-3625<br>Fax #:  (303) 763-3511 |

| | | |
|---|---|---|
| **QUANTITY** | | |
| **TERM** | | |
| **PRICE** | | |
| **MEASURING PARTY** | | **PAYMENT ADDRESS:** |
| **DELIVERY POINT(S)** | | |

**SPECIAL PROVISIONS**

Sale and purchase is on interruptible basis as defined herein.

THIS SALE IS SUBJECT TO THE TERMS ON THE BACK OF THIS DOCUMENT.
DELIVERIES OF GAS BY SELLER CONSTITUTES AN ACCEPTANCE OF THE
TERMS OF THE AGREEMENT.

This represents the agreement reached between BUYER and SELLER

| | | |
|---|---|---|
| **BUYER**<br><br>Sinclair Oil Corporation | **SIGNATURE:** | |
| | **TITLE:** | **DATE:** |
| **SELLER** | **SIGNATURE:** | |
| K N Marketing, Inc. | **TITLE:** | **DATE:** |

# BASE GAS SALES AGREEMENT

This Agreement, made and entered into as of the 1st day of August, 1996 sets forth the understanding and agreement between ONEOK GAS MARKETING COMPANY ("Seller") and SINCLAIR OIL CORPORATION ("Buyer") concerning the sale of natural gas. Buyer and Seller may jointly be referred to herein as Parties and separately as Party.

## ARTICLE I
## GENERAL PROVISIONS
## PURPOSE AND PROCEDURES

1.1    These General Provisions are intended to be incorporated into and become a part of an agreement ("Agreement") between ONEOK Gas Marketing Company ("OGMC") and Buyer relating to the sale of natural gas by OGMC. The Agreement will consist of these General Provisions, written special provisions and any other terms that may be specified or incorporated by reference in a letter of confirmation ("Confirmation Notice"). As used herein "Buyer" refers to the Party receiving and taking title to Gas and "OGMC" refers to the Party delivering and relinquishing title to Gas.

1.2    Should OGMC and Buyer from time to time, come to an understanding regarding the sale of Gas for a particular period of delivery, then OGMC will communicate that understanding to Buyer by sending a Confirmation Notice with the terms provided therein, including the Service Level, Sales Period, Sales Price, Daily Sales Volume, Contract Quantity, Transporting Pipeline(s), Receipt/Delivery Point(s), and such other special provisions agreed upon, and shall transmit that Confirmation Notice to Buyer. If the Confirmation Notice is contrary to Buyer's understanding regarding the sale of Gas, the Buyer shall notify OGMC, via facsimile, before the close of the Business Day next following receipt of the Confirmation Notice from OGMC, or as otherwise stated in the Confirmation Notice, in order to negate or amend the terms of the understanding. Buyer's failure to so notify OGMC in writing within the aforementioned time period constitutes Buyer's agreement to the terms of the transaction as described in the Confirmation Notice.

## ARTICLE II
## DEFINITIONS

2.1    "Baseload Service" means an absolute obligation to sell and purchase the Gas as specified in the Confirmation Notice without interruption of any kind unless the obligation is interrupted by a Force Majeure event as provided in the applicable provisions of Article XIV of this Agreement.

2.2    "Confirmation Notice" shall mean the form attached as Exhibit "A" of this Agreement.

2.3    "Contract" shall mean the legally-binding relationship established by (i) this Base Gas Sales Agreement and (ii) the provisions contained in any effective Confirmation Notice.

2.4    "Contract Quantity" shall mean the total quantity of Gas to be delivered in the Sales Period as set forth in the Confirmation Notice.

2.5    "Daily Sales Volume" shall mean the quantity of Gas to be delivered and taken each Gas Day in the Sales Period as set forth in the Confirmation Notice.

2.6    "Firm Service" means that OGMC and Buyer have made an absolute obligation to purchase and sell Gas as specified in the applicable Confirmation Notice without interruption of any kind except any interruptions which are caused by Force Majeure events set forth in Article XIV hereof.

2.7    "Force Majeure" shall mean an unforeseen occurrence or event beyond the control of the Party claiming excuse which partially or entirely prevents that Party's performance of its obligations as described in Article XIV hereof.

2.8    "Gas" shall mean merchantable natural gas that meets or exceeds the specifications of the Transporter(s).

EXHIBIT B

2.9    "Gas Daily Price" means the simple arithmetic average of the daily high/low price quotations as listed in the Gas Daily section titled "Daily Price Survey" for production from the same region and pipeline as defined by Gas Daily for the Receipt/Delivery Point(s) specified in the relevant Confirmation Notice for the day(s) of either Party's failure to perform.

2.10    "Gas Day" shall mean a period of twenty-four (24) consecutive hours, coextensive with a "day" as defined in the tariff of the Transporter(s) delivering Gas to the Delivery Point(s) in a particular transaction effected hereunder.

2.11    "Imbalance Charges" shall mean any scheduling penalties, imbalance penalties, overpull or unauthorized overrun penalties, operational flow order penalties, cash out charges, banking charges, fees or charges, or similar penalties assessed by a Transporter for failure to satisfy the Transporter's balancing and/or nomination requirements.

2.12    "Interruptible Swing Service" means an obligation to sell and purchase Gas as specified in the applicable Confirmation Notice where either Party has the absolute right to stop delivery or receipt of the Gas for whatever reason, provided that the prior notice required by Article III is given.

2.13    "Liquidated Damages" are damages caused by a failure to perform by either Party under a Firm Service or NYMEX Service transaction which the Parties have agreed are a reasonable reflection of the anticipated costs that would be incurred by the non-failing Party.

2.14    "Natural Gas Futures Contract" means a standardized contract for the purchase or sale of Natural Gas which is traded for future delivery under the provisions of NYMEX rules and regulations.

2.15    "NYMEX" means the New York Mercantile Exchange or any successor thereto.

2.16    "NYMEX Service" shall mean that the Parties have made an absolute obligation to purchase and sell Gas as specified in the applicable Confirmation Notice without interruption of any kind except any interruptions which are caused by Force Majeure events as set forth in Article XIV hereof. The Parties acknowledge that where NYMEX Service is specified, the Parties will be purchasing, selling and/or exchanging Gas (i) as the "physical side" of an "exchange for physical" transaction involving Natural Gas Futures Contracts on the NYMEX, (ii) where the price to be paid for such Gas is "to be priced" utilizing Natural Gas Futures Contracts on the NYMEX or (iii) where the purchase and sale of Gas otherwise involves Natural Gas Futures Contracts on the NYMEX.

2.17    "Sales Period" shall be the period during which deliveries are to be made as set forth in the Confirmation Notice.

2.18    "Sales Price" shall mean the price per MMBtu of the Gas sold hereunder as agreed to and exhibited in accordance with an executed Confirmation Notice.

2.19    "Receipt/Delivery Point(s)" shall mean that specific point or points at which the Parties have agreed to make and take delivery of Gas.

2.20    "Schedule" or "Scheduled" shall refer to the act of OGMC, the Buyer and the Transporter(s) notifying, requesting, and confirming to each other the quantity of Gas to be delivered hereunder on any given Gas Day during the Sales Period.

2.21    "Service Level" is the level of commitment that OGMC and Buyer have agreed upon for the sale of Gas under a particular Confirmation Notice, i.e., Interruptible Swing Service, Baseload Service, Firm Service, and NYMEX Service.

2.22    "Transporter(s)" shall mean all Gas pipeline companies, or the physical facilities thereof, transporting Gas for OGMC or Buyer, upstream or downstream, respectively, of the Delivery Point(s) pursuant to a particular Confirmation Notice.

## ARTICLE III
## SCHEDULING, DISPATCHING AND PRICING

3.1    OGMC agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of this Agreement and the applicable executed Confirmation Notice. Pursuant to the Service Level stated in the Confirmation Notice, Seller is obligated to nominate and Schedule, or cause to be Scheduled, and to deliver to the Transporter(s) which is delivering Gas to the Delivery Point(s), and Buyer is obligated to nominate and Schedule, or cause to be Scheduled, and to receive from the Transporter(s) receiving the Gas at the Delivery Point(s), the Daily Sales Volume of Gas agreed to by the Parties as set forth in and in accordance with the other terms and conditions of an executed Confirmation Notice.

3.2   OGMC shall have the sole responsibility for transporting the Gas, or ensuring that the Gas is transported to the Delivery Point(s). Buyer shall have the sole responsibility for transporting the Gas, or ensuring that the Gas is transported at and after the Delivery Point(s). Imbalance Charges shall be determined and paid in accordance with Article IV hereof.

3.3   The Parties shall coordinate their Scheduling requirements by telephone with immediate confirmation in writing by telecopy. Each Party's dispatcher shall give the other Party's dispatcher timely prior notice, sufficient to meet the requirements of all Transporter(s) involved in the Gas delivery to Buyer, of the quantities of Gas to be delivered and purchased each day. Such notice shall be at least two (2) hours prior to the earliest regularly scheduled nomination deadline of the Transporters receiving or delivering Gas commencing on the first day of a month, and two (2) hours earlier than such deadline for any subsequent nomination if intra-month changes are authorized. Should either Party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such Party shall immediately notify the other Party's gas control dispatcher by telephone to be followed up with written telecopy notice within twenty-four (24) hours.

3.4   The price per MMBtu to be paid by Buyer to Seller for all Gas delivered shall be as set forth on the Confirmation Notice. The price shall be the complete consideration to Seller and shall include, unless otherwise described on the Confirmation Notice, the cost of compressing, gathering, processing, treating, liquefying, and transporting the Gas together with royalties and taxes on the Gas and all other costs and charges which are incurred prior to and at the Delivery Point.

### ARTICLE IV
### FAILURE TO PERFORM

4.1   The Parties shall use all reasonable efforts to avoid imposition of Imbalance Charges by any Transporter(s). If, during any Month, Buyer or Seller receives an invoice from a Transporter which includes Imbalance Charges, the Parties shall use their best efforts to promptly determine the validity as well as the cause of such Imbalance Charges. If the Parties determine that the Imbalance Charges were incurred as a result of Buyer's actions or inactions (which shall include, but not be limited to, Buyer's failure to accept quantities of Gas equal to the Scheduled Gas), then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller to the Transporter. If the Parties determine that the Imbalance Charges were incurred as a result of Seller's actions or inactions (which shall include, but not be limited to, Seller's failure to deliver quantities of Gas equal to the Scheduled Gas), then Seller shall pay for such Imbalance Charges, or reimburse Buyer for such Imbalance Charges paid by Buyer to the Transporter.

4.2   For transactions with Baseload Service, Firm Service and NYMEX Service, if either Party fails to perform its obligations in accordance with Section 4.1 above, that Party shall be liable for the following Liquidated Damages:
        (1)   If Buyer fails to purchase and accept delivery of the Daily Sales Volume, and if Seller is unable to sell to a third party the quantity not accepted by Buyer for an amount equal to or greater than the Sales Price as specified in the Confirmation Notice, then Buyer shall pay to Seller as Liquidated Damages for the quantity not accepted, the difference between (i) the Sales Price at the time of Buyer's failure; and (ii) the Gas Daily Price.
        (2)   If Seller fails to sell and make delivery of the Daily Sales Volume, and if Buyer is unable to purchase from a third party the quantity not delivered by Seller for an amount equal to or less than the Sales Price as specified in the Confirmation Notice, then the Seller shall pay to Buyer as Liquidated Damages for the quantity not delivered, the difference between (i) the Gas Daily Price; and (ii) the Sales Price at the time of Seller's failure.

4.3   In the event the Gas Daily Price for the day(s) of a Party's failure can not be determined, the price for the Gas not delivered/ accepted shall be based upon the arithmetic average of (i) the Gas Daily Price for the first day immediately preceding the day in which the failure occurred for which such price can be determined, and (ii) the Gas Daily Price for the day immediately following the day in which such failure occurred for which a price can be determined.

### ARTICLE V
### QUALITY

5.1   All Gas delivered by Seller shall meet the quality and heat content requirements of Transporter(s)' tariff(s), as may be amended from time to time.

## ARTICLE VI
## RECEIPT/DELIVERY POINT AND DELIVERY PRESSURE

6.1 The Receipt/Delivery Point(s) for all Gas delivered hereunder shall be such points as are mutually agreed upon between Seller and Buyer as set forth in the Confirmation Notice.

6.2 Gas delivered hereunder shall be at commercial operating pressures sufficient to deliver such quantities at the Delivery Point(s).

## ARTICLE VII
## MEASUREMENT

7.1 Measurement of Gas quantities hereunder shall be in accordance with the tariff of the first Transporter immediately downstream of the Delivery Point(s). The unit of quantity measurement for purposes of this Contract shall be one (1) MMBtu.

## ARTICLE VIII
## TITLE

8.1 Title to, possession of, and the risk of loss of Gas shall pass from Seller to Buyer at the applicable Receipt/Delivery Point(s).

8.2 As between Seller and Buyer, Seller shall be in exclusive control and possession of the Gas and responsible for any damage or injury caused thereby until the Gas has been delivered to Buyer or to Buyer's account at the relevant Receipt/Delivery Point(s), after which delivery, Buyer shall be deemed to be in exclusive control and possession thereof and responsible for any injury or damage caused thereby.

## ARTICLE IX
## WARRANTIES

9.1 Seller warrants that Seller has good title to all Gas delivered hereunder, that Seller has the right to sell such Gas to Buyer, and that such Gas shall be free from all royalties, liens, encumbrances, and all applicable taxes that are imposed upon such production and/or as relevant to the removal of Gas prior to passage of title. Seller agrees to indemnify Buyer and save Buyer harmless from all suits, actions, debts, accounts, damages, costs, losses, and expenses arising from or out of adverse claims of any or all persons to said Gas or to royalties, taxes, license fees, or charges thereof which are applicable before title passes to Buyer. Buyer agrees to indemnify Seller and save Seller harmless from all suits, actions, debts, accounts, damages, costs, losses, and expenses arising from or out of adverse claims of any or all persons to said Gas or to royalties, taxes, license fees, or charges thereof which are applicable after the title passes from Seller to Buyer. Seller further warrants that the Gas to be sold hereunder has been purchased and transported to the Receipt/Delivery Point(s) in accordance with all applicable laws, rules, regulations, and orders of all local, state, and federal authorities. Imbalance Charges shall be determined and paid in accordance with Article IV hereof.

9.2 Buyer and Seller hereby warrants to the other that it has, and will maintain, all the regulatory authorizations, certificates, and documentation as may be necessary and legally required to transport, buy, or make sales for resale of Gas sold or purchased hereunder in interstate commerce.

## ARTICLE X
## LIMITATION OF LIABILITY AND WARRANTY

10.1 THE PARTIES DO HEREBY CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS HEREIN PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY HEREUNDER. THE OBLIGATOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN PROVIDED, THE OBLIGATOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY HEREUNDER AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. EXCEPT AS PROVIDED IN SECTION 10.2 BELOW, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, IN TORT, CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. NOTWITHSTANDING ANY OTHER

PROVISION IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY PENALTIES OR CHARGES ASSESSED BY ANY TRANSPORTER FOR THE UNAUTHORIZED RECEIPT OF GAS BY THE OTHER PARTY EXCEPT AS PROVIDED IN ARTICLE IV HEREOF. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING, WITHOUT LIMITATION, THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE LIQUIDATED DAMAGES CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS. BUYER ACKNOWLEDGES THAT IT HAS ENTERED INTO THIS AGREEMENT AND IS CONTRACTING FOR THE GOODS TO BE SUPPLIED BY SELLER BASED SOLELY UPON THE EXPRESS REPRESENTATIONS, WARRANTIES, AND QUALITY SPECIFICATIONS HEREIN SET FORTH AND SUBJECT TO SUCH REPRESENTATIONS, WARRANTIES, AND QUALITY SPECIFICATIONS, ACCEPTS SUCH GOODS "AS IS" AND "WITH ALL FAULTS". SELLER EXPRESSLY NEGATES ANY OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO CONFORMITY TO MODELS OR SAMPLES, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

10.2   Each Party expressly recognizes that its failure to perform under a Confirmation Notice could adversely impact "hedge" financial positions taken by the other Party on Firm Service and NYMEX Service only. Due to this foreknowledge, each Party agrees to be liable to the other for any consequential damages incurred by the other, resulting from the breach of a Confirmation Notice, in respect to "hedge" or similar financial positions on Firm Service and NYMEX Service only.

## ARTICLE XI
## FINANCIAL RESPONSIBILITY

11.1   When reasonable grounds for insecurity of payment or payment through net-out arise, either Party may demand adequate assurance of performance. Adequate assurance shall mean sufficient security in the form and for the term specified by Seller, including, but not limited to, a standby irrevocable letter of credit, a prepayment, a security in an asset acceptable to Seller, or a guarantee by a credit worthy entity. In the event either Party shall (i) make an assignment or any general arrangement for the benefit of creditors; (ii) default in the payment obligation to the other Party; (iii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or cause under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iv) otherwise become bankrupt or insolvent (however evidenced); (v) be unable to pay its debts as they fall due; or (vi) fail to give adequate assurance of its ability to perform its obligations under the Agreement within forty-eight (48) hours of a reasonable request by the other Party, then the other Party shall have the right to either withhold and/or suspend deliveries, or terminate the Agreement without prior notice, in addition to any and all other remedies available hereunder.

## ARTICLE XII
## TAXES

12.1   Seller shall pay or cause to be paid, all taxes, fees, levies, gas compression fees, penalties, licenses or charges ("Taxes") imposed by any governmental authority on or with respect to the Gas prior to its delivery at the Delivery Point(s). Buyer shall pay or cause to be paid, all Taxes on or with respect to the Gas at or after its delivery at the Delivery Point(s). If a Party is required to remit any or pay any Taxes which are the other Party's responsibility hereunder, such Party shall promptly reimburse the other Party for such Taxes. If Buyer is entitled to an exemption of such Gas from any such Taxes or charges, Buyer shall furnish Seller any necessary exemption or resale certificate covering the Gas delivered hereunder at the Delivery Point(s).

## ARTICLE XIII
## PROCESSING AND LIQUEFIABLES

13.1   If Seller's Gas is processed prior to delivery to Buyer, Seller shall retain title to all liquids or liquefiables removed. If after receiving title to the Gas, such Gas is processed, Buyer or other party processing such Gas shall retain all proceeds from the sale of the Gas liquids or liquefiables.

## ARTICLE XIV
## FORCE MAJEURE

14.1    Except with regard to a Party's obligation to make payments due in accordance with a Confirmation Notice for Gas actually delivered and received and a Party's obligation under Article IV of this Agreement, in the event either Party hereto is rendered unable, wholly or in part, by Force Majeure to carry out its obligations in accordance with a Confirmation Notice, it is agreed that, upon such Party's giving notice and full particulars of such Force Majeure as promptly as reasonably practicable after the occurrence of the event relied on, the obligations of the Parties insofar as they are effected by such Force Majeure shall be canceled during the continuance of any inability so caused from its inception but for no longer period and only to the extent such obligations were to be performed during the continuance of such Force Majeure.

14.2    The term "Force Majeure" means (except as otherwise provided in paragraph 14.3 or 14.4) acts of God, strikes, lockouts, or industrial disputes or disturbances, riot, civil disturbances, interruptions by government or court orders, necessity for compliance with any court order, law, statue, ordinance or regulation promulgated by a governmental authority having jurisdiction, failure of transportation or of a supplier or purchaser to perform, or any other cause not reasonably within the control of the Party claiming Force Majeure and which by the exercise of due diligence of such Party could not have been prevented or is unable to be overcome.

14.3    Baseload Service:  The term "Force Majeure" specifically excludes the following events: (a) increases or decreases in the market price of Gas, (b) Buyer's loss of markets or inability to use economically or resell Gas purchased under this Agreement, (c) regulatory disallowance of the pass through of the costs of Gas or of related costs, (d) the availability of alternate Gas supplies or markets at the same or different prices, and (e) a State's controlling or rationing production.

14.4    Firm Service and NYMEX Service:  The term "Force Majeure" specifically excludes (a) the events specified in paragraph 14.3 above, (b) the loss, interruption or curtailment of interruptible third-party transportation on any Transporter necessary to effect delivery or receipt of Gas hereunder, unless the same event also curtails firm transportation on the affected pipeline segment, (c) increases or decreases in Gas supply due to allocation or reallocation of production by well operators, pipelines or other parties, (d) failure of specific, individual wells or appurtenant facilities in the absence of a Force Majeure event broadly affecting other wells in the same geological area and (e) any other failure of a supplier or purchaser to perform.

14.5    It is understood and agreed that the settlement of strikes or lockouts shall be entirely within the descreation of the Party having the difficulty, and that the above requirement of the use of diligence in restoring normal operating conditions shall not require the settlement of strikes or lockouts by acceding to the terms of the opposition when such course is inadvisable in the discretion of the Party having the difficulty.

## ARTICLE XV
## GOVERNMENTAL REGULATION

15.1    This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any Federal, State, or local governmental authority having jurisdiction over the Parties, their facilities, Gas supply, this Base Gas Sales Agreement, Confirmation Notice, or any provisions thereof.

15.2    Except as provided for in Article XIV, neither Party will be held in default for failure to perform under this Contract, if such failure is due to compliance with such rules, regulations, laws, orders or directives of any Federal, State, or other governmental regulatory authority.

## ARTICLE XVI
## TERM OF THE AGREEMENT

16.1    This Contract shall remain in full force and effect for one (1) year from the date first set forth above (Initial Term) and shall continue month-to-month thereafter, unless terminated at any time following the Initial Term.  Either Party may terminate this Contract by giving thirty (30) days prior written notice to the other Party; provided, however, that if one or more Confirmation Notices are in effect, this Contract shall not terminate until the expiration of the effective Sales Period(s) corresponding with the Confirmation Notice(s) in effect.  No notice of termination shall be effective prior to the end of the term of a Confirmation Notice without the written consent of the other Party.

## ARTICLE XVII
### NOTICES

17.1  All Confirmation Notices and other communications made pursuant to the Contract shall be made as follows:

| ONEOK Gas Marketing Company | | Sinclair Oil Corporation |
|---|---|---|
| P.O. Box 2405 | | 550 East South Temple |
| Tulsa, Oklahoma 74102 | | Salt Lake City, UT  84102 |
| Attn: Contract Administration | Attn: | H. C. Ouzts |
| Phone: (918) 591-5151 | Phone: | (801) 524-2861 |
| Fax: (918) 585-9254 | Fax: | (801) 524-2848 |

17.2  All invoices and payments shall made as follows:

| ONEOK Gas Marketing Company | | Sinclair Oil Corporation |
|---|---|---|
| P.O. Box 2405 | | 550 East South Temple |
| Tulsa, Oklahoma 74102 | | Salt Lake City, UT  84102 |
| Attn: Manager Accounting | Attn: | Luci Grys - Inventory |
| Phone: (918) 591-5151 | Phone: | (801) 524-2873 |
| Fax: (918) 584-7551 | Fax: | (801) 524-2848 |

Wire Transfer or ACH Nos. (If applicable)

17.3  Either Party may modify any information specified above by written notice to the other Party.

17.4  All communications, invoices and payments required hereunder may be sent by telecopier or generally accepted electronic means, a nationally recognized overnight courier service, first class mail or hand delivered.

17.5  Notices sent by telecopy shall be deemed to have been received upon the sending Party's receipt of its telecopier's confirmation thereof. Notice sent by overnight mail or courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving Party. Notice delivered by hand shall be deemed to be received at the time it is delivered to an officer or to a responsible employee of the receiving Party. Notice via first class mail shall be considered delivered two (2) Business Days after mailing.

## ARTICLE XVIII
### MISCELLANEOUS

18.1  This Agreement shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective Parties hereto, and the covenants, conditions, and obligations of this Agreement shall run for the full term of this Agreement. No assignments of this Agreement, in whole or in part, will be made without the prior written consent of the non-assigning Party, which consent will not be unreasonably withheld, provided however, this Agreement can be assigned to any affiliate without prior written consent of the non-assigning Party as long as such entity has a credit status which is at least as high as that of the assignor or such assignment is pursuant to a pledge or mortgage of all or any part of such Party's property as security.

18.2  If any provision, agreement, covenant, paragraph, section, sentence or phrase in this Agreement is determined to be invalid, void, or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement, covenant, paragraph, section, sentence or phrase of this Agreement.

18.3  No waiver of any breach of this Agreement shall be held to be a waiver of any other subsequent breach. All remedies afforded in this Agreement shall be taken and construed as cumulative.

18.4  This Agreement sets forth all understandings between the Parties respecting the subject matter of each transaction and any prior contracts, understandings and representations, whether oral or written, representing this subject matter are merged into and superseded by the Base Gas Sales Agreement and any effective Confirmation Notice. This Agreement may only be amended in

writing.

18.5   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. As used herein, the singular of any term shall include the plural.

18.6   THE INTERPRETATION AND PERFORMANCE OF THIS CONTRACT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICT OF LAWS RULE WHICH WOULD APPLY THE LAW OF ANOTHER JURISDICTION.

18.7   The terms of this Agreement and of any Confirmation Notice entered into pursuant hereto, including but not limited to the Service Level, Sales Price, Daily Sales Volume, Contract Quantity, Transporting Pipeline(s), Receipt/Delivery Point(s), and all other material terms thereof shall be kept confidential by the Parties hereto for one (1) year from the expiration of such transaction, except to the extent that any information must be disclosed to a third party for the purpose of effectuating transportation of Gas subject to the Agreement or to meet governmental filing requirements where necessary. If disclosure is required, the disclosing Party will immediately notify the other Party.

18.8   No Party shall record any discussion between the Parties without first obtaining the written consent of the other Party. The Parties agree that any unauthorized recording may not be used in any proceedings between the Parties.

18.9   In the event of a conflict between the terms of this Base Gas Sales Agreement and any Confirmation Notice, the terms of the Confirmation Notice shall prevail.

NOW THEREFORE, the Parties evidence their consent and agreement to the foregoing by executing below:

**BUYER:**                                         **SELLER:**

SINCLAIR OIL CORPORATION               ONEOK GAS MARKETING COMPANY

By: _____           By: _____

Title: Manager, Crude & NGL Supply      Title: CHRISTOPHER R. SKOOG
                                                              VICE PRESIDENT

Date: October 2, 1996                          Date: _____

# CONFIRMATION NOTICE
## EXHIBIT "A"

| | |
|---|---|
| Base Gas Sales Agreement # | S-SINCLAIR-E-01 |
| Transaction ID Number: | |
| Production Month: | |

This Confirmation Notice is executed pursuant to and becomes a part of the Base Gas Sales Agreement between ONEOK GAS MARKETING COMPANY ("Seller") and SINCLAIR OIL CORPORATION ("Buyer") and provides the following:

Service Level:    Firm Service   * or *   NYMEX Service

Sales Period:

Sales Price:

Daily Sales Volume:

Contract Quantity:

Nominated Transporting Pipeline(s):

Delivery Point(s):

Special Provisions:

Unless covered by a valid executed Contract with Terms and Conditions to the contrary, Buyer will pay Seller for the Scheduled Gas within ten (10) days after receipt of Seller's invoice, but not earlier than the 25th of the month following the month of delivery. If the payment date falls on a Saturday, Sunday, or legal holiday, payment will be made on the next business day. Buyer or Seller shall pay any adjustments within fifteen (15) days after receipt of a revised pipeline verification. All applicable sums accruing under the Base Gas Sales Agreement shall either be offset against or added to amounts owed the other Party. If Buyer, in good faith, disputes the amount of any statement or any part thereof, Buyer will pay Seller such amount it concedes to be correct. If it is ultimately determined that Buyer owes the disputed amount, Buyer will pay Seller that amount with interest as calculated below, immediately upon such determination.

Interest on late payments shall accrue from the due date until the payment date at the prime rate of interest (as such rate is reported on the due date) for large U.S. Money Center commercial banks published under "Money Rates" by The Wall Street Journal plus two (2) percent.

Each Party shall have the right, at its own expense, upon reasonable notice and reasonable times, to examine the records of the other Party to the extent necessary to verify the accuracy of any statement, payment, demand charge or computation made for deliveries and receipts. Any audit or claim based upon errors in any statement, etc., must be made within two (2) years of the date of such statement.

Buyer:  SINCLAIR OIL CORPORATION

By: _____ H. C. OUZTS _____

Title: __ Manager, Crude & NGL Supply __

Date: __ October 2, 1996 __

Seller:  ONEOK GAS MARKETING COMPANY

By: _____

Title: _____

Date: _____

# CONFIRMATION NOTICE
## EXHIBIT "A"

Base Gas Sales Agreement #    S-SINCLAIR-E-01
Transaction ID Number:
Production Month:

This Confirmation Notice is executed pursuant to and becomes a part of the Base Gas Sales Agreement between ONEOK GAS MARKETING COMPANY ("Seller") and SINCLAIR OIL CORPORATION ("Buyer") and provides the following:

Service Level:    Interruptible Swing Service  * or *  Baseload Service

Sales Period:

Sales Price:

Daily Sales Volume:

Contract Quantity:

Nominated Transporting Pipeline(s):

Delivery Point(s):

Special Provisions:

Unless covered by a valid executed Contract with Terms and Conditions to the contrary, Buyer will pay Seller for the Scheduled Gas within ten (10) days after receipt of Seller's invoice, but not earlier than the 25th of the month following the month of delivery. If the payment date falls on a Saturday, Sunday, or legal holiday, payment will be made on the next business day. Buyer or Seller shall pay any adjustments within fifteen (15) days after receipt of a revised pipeline verification. All applicable sums accruing under the Base Gas Sales Agreement shall either be offset against or added to amounts owed the other Party. If Buyer, in good faith, disputes the amount of any statement or any part thereof, Buyer will pay Seller such amount it concedes to be correct. If it is ultimately determined that Buyer owes the disputed amount, Buyer will pay Seller that amount with interest as calculated below, immediately upon such determination.

Interest on late payments shall accrue from the due date until the payment date at the prime rate of interest (as such rate is reported on the due date) for large U.S. Money Center commercial banks published under "Money Rates" by The Wall Street Journal plus two (2) percent.

Each Party shall have the right, at its own expense, upon reasonable notice and reasonable times, to examine the records of the other Party to the extent necessary to verify the accuracy of any statement, payment, demand charge or computation made for deliveries and receipts. Any audit or claim based upon errors in any statement, etc., must be made within two (2) years of the date of such statement.

If there are any questions or discrepancies, please notify your ONEOK Gas Marketing Company representative at (918) 591-5151. Please note that this will be the only documentation concerning this transaction that you will receive as ONEOK Gas Marketing Company does not send or execute counterparty amendments for Interruptible Swing Service or Baseload Service transactions. Unless advised otherwise, within ten (10) days of receipt of this Confirmation Notice, pursuant to the Uniform Commercial Code, Section 2-201, all terms and conditions are binding and effective and the Parties described above will be deemed to have contracted to sell and buy Gas pursuant to these terms and conditions.

August 23, 1996