# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | 2:03-cv-01431-RCJ-PAL<br>MDL No. 1566<br>**ORDER** |
| ARANDELL CORP. et al.,<br><br>              Plaintiffs,<br><br>     vs.<br><br>XCEL ENERGY INC. et al.,<br><br>              Defendants. | 2:07-cv-01019-RCJ-PAL |
| REORGANIZED FLI, INC.,<br><br>              Plaintiff,<br><br>     vs.<br><br>WILLIAMS COMPANIES, INC. et al.,<br><br>              Defendants. | 2:05-cv-01331-RCJ-PAL |

These consolidated cases arise out of the energy crisis of 2000–2002. Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade publications and

engaging in wash sales.  Pending before the Court are a motion to reconsider and two motions for summary judgment.

## I. PROCEDURAL HISTORY

In 2003, the Judicial Panel on Multidistrict Litigation ("JPML") transferred seven class action cases from various districts in California to this District under 28 U.S.C. § 1407 as Multidistrict Litigation ("MDL") Case No. 1566, assigning Judge Pro to preside.  Since then, the JPML has transferred in several more actions from various districts throughout the United States.  Between 2003 and 2015, Judge Pro ruled on many motions to remand, to dismiss, and for summary judgment.  He also approved several class settlements.  Several parties settled on their own.  One or more of the cases have been to the Court of Appeals twice and to the Supreme Court once.  In 2007, the Court of Appeals reversed several dismissals under the filed rate doctrine and remanded for further proceedings.  In 2013, the Court of Appeals reversed several summary judgment orders, ruling that the Natural Gas Act did not preempt state law anti-trust claims and that certain Wisconsin- and Missouri-based Defendants should not have been dismissed for lack of personal jurisdiction.  The Supreme Court granted certiorari as to preemption under the Natural Gas Act and affirmed.  The case was soon thereafter reassigned to this Court when Judge Pro retired.  The Court granted three motions to dismiss for lack of personal jurisdiction.  Plaintiffs have asked the Court to reconsider that order, and Defendants in two of the actions have separately moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court needn't consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid

summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### III. ANALYSIS

#### A. Motion to Reconsider

Plaintiffs Briggs & Stratton Corp. and Carthage College (collectively, "Movants") ask the Court to reconsider its dismissals of Defendants Reliant Energy, Inc. ("New Reliant"), CMS Energy Corp. ("CMS"), and Cantera Gas Co. ("Cantera").  Movants do not ask the Court to reconsider as to Defendant Duke Energy Carolinas, LLC, because they have tentatively settled with that Defendant.

Movants argue that Defendants failed to note in their previous motion that Movants were not yet parties to the case when Judge Pro granted the previous motions to dismiss for lack of personal jurisdiction.  Movants note that the allegations in the Third Amended Complaint ("TAC") (by which they joined the case) are the same as those in the Second Amended Complaint ("SAC") against which Judge Pro granted motions to dismiss as against Wisconsin Plaintiffs.  Movants note that Defendants never moved against Movants as to the TAC, however, but only against other Plaintiffs as to the SAC, and although the similarity of the allegations might lead the Court to rule similarly to Judge Pro, the Court of Appeals in fact reversed Judge Pro's grant of Defendants' motions to dismiss for lack of personal jurisdiction as to those Plaintiffs who appealed.

In response, Defendants note that Movants were parties to the appeal decided in 2013 but that they did not appeal the personal jurisdiction dismissal orders.  Defendants note that the personal jurisdiction issue concerns a defendant's contacts with a forum state, not a defendant's contacts with any particular plaintiff, and that each plaintiff need not therefore be given an opportunity to argue the issue for himself.

The Court agrees with Movants that neither Judge Pro's dismissal as to the SAC only (and not as to the TAC whereby Movants joined as Plaintiffs) nor Movants' failure to raise the personal jurisdiction issue on appeal after joining the appeal (apparently for some other reason, as they would not have had standing to appeal a personal jurisdiction dismissal not entered against them) did not result in the direct loss of the issue as to Movants.  Defendants also note, however, that the Court of Appeals reversed the dismissal orders as to AEPES because Judge Pro had relied only on allegations concerning direct natural gas sales without considering broader allegations of anticompetitive behavior directed at Wisconsin (and Missouri).  *See In re W. States*

*Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013).  Defendants argue that Judge Pro did consider allegations of anticompetitive behavior in the dismissal orders at issue here, however, and that even if those rulings did not apply to Movants' substantively identical allegations in the TAC under the law of the case doctrine, the Court should adopt Judge Pro's reasoning anew.  That would appear sensible at first glance, but as Movants correctly note, the Court of Appeals ruled that the allegations in the SAC (which the parties appear to agree are substantively identical to those in the TAC in relevant respects) were sufficient to support personal jurisdiction.  Therefore, even if Judge Pro conducted the required analysis as to Defendants that he did not conduct as to AEPES, the Court of Appeals has already declared the outcome, i.e., that the SAC's (and hence the TAC's) allegations concerning personal jurisdiction over Defendants in Wisconsin are sufficient.  The Court therefore reconsiders and denies the motions to dismiss.

   **B.**  **Motions for Summary Judgment**

     **1.**  **CES's Motion**

  CenterPoint Energy Services, Inc. ("CES") is a Defendant in Case No. 2:07-cv-1019, which is Western District of Wisconsin Case No. 2:07-cv-76, the same case at issue as to the motion to reconsider addressed, *supra*. (*See* Third Am. Compl. in Case No. 2:07-cv-1019, ECF No. 1846).  CES asks the Court to grant it summary judgment against the TAC.  CES notes that it is implicated only in six paragraphs of the TAC. (*See id.* ¶¶ 55–60, at 37–41).  CES argues that it is not alleged to have engaged in any anticompetitive activity or other wrongdoing in or directed to Wisconsin.  Rather, it is only alleged to be affiliated with Defendant Reliant Energy Services, Inc. ("RES").

CES explains that during the first one-third of the Relevant Time Period (January 1, 2000 to October 31, 2002, (*see id.* ¶ 1)), CES and RES were subsidiaries of the previous Reliant Energy, Inc. ("Old Reliant"); CES was a natural gas distributor, and RES was involved in wholesale energy and trading. RES became a subsidiary of a new corporation ("New Reliant") with the same name as Old Reliant during the Relevant Time Period, and CES became a subsidiary of CenterPoint Energy, Inc. ("CenterPoint"). Thereafter, the only corporate relationships between any of these entities were between CES and its parent CenterPoint and between RES and its parent New Reliant. Moreover, CES argues, Plaintiffs have not alleged that CES has ever manipulated, participated in a conspiracy to manipulate, or become the subject of any government investigation into the manipulation of the price of natural gas in Wisconsin during the Relevant Time Period.

The TAC includes the following allegations against CES: (1) Plaintiff Ladish Co., Inc. purchased natural gas from CES, (*id.* ¶ 14); (2) CES was formerly known as Reliant Energy Retail, Inc., CenterPoint Energy Marketing, Inc., and CenterPoint Energy Gas Services, Inc., (*id.* ¶¶ 55, 60); (3) CES is a Delaware corporation with its principal place of business in Texas, (*id.* ¶ 60); and (4) during the Relevant Time Period, CES was a subsidiary of Old Reliant and sold natural gas at unlawfully inflated prices directly to Ladish Co. for use in Wisconsin, as well as to many other members of the class, (*id.*). In other words, CES is accused in the TAC of selling natural gas in Wisconsin at unlawfully inflated prices. Unlike the other Defendants listed in the TAC, CES is not accused of unlawfully inflating or conspiring to unlawfully inflate the price of the natural gas, reporting false prices, engaging in wash trades, being investigated for anticompetitive activities, or having been aware of such conduct. Nor does the TAC accuse CES of having done any of these things under any of its former names.

1    The claim against CES is made under the Wisconsin Antitrust Act, which states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. § 133.03(1).  A contract is in restraint of trade if it unreasonably limits competition in any business. *See Milwaukee Linen Supply Co. v. Ring*, 246 N.W. 567, 568 (Wis. 1933).  Such a contract is illegal if it is unreasonable, meaning it "is greater than is required for the protection of the person for whose benefit the restraint is imposed" or "imposes undue hardship upon the person restricted." *See Journal Co. v. Bundy*, 37 N.W.2d. 89, 92 (Wis. 1949) (quoting *id.* (quoting Restatement (First) of Contracts §§ 513–15)).  CES argues that simply selling natural gas is not an anticompetitive activity in restraint of trade, and that the conduct of RES cannot be imputed to CES.

    Plaintiffs note in response that Judge Pro denied CES's motion to dismiss for failure to state a claim that made the same arguments as against the SAC.  But the substance of Judge Pro's order makes clear that he simultaneously permitted amendment of the SAC to add Plaintiffs and substantive amendments to the allegations against CES. (*See* Order 2, ECF No. 1834).  Although Judge pro addressed some arguments against permitting amendment as futile, he listed but did not address the substance of CES's argument that neither the SAC nor the TAC stated a claim against CES.  It is therefore not fair to say that Judge Pro rejected the arguments made in the present motion such that the law of the case is dispositive.

    In any case, the sufficiency of the allegations is not the issue under the present motion, but the production of evidence sufficient to support a verdict.  Plaintiffs have adduced excerpts of the deposition of Eric Sullivan, the "person most knowledgeable" deponent for CES, wherein he admits that in addition to simply selling gas to Wisconsin customers, CES provided management services whereby it would allow its customers to "lock in" prices for future

purchases, that CES traded financial instruments to accomplish this, and that these instruments were financial swaps with RES, its exclusive trading partner for such instruments. (*See* Sullivan Dep. 97–98, 108–09, 116–17, 163–64, 224–26, 259, 262–65, ECF No. 2354-3). The Court finds that this is not enough to create a genuine issue of material fact sufficient to support a verdict under section 133.03(1). Sullivan distinguished pure trading from trades "paired with a physical gas contract . . . to lock in a cost of gas for the customer," (*id.* 117:6–10), and he also explained that CES entered into swap agreements with its supplier RES in order to protect itself against changing prices after locking in prices with customers, and that CES didn't concern itself with whether RES itself traded directly in natural gas in order to hedge itself against its own risk, (*id.* 259:11–19). There is no evidence that CES participated in a conspiracy or direct acts in restraint of trade. Although a jury could find that CES's price swaps with RES (if reported and published as if they had constituted natural gas sales, as has apparently occurred in other cases) may have caused an increase in the market price of natural gas by artificially inflating the perceived demand, *see E&J Gallo Winery v. EnCana Energy Servs.*, No. CV F 03-5412, 2008 WL 4224492 (E.D. Cal. Sept. 12, 2008), there is no evidence adduced showing that CES knowingly engaged in swaps in conspiracy with RES (a critical element of § 133.03(1), as with the Sherman Anti-Trust Act, 15 U.S.C. § 1) with the purpose of increasing the price of natural gas (as opposed to the legitimate purpose of securing itself against rising rates after locking in prices to its customers), knew that RES or others were engaged in such behavior, or even reported its swaps with RES as sales.

### 2. Oneok's Motion

Oneok, Inc. and Oneok Energy Services Co., LP, formerly known as Oneok Energy Marketing & Trading Co. (collectively, "Oneok"), are Defendants in Case No. 2:05-cv-1331,

which is District of Kansas Case No. 2:05-cv-2389. (*See* Am. Compl., ECF No. 11 in Case No. 2:05-cv-1331). Oneok asks the Court to grant it summary judgment against the Amended Complaint ("AC"), arguing that the claims are precluded either directly or as released under a settlement agreement reached in a consolidated class action brought in the Southern District of New York ("the NYMEX Case"). The Court determines the motion on the issue of release, not claim preclusion.

The Amended Consolidated Class Action Complaint ("ACCAC") in the NYMEX Case alleged that the defendants had manipulated the prices of natural gas futures and options on the New York Mercantile Exchange ("NYMEX") between January 1, 2000 and December 31, 2002 by reporting inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information. The AC here makes the same allegations. (*Compare* Am. Compl. ¶¶ 46–54, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70, ECF No. 2300-1). Oneok was a Defendant under the ACCAC. The plaintiff class in the NYMEX Case was defined as persons who had bought or sold natural gas futures or options on NYMEX during the relevant times. On May 24, 2006, the court in the NYMEX case entered a Final Judgment and Order of Dismissal ("the First Settlement Order") with an expanded plaintiff class definition reaching back to June 1, 1999. The first group of settling class members was to receive a total of nearly $73 million. On June 15, 2007, the court in the NYMEX case entered a Final Judgment and Order of Dismissal ("the Second Settlement Order") with a similarly defined plaintiff class. The second group of settling class members was to receive a total of nearly $28 million. Paragraph 6 of the First Settlement Order and Paragraph 5 of the Second Settlement Order provided for releases of the parties from further litigation:

> The Released Parties are finally and forever released and discharged from any manner of claims . . . and causes of action in law, admiralty, or equity,

> whether class, individual, or otherwise in nature . . . whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty, or equity, that the Representative Plaintiffs and other members of the Class who have not timely opted out of the settlement and excluded themselves from the Class ("Settling Plaintiffs''), or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Funds), ever had, now have or hereafter can, shall or may have, against the Released Parties arising from or relating in any way to trading in NYMEX Natural Gas Contracts (including purchasing, selling, or holding any NYMEX Natural Gas Contract, or taking or making delivery of physical natural gas pursuant to any NYMEX Natural Gas Contract, or any combination thereof, whether as a hedger or speculator), whether or not asserted in the Action, including without limitation, claims which (a) arise from *or relate in any way to any conduct complained of in any complaint filed in the Action*, (b) have been asserted or could have been asserted in any state or federal court or any other judicial or arbitral forum against the Released Parties or any one of them, (c) arise under *or relate to any federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation, the Commodity Exchange Act, 7 U.S.C. § 1 et seq., the federal antitrust laws (as that term is defined in 15 U.S.C. § 12), or state antitrust laws* and/or (d) the claims brought in this Action. The Settling Plaintiffs, and each of them, are hereby enjoined from asserting any such claims against the Released Parties.

(First Settlement Order ¶ 6(a), at 4–6, ECF No. 2300-5 (emphases added; footnote omitted)). The omitted footnote defines "Released Parties" as, *inter alia*, the settling defendants and their predecessors and successors. (*See id.* 4 n.3, at 4–5). The release language of the Second Settlement Order is the same in relevant respects. (*See* Second Settlement Order ¶ 5(a), at 4–5, ECF No. 2300-7).

These releases would seem to bar the present claims against Oneok. Both Oneok entities were Defendants in the NYMEX case. (*See* Am. Consol. Class Action Compl. ¶¶ 39–40). Plaintiff in the present case is Reorganized Farmland, Inc., as successor-in-interest to previous Plaintiff J.P. Morgan Trust Co., N.A., as trustee of the FI Liquidating Trust ("Farmland"). Farmland was a member of the NYMEX class according to uncontroversial facts admitted by Farmland's "person most knowledgeable" deponent. (*See* Schuck Dep. 54–56, ECF No. 2300-10

1  (noting that Farmland entered into natural gas futures contracts on NYMEX in 2000 and 2001)).
2  The NYMEX court found that notice to the class had been sufficient and that the settlements
3  were fair and reasonable, and Oneok provides evidence that the claims administrator mailed both
4  notices to Farmland's agent, (*see* Glenn Aff., ECF No. 2300-11; Young Aff., ECF No. 2300-12),
5  and also mailed the second notice to Farmland itself, (*see* Young Aff.). There is no evidence that
6  Farmland opted out of the class.
7       In response, Farmland argues that the NYMEX Case concerned harm to natural gas
8  *futures traders* via Defendants' acts, i.e., the artificial inflation of futures prices via reporting
9  false prices and engaging in wash trades, whereas the present case concerns harm to natural gas
10 *consumers* due to those acts. That is the long and short of Farmland's argument, and the Court
11 rejects it. The release language of the Settlements is easily broad enough to preclude the present
12 claims. The release clause releases Oneok and other settling defendants from "any manner of
13 claims . . . and causes of action" by settling plaintiffs:

> *relating in any way* to trading in NYMEX Natural Gas Contracts . . . *including . . . claims which . . . relate in any way to any conduct complained of in any complaint filed in the Action* [or which] *arise under or relate to any* federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation . . . *state antitrust laws*.

(First Settlement Order ¶ 6(a), at 4–6 (emphases added; footnote omitted)). The language of the
release is of course broader than the natural release as a matter of law that would have resulted
from the settlement under ordinary principles of claim preclusion, otherwise the release would
serve no purpose. And the language of the release here is extremely broad. It releases Oneok
from the present claims even without recourse to any of its "catch-all" provisions, because it
explicitly releases Oneok from any claims that arise under any state antitrust laws. Even if the
release were not so specific as to state antitrust claims, it releases Oneok as to any claims relating

1  in any way to any conduct complained of in the ACCAC, and, as noted *supra*, the AC here and
2  the ACCAC in the NYMEX action both complain of Oneok's alleged manipulation of NYMEX
3  futures prices via the reporting of inaccurate, misleading, and false trading information,
4  including artificial volume and price information, to trade publications that compile and publish
5  such information. (*Compare* Am. Compl. ¶¶ 46–54, *with* Am. Consol. Class Action Compl. ¶¶ 5,
6  60–70).

7        Nor is the affirmative defense of release waived.  Oneok pled the defense of "Release" as
8  its thirtieth affirmative defense in its initial Answer. (*See* Answer 15, ECF No. 85 in Case No.
9  2:05-cv-1331).  The nature of the defense was all Oneok was required to state in order to
10 preserve it. *See, e.g.*, *Rockwell Automation, Inc. v. Beckhoff Automation, LLC*, 23 F. Supp. 3d
11 1236, 1241–42 (D. Nev. 2014) (Jones, J.).  Moreover, the Answer went beyond simply
12 identifying the nature of the defense.  It identified the alleged release as being based on Farmland
13 not having opted out of the settlement class in the NYMEX Case, which it identified by name
14 and case number.  This pleading would satisfy Rule 8(c) even if the Court of Appeals were to
15 adopt a rule applying the strictures of *Iqbal* and *Twombly* to affirmative defenses, which no court
16 of appeals has done to this Court's knowledge.

17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Reconsider (ECF No. 2277) is GRANTED.

IT IS FURTHER ORDERED that the Order (ECF No. 2270) is VACATED, and the Motions to Dismiss (ECF Nos. 2248, 2249, 2250) are DENIED.

IT IS FURTHER ORDERED that the Motions for Summary Judgment (ECF Nos. 2286, 2299) are GRANTED.

IT IS SO ORDERED.

Dated this 23rd day of May, 2016.

_____
ROBERT C. JONES
United States District Judge