# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | ) ) ) ) ) | 2:03-cv-01431-RCJ-PAL<br>MDL No. 1566<br>**ORDER** |
| REORGANIZED FLI, INC. et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 2:05-cv-01331-RCJ-PAL |
| WILLIAMS COMPANIES. et al., | ) ) | |
| Defendants. | ) ) | |
| LEARJET, INC. et al., | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 2:06-cv-00233-RCJ-PAL |
| ONEOK, INC. et al., | ) ) | |
| Defendants. | ) ) | |

SINCLAIR OIL CORP.,

        Plaintiff,

  vs.                         2:06-cv-00267-RCJ-PAL

E PRIME INC. et al.,

        Defendants.

SINCLAIR OIL CORP.,

        Plaintiff,

  vs.                         2:06-cv-00282-RCJ-PAL

ONEOK ENERGY SERVICES CO., L.P.,

        Defendant.

BRECKENRIDGE BREWERY OF
COLORADO, LLC et al.,

        Plaintiffs,

  vs.                         2:06-cv-01351-RCJ-PAL

ONEOK INC. et al.,

        Defendants.

HEARTLAND REGIONAL MEDICAL
CENTER et al.,

        Plaintiffs,

  vs.                         2:07-cv-00987-RCJ-PAL

ONEOK, INC. et al.,

        Defendants.

| | |
|---|---|
| ARANDELL CORP. et al., | ) |
| Plaintiffs, | ) |
| vs. | ) 2:07-cv-01019-RCJ-PAL |
| XCEL ENERGY INC. et al., | ) |
| Defendants. | ) |
| | ) |
| NEWPAGE WISCONSIN SYSTEM INC., | ) |
| Plaintiff, | ) |
| vs. | ) 2:09-cv-00915-RCJ-PAL |
| CMS ENERGY RESOURCE MANAGEMENT CO. et al., | ) |
| Defendants. | ) |

These consolidated cases arise out of the energy crisis of 2000–2002.  Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade publications and by engaging in "wash sales."  Four motions for class certification, six motions for summary judgment, fourteen motions to strike expert opinions or briefs, a motion to amend complaints, a motion to reconsider an order of the magistrate judge, a motion to seal, and a motion for suggestion of remand of five of the eight remaining actions (the class actions) to their respective transferor courts are pending before the Court.

I.      PROCEDURAL HISTORY

In 2003, the Judicial Panel on Multidistrict Litigation ("JPML") transferred seven class action cases from various districts in California to this District under 28 U.S.C. § 1407 as

Multidistrict Litigation ("MDL") Case No. 1566, assigning Judge Pro to preside.  Since then, the JPML has transferred in several more actions from various districts throughout the United States. Between 2003 and 2015, Judge Pro ruled on many motions to remand, to dismiss, and for summary judgment.  He also approved several class settlements.  Several parties settled on their own.  One or more of the cases have been to the Court of Appeals twice and to the Supreme Court once.  In 2007, the Court of Appeals reversed several dismissals under the filed rate doctrine and remanded for further proceedings.  In 2013, the Court of Appeals reversed several summary judgment orders, ruling that the Natural Gas Act did not preempt state law anti-trust claims and that certain Wisconsin- and Missouri-based Defendants should not have been dismissed for lack of personal jurisdiction.  The Supreme Court granted certiorari as to preemption under the Natural Gas Act and affirmed.  The case was soon thereafter reassigned to this Court when Judge Pro retired.  The Court has issued several orders on motions to dismiss and for summary judgment.  Eight of the eighteen consolidated cases remain open, the others having been variously settled, dismissed, or remanded to state courts.

## II.   MOTIONS TO STRIKE

The motions are based primarily upon the opposing sides' arguments (which are in turn based on opinions by their own experts) that the other side's experts have used unreliable methods, have made poor assumptions, etc.  The main problem with these kinds of arguments is that the Court requires expert assistance to understand the issues in the first instance.  An opposing expert's opinion may be helpful in understanding the issues, as well.  Some degree of debate and uncertainty as to the issues may exist, and the Court must determine class certification (and juries must eventually determine liability) based on the relevant legal standards having considered the expert evidence provided by all proffered witnesses who have more

expertise in some relevant area than a layman and whose testimony will be helpful to the Court in understanding the issues.  Finally, the Court notes that it does not require and will not consider any expert's opinion on the law itself.

**A.    Motions Nos. 2547 and 2548**

Defendants in the '233, '987, '1019, '915, and '1351 Cases ("the Class Actions") ask the Court to strike the expert opinions of Dr. Mark Dwyer and his colleague Dr. Michael Harris. The Court denies the motions.  It does not matter whether the experts used a reliable definition of "churning" but whether their "testimony is the product of reliable principles and methods [they have] reliably applied . . . to the facts of the case." Fed. R. Evid. 702.  FERC's or others' definition of "churning" for regulatory or industry purposes may or may not overlap completely or partially with Dwyer's and Harris's understandings of the term.  But so long as they have reliably applied reliable principles and methods to determine that Defendants' activity— whatever it was and whether it falls within anyone's definition of "churning"— had the effect of artificially inflating natural gas prices or some other effect that could reasonably support a verdict in Plaintiffs' favor under the antitrust laws at issue, their testimony is not objectionable under Rule 702 based on unreliability.  Defendants argue that Dwyer and Harris did not sufficiently establish causal relationships between trades and price increases or even separate legitimate, non-manipulative rapid trades from manipulative rapid trades.  But Defendants are able to argue (and counter with other experts) as to the depth of their analysis and as to their alleged prior inconsistent statements as to definitions they have used during the litigation. Dwyer and Harris may testify as to the pace of trading and their opinions as to the effect it had on prices.  Defendants can argue as to whether Plaintiffs have any evidence of individual or concerted intent to manipulate prices.

### B.      Motion No. 2620

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Michelle Burtis.  The Court denies the motion.  Dr. Burtis's alleged antagonism towards class actions may be relevant to impeachment for bias, but it does not disqualify her as an expert.  Plaintiffs' objection to Dr. Burtis is mainly over her disagreement with their own expert, Dr. Harris, as to whether individual trades should be examined for legitimacy versus conspiracy before concluding a conspiracy.  The Court does not need either side's experts to address that issue. The Court will not strike Dr. Burtis's testimony but will not rely on any of her legal conclusions just as it will not rely on legal conclusions made by any expert.  The Court will consider her expert testimony where it is helpful to class certification.

### C.      Motion No. 2621

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Michael De Laval.  Plaintiffs mainly attack De Laval's lack of academic credentials in the field of economics and argue that his experience trading in the wholesale energy market is not relevant.  The Court disagrees.  The experience of an actual natural gas trader may be very valuable to understanding the impact of Defendants' actions on price fluctuations.  In some respects, it may even be more valuable than the opinions of economics experts who have never actually traded natural gas.  An actual trader who witnesses trades and price fluctuations as they happen may have a perspective that cannot be replicated by a cold, after-the-fact mathematical analysis.  That is not to say that his testimony will be more important or helpful than that of any particular economist's, but it is certainly relevant and helpful enough for him to give expert testimony in this case.  The Court finds that his testimony, along with the testimony of experts in other areas, will aid in understanding the issues and evidence.

**D.    Motion No. 2622**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Christopher L. Cavanagh.  They argue that he has wrongly impugned the methods of one of their own experts, Dr. Dwyer.  They also argue that his methods are unreliable because he makes incorrect assumptions about the natural gas market.  The Court will not exclude his testimony for these reasons.  As noted, the Court will consider his testimony and Dr. Dwyer's, as well as their criticisms of one another's methods, in determining the relevant legal issues.

**E.    Motion No. 2623**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Randall Heeb, Ph. D.  They argue that his testimony is based on a misunderstanding of Plaintiffs' theory of collusion and is based on unreliable methods.  Plaintiffs argue that Dr. Heeb concludes there was no illegal collusion because the evidence does not show that Defendants acted identically at all times with respect to price reporting, but Plaintiffs note that a conspiracy can exist even though not all members of the conspiracy participate in it in the exact same way at the exact same time and that some members of the conspiracy may in fact be at cross purposes at various times based on their individual interests.  The Court agrees with Plaintiffs' statement of the law, but it will not strike Dr. Heeb's testimony altogether simply because his conclusions imply his belief in an incorrect legal standard.  As with other experts who have a flawed understanding of the law or, more accurately, who have exceeded the limits of their expertise by opining on the law at all (which probably includes most of the experts in this case), Dr. Heeb offers some amount of valuable expertise to the Court, and the Court will not strike his testimony.

///

///

**F.      Motion No. 2624**

Plaintiffs in the Class Actions ask the Court to strike the expert opinions of Dr. Hendrik Bessembinder, Ph. D.  They argue that his opinions contradict opinions he offered in 2007 as a witness for the CFTC.  The Court notes that this is legitimate evidence of bias for impeachment purposes but is not a basis to strike his testimony as altogether unreliable.  Plaintiffs also argue that Dr. Bessembinder's analysis of "wash trading" and "churning" is not made in the context of Rule 23 standards.  But it is this Court's function to analyze expert testimony against the standards of Rule 23.  No proffered expert in the case is a legal expert as to Rule 23 (or even an attorney to the Court's knowledge), so such an analysis is not expected; it would be beyond the scope of his or her expertise.  The Court does not need that kind of expert testimony.  It needs expert factual testimony, and Dr. Bessembinder, like the other experts in the case, provides some.

**G.      Motion No. 2625**

Plaintiffs in the Class Actions ask the Court to strike the expert declaration of Bob Broxson (attached as Exhibit 3 to Dr. Bessembinder's expert report) for largely the same reasons they move to strike the testimony of Drs. Burtis and Cavanagh, i.e., his attacks on Plaintiffs' own experts.  Broxson is an expert in natural gas procurement, marketing, transportation, and trading, having worked in the industry for 35 years and testified as an expert in several cases, (*see* Broxson Decl. 5 & apps. A–B, ECF No. 2465, at 52), and his testimony, limited to his area of expertise, will be helpful to the Court.

**H.      Motions Nos. 2644 and 2645**

Defendants in the Class Actions ask the Court to strike the expert opinions of George L. Donkin and Dr. Merrill J. Bateman.  The Court grants the motion to strike their testimony in part

based on untimeliness.  As noted, their testimony was offered only in reply to Defendants'

objections to the class certification motions and Defendants therefore were not able to depose

them by June 24, 2016, as contemplated by the Scheduling Order, or to provide expert testimony

in response.  The evidence therefore cannot be considered, *see, e.g.*, *Tovar v. U.S. Postal Serv.*, 3

F.3d 1271, 1273 n.3 (9th Cir. 1993), except as relevant to rebutting evidence in the opposition

briefs.  The Court will not strike the testimnony (as relevant to rebutting evidence in opposition

to the motions for class certification) for unreliability, however.  Again, movants argue that the

experts' testimony is unreliable because it is in conflict with (and criticizes) the methods and

conclusions of their own experts.  The Court again rejects this argument, as it has done

consistently as to experts on both sides.

I.      **Motion No. 2650**

Defendants in the '1351 Case ask the Court to strike certain evidence offered by Plaintiffs

in opposition to Defendants' Motion for Summary Judgment (ECF No. 2399). (*See* Opp'n, ECF

No. 2638).  The Court denies the motion as moot because it denies the motion for summary

judgment without relying on any of the challenged evidence. *See infra*.

J.      **Motion No. 2651**

Defendants in the Class Actions ask the Court to strike the declarations of Dr. Merrill J.

Bateman and George Donkin submitted with Plaintiffs' reply briefs or for leave to file a

surresponse.  The Court grants the motion in part for the reason it granted Motions Nos. 2644

and 2645 in part. *See supra*.  The Court will not permit a surresponse but will strike the expert

testimony, except as relevant to rebuttal of expert testimony adduced by Defendants in

opposition to the relevant motions.

///

**K.      Motion No. 2679**

Plaintiffs in the Class Actions ask the Court to strike the declarations of Drs. Joseph Kalt, Michelle Burtis, and Christopher Cavanagh filed on November 2, 2016.  Plaintiffs first argue the declarations are untimely.  The Court agrees and grants the motion.  The issue is largely moot, however, because the November 4, 2016 declarations were proffered as support for a requested surresponse with respect to the motions for class certification.  The Court has denied leave to file a surresponse and has rendered one unnecessary by striking the untimely expert testimony of Dr. Merrill J. Bateman and George Donkin as to support for class certification.

**L.      Motion No. 2767**

Defendants in the '1019 and '915 Cases ask the Court to strike Plaintiffs' Opposition (ECF No. 2737) to Defendants' Motion for Summary Judgment (ECF No. 2694).  The Court denies the motion.  The opposition is in excess of the local page limits, but the briefings in these consolidated cases are voluminous in general.  To the extent leave is required for the oversized brief, the Court grants it.  The Court denies the motion as moot on the merits of the admissibility of the challenged evidence, because the Court does not rely on that evidence in denying summary judgment. *See infra.*

## III.   SUMMARY JUDGMENT MOTIONS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

*id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme.  The moving party must first satisfy its initial burden.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court needn't consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  If the moving party meets its initial burden, the burden then shifts to the nonmoving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the

assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### A.     Motion No. 2399

E prime Energy Marketing, Inc. ("EPEM") and Xcel Energy Inc. ("XE") move for defensive summary judgment in the '1351 Case (*Breckenridge Brewery of Colo., LLC v. OneOK, Inc.*). Movants argue there is no evidence EPEM traded natural gas commodities or reported trades to industry publications during the relevant time period (January 1, 2000 to October 31, 2002) ("the RTP"), and therefore neither EPEM nor XE (EPEM's former parent company) can be liable under the Colorado Antitrust Act of 1992, Colo. Rev. Stat. section ("CRS") 6-4-101 *et seq.*

Even assuming Movants have satisfied their initial burden on summary judgment, however, Plaintiffs have satisfied their shifted burden to provide evidence of EPEM's sale of

natural gas to Plaintiffs during the RTP.  E prime, Inc.'s Rule 30(a)(6) deponent testified that EPEM purchased natural gas from e prime, Inc. for sale to customers by EPEM personnel. (Figoli Dep. 117–19, ECF No. 2638-3).  Plaintiffs have adduced copies of natural gas sales contracts between EPEM and BBI Acquisition Co. and between EPEM and Breckenridge Brewery of Colo., LLC on August 29 and 24, 2001, respectively, both effective for one year beginning September 1, 2001. (Suppl. Smith Decl. ¶¶ 6, 8 & Exs. 3, 5, ECF No. 2638-9).  The Court denies the motion for summary judgment.

### B.    Motions Nos. 2436 and 2709

OneOK Energy Services Co., L.P. ("OESC"), formerly known as OneOK Energy Marketing and Trading Co., moves for summary judgment against Sinclair Oil Corp. ("Sinclair") in the '282 Case (*Sinclair Oil Corp. v. OneOK Energy Services Co., L.P.*) based on res judicata and/or release based on release under a settlement agreement reached in a consolidated class action brought in the Southern District of New York ("the NYMEX Case").  Sinclair has counter-moved for summary judgment on the res judicata and release issues.  The Court denies both motions, as material issues of fact remain as to notice to Sinclair of the NYMEX settlements.

The Amended Consolidated Class Action Complaint ("ACCAC") in the NYMEX Case alleged that the defendants had manipulated the prices of natural gas futures and options on the New York Mercantile Exchange ("NYMEX") between January 1, 2000 and December 31, 2002 by reporting inaccurate, misleading, and false trading information, including artificial volume and price information, to trade publications that compile and publish such information.  The Complaint here makes the same allegations. (*Compare* Compl. ¶¶ 2–5, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70, ECF No. 2300-1).  OESC was a Defendant under the ACCAC.  The

plaintiff class in the NYMEX Case was defined as persons who had bought or sold natural gas futures or options on NYMEX during the relevant times.  Plaintiff was a member of the NYMEX class according to facts it has admitted. (*See* Am. Resps. to Reqs. for Adm. 2–3, ECF No. 2437-6 ("Sinclair admits that it traded in NYMEX contracts during the Relevant Time Period.")).

On May 24, 2006, the court in the NYMEX Case entered a Final Judgment and Order of Dismissal ("the First Settlement Order") with an expanded plaintiff class definition reaching back to June 1, 1999.  The first group of settling class members was to receive a total of nearly $73 million.  On June 15, 2007, the court in the NYMEX Case entered a Final Judgment and Order of Dismissal ("the Second Settlement Order") with a similarly defined plaintiff class.  The second group of settling class members was to receive a total of nearly $28 million.  Paragraph 6 of the First Settlement Order and Paragraph 5 of the Second Settlement Order provided for releases of the parties from further litigation:

> The Released Parties are finally and forever released and discharged from any manner of claims . . . and causes of action in law, admiralty, or equity, whether class, individual, or otherwise in nature . . . whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty, or equity, that the Representative Plaintiffs and other members of the Class who have not timely opted out of the settlement and excluded themselves from the Class ("Settling Plaintiffs''), or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Funds), ever had, now have or hereafter can, shall or may have, against the Released Parties arising from or relating in any way to trading in NYMEX Natural Gas Contracts (including purchasing, selling, or holding any NYMEX Natural Gas Contract, or taking or making delivery of physical natural gas pursuant to any NYMEX Natural Gas Contract, or any combination thereof, whether as a hedger or speculator), whether or not asserted in the Action, including without limitation, claims which (a) arise from *or relate in any way to any conduct complained of in any complaint filed in the Action*, (b) have been asserted or could have been asserted in any state or federal court or any other judicial or arbitral forum against the Released Parties or any one of them, (c) arise under *or relate to any federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation, the Commodity Exchange Act, 7 U.S.C. § 1 et seq., the federal antitrust laws (as that term is defined in 15 U.S.C. § 12), or state antitrust laws* and/or (d) the claims brought in this

Action.   The Settling Plaintiffs, and each of them, are hereby enjoined from asserting any such claims against the Released Parties.

(First Settlement Order ¶ 6(a), at 4–6, ECF No. 2300-5 (emphases added; footnote omitted)).

The omitted footnote defines "Released Parties" as, *inter alia*, the settling defendants and their predecessors and successors. (*See id.* 4 n.3, at 4–5).  The release language of the Second Settlement Order is the same in relevant respects. (*See* Second Settlement Order ¶ 5(a), at 4–5, ECF No. 2300-7).

These releases would seem to bar the present claims against OESC, which was a defendant in the NYMEX Case. (*See* Am. Consol. Class Action Compl. ¶¶ 39–40).  The NYMEX court found that notice to the class had been sufficient and that the settlements were fair and reasonable, and OESC provides evidence that the NYMEX Case claims administrator mailed notices to both of Sinclair's NYMEX brokers, ABN AMRO and Smith Barney, (*see* Glenn Aff., ECF No. 2437-8).  There is no evidence that Sinclair opted out of the class.  Sinclair, however, argues that it had no relationship with the brokers to whom notice was mailed since 2003, before it even filed the ACCAC in the NYMEX Case. (*See* Johnson Aff. ¶¶ 5–6, ECF No. 2520-1).  It also argues that this was known to the settlement administrator, so notice to its previous brokers was not reasonable.  The Court finds that service upon a party's broker at the time of the relevant trades was reasonable.  A broker has a fiduciary duty to notify a former client of such notice.  If the broker fails to do so, the client may have a fiduciary claim against the broker, but he has no argument that notice to the broker of record was not a reasonable attempt to notify him of the relevant information.

The Court has also rejected the argument in granting a similar summary judgment motion in the '1331 Case, (*see* Order 9–13, ECF No. 2416), that the NYMEX Case concerned harm to natural gas *futures traders* via Defendants' acts, i.e., the artificial inflation of futures prices via

reporting false prices and engaging in wash trades, whereas the present case concerns harm to

natural gas *consumers* due to those acts.  The release language of the Settlements is broad

enough to preclude the present claims.  The release clause releases OESC and other settling

defendants from "any manner of claims . . . and causes of action" by settling plaintiffs:

> *relating in any way* to trading in NYMEX Natural Gas Contracts . . . *including without limitation*, *claims which* . . . *relate in any way to any conduct complained of in any complaint filed in the Action* [or which] *arise under or relate to any* federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation . . . *state antitrust laws*.

(First Settlement Order ¶ 6(a), at 4–6 (emphases added; footnote omitted)).  The language of the

release is of course broader than the natural release as a matter of law that would have resulted

from the settlement under ordinary principles of claim preclusion, otherwise the release would

serve no purpose.  And the language of the release here is extremely broad.  It releases OESC

from the present claims, because they arise out of alleged conduct relating to conduct

complained of in the NYMEX Case.  As noted *supra*, the Complaint here and the ACCAC in the

NYMEX Case both complain of OESC's alleged manipulation of NYMEX futures prices via the

reporting of inaccurate, misleading, and false trading information, including artificial volume and

price information, to trade publications that compile and publish such information. (*Compare*

Compl. ¶¶ 2–5, *with* Am. Consol. Class Action Compl. ¶¶ 5, 60–70).

Sinclair notes that:

> A settlement agreement may preclude a party from bringing a related claim in the future "even though the claim was not presented and might not have been presentable in the class action," but only where the released claim is "based on the identical factual predicate as that underlying the claims in the settled class action."

*Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517

F.3d 1120, 1133 (9th Cir. 2008) and *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th

Cir. 1992)).  The claims in the Complaint are based on the "identical factual predicate" as the claims in the NYMEX Case, i.e., the alleged manipulation of natural gas prices via false reporting of trading information to various trade publications.  The NYMEX class complained of having paid inflated prices for NYMEX natural gas contracts or taking delivery of natural gas itself pursuant to such a contract, whereas Sinclair complains of having paid inflated prices due to having purchased natural gas directly from OESC.

Sinclair also argues that the NYMEX class representatives did not adequately represent Sinclair's interests. *See Hesse*, 598 F.3d at 588.  But Sinclair provides no evidence indicating that none of the named plaintiffs had potential claims based on having directly purchased natural gas in addition to having purchased natural gas futures.  Without such evidence, the Court cannot find that the named plaintiffs in the NYMEX Case did not adequately represent class members who potentially had such claims.  And OESC has shown in reply that the claim is simply false; at least one of the named plaintiffs in the NYMEX Case, Cornerstone Propane Partners, L.P., alleged in its complaint that it had marketed natural gas in the United States, and its SEC filings indicate that it not only bought and sold propane (which is produced from natural gas) but also bought and sold natural gas itself during the RTP and in fact only purchased futures contracts for the purpose of managing its exposure to fluctuations in the purchase prices of natural gas and crude oil. (*See* ECF Nos. 2552-8 to 2552-9).

Furthermore, unlike in *Hesse*, here the judgment in the class action expressly found that the interests of the NYMEX class were adequately represented by both counsel and the named plaintiffs. (*See* First Settlement Order ¶ 2(a)(iv)–(v)).  The Court cannot undermine this express finding. *See Hesse*, 598 F.3d at 588 (citing *Epstein v. MCA, Inc. (Epstein II)*, 179 F.3d 641, 643, 648–50 (9th Cir. 1999)).

Defendants e prime, inc. ("e prime") and Xcel Energy Inc. ("Xcel Energy") (collectively, "e prime Defendants") have joined the motion.  e prime was a settling Defendant in the NYMEX Case.  Xcel Energy is and was e prime's parent company, and it is therefore included in the definition of "Released Parties." (*See* First Settlement Order ¶ 6(a) & n.3).  Sinclair makes no separate arguments against e prime Defendants, and it appears to agree that they are similarly situated to OESC with respect to the present issues.  The Court grants the joinder, as well.

### C.    Motion No. 2508

All remaining Defendants move for defensive summary judgment in the '1019 Case (*Arandell Corp. v. Xcel Energy, Inc.*) against all claims brought by Briggs & Stratton Corp. ("BSC") and Carthage College ("CC") (collectively, "Plaintiffs") based on release and res judicata.  The Court denies the motion.  Movants (or their parents and subsidiaries, who were also covered by the releases)[1] were defendants in the NYMEX case. (*See* Am. Consol. Class Action Compl. ¶¶ 28, 32–33, 41, 45–46).  Plaintiffs were members of the NYMEX class because they purchased NYMEX Natural Gas Contracts within the Relevant Time Period. (*See* Mourand Dep., 57–62, ECF No. 2509-7; Hoare Dep. 102–09, ECF No. 2509-8).  Finally, Plaintiffs purportedly received notice of the NYMEX settlements through their broker, Kaztex Energy Management, Inc., and did not opt out. (*See* Glenn Aff. & Ex. 5, ECF No. 2509-9; Young Aff. & Ex. 5, ECF No. 2509-10).  But as Plaintiffs note, Kaztex only received notice in its capacity as a class member itself, not as Plaintiffs' agent.  Indeed, Defendants and Kaztex itself have always

---

1 The Williams Cos., Inc., Williams Merchant Services Co., LLC (f/k/a Williams Merchant Services Co., Inc.), Williams Gas Marketing, Inc. (f/k/a Williams Power Co., Inc. and Williams Energy Marketing & Trading); Dynegy Ill. Inc., DMT G.P. L.L.C., Dynegy GP Inc., Dynegy Marketing & Trade; El Paso Corp. and El Paso Merchant Energy, L.P.; CMS Energy Corp., Cantera Gas Co., CMS Marketing Services & Trading Co., Reliant Energy, Inc. (n/k/a RRI Energy, Inc.), Reliant Energy Services, Inc. (n/k/a RRI Energy Services, LLC), Northern States Power Co., and Xcel Energy Inc.

denied that Kaztex was Plaintiffs' agent, and in the present motion, Defendants attempt to qualify their claim of Kaztex's agency as limited to the present motion.  The Court will not grant summary judgment under these circumstances, where notice to Plaintiffs of the NYMEX settlements is so factually uncertain.

### D.      Motion No. 2555

Defendants in the '233, '987, '1019, '0915, '1351, and '1331 Cases move for summary judgment under the Supremacy Clause, specifically, conflict preemption.  The Court denies the motion.  The Supreme Court has already affirmed the Court of Appeals' ruling that the claims in the present cases are not preempted under the doctrine of field preemption.  The Court agrees with Plaintiffs that although Defendants use the term "conflict preemption," they in substance mainly reargue the issue of field preemption, although as limited to the practice of "churning."

Moreover, there is no conflict preemption, here.  "[C]onflict pre-emption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ONEOK, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1596 (2015) (citations and internal quotation marks omitted).  Defendants argue that conflict preemption applies to the state law claims here insofar as state law makes "churning" (rapid, high-volume trading activity) unlawful, because the Federal Energy Regulatory Commission ("FERC") has opined that the practice does not violate the Natural Gas Act or attendant regulations.

But the fact that federal law permits a given practice does not mean that compliance with federal law is made impossible by stricter state laws, at least not where the federal law does not explicitly prohibit stricter state regulation, and Defendants do not argue that federal law expressly prohibits the kinds of state law regulation at issue here. *See, e.g.*, *Yung Kim v. Gen.*

*Motors, LLC*, 99 F. Supp. 3d 1096, 1106 (C.D. Cal. 2015).  Nor does potential liability for churning obstruct the purposes or objectives of Congress.  The opinion of FERC with respect to whether one violates federal law by "churning" therefore has no bearing on whether conflict preemption applies here.  The Court's task is to determine by reference to the statutes and regulations themselves whether the federal and state laws impose inconsistent obligations or whether the state laws obstruct congressional objectives.  Defendants have not pointed to any federal statutes or regulations in conflict with the state laws at issue.  Even if FERC had found in some other case that "churning" was *mandated* by federal law, that would not determine this Court's ruling on the conflict preemption issue in the present case.  It would still be for this Court to determine whether there were any conflict between the state laws against "churning" and federal law, e.g., whether federal law mandated "churning."  The FERC's opinion would only be potentially persuasive.  The only authority put forth in Defendants' favor as to the preemption of the kinds of state laws at issue here is a pre-*ONEOK* ruling by the Nevada Supreme Court in which it found that certain Nevada antitrust claims were *field* preempted, not *conflict* preempted, *see State ex rel. Johnson v. Reliant Energy, Inc.*, 289 P.3d 1186, 1193 (Nev. 2012), a ruling entirely abrogated, in any case, by the U.S. Supreme Court's decision to the contrary in this very case.

### E.    Motion No. 2694

Northern States Power Co.-Wisconsin ("NSP") moves for defensive summary judgment in the '1019 Case (*Arandell Corp. v. Xcel Energy, Inc.*) and the '915 Case (*NewPage Wisconsin System, Inc. v. CMS Energy Resources Management Co.*), arguing that there is no evidence it traded natural gas commodities on the wholesale market or reported any trades to any industry

publication and that as a "Local Distribution Company" under Wisconsin law, it was prohibited from doing either.

Even assuming NSP has satisfied its initial burden on summary judgment, however, Plaintiffs have satisfied their shifted burden to provide evidence of NSP's sale of natural gas to Plaintiffs during the RTP. (*See* Hess Decl., ECF No. 2737-32; Billings Decl. ¶¶ 37–40 & Exs. JJ–MM, ECF No. 2737-3). There is evidence adduced that during the RTP, Integrys Energy Services, Inc. purchased tens of thousands of dollars' worth of natural gas from NSP, (Hess Decl. ¶¶ 1–3, ECF No. 2737-32), that in 2001 NewPage Wisconsin System, Inc. was purchasing its natural gas from WPS, (Krolikowski Dep. 67, ECF No. 2737-33), that Merrick's, Inc. was purchasing its natural gas from WPS at some point in time, (Morris Dep. 10, ECF No. 2737-34), that between 2000 and 2002, Sargento bought its natural gas from WPS, (Link Dep. 29–31, ECF No. 2737-35), and that NewPage Wisconsin System, Inc. had purchased several thousand dollars' worth of natural gas from NSP between 2000 and 2002, (Invoice List, ECF No. 2737-36).

## IV.   CLASS CERTIFICATION

In order to obtain class certification under Rule 23, plaintiffs must satisfy two sets of criteria. First, plaintiffs must show each of the following:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Rodriguez v. Hayes*, 591 F.3d 1105, 1121–22 (9th Cir. 2010) (citing Fed. R. Civ. P. 23(a)).

Second, plaintiffs must show at least one of the following:

(1) prosecuting separate actions by or against individual class members would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)–(3); *see Hayes*, 591 U.S. at 1122.  A district court should not address the merits of a case directly when determining certification under Rule 23, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974) (holding that a class action plaintiff cannot argue the merits of his case to circumvent the Rule 23 certification requirements), except to the extent that determining the certification motion requires probing the merits, in which case the court must address any relevant merits issues, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–52 (2011).

If the certification requirements are satisfied, a court should not refuse to certify simply because it believes the case should be dismissed or summarily adjudicated in favor of the defendant.

### A.  Motion No. 2308

Plaintiffs in the '233 Case ask the Court to certify the following class:

> All industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Kansas.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 2000 through February 2002.

### 1.  Rule 23(a)

#### a.  Numerosity

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and tens of thousands of commercial consumers of natural gas in Kansas during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

#### b.  Commonality and Typicality

The Court finds that although there are surely some questions of law and fact common to some members of the class and other questions of law and fact common to other members of the class, the Court is not convinced that there are questions of law and fact common to all members of the class.  The class members have similar allegations under Kansas law—that they purchased natural gas for their own consumption the price of which had been unlawfully inflated by Defendants' actions in violation of the Kansas Restraint of Trade Act.  Plaintiffs' claims are also typical of the class members' claims in this regard.  Plaintiffs Learjet, Inc.; Cross Oil Refining &

Marketing, Inc.; and Topeka Unified School District 501, like the proposed class members, are industrial or commercial users of natural gas who purchased natural gas in Kansas for their own use in that state.

But, as Defendants note, the different purchasing strategies used by Plaintiffs and class members will require individualized examination of whether each class member was harmed, both factually (a standing issue) and legally (an antitrust law issue).  So although it may be the case that some subset of the proposed class has been harmed, and that several subclasses (though yet undefined) of that subset have been harmed in the same way such that their damages can be calculated using some yet undetermined number of common methods, the class as currently defined does not satisfy the commonality requirement. *See Dukes*, 564 U.S. at 350 ("Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

Defendants also argue that some Plaintiffs are subject to claim preclusion and release defenses that not all putative class members are, i.e., based on the settlements in the NYMEX Case.  The Court finds that this also weighs against class certification.  The Court has variously granted or denied motions for summary judgment based on this defense based on the particular facts presented, e.g., whether a broker who received notice was an agent of the class member.  If all Plaintiffs in a given class action were to be eliminated via such a defense, a court could either require substitution of one or more class representatives not subject to the defense.  That possibility alleviates the typicality concerns.  But the commonality concerns would remain.  A trial court or jury would potentially have to sift through thousands of records of notice and

1  resolve thousands of agency issues to determine whether a given class member were properly

2  notified of the NYMEX settlements and therefore bound by the attendant releases.

3       **c.**     **Adequacy of Representation**

4       The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–

5  4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the

6  Missouri Bar who has been involved with many of the 130-plus class actions her firm has

7  prosecuted); Barry Decl. ¶ 3, ECF No. 2315-15 (attesting that he is a 52-year attorney with

8  significant antitrust litigation experience); Bentz Decl. ¶¶ 3, 6, ECF No. 2315-11 (attesting that

9  he is a 34-year attorney who has been involved with many of the 130-plus class actions his firm

10  has prosecuted); Heinz Decl. ¶ 5, ECF No. 2315-13 (attesting that he is currently litigating two

11  other class actions in this District); McCallister Decl. ¶¶ 3, 5, 8, ECF No. 2315-14 (attesting that

12  he is a 42-year attorney and former President of the Kansas Trial Lawyers Association who has

13  prosecuted over a dozen antitrust and class actions with his current firm); Jones Decl. ¶¶ 3, 6,

14  ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the

15  250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court

16  also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

17       **2.**     **Rule 23(b)(3)**

18       Under Rule 23(b)(3), questions of law or fact common to class members must

19  "predominate" over questions affecting individual members, and a class action must be

20  "superior" to other available methods for fairly and efficiently adjudicating the controversy.

21  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

22  cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

23  591, 623 (1997).  Factors to be considered as to the superiority requirement include the class

24

members' interests in individually controlling separate actions, the extent and nature of any

litigation already begun by class members, the desirability or undesirability of concentrating the

litigation of the claims in the particular forum, and the likely difficulties in managing a class

action.  The fact that a defendant may be able to eliminate one or more plaintiffs or class

members due to individual issues does not cause individual questions to predominate.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014).  "Private damage

claims by numerous individuals arising out of concerted antitrust violations may or may not

involve predominating common questions." Fed. R. Civ. P. 23(b)(3) advisory committee's note

to 1966 amendment, subdivision (b)(3).

Where "the damages for individual class members will entail a straightforward

calculation," those individual issues are considered "relatively easy" and will not defeat the fact

that the class members' harm stems from common acts of a defendant. *Local Joint Exec. Bd. of

Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001)

(reversing Judge Pro's denial of class certification).  That is not the case here.  As counsel for

Defendants noted at the hearing, class members in these cases are not small consumers whose

damages constitute a straightforward calculation of units of product purchased times some

amount by which the retail price was wrongly inflated.  Rather, they were sophisticated industrial

and commercial consumers who used varying and complex strategies for purchasing natural gas

such that it is difficult to calculate their damages in most cases.  In many cases, there are no

damages at all.  And Plaintiffs' own experts have used different methods to calculate injury,

resulting in disparate estimations of what percentage of class members were even harmed.

Although there are some common questions of law and fact, they do not predominate over

individual issues.

**B.    Motion No. 2309**

Plaintiffs in the '987 Case ask the Court to certify the following class:

> All industrial and commercial direct purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Missouri.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 1, 2000 through February 2002.

**1.    Rule 23(a)**

**a.    Numerosity**

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and over a hundred-thousand commercial consumers of natural gas in Missouri during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

**b.    Commonality and Typicality**

The Court finds the commonality and typicality requirements not to be satisfied for the reasons given as to the motion in the '233 Case. *See supra.*

**c.    Adequacy of Representation**

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the Missouri Bar who has been involved with many of the 130-plus class actions her firm has prosecuted); Barry Decl. ¶ 3, ECF No. 2315-15 (attesting that he is a 52-year attorney with significant antitrust litigation experience); Bentz Decl. ¶¶ 3, 6, ECF No. 2315-11 (attesting that he is a 34-year attorney who has been involved with many of the 130-plus class actions his firm

has prosecuted); Heinz Decl. ¶ 5, ECF No. 2315-13 (attesting that he is currently litigating two other class actions in this District); Jones Decl. ¶¶ 3, 6, ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the 250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

### 2.      Rule 23(b)(3)

The Court finds that the predominance and superiority requirements of Rule 23(b)(3) are not met in this case for the same reasons given as to the '233 Case, *supra.*

### C.      Motion No. 2310

Plaintiffs in the '1351 Case ask the Court to certify the following class:

> All industrial and commercial purchasers of natural gas for their own use or consumption that bought from defendants Xcel Energy, Inc., e prime Energy Marketing, or their corporate affiliates during the Relevant Time Period, and which gas was used or consumed by them in Colorado.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) defendants and their predecessors, affiliates and subsidiaries; and (d) the federal government and its agencies.

The "relevant time period" is January 1, 2000 through February 2002.

### 1.      Rule 23(a)

#### a.      Numerosity

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and over a hundred-thousand commercial consumers of natural gas in Colorado during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

///

### b.    Commonality and Typicality

The Court finds the commonality and typicality requirements not to be satisfied for the reasons given as to the motion in the '233 Case. *See supra.*

### c.    Adequacy of Representation

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the Missouri Bar who has been involved with many of the 130-plus class actions her firm has prosecuted); Barry Decl. ¶ 3, ECF No. 2315-15 (attesting that he is a 52-year attorney with significant antitrust litigation experience); Bentz Decl. ¶¶ 3, 6, ECF No. 2315-11 (attesting that he is a 34-year attorney who has been involved with many of the 130-plus class actions his firm has prosecuted); Heinz Decl. ¶ 5, ECF No. 2315-13 (attesting that he is currently litigating two other class actions in this District); Jones Decl. ¶¶ 3, 6, ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the 250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

### 2.    Rule 23(b)(3)

The Court finds that the predominance and superiority requirements of Rule 23(b)(3) are not met in this case for the same reasons given as to the '233 Case, *supra.*

### D.    Motion No. 2311

Plaintiffs in the '1019 and '915 Cases ask the Court to certify the following class:

> All industrial and commercial purchasers of natural gas for their own use or consumption during the Relevant Time Period, and which gas was used or consumed by them in Wisconsin.  Excluded from the Class are (a) entities that purchased natural gas for resale (to the extent of such purchase for resale); (b) entities that purchased natural gas for generation of electricity for the purpose of sale (to the extent of such purchase for generation); (c) entities that purchased

natural gas from entities that sold natural gas at rates approved by the Wisconsin Public Service Commission (to the extent of such purchases at such approved rates); (d) defendants and their predecessors, affiliates and subsidiaries; and (e) the federal government and its agencies.

The "relevant time period" is January 1, 2000 through October 31, 2002.

### 1.    Rule 23(a)

#### a.    Numerosity

The Court finds the numerosity requirement to be satisfied.  There were thousands of industrial consumers and over a hundred-thousand commercial consumers of natural gas in Wisconsin during the relevant time period. (*See* Ennis Decl. ¶ 8 & Ex. E, ECF No. 2315-16, 2315-19, at 89).

#### b.    Commonality and Typicality

The Court finds the commonality and typicality requirements not to be satisfied for the reasons given as to the motion in the '233 Case. *See supra.*

#### c.    Adequacy of Representation

The Court finds that counsel is competent to represent the class.  (*See* Bacon Decl. ¶¶ 3–4, 6, ECF No. 2315-10 (attesting that she is a 41-year attorney and former President of the Missouri Bar who has been involved with many of the 130-plus class actions her firm has prosecuted); Gegios Decl. ¶¶ 3, 6, ECF No. 2315-12 (attesting that he is a 36-year attorney who has been involved in many class actions since 1984, including at least two antitrust class actions); Jones Decl. ¶¶ 3, 6, ECF No. 2315-9 (attesting that he is a 37-year attorney who has been involved with many of the 250-plus class actions (some of which were antitrust cases) his firm has prosecuted)).  The Court also finds that there is no evidence of any conflicts of interest between Plaintiffs and the class.

///

### 2.    Rule 23(b)(3)

The Court finds that the predominance and superiority requirements of Rule 23(b)(3) are not met in these cases for the same reasons given as to the '233 Case, *supra*.

## V.    MOTION TO AMEND

> A party may amend its pleading once as a matter of course within . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier. . . . In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(1)–(2).  As noted by Judge Pro in previously denying a motion to amend, however, a deadline to amend pleadings set by scheduling order may only be amended for good cause. *See* Fed. R. Civ. P. 16(b)(3)(B)(vii), (b)(4).

Sinclair has requested leave to amend the complaints in the '267 and '282 cases to delete five claims, make additional allegations as to six claims, and to add two claims under Wyoming law.  Sinclair has not shown that it has been diligent in making this request or that the fact and law upon which the new claims lie were not reasonably available to it until it made the motion. *See  United States v. Dang*, 488 F.3d 1135, 1142–43 (9th Cir. 2007); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citing Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment).  Amendment at this stage would also be extraordinarily disruptive and prejudicial to Defendants.  That weighs against a good cause finding, although prejudice need not be found to deny an untimely amendment. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir. 2000).  Discovery is now nearly closed after several years of litigation, all dispositive motions have been filed, and the Court via the present order is making what will likely be its penultimate dispositive rulings in these cases before remand to the transferor courts for trial.

Movant has not shown good cause for such a late amendment.  As Defendants note, Sinclair may voluntarily dismiss some of its claims without obtaining leave to amend.  Because the dismissal stage of the litigation is over, repleading claims that have survived to the summary judgment stage would be superfluous, and a request to replead any dismissed claim would in substance constitute a motion to reconsider a previous dismissal.  The only purpose of the present motion is to add the constitutional and statutory claims under Wyoming law.  But Sinclair has made no showing that those claims are based on new evidence or theories not reasonably available to Sinclair before certain deposition and expert testimony obtained in 2016 leading Sinclair to think that causes of action under Article X, Section 8 of the Wyoming Constitution or section 40-4-101 of the Wyoming Statutes had suddenly become viable.  Section 40-4-101 makes it unlawful to "prevent competition or to control or influence production or prices." Wyo. Stat. § 40-4-101.  The Wyoming Constitution prohibits the "consolidation or combination of corporations of any kind whatever to prevent competition, to control or influence productions or prices thereof." Wyo. Const. art. X, § 8.  The kind of activity those provisions make unlawful as relevant to the present case, i.e., price manipulation, has been the core basis of the '267 and '282 Cases since they were filed in 2005.  The complaints in those cases are both premised on Defendants having acted alone and in tandem to inflate natural gas prices. (*See* Compl. ¶ 4, ECF No. 1 in Case No. 2:06-cv-267; Compl. ¶ 3, ECF No. 1 in Case No. 2:06-cv-282).

## VI.     MOTION TO RECONSIDER A RULING OF THE MAGISTRATE JUDGE

Rule 72(a) permits a district court judge to modify or set aside a magistrate judge's non-dispositive ruling that is clearly erroneous or contrary to law:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must

promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision.  A party may serve and file objections to the order within 14 days after being served with a copy.  A party may not assign as error a defect in the order not timely objected to.  The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Fed. R. Civ. P. 72(a); *see also* Local R. IB 3-1(a).  Rule 72(a) institutes an abuse of discretion standard. *See Grimes v. City and Cnty. of S.F.*, 951 F.2d 236, 241 (9th Cir. 1991) (citing *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988) ("We still must determine, however, whether the court abused its discretion in issuing its order based on the facts before it which are supported by the record.  Under the abuse of discretion standard, we cannot simply substitute our judgment for that of the district court, but must be left with the definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors.")).

Movants ask the Court to reverse the order of the Magistrate Judge denying their motion to compel Reliant Energy, Inc. to provide certain discovery.  Movants have adduced a transcript of the hearing before the Magistrate Judge.  The Court has reviewed the entire transcript of the hearing on the motion to compel, as well as the previously adduced excerpts of the transcript of Ms. Kupieck's deposition and does not find that the Magistrate Judge erred in denying the motion.  The Magistrate Judge recounted the extensive discovery she had provided Plaintiffs, including granting a previous motion to compel the deposition of Ms. Kupieck, whose deposition led to the most recent motion to compel.  The Magistrate Judge did not err in concluding that Ms. Kupieck's testimony did not indicate the existence of the kinds of documents Movants have sought to compel Defendants to produce, but that Movants were simply unhappy with their failure to obtain sought-after admissions from Ms. Kupieck.

///

## VII.   MOTION FOR SUGGESTION OF REMAND

Movants ask the Court to suggest to the JPML under JPML Rule 10.1(b) that it remand the Class Actions back to the transferor courts.  Plaintiffs note the Class Actions involve state law antitrust claims under four different states' laws and argue they are therefore better addressed by the transferor courts.  They argue that the JPML typically defers to a transferee court's recommendation of remand. *See In re Franklin Nat'l Bank Sec. Litig.*, 407 F. Supp. 248, 248 (J.P.M.L. 1976) ("Generally, the Panel gives great deference to a transferee judge's suggestion that an action pending before him for Section 1407 treatment is ripe for remand.").  Fact and class discovery has closed in the Class Actions.  The parties will soon finish merits expert depositions.  The Court will not suggest remand of the Class Actions before making summary judgment and class certification rulings where the same conduct by many of the same Defendants forms the basis for Plaintiffs' claims under similar state laws.

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motions for Summary Judgment (ECF Nos. 2399, 2508, 2555, 2694, 2709), Motions for Class Certification (ECF Nos. 2308, 2309, 2310, 2311), the Motions to Strike (ECF Nos. 2547, 2548, 2620, 2621, 2622, 2623, 2624, 2625), the Motion to Reconsider (ECF No. 2772) and Motion to File a Reply (ECF No. 2796), the Motion to File a Surresponse (ECF No. 2718), the Motion to Amend (ECF No. 2454), and the Motion for Suggestion of Remand (ECF No. 2765) are DENIED.

IT IS FURTHER ORDERED that the Motion to Seal (ECF No. 2766), the Motion to Strike (ECF No. 2679), the Motion for Summary Judgment (ECF No. 2436), and the Joinder to Motion No. 2436 (ECF No. 2444), are GRANTED.

IT IS FURTHER ORDERED that the Motions to Strike (ECF Nos. 2644, 2645, 2651) are GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that the Motion to Strike (ECF No. 2650) is DENIED as moot.

IT IS FURTHER ORDERED that the Motion to Strike (ECF No. 2767) is DENIED IN PART and DENIED as moot in part.

IT IS SO ORDERED.

Dated this 30th day of March, 2017.

_____
ROBERT C. JONES
United States District Judge