# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

IN RE WESTERN STATES WHOLESALE
NATURAL GAS ANTITRUST LITIGATION

------------------------------------------------------

*Learjet, et al. v. ONEOK, Inc., et al.*

*Heartland Regional Medical Center, et al. v.
ONEOK, Inc., et al.*

MDL No. 1566
Case File No. 03-CV-01431-RCJ-PAL

## PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF SETTLEMENTS WITH CMS AND EL PASO <u>AND NOTICE OF HEARING</u>

59468930.1

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL AND PROCEDURAL HISTORY .................................................. 2

  A.   Plaintiffs Allege a Nationwide Conspiracy to Manipulate Prices of Natural Gas ............ 2

III.   ARGUMENT AND AUTHORITIES................................................................... 4

  A.   These Settlements Should Be Given Final Approval. .................................................. 4

      1.   Strength of the Plaintiffs' Cases ............................................................... 5

      2.   Risk, Expense, Complexity and Likely Duration of Further Litigation. ............... 8

      3.   Risk of Maintaining Class Action Status Throughout the Trial ........................... 8

      4.   The Amount of the Settlements ................................................................. 9

      5.   The Extent of Discovery Completed and Stage of Proceedings ......................... 11

      6.   Experience and Views of Counsel ........................................................... 12

      7.   Presence of a Governmental Participant .................................................. 13

      8.   Reaction of the Class Members to the Proposed Settlement ............................. 13

IV.   SETTLEMENT ADMINISTRATION AND DISTRIBUTION METHODOLOGY ... 14

  A.   Settlement Administration ..................................................................... 14

  C.   Settlement Distributions....................................................................... 17

V.    CONCLUSION.................................................................................... 18

59468930.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bluetooth Headset Prods. Liab. Litig*,
    654 F.3d 935 (9th Cir. 2011) .................................................................................4

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 14-CV-2058 JST, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) *(CRT II)* .....................11

*Churchill Village, LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir.2004) ...........................................................2, 4, 5, 8, 11, 13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..............................................................................4

*Howell v. JBI, Inc.*,
    298 F.R.D. 649 (D. Nev. 2014)........................................................................2, 4

*Lee v. Enter. Leasing Co-W.*,
    No. 3:10-CV-00326-LRH, 2015 WL 2345540 (D. Nev. May 15, 2015) (Hicks, J.)...............4

*In re Linerboard Antitrust Litig*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ..................................................9, 11, 12, 13

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) .................................................................................4

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
    688 F.2d 615 (9th Cir. 1982), *cert. denied,* 459 U.S. 1217 (1983).........................4

*Roeder v. Atlantic Richfield Company*,
    2013 WL 5878432 ..............................................................................................4

*Stanton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .................................................................................4

*Torist v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir 1993) .....................................................................................4

**Statutes**

KSA § 50-163(c).................................................................................................6

R.S. Mo. §416.031.1 .........................................................................................6

## I.      INTRODUCTION

On June 5, 2017, this Court granted preliminary approval of two settlements in this class action.  (MDL ECF No. 2907).  Those settlements were reached with CMS[1] and El Paso[2] (collectively the "Settling Defendants") in two of the four classes.  Plaintiffs and the settling Defendants now jointly ask that this Court grant final approval of this second round of settlements so that the proceeds can be distributed to the class members.[3]

The classes in *Learjet, et al. v. ONEOK, Inc., et al.*, 2:06-CV-0233-RCJ-PAL (hereinafter, "Kansas Settlement Class"), and *Heartland Regional Medical Center, et al. v. ONEOK, Inc., et al.*, 2:07-CV-0987-RCJ-PAL (hereinafter, "Missouri Settlement Class") (collectively "Settling Classes"), have reached settlements totaling $15.125 million with CMS. As part of these second settlements, CMS will pay the Settling Classes $5.125 million, and El Paso will pay the Settling Classes $10 million. Assuming the Court grants Class Counsel's concurrently-filed motion for attorneys' fees and expense reimbursement, class members in Kansas and Missouri will receive their share of approximately $9.3 million.  This is in addition to their share of the previous first settlements which totaled $42.8 million dollars.[4]

---

[1] CMS Energy Corporation, CMS Energy Resources Management Company (f/k/a CMS Marketing, Services and Trading Company), and CMS Field Services, Inc. are collectively referred to as "CMS" herein.

[2] El Paso Corporation (n/k/a El Paso LLC) and El Pas Merchant Energy, L.P. (n/k/a El Paso Marketing Company, L.L.C.) are collectively referred to as "El Paso" herein.

[3] These settlements with CMS and El Paso are referred to herein as the "second" settlements.  The first settlements, totaling $42.8 with AEP, Duke, ONEOK and Coral, were approved by a series of final judgments entered on June 5, 2017.

[4] The first round of settlements totaled $42.8 million among three of the four classes.

Each settlement's terms and conditions, including the settlement agreements themselves,[5] are described in greater detail in Plaintiffs' Motion for Preliminary Approval. Timely and adequate notice[6] was given as set forth in the Motion for Preliminary Approval, advising all potential class members of their rights to object to or request exclusion from these settlements.[7] There were *no* objections nor any requesats for exclusion to the proposed settlements, nor any objections to Class Counsel's preliminary request for an award of attorneys' fees, reimbursement of expenses and granting of incentive awards to the named Plaintiffs.[8] The Court should grant final approval of the settlements at the Final Hearing on August 9, 2017, on the grounds that each settlement is fair, reasonable and adequate[9] and meets all requirements set forth in *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir.2004) and *Howell v. JBI, Inc.,* 298 F.R.D. 649 (D. Nev. 2014).

## II.     FACTUAL AND PROCEDURAL HISTORY

### A.     Plaintiffs Allege a Nationwide Conspiracy to Manipulate Prices of Natural Gas

This Multi-District Litigation arises from a broadly-based arrangement to manipulate the prices of natural gas sold to industrial and commercial users in violation of the anti-trust laws of the states of Kansas, Missouri, Wisconsin and Colorado. This second set of settlements resolves

---

[5] Fed. R. Civ. P. Rule 23(e)(3).

[6] Fed. R. Civ. P. Rule 23(e)(1).

[7] Fed. R. Civ. P. Rule 23(e)(4).

[8] Class Counsel's final motion for approval of attorneys' fees, reimbursement of expenses and granting of incentive awards to the named Plaintiffs is filed on this date.

[9] Fed. R. Civ. P. Rule 23(e)(2).

claims brought by the Kansas Class and Missouri Class against the two Settling Defendants, CMS and El Paso.

Plaintiffs have alleged that defendants' price manipulation began by early 2000 and continued in many respects through October 2002.[10] The manipulation was carried out through a scheme to falsely report prices to trade publications which generated and published natural gas price indexes.[11]  This false reporting included the delivery of false or misleading or knowingly inaccurate information concerning trades that did not occur, submitted actual trades with altered volumes and/or prices, and/or failed to submit other actual trades.[12]  The manipulative conduct was facilitated in several ways, including by telephone, by facsimile and via the internet.[13]  Plaintiffs have alleged – and their experts have verified – that Defendants' actions impacted prices for natural gas traded or sold in the United States and in particular in the states at issue.[14]  The anticompetitive effect of the Defendants' illegal arrangements, contracts, agreements, combination and conspiracy was to distort, for at least a large part of the class period, and artificially inflate the prices that the Plaintiffs and class members paid for natural gas.[15]

---

[10] *I.e.,* Learjet Complaint ¶ 46

[11] *I.e.,* Learjet Complaint, ¶ 49.

[12] *I.e.,* Learjet Complaint, ¶ 51.

[13] *I.e.,* Learjet Complaint, ¶ 49.

[14] *I.e.*, Learjet Complaint, ¶ 53

[15] *Id.*

3

## III.    ARGUMENT AND AUTHORITIES

### A.    These Settlements Should Be Given Final Approval.

Final approval of settlements under Rule 23(e) "may be granted only after a fairness hearing and a determination that the settlement taken as a whole is fair, reasonable, and adequate."[16]  While the inquiry in different cases may vary, in the Ninth Circuit, courts generally weigh the following eight factors, sometimes referred to as the *Churchill*[17] factors, in making final fairness determinations. The settlement is viewed as a whole, rather than as individual component parts.[18] This approval process requires the Court to balance a number of factors.  A district court "may consider *some or all* of the following factors" when determining whether a class action settlement is fair, reasonable and adequate:[19]

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.[20]

---

[16] *Lee v. Enter. Leasing Co-W.*, No. 3:10-CV-00326-LRH, 2015 WL 2345540, at *4 (D. Nev. May 15, 2015) (Hicks, J.) (quoting *In re Bluetooth Headset Prods. Liab. Litig,* 654 F.3d 935, 946 (9th Cir. 2011)).

[17] *E.g., Howell v. JBI, Inc.,* 298 F.R.D. 649, 656 (D. Nev. 2014); *Roeder v. Atlantic Richfield Company,* 2013 WL 5878432 at *5 (citing *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir.2004)).

[18] *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026-27 (9th Cir. 1998).

[19] *Molski v. Gleich,* 318 F.3d 937, 953 (9th Cir. 2003); *accord Stanton v. Boeing Co.,*327 F.3d 938, 959 (9th Cir. 2003)(emphasis added).

[20] *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir.2004); *see also, Torist v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir 1993)(quoting *Officers for Justice v. Civil Serv. Comm'n of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied,* 459 U.S. 1217 (1983)(internal quotation marks omitted).

59468930.1

A full analysis of these *Churchill* factors leads to the inevitable conclusion that these settlements warrant final approval.

### 1.    Strength of the Plaintiffs' Cases

In March 2003, the staff of the Federal Energy Regulatory Commission ("FERC") issued a report entitled Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, Docket No., PA02-2-000.   The report found that, "[m]arket participants provided false reports of natural gas prices and trade volumes to industry publications. These publications used the reports to compile price indices and false reporting became epidemic."[21]   The report went on to find that, "[t]he predominant motives for reporting false information were to influence reported gas prices, to enhance the value of financial positions or purchase obligations, and to increase reported volumes to attract participants by creating the impression of more liquid markets."[22]   Participants not only influenced the price of natural gas through false reporting but also may have influenced pricing through wash trading, the simultaneous purchase and sale of natural gas at the same price and in the same quantity for no legitimate business purpose.[23]   Defendants in these cases were among the "participants" that FERC cited.

Plaintiffs' experts have found that because of the fungible nature of natural gas, natural gas prices across the country are tied together.[24]   While prices may not be identically impacted at

---

[21] FERC March 2003 Report, ES-6 (*See* Bacon Declaration ("Bacon Decl.") attached hereto as Exhibit A, Ex. 1).

[22] *Id.*

[23] *Id.* at III-37.

[24] Bateman 4.12.2016 Report, p. 5 (Ex. A, Bacon Decl., Ex. 2).

all locations, all locations will be affected by manipulations elsewhere.[25]   Thus, regardless of where false and misleading information was reported, the prices of natural gas across the country were similarly impacted.

Plaintiffs' experts have specifically found that Defendants and their co-conspirators were engaged in a collusive behavior.[26]  The conspiracy[27] to false report was conducted between the Defendants and their co-conspirators and they worked with a joint purpose of manipulating gas prices for their own profits.[28]  Defendants also manipulated natural gas prices by wash trading – offsetting buy-sell transactions with no net change in ownership position and no economic benefit.[29]  This conspiratorial misconduct continued over the course of nearly three years.[30]  At bottom, Defendants participated in an illegal price fixing agreement with a nationwide impact on natural gas prices.[31]

When employees and corporate representatives were challenged regarding their fraudulent reporting, wash trading and general conspiratorial conduct, they offered meager

---

[25] George Donkin Depo at 134:24-135:16 (Ex. A, Bacon Decl., Ex. 3).

[26] *Id*. at 122:5-9.

[27] The state statutes on which Plaintiffs' claims are based do not limit themselves to prohibiting traditional Sherman Act "conspiracies."  *E.g.,* KSA § 50-163(c) (prohibiting "all arrangements, contracts, agreements, trusts or combinations…made with a view or which tend to prevent full and free competition…"); and R.S. Mo. §416.031.1 ("Every contract, combination or conspiracy in restraint of trade…").  As used herein, "conspiracy" includes any collusive, joint or cooperative conduct that would be deemed unlawful under the laws of Missouri or Kansas.

[28] George Donkin Depo at 104:15-25; *see also* 118:2-6 (Ex. A, Bacon Decl., Ex. 3).

[29] *Id*. at 247:2-7.

[30] *Id*. at 109:4-10.

[31] *Id*. at 231:11-23.

excuses such as, that they were told by their supervisors to false report,[32] "false reporting was common industry practice,"[33] and "everybody lies about their index."[34] Despite their excuses, Defendants understood that the false reporting affected the price of natural gas.[35]

The alleged activities led to investigations and actions brought by the Commodity Futures Trading Commission ("CFTC"), U.S. Department of Justice ("DOJ"), Federal Energy Regulatory Commission ("FERC"), the Securities and Exchange Commission ("SEC") and numerous individual lawsuits.  Every Defendant resolved claims of false reporting brought by the CFTC, each paying fines ranging from $3 million to $30 million.[36]  Co-conspirators also entered into such resolutions with the CFTC for claims of false reporting, including Enron, EnCana, Mirant, Cinergy, Enserco, Entergy-Koch, NRG, and Calpine.[37]  Certain Defendants entered into resolutions with the DOJ, FERC and SEC.  In addition to the Defendant companies themselves, dozens of Defendants' employees also faced charges and entered into plea agreements or were convicted of claims of manipulation or fraudulent reporting of gas prices.

---

[32] Michael Whitney Depo at 120:4-122:10 (Ex. A, Bacon Decl., Ex. 4).

[33] *See,* Michael Hoover, AEP DIV:495-503; John Baggett, Baggett Statement of Fact from Plea filed 2/15/2007; Randy Turturice Depo at 122:3-123:10 (Ex. A, Bacon Decl., Exhs. 5 - 7).

[34] Todd Lambert Depo at 142:7-146:5 (Ex. A, Bacon Decl., Ex. 8).

[35] Donald Burwell Plea Agreement ¶ 19; Christopher Bakkenist Plea Agreement ¶ 15; Dallas Dean Plea Agreement ¶ 15; William Ham Plea Agreement ¶ 15; Donald Guilbault Plea Agreement ¶ 15; Dallas Dean Depo at 53:2-54:18 (Ex. A, Bacon Decl., Exhs. 9-14).

[36] Donkin 4.13.2016 Report, p. 13-16 (Ex. A, Bacon Decl., Ex. 15).

[37] *Id.*, p. 17-20.

**2.      Risk, Expense, Complexity and Likely Duration of Further Litigation.**

These class actions are unlike most such actions based on their scope, longevity and complexity. More than eleven years have passed since the *Learjet* plaintiffs in Kansas first filed their class and individual actions against these Defendants. Soon thereafter, class and individual actions were filed in Missouri, Wisconsin and Colorado. Defendants have denied that what they did violated antitrust laws and have vigorously defended these actions since their inception. Defendants have filed dozens of dispositive motions.  Rulings on those motions have thus far resulted in two separate appeals to the Ninth Circuit and an appeal to the U.S. Supreme Court. A new appeal to the Ninth Circuit is currently underway addressing this Court's rulings on class certification.  Even after recent rulings, there remain motions for summary judgment pending before this Court. Despite how strongly Plaintiffs feel about the merits and validity of their claims, there are no guarantees of ultimate success.

**3.      Risk of Maintaining Class Action Status Throughout the Trial**

The third *Churchill* factor is the risk of maintaining class action status from the preliminary approval stage throughout the trial.  The greater the risk of losing that class action status, the more likely a class settlement is to be approved. Here, if class action status is ultimately lost, putative class members risk collecting nothing more in these cases, and could lose the benefit of the proposed $15.125 million in additional settlements.

Indeed, the risk is far from theoretical, in that this Court recently denied certification of contested classes in these actions.  (Dkt. 2832). While that decision is now being appealed, it is undeniable at this time that maintaining these cases as class actions through trial is a volatile question. This *Churchill* factor weights in favor of a finding that these class settlements should be approved.

59468930.1

### 4.    The Amount of the Settlements

Under the terms of the settlements, CMS will pay the Settling Classes $5.125 million, and El Paso will pay the Settling Classes $10 million. Assuming the Court approves the fees and expenses proposed in counsel's motion, class members in Kansas and Missouri will receive their share of approximately $9.3 million in these second settlements.  This is in addition to their share of the previous $42.8 million dollars in the first settlements.

To the extent that this court's analysis considers the allocation of settlement monies in this second settlement between the Kansas and Missouri Settling Classes,[38] the court should note that each settling Defendant is paying a lump sum to settle with two separate classes. The proposed settlement amounts will be distributed among the Missouri and Kansas Settling Classes as follows:[39]

- CMS:  $5,125,000 total settlement, gross recovery divided among the states as follows:  37% to Missouri ($1,896,250) and 63% to Kansas (3,228,750).

- El Paso:  $10,000,000 total settlement, gross recovery divided among the states as follows: 37% to Missouri ($3,700,000) and 63% to Kansas ($6,300,000).

The amounts of the settlements to date are significant standing alone, but particularly so when compared to what companion cases have settled for.  While the *Learjet*, *Heartland*, and *Arandell* cases were pending, five companion cases reached settlement:  *Texas-Ohio Energy, Inc. v. Centerpoint Energy, Inc., et al.*, CV-S-04-0465-PMP-PAL; *Fairhaven Power Co. v. EnCana Corp.*, CV-S-05-0243-PMP-PAL; *Abelman Art Glass Company v. EnCana Corp., et al.*, CV-S-

---

[38] *In re Linerboard Antitrust Litig,* 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003).

[39] Less approved attorneys' fees, expenses, and approved incentive awards made to any of the named Plaintiffs.  The Missouri and Kansas Plaintiffs request incentive awards of $25,000 each.

05-0437-PMP-PAL; *Utility Savings & Refund Services, Inc. v. Reliant Energy Services, Inc., et al.*, CV-S-05-0110-PMP-LRL; and *Ever-Bloom, Inc., et al. v. AEP Energy Services, Inc., et al.*, CS-S-05-0808-MPM (collectively, the "California Class Actions").[40] In the first wave of the California settlements, the class members settled with four of the defendants for $2.4 million, one of which is a Settling Defendant in the present cases, and with another defendant for $700,000.[41] As in *Learjet* and *Heartland*, the California Class Actions alleged antitrust violations against many of the same Defendants arising from manipulation of natural gas prices between January 1, 2000 and October 31, 2002.[42] The settlement results in those California cases were mere fractions of the favorable settlements that have thus far been reached in this litigation.

Upon the settlements becoming final, Plaintiffs and Class Members will release any and all claims against the Settling Defendants relating to the subject matter of this lawsuit. The release does not release the settling Defendants' co-conspirators and/or Co-Defendants for any liability resulting from their participation in an agreement or a conspiracy with the settling Defendants.[43]

The settlements also require the settling Defendants to cooperate with the Plaintiffs in the prosecution of the case against the non-settling Defendants by, *inter alia*, stipulating to authenticity, genuineness, and admissibility of certain evidence and by potentially producing

---

[40] The claims in the present cases arise from the same price manipulation claims against many of the same defendants that were made in the California Class Actions.

[41] MDL ECF No. 492 (D. Nev. April 3, 2007).

[42] Order Preliminarily Approving Settlements, Certifying a Settlement Class, and Authorizing Dissemination of Notice, MDL ECF No. 510 (D. Nev. May 3, 2007).

[43] *See,* Settlement Agreements attached to Motion for Preliminary Approval of Settlement

employees for depositions or testimony at trial.[44] The settling Defendants' alleged conspiratorial conduct and sales remain in the case for purposes of proving liability and computing damages against the remaining Defendants.

These Settlements do not reduce the Classes' potential total recovery because they preserve the Classes' ability to recover additional damages from the remaining co-conspirator Defendants based on the Settling Defendants' conduct and sales under a joint and several liability theory, thus creating added incentive for the remaining Defendants to settle or allowing greater recovery for the Plaintiffs at trial."[45]  The results are also important because they likely encourage other settlements hereafter:

> The Court also notes that this settlement has significant value as an *'icebreaker'* settlement—it is the first settlement in the litigation— and should increase the likelihood of future settlements. An early settlement with one of many defendants can 'break the ice' and bring other defendants to the point of serious negotiations.[46]

(emphasis added).[47]

## 5.    The Extent of Discovery Completed and Stage of Proceedings

The fifth *Churchill* factor asks the Court to determine whether sufficient discovery has been completed and the proceedings have progressed so that the Plaintiffs are able to evaluate the value of their settlement. Here, discovery is essentially completed after years of depositions

---

[44] *Id.*

[45] *In re Cathode Ray Tube (CRT) Antitrust Litig.,* No. 14-CV-2058 JST, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) *(CRT II).*

[46] *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at 643.

[47] Though these are not the first settlements in these cases, they come after settlement negotiations had stalled for some time, and therefore provide additional value by bringing settlement issues to the forefront for the remaining defendants.

and millions of pages of documents being exchanged. Plaintiffs have submitted responses to hundreds of interrogatories, requests for production of documents, and requests for admissions. Altogether, Class Counsel reviewed, analyzed and indexed well over one million documents. Defendants also produced 262,071 audio wave files, containing recorded conversations of their natural gas traders' telephone lines, recorded between January 1, 2000 and October 31, 2002, to which Class Counsel has listened. Class Counsel has responded to dozens of contention interrogatories in which they identified all evidence collected throughout discovery, including documents, audio tapes, deposition testimony and information in the public domain supporting their claims. Counsel have also traveled to and appeared in monthly status hearings before this Court throughout these years.  The parties have prepared for and taken depositions and produced clients for depositions, for a total of more than 160 fact depositions.[48]  Expert depositions are all but complete at this point.[49]

After all this, this litigation is at a stage at which counsel thoroughly knows the strengths and weaknesses of their cases.  With an understanding of those strengths and weaknesses, Plaintiffs have determined that these settlements provide fair and adequate compensation for their pending claims.  In the absence of approval of this final settlement, these cases will proceed to trial with all the inherent risks of those stages to the class members.

### 6.    Experience and Views of Counsel

Plaintiffs have retained skilled counsel with extensive experience in prosecuting antitrust class actions. Class Counsel are prepared to fully prosecute these claims on behalf of all of the class members.  Polsinelli PC, McCallister Law Group, LLC, Frieden, Unrein & Forbes LLP,

---

[48] *See* Motion for Approval of Settlement (ECF No. 2833).

[49] *Id.*

and the Barry Law Firm LLC, have vigorously pursued the litigation on behalf of Plaintiffs and the proposed Classes. They have devoted substantial time, resources, and leadership necessary to prosecute this action, and will continue to prosecute these cases against the Non-settling Defendants.[50]

It is the opinion of these experienced class counsel that this final settlement is fair, reasonable and adequate and is in the best interests of the interested putative class members.[51]

### 7. Presence of a Governmental Participant

There are no governmental participants either as a party plaintiff or a party defendant.  As such, this *Churchill* factor has no bearing.

### 8. Reaction of the Class Members to the Proposed Settlement

This Court approved both long-form notices and short-form notices, which were mailed and published beginning on June 15, 2017.  The Court set the following dates for responsive actions by putative class members:

a. Putative class members must submit requests for exclusion from the settlement no later than July 10, 2017; and

b. Putative class members must submit written objections to the terms of the settlement no later than July 10, 2017.

No requests for exclusion or written objections have been submitted by any putative class members.  Thus, this *Churchill* factor weighs in favor of approval of final settlement.

---

[50] *See* Declarations of each Class Counsel, Exhibits B to F, attached to Motion for Approval of Settlement (ECF No. 2833).

[51] *Id.*

These second settlements are fair and reasonable and should be approved. The settlements were reached after years of hard-fought litigation, through arms-length negotiations involving experienced counsel, a skilled mediator, and actively-involved class representatives. The second settlements total $15.125 million, a substantial sum under any measure. Counsel are seeking only 20% of their expenses advanced as of December 31, 2016, and fees that amount to approximately 33% of the gross settlement funds, an amount that is very reasonable given the contingent nature of the representation and given that the total attorneys' fees billed thus far exceed the fees sought in these settlements. Most importantly, these settlements will result in close to $9.3 million being returned to commercial and industrial entities who bought natural gas during the period in which gas prices were being manipulated.

## IV.   SETTLEMENT ADMINISTRATION AND DISTRIBUTION METHODOLOGY

### A.   Settlement Administration

As noted in the Preliminary Approval papers, Dahl Administration has handled the notice and response program. The following notice efforts occurred:

1.   Direct Notice – For the notice mailing with the first settlements, Dahl received seven data files from Class Counsel derived from multiple sources of potential class members. Dahl formatted, cleansed and de-duplicated those records and researched mailing addresses for each listed entity. For this notice mailing involving settlements with CMS and El Paso, Dahl included only records with a mailing address in Kansas or Missouri. This process produced a final mailing list of 2,971 records.[52] Dahl mailed 2,971 long-form notices on June 15,

---

[52] *See* Declaration of Jeffrey Fellows of Dahl Administration ("Dahl Decl."), attached hereto as Exhibit B, ¶ 7.

2017 to the addresses on the final mailing list.[53]  Dahl received 752 returned long-form notices without forwarding address information and was able to obtain updated address information for 486 of those records, which were then re-mailed to the updated addresses.  Dahl received one returned long-form notice with a forwarding address and this notice was re-mailed to the forwarding address.[54]

   2. Print and Electronic Publication Notice – The short-form notice was published in the USA Today as a 1/8th page nationwide notice advertisement on June 19, 2017.[55] The short-form notice was published in the Kansas City Star, St. Louis Post-Dispatch, Springfield News Leader, Topeka Capital Journal and Wichita Eagle.[56]  The short-form notice was also published in prominent natural gas industry electronic newsletters such as Inside FERC, Gas Daily and NGI Weekly Gas Price Index.[57]

   3. Digital Banner Notice – Dahl initiated a web-based notice campaign using banner-style notices which contained a link to the Settlements Website.[58]  The banner notices were caused to appear in prominent positions on internet websites likely to be viewed by settlement class members.  The banner notices were placed on selected websites 1,878,625 times.[59]

---

[53] *Id.* at ¶ 8.

[54] *Id.* at ¶ 9.

[55] *Id.* at ¶ 11.

[56] *Id.* at ¶ 12.

[57] *Id.* at ¶ 14.

[58] *Id.* at ¶ 15.

[59] *Id.* at ¶ 16.

59468930.1

4.      Digital Social Media Notice – Dahl's media partner FRWD implemented social media notice campaigns on the LinkedIn and Twitter social networks.   During the campaign period of June 15, 2017 to July 10, 2017, notices were placed a combined 711,652 times.[60]

5.      Digital Paid Search Notice – Paid Search Notice advertisements were targeted to appear for users of the Google and Bing search engines who entered search terms related to natural gas.  During the paid search campaign period of June 15, 2017 to July 5, 2017, notices were displayed on Google and Bing a combined 10,729 times.[61]

6.      Press Releases – The short-form notice was issued as a nationwide press release through PR Newswire on June 21, 2017.[62]

7.      Settlements Website – Dahl established a new section on the Settlements Website first created for the first round of settlements.   The site can be located at www.NaturalGasAntitrustSettlement.com and is still operating.  The new webpage section for these second settlements incorporates information from the long-form notice.  Between June 15, 2017 and July 16, 2017, the Settlements Website received 247 unique visits.[63]

8.      Settlements Information Line – On June 15, 2017, Dahl established an automated toll-free Settlement Information Line, available any time, to assist potential settlement class members and any other persons seeking information about the settlements.  The toll-free number was printed on the long-form notice, print and electronic publication notices and earned

---

[60] *Id.* at ¶ 17, 19.

[61] *Id.* at ¶ 21-22.

[62] *Id.* at ¶24.

[63] *Id.* at ¶ 25, 27.

media notice and is displayed on the Settlements Website.[64]  As of July 16, 2017, the Settlement

Information Line has received 12 telephone calls.[65]

### B.        Exclusion Requests and Other Communications

As of July 19, 2017, Dahl had received no objections or requests for exclusion related to

the settlements.[66]  As of July 19, 2017, Dahl had received and responded to two (2) pieces of

mailed correspondence and five (5) pieces of emailed correspondence.[67]

### C.        Settlement Distributions

Once the Court gives final approval to the settlements, Dahl will again publish and send

notices to all class members, asking them to submit claims containing information about the

volume of their natural gas purchases during the class period.  Plaintiffs propose that the deadline

for submitting claims should be September 8, 2017.  Distributions will be made on a *pro rata*

basis in each state to those class members that submitted the required information.  As noted,

assuming approval of the requested fees and expenses, counsel expects that approximately the

following amounts will be available for distribution in each state:[68]

Kansas: $5,971,100.04

Missouri: $3,378,149.00

---

[64] *Id.* at ¶ 28.

[65] *Id.* at ¶ 29.

[66] *Id.* at ¶ 30.

[67] *Id.* at ¶ 31.

[68] These maybe be reduced slightly depending on the costs of administration and the incentive awards, if any, that the Court approves.

There are no reversionary features, and no need for any *cy pres* or other default procedure, as it is anticipated that all claimants will receive their pro rata share of the funds listed above, and because each claimant will provide contact information, there should be no or minimal issues with respect to uncashed checks.   Any unclaimed or uncashed funds will be redistributed pro rata to the other claiming class members.   *All settlement funds*, other than approved fees, expenses, and incentive awards, will be paid to claiming class members.

Assuming timely approval, counsel expects that all distributions from this second tranche of settlements should be completed by November 15, 2017.

## V.   CONCLUSION

For the foregoing reasons, and in the interests of justice, Plaintiffs respectfully submit that the Court enter an order granting final approval of this second class action settlement as fair, adequate and reasonable.   Plaintiffs further pray for such other and further relief as this Court deems just and reasonable.

18

Dated:  July 25, 2017                          */s/ Russell S. Jones, Jr.*
                                               Russell S. Jones, Jr.
                                               Jennifer G. Bacon
                                               Gregory M. Bentz
                                               Andrew J. Ennis
                                               POLSINELLI PC
                                               900 W. 48th Place, Suite 900
                                               Kansas City, MO 64112
                                               Telephone:  (816) 753-1000
                                               Facsimile:    (816) 753-1536

                                               Von S. Heinz
                                               LEWIS ROCA ROTHGERBER CHRISTIE LLP
                                               3993 Howard Hughes Parkway, Suite 600
                                               Las Vegas, NV 89169
                                               Telephone: (702) 949-8215
                                               Facsimile: (702) 949-8351

                                               *Counsel for Plaintiffs Learjet Inc., et al.,*
                                               *Heartland Health, et al., Arandell Corp., et al,*
                                               *and NewPage Wisconsin System, Inc., et al.*

                                               Gary D. McCallister
                                               MCCALLISTER LAW GROUP, LLC
                                               120 North LaSalle Street, Suite 2800
                                               Chicago, IL 60602
                                               Telephone:  (312) 345-0611
                                               Facsimile:    (312) 345-0612

                                               Eric I. Unrein
                                               FRIEDEN, UNREIN, FORBES & BIGGS, LLP
                                               555 S. Kansas Ave., Suite 303
                                               Topeka, KS 66603
                                               Telephone:  (785) 354-1100
                                               Facsimile:    (785) 354-1113

                                               *Counsel for Plaintiffs Learjet, et al.*

19

Donald D. Barry
BARRY LAW OFFICES, LLC
5340 SW 17th Street
P.O. Box 4816
Topeka, KS 66604
Telephone:   (785) 273-3151
Facsimile:   (785) 273-5115

*Counsel for Plaintiffs Breckenridge Brewery,*
*et al., Learjet, Inc., et al., Arandell Corp.,*
*et al., NewPage Wisconsin System, et al.,*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July, 2017, a true and correct copy of the foregoing was electronically filed and served on counsel for all parties properly registered to receive notice via the Court's CM/ECF system.

 */s/ Russell S. Jones, Jr.*

59468930.1